**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

|  |  |  |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| QVC GROUP, INC., *et al.*,[1] | ) | Case No. 26-90447 (ARP) |
| | ) | |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

**DEBTORS' <u>EMERGENCY</u>**
**MOTION FOR ENTRY OF AN ORDER**
**(I) APPROVING NOTIFICATION AND HEARING**
**PROCEDURES FOR CERTAIN TRANSFERS OF AND DECLARATIONS OF**
**WORTHLESSNESS WITH RESPECT TO STOCK, (II) DIRECTING THAT ANY**
**SUCH TRANSFER OR DECLARATION OF WORTHLESSNESS IN VIOLATION OF SUCH**
**PROCEDURES BE NULL AND VOID *AB INITIO*, AND (III) GRANTING RELATED RELIEF**

> **Emergency relief has been requested. Relief is requested not later than 1:00 p.m. (prevailing Central Time) on April 17, 2026.**
>
> **If you object to the relief requested or you believe that emergency consideration is not warranted, you must appear at the hearing if one is set, or file a written response prior to the date that relief is requested in the preceding paragraph. Otherwise, the Court may treat the pleading as unopposed and grant the relief requested.**
>
> **A hearing will be conducted on this matter on April 17, 2026, at 1:00 p.m. (prevailing Central Time) in Courtroom 400, 4th floor, 515 Rusk Street, Houston, Texas 77002. Participation at the hearing will only be permitted by an audio and video connection.**
>
> **Audio communication will be by use of the Court's dial-in facility. You may access the facility at (832) 917-1510. Once connected, you will be asked to enter the conference room number. Judge Pérez's conference room number is 282694. Video communication will be by use of the GoToMeeting platform. Connect via the free GoToMeeting application or click the link on Judge Pérez's homepage. The meeting code is "Judge Pérez." Click the settings icon in the upper right corner and enter your name under the personal information setting.**
>
> **Hearing appearances must be made electronically in advance of both electronic and in-person hearings. To make your appearance, click the "Electronic Appearance" link on Judge Pérez's homepage. Select the case name, complete the required fields, and click "Submit" to complete your appearance.**

---

[1]  A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://restructuring.ra.kroll.com/QVC. The location of Debtor QVC Group, Inc.'s corporate headquarters and the Debtors' service address in these chapter 11 cases is 1200 Wilson Drive, West Chester, Pennsylvania 19380.

4903-0376-8482

The above-captioned debtors and debtors in possession (collectively, the "Debtors") state the following in support of this motion (this "Motion"):[2]

**Relief Requested**

1. As set forth below, the Debtors have generated substantial Tax Attributes (as defined herein) that will likely be critical to their reorganization. In some instances, however, Tax Attributes can be lost or reduced due to the occurrence of an "ownership change." To ensure that this does not happen in these chapter 11 cases, the Debtors seek relief that would enable them to monitor the types of transactions that pose a serious risk of an ownership change and preserve the Debtors' ability to seek substantive relief, as such transactions could jeopardize the Debtors' ability to utilize the Tax Attributes in the future. Specifically, the Debtors seek entry of an order, substantially in the form attached hereto (the "Order"): (a) approving certain notification and hearing procedures, substantially in the form attached as Exhibit 1 to the Order (the "Procedures"), related to certain transfers of, or declarations of worthlessness with respect to, (i) Debtor QVC Group, Inc.'s existing classes (or series) of common stock or any Beneficial Ownership[3] therein

---

[2] A description of the Debtors, their business, and the facts and circumstances supporting this Motion and the Debtors' chapter 11 cases is set forth in greater detail in the *Declaration of Bill Wafford in Support of Debtors' Chapter 11 Petitions and First Day Motions* (the "First Day Declaration"), filed contemporaneously herewith and incorporated by reference herein. Capitalized terms used but not otherwise defined in this Motion shall have the meanings ascribed to them in the First Day Declaration or in the contemporaneously filed *Joint Prepackaged Plan of Reorganization of QVC Group, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* (as may be amended, supplemented, or otherwise modified from time to time, the "Plan"), as applicable.

[3] "Beneficial Ownership" will be determined in accordance with the applicable rules of sections 382 and 383 of the Internal Revenue Code of 1986, 26 U.S.C. §§ 1–9834, as amended (the "IRC"), and the U.S. Department of the Treasury regulations thereunder ("Treasury Regulations") (other than Treasury Regulations section 1.382-2T(h)(2)(i)(A)), and includes direct, indirect, and constructive ownership (*e.g.*, (1) a holding company would be considered to beneficially own all equity securities owned by its subsidiaries, (2) a partner in a partnership would be considered to beneficially own its proportionate share of any equity securities owned by such partnership, (3) an individual and such individual's family members may be treated as one individual, (4) persons and entities acting in concert to make a coordinated acquisition of equity securities may be treated as a single entity, and (5) a holder would be considered to beneficially own equity securities that such holder has an Option to acquire). As used herein, an "Option" to acquire stock includes all interests described in Treasury Regulations section 1.382-4(d)(9), including any contingent purchase right, warrant, convertible debt, put, call, stock subject to risk of forfeiture, contract to acquire stock, or similar interest, regardless of whether it is contingent or otherwise not currently exercisable.

2

(any such record or Beneficial Ownership of common stock, collectively, the "Common Stock") and (ii) Debtor QVC Group, Inc.'s class (or series) of preferred stock or any Beneficial Ownership therein (any such record or Beneficial Ownership of preferred stock, collectively, the "Preferred Stock," and together with the Common Stock, the "Stock"); (b) directing that any purchase, sale, other transfer of, or declaration of worthlessness with respect to, Stock in violation of the Procedures shall be null and void *ab initio*; and (c) granting related relief.

### Jurisdiction and Venue

2.      The United States Bankruptcy Court for the Southern District of Texas (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and the *Order of Reference to Bankruptcy Judges* from the United States District Court for the Southern District of Texas, entered May 24, 2012.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  The Debtors confirm their consent to the Court's entry of a final order in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

3.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

4.      The bases for the relief requested herein are sections 105(a), 362, and 541 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), rules 2002(a) and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), rules 1075-1 and 9013-1(i) of the Bankruptcy Local Rules for the Southern District of Texas (the "Bankruptcy Local Rules").

### Background

5.      QVC Group, Inc. and its direct and indirect Debtor and non-Debtor subsidiaries (collectively, "QVC" or the "Company") are global leaders in video retailing, ecommerce, and

3

social commerce, curating and selling a wide variety of consumer products via highly engaging, video-rich, interactive shopping experiences.  QVC's strong social media presence, influencer relationships, and long-term relationships with companies across cable, satellite, and telecommunication platforms allowed the Company to reach over 200 million households across three continents, serve nearly 10.3 million unique customers, and ship close to 182 million units of products in 2025.

6.      Founded in 1986 and headquartered in West Chester, Pennsylvania, QVC employs over 15,800 employees.  For the fiscal year 2025, QVC's revenue was more than $9.2 billion.  As of the Petition Date, the Debtors have approximately $6.5 billion in funded debt, plus approximately $1.3 billion in face amount of preferred stock.

7.      As described more fully in the First Day Declaration, the Debtors commenced these chapter 11 cases to implement a consensual deleveraging and recapitalization transaction, with the goal of preserving, among other things, the QVC brand, business, and workforce.  On April 16, 2026 (the "Petition Date"), each Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtors are operating their businesses and managing their property as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  Concurrent with the filing of this Motion, the Debtors filed a motion requesting procedural consolidation and joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b).  No request for the appointment of a trustee or examiner has been made in these chapter 11 cases, and no official committees have been appointed or designated.

**I.      The Tax Attributes**.

8.      Companies may generate various Tax Attributes (as defined herein) through the course of their operations.  Generally, a company generates net operating losses ("NOLs") if the operating expenses it has incurred exceed the revenues it has earned during a single tax year.

4903-0376-8482

A company may apply or "carry forward" NOLs to reduce future tax payments (subject to certain conditions discussed below).  NOLs arising in taxable years beginning before January 1, 2018, may be used to offset up to 100 percent of taxable income, and NOLs arising in taxable years beginning after December 31, 2017, may be used to offset up to 80 percent of taxable income.  *See* Internal Revenue Code of 1986, as amended ("IRC"), § 172.  Generally, a company's deduction for net business interest expense is limited to 30 percent of its adjusted taxable income plus certain other amounts.  Any business interest expense disallowed is carried forward and treated as business interest expense in the following tax year ("163(j) Carryforwards").  *See* IRC § 163(j).  Other Tax Attributes have other sources.  While NOLs and 163(j) Carryforwards are the most ubiquitous tax attributes, companies can also generate a variety of other tax attributes, including general business credits, research and development credit carryforwards, unused minimum tax credits, foreign tax credits, business tax credits, and capital loss carryforwards, as the case may be.  Moreover, the "tax basis" in a company's assets can itself be a tax attribute.

9.        As discussed below, a company's Tax Attributes can become subject to significant limitation under sections 382 and 383 of the IRC if an "ownership change" occurs.  *See* IRC §§ 382, 383.  The purpose of the relief requested herein is to minimize the risk that an "ownership change" occurs before the conclusion of these chapter 11 cases.  In doing so, the Debtors intend to maximize the value of their estates by limiting tax liabilities generated during or as a result of the actions taken during the cases.

10.        The Debtors estimate that, as of December 31, 2025, they and their non-debtor affiliates had approximately $2.1 billion of state NOLs, approximately $159 million of federal NOLs, $1.6 billion of foreign NOLs, approximately $104 million of general business credits

("General Business Credits"), and approximately $1.1 billion of 163(j) Carryforwards.[4] The Debtors may generate substantial additional tax attributes in the current tax year, including during the pendency of these chapter 11 cases (such additional tax attributes, together with the NOLs, the General Business Credits, the 163(j) Carryforwards, and certain other tax attributes, the "Tax Attributes"). The Tax Attributes are potentially of significant value to the Debtors and their estates because the Debtors may be able to utilize the Tax Attributes to offset taxable income, including any taxable income generated by transactions consummated during these chapter 11 cases (including, if applicable, with respect to any taxable disposition of some or all of the Debtors' assets, including, pursuant to one or more sale transactions under section 363 of the Bankruptcy Code). Additionally, depending on the Plan structure, in the event any of the Debtors' Tax Attributes were to survive, the Debtors may be able to carry forward certain of those Tax Attributes to offset federal taxable income or federal tax liability in future years. Accordingly, the value and protection of the Tax Attributes will inure to the benefit of all of the Debtors' stakeholders.

11. The Procedures are designed to preserve the value of the Tax Attributes to the benefit of the Debtors' stakeholders by ensuring that there are no "ownership changes" that may negatively affect the Debtors' utilization of the tax attributes. Conversely, a premature limitation of the Debtors' Tax Attributes could cause substantial deterioration of value and significantly reduce recoveries to the Debtors' stakeholders. Failure to obtain the relief sought in this Motion could therefore greatly increase the risk that the Debtors would be unable to maximize the value of their estates.

---

[4] Amounts are subject to change. Additionally, the Debtors have utilized a substantial amount of 163(j) Carryforwards in the period between December 31, 2025, and the Petition Date, though material 163(j) Carryforwards remain available.

4903-0376-8482

**II.     An "Ownership Change" May Negatively Affect the Debtors' Ability to Utilize the Tax Attributes.**

12.     Sections 382 and 383 of the IRC limit the amount of federal taxable income and federal tax liability, respectively, that can be offset by a corporation's tax attributes in taxable years (or portions thereof) following an "ownership change."  Similar state laws apply to state tax attributes.  Generally, an "ownership change" occurs if the percentage (by value) of the stock of a corporation owned by one or more "5-percent shareholders" has increased by more than 50 percentage points over the lowest percentage of stock owned by such shareholders at any time during the three-year testing period ending on the date of the relevant ownership change.  *See* IRC §§ 382(g), 382(i).  The total percentage point increase of stock owned by one or more "5-percent shareholders" within the measuring period is generally referred to as the amount of the "ownership shift."   In situations involving multiple classes of stock with different rights, the determination of whether a shareholder is a "5-percent shareholder" is made by reference to stock value (without regard to certain considerations such as control premiums or minority discounts, and with reference to certain mechanical tests).  For example, an ownership change would occur in the following situation:

> An individual ("A") owns 50.1 percent of the stock of corporation XYZ.  A sells her 50.1 percent interest to another individual ("B"), who owns 5 percent of XYZ's stock.  Under section 382 of the IRC, an ownership change has occurred because B's interest in XYZ has increased more than 50 percentage points (from 5 percent to 55.1 percent) during the testing period.  The same result would follow even if B owned no XYZ stock prior to the transaction with A, because B both becomes a 5-percent shareholder and increases his ownership by more than 50 percentage points during the testing period.

13.     An "ownership change" can also occur as a result of a "worthless stock deduction" claimed by any "50-percent shareholder."  IRC § 382(g)(4)(D).  A 50-percent shareholder is any person or entity (or group of people that is treated as a single entity under the applicable rules)

7

with Beneficial Ownership of 50 percent or more of a corporation's stock "at any time during the 3-year period ending on the last day of the taxable year" with respect to which the worthless stock deduction is claimed.  *Id*.  If the 50-percent shareholder still owns the corporation's stock at the end of the taxable year, sections 382 and 383 of the IRC essentially treat such person or entity as newly purchasing the stock on the first day of the next taxable year.  For example, if a person or entity with 50 percent of a corporation's stock claims a worthless stock deduction with respect to the 2025 tax year but does not sell such stock in 2025, that person is treated as (a) not having owned the stock at the end of 2025 and (b) having purchased the stock on the first day of the 2026 tax year.  That deemed purchase would cause an ownership change because the 50-percent shareholder would be deemed to have a 50-percentage-point increase in its stock ownership.[5]

14.     If an ownership change occurs, section 382 of the IRC limits the amount of a corporation's future federal taxable income that may be offset by its "pre-change losses," and section 383 of the IRC limits the amount of a corporation's future federal tax liability that may be offset by its "excess credits," in each case, to an annual amount based on the fair market value of all of the stock of the corporation prior to the ownership change multiplied by the long-term tax-exempt rate that applies to the month of the ownership change.[6]  *See* IRC §§ 382(b) and 383(a).  Pre-change losses and excess credits include the Debtors' Tax Attributes and any so-called "recognized built-in losses" (as defined in section 382(h)(2) of the IRC).[7]  Once a Tax Attribute is

---

[5]     In fact, while the seminal case of *Official Committee of Unsecured Creditors v. PSS S.S. Co. (In re Prudential Lines Inc.)*, 928 F.2d 565 (2d Cir. 1991), is generally relied upon to support equity trading motions such as this Motion, the specific issue in *Prudential Lines* was, in fact, a worthless stock deduction.

[6]     The applicable long-term tax-exempt rate is set by the IRS and changes from month to month.  For ownership changes occurring in April 2026, the applicable long-term tax-exempt rate is 3.58 percent.

[7]     The rules relating to potential limitations on the ability to offset taxable income with so-called realized built-in losses are highly complex and depend on, among other things, the extent (if any) of a debtor's "net unrealized built-in loss."  A net unrealized built-in loss is equal to the excess of the aggregate adjusted basis of all of a corporation's applicable assets over their fair market value (as determined for purposes of section 382 of the IRC)

8

limited under section 382 or 383 of the IRC, its use may be limited forever.[8]  Thus, certain transfers or worthless stock deductions with respect to the Beneficial Ownership of Stock effected before the effective date of the Debtors' emergence from chapter 11 protection may trigger an "ownership change" for IRC purposes, endangering the Debtors' ability to utilize the Tax Attributes, which could cause substantial damage to the Debtors' estates.  Even if certain of the Debtors' Tax Attributes are already subject to limitations as a result of prior ownership changes, a subsequent ownership change prior to the effective date would result in a much more restrictive limitation.

15.      Critically, under these rules, a company can be harmed as a result of actions by parties that are unknown to the company.  As previously discussed, if a person unknown to the company were to acquire more than 5 percent of the company's stock (determined in accordance with the rules set forth above), the company would experience an "owner shift" (or an increase in the magnitude of an "owner shift") that could lead to an ownership change and resulting limitation in the amount of a corporation's future taxable income that may be offset.  By the time the company knew who the unidentified shareholder was, the shareholder would have already purchased the shares, and the harm would be done.

### III.  Proposed Procedures for Transfers of, or Declarations of Worthlessness with Respect to, Stock.

16.      To maximize the Debtors' ability to benefit from the Tax Attributes and, in turn, enhance recoveries for their stakeholders, the Debtors seek limited relief to establish the Procedures, which will enable them to closely monitor certain transfers of Beneficial Ownership

---

immediately prior to the ownership change.  IRC § 382(h)(3)(A)(i).  Once a net unrealized built-in loss is limited under section 382 or 383 of the IRC, its use is limited for five years.

[8]     Realized built-in losses that are deducted beginning after the expiration of a five-year "recognition period" are no longer subject to limitation, but any realized built-in losses that are deducted prior to the expiration of such period are limited forever.

9

of Stock and certain worthless stock deductions with respect to Beneficial Ownership of Stock. If approved, the Procedures will enable the Debtors to act expeditiously to prevent such transfers or worthlessness deductions, if necessary, in order to preserve the Tax Attributes. In particular, the Procedures will allow the Debtors to object to "owner shifts" that threaten their ability to preserve the value of their Tax Attributes for the benefit of their estates and all of the stakeholders in these chapter 11 cases.

17.     Importantly, the Procedures must bind unknown parties in order for them to be effective in preserving the value of the Debtors' Tax Attributes; however, similar binding mechanisms are not unusual regarding stock ownership. For example, companies in certain instances may enact charter restrictions to protect their tax attributes. Such charter restrictions may impose *substantive* limitations on sales and purchases of equity similar to the procedural limitations requested in this Motion. Although such charter restrictions are put to a shareholder vote before being enacted, they always bind unknown parties (*i.e.*, persons that are not shareholders at the time the vote is taken) and do so via public information issued by the company in connection with the adoption of such charter restrictions. It is true that the relief requested in this Motion is not being put to a shareholder vote—nor should it be, because the requested relief is intended to maximize the value of the Debtors' estates for all stakeholders. Unlike charter restrictions, the relief requested in this Motion, if approved, would merely implement *procedures* that must be observed before relevant actions are taken. The Debtors respectfully submit that the notice provided to all parties potentially subject to the procedural relief requested herein—which will be made via first class mail to known current five-percent holders and via publication to potential purchasers—is sufficient under these circumstances.

18.     Further, the Debtors have limited the relief requested herein solely to that which is necessary to preserve estate value.  Specifically, the proposed Order will affect only:  (a) holders of the equivalent of more than (i) 354,870 shares of Common Stock (*i.e.*, 4.5 percent or more of all issued and outstanding shares of Common Stock)[9] and (ii) 4.5 percent of any individual class (or series) of Preferred Stock; (b) parties who are interested in purchasing sufficient Common Stock or Preferred Stock to result in such party becoming a holder of 4.5 percent or more of Beneficial Ownership of any outstanding Common Stock or of any class (or series) of Preferred Stock; and (c) any "50-percent shareholder" seeking to claim a worthless stock deduction.[10]  Based on the Debtors' books and records, as of the Petition Date, only six people or entities hold 4.5 percent or more of outstanding Common Stock, representing over 42 percent of total outstanding Common Stock in aggregate, and only one person or entity holds 4.5 percent or more of any individual class (or series) of  Preferred Stock.  Accordingly, the relief requested impacts only a small number of interested parties and is narrowly tailored.

19.     The Procedures are the mechanism by which the Debtors propose that they will monitor and, if necessary, object to certain transfers of Beneficial Ownership of Stock and declarations of worthlessness with respect to Beneficial Ownership of Stock to ensure that the Tax Attributes are preserved.  The Procedures are fully set forth in Exhibit 1 to the Order.

---

[9]     Based on approximately 7,911,000 shares of Common Stock outstanding as of the Petition Date.

[10]    As defined above, a "50-percent shareholder" is any person or entity (or group of people that is treated as a single entity under the applicable rules) with Beneficial Ownership of 50 percent or more of a corporation's stock "at any time during the 3-year period ending on the last day of the taxable year" with respect to which the "worthless stock deduction" (for U.S. federal income tax purposes) is claimed.  IRC § 382(g)(4)(D).  For the avoidance of doubt, a person or entity owning less than 50 percent of the Debtors' equity may nevertheless constitute a "50-percent shareholder" because of aggregation with other person or entities that acquired the Debtors' equity as part of a coordinated acquisition.

4903-0376-8482

**Basis for Relief**

20.     Section 541 of the Bankruptcy Code provides that property of the estate comprises, among other things, "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1).   The Tax Attributes are property of the Debtors' estates.   *See Off. Comm. of Unsecured Creditors v. PSS S.S. Co. (In re Prudential Lines Inc.)*, 928 F.2d 565, 573 (2d Cir. 1991) ("We hold that the right to a carryforward attributable to its . . . NOL was property of [the debtor's] bankruptcy estate."); *Off. Comm. of Unsecured Creditors v. Forman (In re Forman Enters., Inc.)*, 273 B.R. 408, 415 (Bankr. W.D. Pa. 2002) (finding that NOLs are property of the debtors' estates).

21.     Section 362(a)(3) of the Bankruptcy Code stays "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate." 11 U.S.C. § 362(a)(3).   Accordingly, any act of a holder of a debtor's equity securities that causes the termination, or limits use, of the Tax Attributes violates the automatic stay. *See, e.g.*, *In re Prudential Lines*, 928 F.2d at 574 (holding that causing the termination of or adversely affecting the value of a debtor's NOL violates the automatic stay).

22.     The Procedures are necessary and appropriate to enforce the automatic stay and, critically, to preserve the value of the Tax Attributes for the benefit of the Debtors' estates. As described above, under sections 382 and 383 of the IRC, certain transfers of or declarations of worthlessness with respect to Beneficial Ownership of Stock prior to the consummation of a Plan could cause the termination of, or limit the use of, the Debtors' Tax Attributes.   As stated previously, the Debtors estimate that, as of December 31, 2025, they and their non-debtor affiliates had approximately $2.1 billion of state NOLs, approximately $159 million of federal NOLs, $1.6 billion of foreign NOLs, approximately $104 million of General Business Credits, and approximately $1.1 billion of 163(j) Carryforwards, and, in addition, the Debtors may generate

12

substantial additional Tax Attributes in the current tax year, including during the pendency of these chapter 11 cases. These Tax Attributes could be necessary to address tax consequences resulting from the implementation of the transactions contemplated by the Plan. Depending on the structure the Plan may take during these chapter 11 cases, the Tax Attributes could provide the potential for material future tax savings, including in the post-emergence years. The termination or limitation of the Tax Attributes could, therefore, be materially detrimental to all parties in interest, including by potentially limiting the Debtors' ability to utilize certain Plan structures. Granting the relief requested herein will preserve both the Debtors' flexibility to operate their business as debtors in possession during these chapter 11 cases and their ability to maximize the value of their estates by implementing an emergence strategy that makes full and efficient use of the Tax Attributes.

23. To be clear, the Procedures do not bar all transfers of or declarations of worthlessness with respect to Beneficial Ownership of Stock. The Debtors seek to establish procedures only to (a) monitor those types of transactions that pose a serious risk under the ownership change test pursuant to sections 382 and 383 of the IRC and (b) preserve the Debtors' ability to seek substantive relief if it appears that a proposed transfer or declaration of worthlessness could jeopardize the Debtors' ability to utilize the Tax Attributes. Because of the Tax Attributes' importance to the Debtors' chapter 11 cases, and thus all parties in interest, the benefits of implementing the Procedures outweigh any potential drawbacks of subjecting a small subset of transfers to the Procedures.

24. Courts in this district routinely approve relief similar to that requested herein. *See, e.g.*, *In re Nine Energy Serv., Inc.*, No. 26-90295 (CML) (Bank. S.D. Tex. Feb. 3, 2026) (authorizing notification and hearing procedures for certain transfers of common stock and declarations of worthlessness with respect to common stock); *In re Kleopatra Finco S.À R.L.,*

13

No. 25-90642 (CML) (Bankr. S.D. Tex. Nov. 5, 2025) (same); *In re Anthology Inc.*, No. 25-90498 (ARP) (Bankr. S.D. Tex. Sept. 30, 2025) (same); *In re Sunnova Energy Int'l Inc.*, No. 25-90160 (ARP) (Bankr. S.D. Tex. June 9, 2025) (same); *In re Ascend Performance Materials Holdings Inc.*, No. 25-90127 (CML) (Bankr. S.D. Tex. Apr. 22, 2025) (same).

### Emergency Consideration

25.     The Debtors request emergency consideration of this Motion pursuant to Bankruptcy Local Rule 9013-1 and section G of the Complex Case Procedures. This Motion requests relief from procedural rules and requirements that pertain to matters of immediate significance or which involve deadlines sooner than twenty-one days after the commencement of these chapter 11 cases. The relief will save costs and avoid undue administrative burden and confusion only if granted immediately. The Debtors therefore request that the Court approve the relief requested in this Motion on an emergency basis.

### Reservation of Rights

26.     Notwithstanding anything to the contrary herein, nothing contained in this Motion or any actions taken pursuant to any order granting the relief requested by this Motion is intended as or should be construed or deemed to be: (a) an implication or admission as to the amount of, basis for, priority, or validity of any claim against a Debtor entity under the Bankruptcy Code or other applicable nonbankruptcy law; (b) a waiver of the Debtors' right to dispute any claim on any grounds; (c) a promise or requirement to pay any particular claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Motion or any order granting the relief requested by this Motion or a finding that any particular claim is an administrative expense claim or other priority claim; (e) a request or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code or otherwise affecting

14

4903-0376-8482

the Debtors' rights under section 365 of the Bankruptcy Code; (f) an admission as to the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates; (g) a waiver or limitation of the Debtors' rights under the Bankruptcy Code or any other applicable law; (h) a concession that any liens (contractual, common law, statutory, or otherwise) that may be satisfied pursuant to the relief requested in this Motion are valid, and the rights of all parties in interest are expressly reserved to contest the extent, validity, or perfection or seek avoidance of all such liens; or (i) a waiver of the obligation of any party in interest to file a proof of claim.

### Notice

27.     The Debtors will provide notice of this Motion to the following parties or their respective counsel:  (a) the Office of the United States Trustee for the Southern District of Texas; (b) the holders of the thirty largest unsecured claims against the Debtors (on a consolidated basis); (c) Davis Polk & Wardwell LLP and Porter Hedges LLP, as counsel to the QVC Noteholder Group; (d) the Consenting LINTA Noteholders; (e) the Consenting RCF Lenders; (f) the United States Attorney's Office for the Southern District of Texas; (g) the Internal Revenue Service; (h) the United States Securities and Exchange Commission; (i) the state attorneys general for states in which the Debtors conduct business; and (j) any party that has requested notice pursuant to Bankruptcy Rule 2002.  In light of the nature of the relief requested, no other or further notice need be given.

*[Remainder of page intentionally left blank.]*

4903-0376-8482

The Debtors request that the Court enter the Order granting the relief requested herein and such other relief as the Court deems appropriate under the circumstances.

Dated:  April 17, 2026

/s/  Jason S. Brookner

| | |
|---|---|
| **GRAY REED** | **KIRKLAND & ELLIS LLP** |
| Jason S. Brookner (TX Bar No. 24033684) | **KIRKLAND & ELLIS INTERNATIONAL LLP** |
| Lydia R. Webb (TX Bar No. 24083758) | Joshua A. Sussberg, P.C. (*pro hac vice* pending) |
| Emily F. Shanks (TX Bar No. 24110350) | Aparna Yenamandra, P.C. (*pro hac vice* pending) |
| 1300 Post Oak Blvd. | 601 Lexington Avenue |
| Suite 2000 | New York, New York 10022 |
| Houston, Texas 77056 | Telephone:      (212) 446-4800 |
| Telephone:      (713) 986-7000 | Facsimile:      (212) 446-4900 |
| Facsimile:     (713) 986-7100 | Email:            joshua.sussberg@kirkland.com |
| Email:            jbrookner@grayreed.com | aparna.yenamandra@kirkland.com |
| lwebb@grayreed.com | |
| eshanks@grayreed.com | - and - |

Chad J. Husnick, P.C. (*pro hac vice* pending)
Gabriela Zamfir Hensley (*pro hac vice* pending)
333 West Wolf Point Plaza
Chicago, Illinois 60654
Telephone:      (312) 862-2000
Facsimile:      (312) 862-2200
Email:            chad.husnick@kirkland.com
                gabriela.hensley@kirkland.com

*Proposed Co-Counsel for the Debtors and Debtors in Possession*

*Proposed Co-Counsel for the Debtors and Debtors in Possession*

4903-0376-8482

**Certificate of Accuracy**

I certify that the foregoing statements are true and accurate to the best of my knowledge. This statement is being made pursuant to Bankruptcy Local Rule 9013-1(i).

*/s/  Jason S. Brookner*
Jason S. Brookner

**Certificate of Service**

I certify that on April 17, 2026, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/  Jason S. Brookner*
Jason S. Brookner

4903-0376-8482