**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| QVC GROUP, INC., *et al.*,[1] | ) | Case No. 26-90447 (ARP) |
| | ) | |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

**DEBTORS' <u>EMERGENCY</u> MOTION FOR ENTRY OF**
**INTERIM AND FINAL ORDERS (I) AUTHORIZING THE PAYMENT OF**
**ALL TRADE CLAIMS, (II) CONFIRMING THE ADMINISTRATIVE EXPENSE**
**PRIORITY OF OUTSTANDING ORDERS, AND (III) GRANTING RELATED RELIEF**

> **Emergency relief has been requested.  Relief is requested not later than 1:00 p.m. (prevailing Central Time) on April 17, 2026.**
>
> **If you object to the relief requested or you believe that emergency consideration is not warranted, you must appear at the hearing if one is set, or file a written response prior to the date that relief is requested in the preceding paragraph.  Otherwise, the Court may treat the pleading as unopposed and grant the relief requested.**
>
> **A hearing will be conducted on this matter on April 17, 2026, at 1:00 p.m. (prevailing Central Time) in Courtroom 400, 4th floor, 515 Rusk Street, Houston, Texas 77002. Participation at the hearing will only be permitted by an audio and video connection.**
>
> **Audio communication will be by use of the Court's dial-in facility.  You may access the facility at (832) 917-1510.  Once connected, you will be asked to enter the conference room number.  Judge Pérez's conference room number is 282694.  Video communication will be by use of the GoToMeeting platform.  Connect via the free GoToMeeting application or click the link on Judge Pérez's homepage.  The meeting code is "Judge Pérez."  Click the settings icon in the upper right corner and enter your name under the personal information setting.**
>
> **Hearing appearances must be made electronically in advance of both electronic and in-person hearings.  To make your appearance, click the "Electronic Appearance" link on Judge Pérez's homepage.  Select the case name, complete the required fields, and click "Submit" to complete your appearance.**

---

[1]   A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://restructuring.ra.kroll.com/QVC.  The location of Debtor QVC Group, Inc.'s corporate headquarters and the Debtors' service address in these chapter 11 cases is 1200 Wilson Drive, West Chester, Pennsylvania 19380.

The above-captioned debtors and debtors in possession (collectively, the "Debtors") state the following in support of this motion (this "Motion"):[2]

**Preliminary Statement**

1.      As described in the First Day Declaration, the Debtors commenced these chapter 11 cases with a restructuring support agreement (the "RSA") signed by key stakeholders across their capital structure.  The ultimate goal of the Debtors' prepackaged Plan and these chapter 11 cases is to restructure the Debtors' balance sheet as expeditiously as possible and minimize disruption to the Debtors' complex, global operations.  The Debtors have tirelessly negotiated with their stakeholders over the past several months to structure a transaction that will accomplish these objectives.

2.      Accordingly, the Plan (a) leaves the legal, equitable, and contractual rights of vendors and trade creditors unimpaired and (b) contemplates that the Debtors will emerge from these chapter 11 cases in approximately 54 days.  Consistent with the transaction the Plan contemplates, the Debtors seek relief through this Motion to pay:  (i) Vendor Claimants, (ii) Drop Ship Claimants, (iii) Foreign Claimants, (iv) Lien Claimants,  and (v) 503(b)(9) Claimants (each as defined below, and collectively, the "Trade Claimants," and the claims of such Trade Claimants, the "Trade Claims"),[3] in each case as they come due in the ordinary course of business.  The relief

---

[2]  A description of the Debtors, their business, and the facts and circumstances supporting this Motion and the Debtors' chapter 11 cases is set forth in greater detail in the *Declaration of Bill Wafford in Support of Debtors' Chapter 11 Petitions and First Day Motions* (the "First Day Declaration"), filed contemporaneously herewith and incorporated by reference herein.  Capitalized terms used but not otherwise defined in this Motion shall have the meanings ascribed to them in the First Day Declaration or in the contemporaneously filed *Joint Prepackaged Plan of Reorganization of QVC Group, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* (as may be amended, supplemented, or otherwise modified from time to time, the "Plan"), as applicable.

[3]  Contemporaneously with the filing of this Motion, the Debtors have filed certain other "first day" motions seeking authority to satisfy certain prepetition obligations to parties including, among others, employees, customers, and taxing authorities.  This Motion is not duplicative of any such motion.  As used herein, the term "Trade Claims" does not include any obligation the Debtors seek to pay under a separate motion.  Nothing contained herein is

2

requested in this Motion is tailored to further the Debtors' restructuring goals and maximize the value of their estates by preserving operational efficiency and ensuring Trade Claims are paid in full, consistent with their contemplated treatment under the Plan.

3.      Given the prepackaged nature of these chapter 11 cases, the unimpaired treatment of Trade Claims under the Plan, and the importance of uninterrupted business operations, the Debtors submit that this relief is appropriate and in the best interests of the Debtors' estates, their stakeholders, and other parties in interest.

## Relief Requested

4.      The Debtors seek entry of interim and final orders, substantially in the forms attached hereto (respectively, the "Interim Order" and "Final Order"):  (a) authorizing, but not directing, the Debtors to pay all Trade Claims in the ordinary course of business; (b) confirming the administrative expense priority status of all undisputed obligations on account of Outstanding Orders (as defined herein) and authorizing, but not directing, the Debtors to satisfy such Outstanding Orders in the ordinary course of business; and (c) granting related relief.  In support of this Motion, the Debtors submit the *Declaration of Jason Keyes in Support of the Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Payment of All Trade Claims, (II) Confirming the Administrative Expense Priority of Outstanding Orders, and (III) Granting Related Relief* (the "Keyes Declaration"), filed contemporaneously herewith. The Debtors request that the Court schedule a final hearing within approximately twenty-one days after the commencement of these chapter 11 cases to consider entry of the Final Order.

---

intended or should be construed as an admission or implication as to the validity of any claim against the Debtors or a waiver of the Debtors' rights to dispute any asserted claim.

5.      The amounts set forth in this Motion refer to the aggregate relief sought by the Debtors.  Unless specifically stated otherwise, the Debtors do not believe that QVCG or the LINTA Debtors owe any prepetition amounts with regard to the relief sought herein.  Out of an abundance of caution, however, the Debtors request the relief described herein as to QVCG and the LINTA Debtors to the extent applicable.  For the avoidance of doubt, notwithstanding general references to "the Debtors," no Debtor is seeking to pay the prepetition or postpetition claims of any other Debtor.  If, notwithstanding the foregoing, any Debtor pays a claim of another Debtor, the Debtors request (via the Cash Management Motion)[4] that the payor Debtor's claim against the obligor Debtor be accorded administrative expense status under section 503(b) of the Bankruptcy Code, with the priority set forth in section 507(b) of the Bankruptcy Code.

**Jurisdiction and Venue**

6.      The United States Bankruptcy Court for the Southern District of Texas (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and the *Order of Reference to Bankruptcy Judges* from the United States District Court for the Southern District of Texas, entered May 24, 2012.  This is a core proceeding pursuant to 28 U.S.C. § 157(b). The Debtors confirm their consent to the Court's entry of a final order in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

7.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

---

[4]   *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue Using the Cash Management System, (B) Maintain Existing Bank Accounts Business Forms, and Books and Records, and (C) Continue Intercompany Transactions, (II) Granting Administrative Expense Status to Postpetition Intercompany Transactions, and (III) Granting Related Relief* (the "Cash Management Motion"), filed contemporaneously herewith.

8. The bases for the relief requested herein are sections 105(a), 363, 503(b), 1107(a), and 1108 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), rules 1075-1 and 9013-1(i) of the Bankruptcy Local Rules for the Southern District of Texas (the "Bankruptcy Local Rules"), and section G of the *Procedures for Complex Cases in the Southern District of Texas* (the "Complex Case Procedures").

## Background

9. QVC Group, Inc. and its direct and indirect Debtor and non-Debtor subsidiaries (collectively, "QVC" or the "Company") are global leaders in video retailing, ecommerce, and social commerce, curating and selling a wide variety of consumer products via highly engaging, video-rich, interactive shopping experiences. QVC's strong social media presence, influencer relationships, and long-term relationships with companies across cable, satellite, and telecommunication platforms allowed the Company to reach over 200 million households across three continents, serve nearly 10.3 million unique customers, and ship close to 182 million units of products in 2025.

10. Founded in 1986 and headquartered in West Chester, Pennsylvania, QVC employs over 15,800 employees. For the fiscal year 2025, QVC's revenue was more than $9.2 billion. As of the Petition Date, the Debtors have approximately $6.5 billion in funded debt, plus approximately $1.3 billion in face amount of preferred stock.

11. On April 16, 2026 (the "Petition Date"), each Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtors are operating their businesses and managing their property as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. Concurrently with the filing of this Motion, the Debtors filed a motion requesting procedural consolidation and joint administration of these chapter 11 cases pursuant to

Bankruptcy Rule 1015(b).  No request for the appointment of a trustee or examiner has been made in these chapter 11 cases, and no official committees have been appointed or designated.

**The Debtors' Business Obligations**

**I.      The Trade Claims.**

12.      In the ordinary course of business, the Debtors rely on the Trade Claimants to provide millions of units of goods and related services, including, among other things, their merchandise, advertising, shipping, and fulfillment needs.  In 2025, the Company generated over $9.2 billion in revenue, spent over $4.5 billion on merchandise production, and shipped over 182 million units to over 10.3 million unique customers worldwide.  The Company spends billions of dollars in the ordinary course of business and as a result, at any point in time, the Company owes various constituents hundreds of millions of dollars.  While QVC is a retail business it does not maintain brick and mortar leases as would an ordinary retail business because of the nature of its television and ecommerce focus.

13.      The Debtors carefully curate the tens of thousands of products sold through their television and ecommerce platforms, including by collaborating with manufacturers to identify, source, design, and develop bespoke products and procure inventory from major national brands. The Debtors do not engage in manufacturing operations themselves, so the Debtors' business depends on their Trade Claimants.  For example, brand name products represent a substantial portion of the Debtors' sales, and if the Debtors were unable to procure such products, their customers may purchase them elsewhere, rather than purchasing an alternative product from the Debtors.  Certain Trade Claimants also assist the Debtors in the marketing of such products, such as by designing and printing catalogs to send to the Debtors' customers or by photographing products for the Debtors' ecommerce platforms.

14.     The Debtors also rely on third party Trade Claimants for distribution and fulfillment.  When an order is placed online, by phone, or by mail, it is either shipped to customers from one of the Debtors' warehouses using third-party shippers or is shipped directly from the supplier to the Debtors' customer.  The Company, through its Trade Claimants, ships millions of units each year to the Company's customers around the world.  Due to the shipping arrangements made with each Trade Claimant, if these shippers are not paid, they may refuse (and, indeed, have refused in the past) to release merchandise or other goods for shipment.  Without access to the Trade Claimants' goods and services, the Debtors would be unable to fulfill their customers' orders, source inventory, or market and sell products, all of which are absolutely crucial to the Debtors' operations.

15.     In the months leading up to the Petition Date, the Debtors, with the assistance of their advisors, spent significant time reviewing and analyzing the Debtors' books and records, accounts payable, key contracts, purchase orders, vendor lists, and consulted with key Company employees.  As part of this process, the Debtors analyzed whether the impairment of Trade Claimants was in the best interests of their estates.  Following this analysis, it became clear that the Debtors could not achieve meaningful savings by impairing Trade Claims or rejecting contracts with Trade Claimants.  This is, in part, due to the Debtors' prepetition completion of "Project Athens," a multi-year turnaround plan, launched in 2022, aimed at, among other things, improving execution, reducing costs, and optimizing the Debtors' brand portfolio.  As part of Project Athens, the Debtors implemented cost-savings initiatives in an effort to reduce their ordinary course vendor obligations.  The Debtors also conducted a thorough analysis of their vendors and approached vendors to negotiate improved terms where they identified potential savings.

16.     In fact, impairing Trade Claims is projected, in the aggregate, to hinder the Debtors' chapter 11 cases given the costs of negotiations, the disruption to the Debtors' business operations, and the resulting protracted chapter 11 timeline.  Moreover, the parties to the RSA—who, as the key economic stakeholders in these chapter 11 cases, bear the economic cost of leaving the Trade Claimants unimpaired—support the treatment of the Trade Claimants under the Plan in recognition of such Trade Claimants' long-term value to the Debtors' business.

17.     In the twelve months before the Petition Date, the Debtors' payment obligations to the Trade Claimants averaged approximately $400 million per month.  As of the Petition Date, the Debtors estimate that approximately $426.1 million is owed to Trade Claimants on account of the Trade Claims.  Given that the Plan contemplates that all general unsecured claims, including the Trade Claims, will be unimpaired—and many of the Trade Claims may otherwise be entitled to priority or administrative treatment as set forth herein—the payment of Trade Claims in full as they come due in the ordinary course of business merely affects the timing of payment.  Continuing to pay the Trade Claims in the ordinary course of business will minimize any disruption to the Debtors' business, thereby maximizing value for all parties.

18.     The following table summarizes the relief sought through this Motion and provides the estimated prepetition amounts attributable to each type of Trade Claim:

| Trade Claims | | | |
|---|---|---|---|
| *Plan Class* | *Type of Trade Claim* | *Interim Amount* | *Outstanding Amount* |
| Vendor Claimants | Non-foreign merchandise and non-merchandise suppliers of goods and services that are provided to the Debtors in the ordinary course of business. | $120,000,000 | $153,800,000 |
| Foreign Claimants | Suppliers of foreign goods and services that are provided to the Debtors in the ordinary course of business. | $31,100,000 | $46,900,000 |
| Lien Claimants | Suppliers of goods and services utilized by or provided to the Debtors that may assert mechanic's, possessory, or other similar liens. | $26,700,000 | $27,700,000 |
| Drop Ship Claimants | Trade Claims for goods shipped directly to customers pursuant to drop ship arrangements with the Debtors. | $69,000,000 | $93,700,000 |
| 503(b)(9) Claimants | Trade Claims that may be entitled to administrative expense priority under section 503(b)(9) of the Bankruptcy Code. | $70,600,000 | $104,000,000 |
| **Total** | | **$317,400,000** | **$426,100,000** |

19.     Some of the Trade Claims may be properly classified as more than one type of claim defined above or may ultimately end up being classified as a different type of claim than they are currently classified.  The Debtors believe the amounts listed herein are necessary to pay to each category of Trade Claimant to ensure the Debtors' ordinary course operations continue uninterrupted.  However, in an exercise of their business judgment, the Debtors may decide that it is prudent to pay more or less to a specific category of Trade Claim.  Accordingly, the Debtors request authority, but not direction, to pay the Trade Claims as they come due in the ordinary course of business regardless of how they are ultimately classified.

## II.     Vendor Claimants.

20.     The Debtors' ability to continue generating revenue and operating their businesses, and thus the success of these chapter 11 cases, fundamentally depends on the Debtors' continued

receipt of essential merchandise and other goods from vendors.  Merchandise is the lifeblood of the Debtors' business, and maintaining a steady supply of merchandise requires healthy, stable relationships with merchandise suppliers (the "Merchandise Claimants").  The Debtors also rely on a range of services from various service providers, including, advertising and marketing service providers, IT service providers, and social media influencers (the "Non-Merchandise Claimants," and collectively with Merchandise Claimants, the "Vendor Claimants," and the claims of such Vendor Claimants, the "Vendor Claims").  The Merchandise Claimants and Non-Merchandise Claimants comprise $45.7 million and $108.1 million of Vendor Claims, respectively, approximately $120 million of which will come due in the interim period.[5]

21.     Many of the Vendor Claimants are not subject to long-term contracts with the Debtors and instead operate on an order-by-order basis when transacting with the Debtors.  As such, these vendors are not contractually obligated to continue to do business with the Debtors.  Any disruption to the Debtors' global supply chain of inventory and services risks causing immediate and irreparable harm to the Debtors' estates, creditors, and businesses, as customers may turn to alternative sources in the market for the Debtors' products.

22.     Overall, attempting to procure and sell products or services from providers other than the Vendor Claimants would impose a severe strain on the Debtors' operations—particularly at this crucial juncture as the Debtors enter chapter 11.  Many of these vendors sell unique brands that are difficult or impossible to obtain through alternative vendors.  Even a temporary interruption of the provision of those products and services would impede the Debtors' operations, and the cumulative effects could have a severe adverse effect on the Debtors' business, and in turn,

---

[5]     The figures included in this sentence do not include claims classified above as Foreign Vendor Claims, Drop Ship Claims, Lien Claims, or 503(b)(9) Claims.

these chapter 11 cases.  That harm greatly outweighs the cost of the timely satisfaction of Vendor Claims in the ordinary course of business.  Accordingly, it is essential to the success of the Debtors' restructuring efforts that relationships with the Vendor Claimants are unimpeded by the filing of these chapter 11 cases.

### III.   Foreign Claimants.

23.   In the ordinary course of business, the Debtors routinely engage in transactions with essential vendors who are either based outside of the United States or who are U.S.-based vendors exclusively focused on connecting the Debtors with foreign suppliers and products (collectively, the "Foreign Claimants," and the claims of such Foreign Claimants, the "Foreign Vendor Claims").  The Debtors' business depends on being able to access competitive global supply chains.  Indeed, approximately 14 percent of Trade Claimants are Foreign Claimants.  Foreign Claimants include manufacturers and suppliers located outside of the United States, including, but not limited to Australia, Canada, China, India, Ireland, Italy, South Korea, and the United Kingdom.  Foreign Claimants also include importers that do extensive business with international suppliers in dozens of other countries.  While the risk inherent in failing to pay claims held by domestic Vendor Claimants is considerable, the risk is even more pronounced when Foreign Claimants are involved.  Many of the Foreign Claimants lack meaningful, if any, contacts with the United States.  Thus, the Foreign Claimants may consider themselves beyond the jurisdiction of the Court, and therefore may disregard the automatic stay, notwithstanding the automatic stay's global effect.  Even where the Debtors pay a related domestic entity, or the Foreign Claimant otherwise has some meaningful contact with the United States, such Foreign Claimant may refuse to arrange international shipments of goods to the Debtors unless and until they are paid.

24.   It would be unduly time-consuming and burdensome for the Debtors to seek to enforce an order of the Court in a Foreign Claimant's country in many instances, thereby

compounding the loss and disruption in services.  As with any company, receiving products and services in a timely and cost-effective manner is critical to the Debtors' businesses—the Debtors cannot afford delays of this nature or the increased costs associated therewith.  In addition, the Debtors do not believe that they can readily or easily replace such foreign suppliers without materially impairing their ability to deliver the variety and quality of products their customers have come to expect.  As of the Petition Date, the Debtors estimate that approximately $46.9 million is owed to Foreign Claimants on account of the Foreign Vendor Claims, approximately $31.1 million of which will come due in the interim period following the Petition Date.

**IV.     Lien Claimants.**

25.     In the ordinary course of business, the Debtors regularly incur obligations to certain third-party suppliers (the "Lien Claimants") whose claims are potentially secured by liens against assets owned or operated by the Debtors pursuant to applicable law (the "Lien Claims").[6] The goods and services that the Lien Claimants provide are fundamental to the Debtors' operations.  At any given time, the Lien Claimants may be in physical possession of goods and supplies used in the Debtors' day-to-day operations or may assert a lien for services rendered to the Debtors in connection with maintaining their facilities.  Obtaining the authority to satisfy the Lien Claims will facilitate the timely release of assets that are critical to the Debtors' businesses.

26.     The Debtors' businesses depend on the uninterrupted flow of goods.  To maintain their operations, the Lien Claimants transport, distribute, and warehouse the products that the Debtors provide to their customers.  The Lien Claimants include commercial common carriers,

---

[6]   For example, section 7-307 of the Uniform Commercial Code provides, in pertinent part, that a "carrier has a lien on the goods covered by a bill of lading or on the proceeds thereof in its possession for charges after the date of the carrier's receipt of the goods for storage or transportation, including demurrage and terminal charges, and for expenses necessary for preservation of the goods incident to their transportation or reasonably incurred in their sale pursuant to law."  *See* U.C.C. § 7-307(a) (2005).

shippers, freight forwarders/consolidators, delivery services, warehousers, fulfillment centers, logistics providers, facility and equipment contractors, and other similar third-party service providers. The Lien Claimants ship, transport, store, and otherwise facilitate the movement of goods and assist in the maintenance of the Debtors' facilities.

27. Under certain applicable non-bankruptcy laws, to the extent the Debtors have not paid for the goods or services provided by a Lien Claimant and the applicable counterparty has not waived any applicable liens, such Lien Claimant may have a lien on the goods in its possession. Any such lien would secure the charges or expenses incurred in connection with the transportation or storage of the goods or on the Debtors' property in connection with services performed. Accordingly, in the event these claims remain unpaid, the Lien Claimants could attempt to assert such liens and refuse to deliver or release goods in their possession, discontinue necessary services, or otherwise impede the Debtors' and/or the Debtors' customers' use of property until their claims are satisfied and their liens are redeemed. The Lien Claimants' possession (and retention) of the Debtors' goods and supplies or enforcement of such liens would disrupt the Debtors' operations, harm the Debtors' customers, and affect the Debtors' ability to efficiently administer these chapter 11 cases. The cost of such disruption would likely be greater than the amounts owed under such Lien Claims. Furthermore, pursuant to section 363(e) of the Bankruptcy Code, the Lien Claimants may be entitled to adequate protection of any valid possessory lien, which could drain estate assets when Lien Claimants, like all other Trade Claimants, are already proposed to be unimpaired under the Plan and entitled to full payment on account of their Lien Claims.

28. As of the Petition Date, the Debtors estimate that approximately $27.7 million is owed to Lien Claimants on account of the Lien Claims, approximately $26.7 million of which will come due in the interim period.

**V.      Drop Ship Claimants.**

29.      The Company's ecommerce operations are a critical component of their business and comprise approximately 54 percent of international sales and 67 percent of domestic sales. Many of the Debtors' ecommerce sales rely on drop shipping arrangements with certain supplier-vendors (the "Drop Ship Claimants," and the claims of such Drop Ship Claimants, the "Drop Ship Claims"). Under the relevant agreements, when customers purchase merchandise online, the Debtors place a purchase order with, or provide delivery instructions to, the relevant Drop Ship Claimant. The applicable Drop Ship Claimant then ships the merchandise directly to the customer. The Drop Ship Claimants benefit the Debtors by reducing shipping and fulfillment times in many cases, which makes the Debtors a more attractive shopping destination for customers and reduces the Debtors' up-front investment in certain inventory. For products sold through these drop-ship arrangements, the applicable Debtors receive a margin based on the merchandise's sale price. Due to the reduced wait times for customers, the Drop Ship Claimants help the Debtors deliver on one of QVC's core values:  customer convenience.

30.      The Debtors estimate that products provided by Drop Ship Claimants pursuant to the drop ship arrangements account for approximately 30 percent of the Debtors' annual revenue. However, certain Drop Ship Claimants also provide the Debtors with inventory through traditional arrangements, and nonpayment of the Drop Ship Claims of such Drop Ship Claimants could compound the negative effects on the Debtors' revenue because such Drop Ship Claimants may also refuse to provide merchandise under such traditional arrangements. Certain Drop Ship Claimants have already refused to continue to supply goods to the Debtors and fulfill drop ship orders due to future uncertainty and credit concerns, even where the Debtors have been paying current.

14

31.     Maintaining relationships with Drop Ship Claimants and having the ability to pay them in the ordinary course is critical to the Debtors' reorganization efforts.  The Debtors cannot afford, and likely could not withstand, the severe disruption to their supply chain that would result from failing to pay Drop Ship Claims on time.  Any interruption to the Debtors' business at this critical juncture, however brief, could induce Drop Ship Claimants to halt shipments, sever commercial relationships, or take other measures that will harm the Debtors' estates.

32.     As of the Petition Date, the Debtors estimate that approximately $93.7 million is owed to the Drop Ship Claimants on account of the Drop Ship Claims, approximately $69 million of which will come due in the interim period.

**VI.     503(b)(9) Claimants.**

33.     In the ordinary course of business, the Debtors may have received certain goods or materials from various vendors (collectively, the "503(b)(9) Claimants") within the twenty days immediately preceding the Petition Date, thereby giving rise to claims entitled to administrative expense status under section 503(b)(9) of the Bankruptcy Code (the "503(b)(9) Claims").

34.     Many of the Debtors' relationships with the 503(b)(9) Claimants are not governed by long-term contracts.  Rather, the Debtors obtain much of their goods and other materials from such claimants on an order-by-order basis.  As a result, a 503(b)(9) Claimant may refuse to supply new orders if their 503(b)(9) Claims remain unpaid.  Any such refusal or interference could negatively affect the Debtors' estates, as the Debtors' business requires the steady flow of the goods and supplies that the 503(b)(9) Claimants provide.

35.     Additionally, certain of the 503(b)(9) Claimants supply goods or materials that are critical to the Debtors' ongoing operations.  The failure to timely pay 503(b)(9) Claims will unnecessarily disrupt the Debtors' business operations.  Given the extremely competitive marketplace in which the Debtors operate, this risk is unnecessary, especially because these claims

must be paid in full under the Plan.  As of the Petition Date, the Debtors estimate that approximately $104 million is owed to the 503(b)(9) Claimants on account of the 503(b)(9) Claims, approximately $70.6 million of which will come due in the interim period.

## VII.  Customary Trade Terms.

36.  Subject to the Court's approval, the Debtors intend to pay the Trade Claims in full to preserve and enhance the value of their estates.  In return for paying the Trade Claims, the Debtors propose that they be authorized, in their sole discretion, to require the Trade Claimants to provide favorable trade terms for the postpetition procurement of goods and services.

37.  Specifically, the Debtors seek authority to condition payment of the Trade Claims upon such Trade Claimant's agreement (a) to continue (or resume) supplying such goods and services to the Debtors in accordance with trade terms at least as favorable to the Debtors as those practices and programs (including credit limits, pricing, discounts, timing of payments, allowances, product mix, availability, and other terms) consistent with the parties' ordinary course prepetition practice or as otherwise acceptable to the Debtors in their discretion (collectively, the "Customary Trade Terms") and (b) that the Trade Claimant shall not be permitted to cancel any contract, agreement, or arrangement pursuant to which they provide such goods and/or services to the Debtors during the course of these chapter 11 cases.  The Debtors also seek authority to require, at their discretion, that the Customary Trade Terms be commemorated in writing, including by email, as a condition to payment.

38.  The Debtors further request that if any party accepts payment pursuant to the relief requested by this Motion and thereafter does not continue to provide goods or services on Customary Trade Terms, then:  (a) any such payment may be deemed, in the Debtor's sole discretion, to be an avoidable postpetition transfer on account of a prepetition claim and therefore immediately recoverable by the Debtors in cash upon written request by the Debtors; (b) upon

such recovery by the Debtors, any prepetition claim of such party shall be reinstated as if the payment had not been made; (c) if there exists an outstanding postpetition balance due from the Debtors to such party, (i) the Debtors may elect to recharacterize and apply any payment made pursuant to the relief requested by this Motion to the outstanding postpetition balance and (ii) such supplier will be required to repay the Debtors such postpetition payments to the extent that they exceed the postpetition obligations then outstanding without the right of any setoffs, claims, provisions for payment of any claims, or otherwise; and (d) the Debtors may pursue any other remedy available to them under the applicable law or any executed writing with such party.

## VIII.   Outstanding Orders.

39.      Prior to the Petition Date, and in the ordinary course of business, the Debtors may have ordered goods or services that will be delivered or provided during these chapter 11 cases (the "Outstanding Orders").  To avoid the risk of becoming general unsecured creditors of the Debtors' estates with respect to such Outstanding Orders, certain vendors may refuse to ship or transport such goods (or may recall such shipments) unless the Debtors issue substitute postpetition orders, potentially disrupting the Debtors' ongoing business operations and requiring the Debtors to expend substantial time and effort in issuing such substitute orders.  Receiving the Outstanding Orders without delay is critical to preventing any disruption to the Debtors' business operations. To prevent such value-destructive disruption, and given that claims on account of goods delivered or services provided after the Petition Date are afforded administrative expense priority under section 503(b) of the Bankruptcy Code, the Debtors seek an order (a) granting administrative expense priority under section 503(b) of the Bankruptcy Code to all undisputed obligations of the Debtors arising from the Outstanding Orders and (b) authorizing the Debtors to satisfy such obligations in the ordinary course of business.  The Debtors further request that if the Debtors

17

terminate any Outstanding Orders prior to delivery, such canceled orders not be afforded administrative priority.

**Basis for Relief**

I.   **The Court Should Authorize Payment of the Trade Claims Because It Is Necessary to Preserve the Debtors' Estates.**

40.   Courts have recognized that it is appropriate to authorize the payment of prepetition obligations where necessary to protect and preserve the estate, including an operating business's going-concern value.  *See, e.g.*, *In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002) ("[T]his Court is prepared to apply the Doctrine of Necessity to authorize payment of prepetition claims in appropriate cases."); *see also Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451, 468 (2017) (noting that courts "have approved . . . 'critical vendor' orders that allow payment of essential suppliers' prepetition invoices"); *In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989) ("The ability of a Bankruptcy Court to authorize the payment of pre-petition debt when such payment is needed to facilitate the rehabilitation of the debtor is not a novel concept.").  In doing so, these courts acknowledge legal theories rooted in sections 363(b), 105(a), 1107(a), and 1108 of the Bankruptcy Code support the payment of prepetition claims as provided herein.

41.   Section 363(b) of the Bankruptcy Code provides, in relevant part, that debtors, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).  This section permits a debtor, subject to court approval, to pay prepetition obligations where a sound business purpose exists for doing so. *See, e.g.*, *In re Ionosphere Clubs*, 98 B.R. at 175 (noting that section 363(b) provides "broad flexibility" to authorize a debtor to honor prepetition claims where supported by an appropriate business justification); *ASARCO, Inc. v. Elliot Mgmt. (In re ASARCO, L.L.C.)*, 650 F.3d 593

18

(5th Cir. 2011) ("Section 363 of the Bankruptcy Code addresses the debtor's use of property of the estate and incorporates a business judgment standard."); *Institutional Creditors Cont'l Air Lines, Inc. v. Cont'l Air Lines, Inc. (In re Cont'l Air Lines, Inc.)*, 780 F.2d 1223, 1226 (5th Cir. 1986) ("[F]or the debtor-in-possession . . . there must be some articulated business justification for using, selling, or leasing the property outside the ordinary course of business."); *In re Bouchard Trans. Co., Inc.*, 639 B.R. 697, 708 (S.D. Tex. 2022) ("The business judgment standard applies to transactions governed by 11 U.S.C. § 363."), *aff'd sub nom.*, 74 F.4th 743 (5th Cir. 2023).

42.     Here, the Debtors satisfy the business judgment standard.  The Debtors maintain relationships with a broad base of Trade Claimants that provide goods and services in the ordinary course of the Debtors' businesses through a variety of arrangements.  Timely payment of Trade Claims is essential to maintaining those relationships.

43.     Disruption in the treatment of such trade relationships during these chapter 11 cases could result in interruptions or delays that would be detrimental to the Debtors' operations and restructuring efforts.  That disruption may occur before the Debtors could bring an action in the Court to compel performance or otherwise enforce the automatic stay, especially in the case of Foreign Claimants who may believe they are beyond the Court's jurisdiction.  Additionally, Lien Claimants may be able to assert liens against certain of the Debtors' assets under state law and refuse to deliver or release goods in their possession or otherwise impede the Debtors' and/or the Debtors' customers' use of property until their claims are satisfied and their liens are redeemed. Any material disruption to the Debtors' businesses that may result from nonpayment of the Trade Claims could threaten the Debtors' ability to consummate their restructuring.

44.     Courts also authorize payment of prepetition claims based on section 105(a) of the Bankruptcy Code, which codifies a bankruptcy court's inherent equitable powers to "issue any

19

order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).  Specifically, courts can authorize preplan payments of prepetition obligations pursuant to the "doctrine of necessity" (also referred to as the "necessity of payment" rule), which permits such payments if they are critical to the debtor's reorganization. *See, e.g.*, *In re Ionosphere Clubs*, 98 B.R. at 176 ("[The doctrine of necessity] recognizes the existence of the judicial power to authorize a debtor in a reorganization case to pay pre-petition claims where such payment is essential to the continued operation of the debtor."); *In re Fin. News Network Inc.*, 134 B.R. 732, 735–36 (Bankr. S.D.N.Y. 1991) (stating that the "'doctrine of necessity' stands for the principle that a bankruptcy court may allow pre-plan payments of prepetition obligations where such payments are critical to the debtor's reorganization"); *In re Just for Feet, Inc.*, 242 B.R. 821, 825–26 (D. Del. 1999) ("The necessity of payment doctrine recognizes that paying certain pre-petition claims may be necessary to realize the goal of chapter 11—a successful reorganization.").

45.     Finally, courts rely on sections 1107(a) and 1108 of the Bankruptcy Code to authorize payment of prepetition claims.  Under these sections, debtors in possession are fiduciaries "holding the bankruptcy estate[s] and operating the business[es] for the benefit of [their] creditors and (if the value justifies) equity owners." *In re CoServ*, 273 B.R. at 497.  Implicit in the fiduciary duties of any debtor in possession is the obligation to "protect and preserve the estate, including an operating business's going-concern value." *Id.*; s*ee also In re CEI Roofing, Inc.*, 315 B.R. 50, 59 (Bankr. N.D. Tex. 2004) (quoting *CoServ*, 273 B.R. at 497).  There are instances in which debtors in possession can fulfill their fiduciary duties "only . . . by the pre-plan satisfaction of a prepetition claim." *In re CoServ*, 273 B.R. at 497.  The *CoServ* court specifically noted that the preplan satisfaction of prepetition claims would be a valid exercise of a debtor's

fiduciary duty when the payment "is the only means to effect a substantial enhancement of the estate" or when the payment was to "sole suppliers of a given product." *Id.* at 498.

46. While there are several statutory bases to authorize payment of prepetition claims, courts in the Fifth Circuit generally follow *CoServ*'s three-part test to determine whether a prepetition claim of a "critical vendor" may be paid outside of the plan process:

> First, it must be critical that the debtor deal with the claimant. Second, unless it deals with the claimant, the debtor risks the probability of harm, or, alternatively, loss of economic advantage to the estate or the debtor's going concern value, which is disproportionate to the amount of the claimant's pre-petition claim. Third, there is no practical or legal alternative by which the debtor can deal with the claimant other than by payment of the claim.

*Id.*

47. Here, the Debtors meet all three *CoServ* requirements. First, it is critical that the Debtors continue to maintain strong relationships with the Trade Claimants because the goods and services they provide are necessary to maintain operational stability. It is for precisely this reason that the Debtors' Plan proposes not to impair the Trade Claims. Second, the cost of paying the Trade Claims is small when compared to the harm the Debtors' estates would suffer if Trade Claimants stopped doing business with the Debtors. A disruption like this could prevent the Debtors from selling such Trade Claimants' products and lead to significant customer attrition— a cost that disproportionately exceeds the cost of paying Trade Claims. Moreover, the Debtors do not have any practical or legal alternatives to paying many of the Trade Claimants because it is incredibly difficult, costly, and time-consuming to replace them (and in some instances, impossible). As for foreign Trade Claimants, they may initiate litigation or exercise remedies in foreign jurisdictions if they are not paid, notwithstanding the worldwide effect of the automatic stay. Given the Trade Claimants' centrality to the Debtors' business and the practical limit of the automatic stay's effect on foreign Trade Claimants, paying the Trade Claims is the most reasonable

path forward.  The Debtors therefore meet all three *CoServ* requirements, making it appropriate to pay the Trade Claims in the ordinary course of business.

48.     The relief requested also represents a sound exercise of the Debtors' business judgment and is warranted under sections 105(a), 363, 1107(a) and 1108 of the Bankruptcy Code. Bankruptcy courts in this district have found authority to authorize payment of prepetition trade claims under such sections.  *See In re Kleopatra Finco S.À R.L., et al.*, No. 25-90642 (CML) (Bankr. S.D. Tex. Dec. 2, 2025) (authorizing the debtors to pay all trade claims on a final basis); *In re Wolfspeed, Inc.,* No. 25-90163 (CML) (Bankr. S.D. Tex. July 1, 2025) (same); *In re Cutera, Inc.*, No. 25-90088 (ARP) (Bankr. S.D. Tex. Mar. 6, 2025) (same); *In re Container Store Grp., Inc.,* No. 24-90627 (ARP) (Bankr. S.D. Tex. Dec. 23, 2024) (same); *In re Jervois Texas, LLC*, No. 25-90002 (CML) (Bankr. S.D. Tex. Mar. 3, 2025) (same).[7]

49.     As discussed above, the Trade Claimants play a critical role in maintaining the uninterrupted flow of inventory that is essential to the Debtors' operations.  The authority to satisfy the Trade Claims in the initial days of these chapter 11 cases without disrupting the Debtors' operations will maintain the integrity of the Debtors' global supply chain, facilitate the sale of the Debtors' inventory, and allow the Debtors to efficiently administer these chapter 11 cases and effectuate the transactions contemplated by the Plan and the RSA.  In sum, the Debtors believe the relief requested comports with the "two recognized policies" of chapter 11 of the Bankruptcy Code—preserving going-concern value and maximizing the value of property available to satisfy creditors.  *See Bank of Am. Nat'l Trust & Savs. Ass'n v. 203 N. LaSalle St. P'Ship*, 526 U.S. 434,

---

[7]     Due to the voluminous nature of the orders cited herein, such orders have not been attached to this Motion.  Copies of these orders are available upon request to the Debtors' proposed counsel.

453 (1999). Accordingly, it is appropriate for the Court to authorize the Debtors to pay the Trade Claims as they come due in the ordinary course of business.

### A. The Court Should Authorize Payment of the Vendor Claims.

50. The Debtors require a steady provision of goods and services provided by the Vendor Claimants in order to continue operating their businesses and maintain operational stability. Without such products and services, the Debtors could be forced to unexpectedly halt operations while they search for substitute vendors and service providers, if any exist, and may have to forego existing favorable trade terms in their haste to find new vendors, thereby hindering the Debtors' ability to generate revenue. Importantly, any disruption to the Debtors' global supply chain could result in a significant loss of operational efficiency, decreasing the value of the Debtors' businesses, which could impair stakeholder value at the outset of these chapter 11 cases.

51. The authority to honor Vendor Claims in the initial days of these chapter 11 cases will maintain the integrity of the Debtors' businesses, allow the Debtors to efficiently administer these chapter 11 cases, and maximize the value of their estates. Further, by executing the RSA, which sets forth the terms of the proposed restructuring transactions, the parties to the RSA have expressly agreed to the payment in full of Trade Claims. If the Debtors are denied the relief requested herein, the resulting harm to the Debtors' estates far outweighs any costs associated with paying the Vendor Claims in the ordinary course of business. Thus, the Debtors' other creditors will be no worse off, and likely fare better, if the Debtors are empowered to pay Vendor Claims to achieve a smooth transition into chapter 11 with minimal disruptions.

52. The relief requested herein represents a sound exercise of the Debtors' business judgment and is necessary to avoid immediate and irreparable harm to the Debtors' estates. Accordingly, it is appropriate for the Court to authorize the Debtors to satisfy Vendor Claims in the ordinary course of business during these chapter 11 cases.

**B.      The Court Should Authorize Payment of the Foreign Vendor Claims.**

53.      Each of the Foreign Claimants are based outside the United States or conduct substantial business on behalf of the Debtors with counterparties based outside of the United States.  Some of the Foreign Claimants may, and likely do, lack meaningful contacts with the United States.  Thus, there is significant risk that the Foreign Claimants consider themselves beyond the jurisdiction of the Court and therefore may disregard the automatic stay, notwithstanding the automatic stay's global effect.  In addition, even where payments to certain Foreign Claimants may be routed through a U.S.-based entity, the Foreign Claimant or its counterpart may refuse to ship materials until it receives payment in full.  Failure to make payments to such parties in the ordinary course could lead to a proliferation of lawsuits in foreign courts and efforts to exercise other detrimental remedies overseas.  In many instances, it would be unduly time-consuming and expensive to seek to enforce an order of the Court in the creditor's home country.

54.      Accordingly, non-payment of any claims owing to Foreign Claimants could lead to immediate and significant disruption to the Debtors' businesses that would heavily outweigh the cost of paying such parties in connection with their prepetition claims, and continuing to pay them on a postpetition basis, in the ordinary course of business.  The Debtors believe that paying prepetition Foreign Vendor Claims is necessary to protect the Debtors' businesses and ensure that the Debtors are able to maximize the value of their estates during these chapter 11 cases.

55.      Allowing the Debtors to pay the Foreign Vendor Claims comports with the "two recognized policies" of chapter 11 of the Bankruptcy Code—preserving going-concern value and maximizing the value of property available to satisfy creditors.  *See Bank of Am. Nat'l Trust & Savs. Ass'n v. 203 N. LaSalle St. P'Ship*, 526 U.S. 434, 453 (1999).  Indeed, paying Foreign

Vendor Claims preserves going-concern value by allowing the Debtors to maintain their essential business relationships, which, in the same vein, improves creditor recoveries.

56.     Indeed, a bankruptcy court within this circuit has identified prepetition claims of foreign vendors "beyond the bankruptcy court's reach" as a paradigmatic case justifying preplan satisfaction of a prepetition claim pursuant to section 105(a). *In re CoServ*, 273 B.R. at 497. Courts in this district also regularly authorize debtors to pay claims owed to foreign entities against which the automatic stay cannot be readily enforced and regularly grant relief consistent with that which the Debtors are seeking in this Motion. *See, e.g.*, *In re Anthology Inc.*, No. 25-90498 (ARP) (Bankr. S.D. Tex. Nov. 11, 2025) (authorizing the payment of foreign vendor claims on a final basis); *In re Ascend Performance Materials Holdings Inc.*, No. 25-90127 (CML) (Bankr. S.D. Tex May 21, 2025) (same); *In re Northvolt AB*, No. 24-90577 (ARP) (Bankr. S.D. Tex. Dec. 20, 2024) (same); *In re Digit. Media Sols., Inc.*, No. 24- 90468 (ARP) (Bankr. S.D. Tex. Oct. 15, 2024) (same); *In re Venator Materials plc*, No. 23-90301 (DRJ) (Bankr. S.D. Tex. May 16, 2023) (same).[8]   Accordingly, it is appropriate for the Court to authorize the Debtors to satisfy Foreign Vendor Claims in the ordinary course of business during these chapter 11 cases.

**C.     The Court Should Authorize the Payment of the Lien Claims.**

57.     Certain Trade Claimants hold Trade Claims that may entitle them to assert liens on account of unpaid obligations.  For instance, certain Trade Claims are held by Trade Claimants that may be able to assert carrier liens and warehousemen's liens against certain of the Debtors', or their customers', assets under certain state, federal, and foreign laws.[9]  And under section 363(e)

---

[8]   Due to the voluminous nature of the orders cited herein, such orders have not been attached to this Motion.  Copies of these orders are available upon request to the Debtors' proposed counsel.

[9]   For example, section 7-307 of the Uniform Commercial Code provides, in pertinent part, that a "carrier has a lien on the goods covered by a bill of lading or on the proceeds thereof in its possession for charges after the date of the carrier's receipt of the goods for storage or transportation, including demurrage and terminal charges, and for

25

of the Bankruptcy Code, Lien Claimants may be entitled to adequate protection of their liens, the enforcement of which may impose additional costs on the Debtors' estates.

58.     Further, under the Plan, Allowed Lien Claims are classified as Other Secured Claims, which are proposed to be unimpaired.  *See* Plan, Art. III.A.  Particularly in light of this treatment under the Plan, to avoid any unnecessary costs to the Debtors' estates and disruption to the Debtors' operations, the payment of such Lien Claims in the ordinary course of business is a sound exercise of the Debtors' business judgment.  Accordingly, it is appropriate for the Court to authorize the Debtors to pay the Lien Claims as they come due in the ordinary course of business.

### D.     The Court Should Authorize Payment of the Drop Ship Claims.

59.     Failure to pay the Drop Ship Claims could lead to a cascade of negative consequences on the Debtors' ability to generate revenue on a postpetition basis.  The Debtors' ecommerce business relies on Drop Ship Claimants to provide customers with quality, name-brand goods on a convenient timeline.  If the Drop Ship Claims are not paid, the Drop Ship Claimants may refuse to deliver or release goods in their possession, which would be particularly damaging to the Debtors because the Debtors' customers have already paid for the goods.  Many Drop Ship Claimants operate on a purchase order basis and, if they are not paid, can refuse to take new orders or otherwise do business with the Debtors.  As a result, the Debtors' customers, who have already paid the Debtors for the product, may be harmed by the Drop Ship Claimants' refusal to fulfill such orders.  Accordingly, it is appropriate for the Court to authorize the Debtors to pay the Drop Ship Claims as they come due in the ordinary course of business.

---

expenses necessary for preservation of the goods incident to their transportation or reasonably incurred in their sale pursuant to law." *See* U.C.C. § 7-307(a) (2005).

E.      **The Plan Pays § 503(b)(9) Claims in Full.**

60.     In the ordinary course of business, the Debtors may have received goods from Trade Claimants within the twenty-day period preceding the Petition Date.  These types of Trade Claims are afforded administrative expense priority under section 503(b)(9) of the Bankruptcy Code and the Debtors are therefore required to pay them in full to confirm a plan of reorganization. *See* 11 U.S.C. § 1129(a)(9)(A).   Consistent with the Bankruptcy Code's requirement, Allowed § 503(b)(9) Claims are Administrative Claims that are proposed to be paid in full under the Plan. *See* Plan, Art. II.A.   Accordingly, the relief requested herein will only change the timing of the payment of such § 503(b)(9) Claims, not the amounts.  As a consequence, no party in interest will be materially prejudiced, and it is appropriate for the Court to authorize the Debtors to pay the 503(b)(9) Claims as they come due in the ordinary course of business.  *See In re CEI Roofing*, 315 B.R. at 60 ("[T]he payment of prepetition . . . claims . . . that qualify as priority . . . claims . . . does not trigger the same concerns (*i.e.*, upsetting priorities under the [Bankruptcy] Code and unfair discrimination among general unsecured claims).").

II.     **The Court Should Confirm That Outstanding Orders Are Administrative Expenses and That Payment of Such Claims Is Authorized.**

61.     Under section 503(b)(1) of the Bankruptcy Code, obligations that arise in connection with the postpetition delivery of goods, including goods ordered prepetition, may be administrative expenses if they (a) benefit the estate and (b) arise from a transaction with the debtor.   *See* 11 U.S.C. § 503(b)(1)(A) (providing that the "actual [and] necessary costs and expenses of preserving the estate" are administrative expenses); *see also In re John Clay & Co.*, 43 B.R. 797, 809–10 (Bankr. D. Utah 1984) (holding that goods ordered prepetition but delivered postpetition are entitled to administrative expense priority).  Thus, for any claimants who meet these requirements, granting the relief sought herein with respect to the Outstanding Orders will

not afford such claimants any greater priority than they otherwise would have if the relief requested herein were not granted and will not prejudice any other party in interest.

62.     Absent such relief, the Debtors may be required to expend substantial time and effort reissuing the Outstanding Orders to provide certain suppliers with assurance of such administrative expense priority.  The attendant disruption to the continuous and timely flow of critical inventory and other goods to the Debtors could result in delays and lost revenue—all to the detriment of the Debtors and their stakeholders.

63.     Indeed, courts in this district routinely grant the type of relief requested herein. *See, e.g., In re Kleopatra Finco S.À R.L., et al.*, No. 25-90642 (CML) (Bankr. S.D. Tex. Dec. 2, 2025) (granting administrative expense priority to undisputed obligations on account of outstanding orders on a final basis); *In re Wolfspeed, Inc.,* No. 25-90163 (CML) (Bankr. S.D. Tex. July 1, 2025) (same); *In re Cutera, Inc.*, No. 25-90088 (ARP) (Bankr. S.D. Tex. Mar. 6, 2025) (same); *In re Jervois Texas, LLC*, No. 25-90002 (CML) (Bankr. S.D. Tex. Mar. 3, 2025) (same); *In re Container Store Grp., Inc.,* No. 24-90627 (ARP) (Bankr. S.D. Tex. Dec. 23, 2024) (same).  Accordingly, the Court should confirm that claims arising from the Outstanding Orders are entitled to administrative expense priority status and should authorize the Debtors to pay such claims as they come due in the ordinary course of business.

**Emergency Consideration**

64.     The Debtors request emergency consideration of this Motion in accordance with Bankruptcy Local Rule 9013-1 and section G of the Complex Case Procedures and pursuant to Bankruptcy Rule 6003, which empowers a court to grant certain relief within the first twenty-one days after the Petition Date to the extent that such "relief is needed to avoid immediate and irreparable harm."  Fed. R. Bankr. P. 6003(a).  An immediate and orderly transition into chapter 11 is critical to the viability of the Debtors' operations.  Failure to receive the requested relief during

28

the first twenty-one days of these chapter 11 cases would severely disrupt the Debtors' operations at this critical juncture and cause immediate and irreparable harm. The requested relief is necessary for the Debtors to operate their businesses in the ordinary course, preserve the ongoing value of their operations, and maximize the value of their estates for the benefit of all stakeholders. The Debtors have demonstrated that the requested relief is "needed to avoid immediate and irreparable harm," as contemplated by Bankruptcy Rule 6003, and the Court should grant the requested relief.

### Processing of Checks and Electronic Fund Transfers Should Be Authorized

65. The Debtors will have sufficient funds to pay the amounts described herein in the ordinary course of business by virtue of expected cash flows from ongoing business operations. Under the Debtors' existing cash management system, the Debtors can readily identify checks or wire transfer requests as relating to any authorized payment in respect of the relief requested herein. Accordingly, the Debtors do not believe that checks or wire transfer requests that are unrelated to authorized payments will be honored inadvertently. Therefore, the Debtors request that the Court authorize all applicable financial institutions, when the Debtors request, to receive, process, honor, and pay any and all checks, direct debits, wire transfer, ACH, or other payment requests in respect of the relief requested herein.

### Waiver of Bankruptcy Rules 6004(a) and 6004(h)

66. The Debtors request that the Order include a finding that the notice of this Motion satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the fourteen-day stay period under Bankruptcy Rule 6004(h).

### Modification of Bankruptcy Rule 2002(a)(2)

67. The Debtors request that the Court, for cause, modify the service requirements set forth in Bankruptcy Rule 2002(a)(2) to limit service of this Motion only to the core service list and

affected creditors.  In light of the breadth and complexity of the Debtors' business, serving the Motion on all creditors, even those that are unaffected by the relief sought herein, would cause unnecessary confusion and expense to the detriment of all stakeholders.  Accordingly, sufficient cause exists under Bankruptcy Rule 2002(a)(2) to modify the service requirements for this Motion.

**Reservation of Rights**

68.     Notwithstanding anything to the contrary herein, nothing contained in this Motion or any actions taken pursuant to any order granting the relief requested by this Motion is intended as or should be construed as:  (a) an implication or admission as to the amount of, basis for, or validity of any particular claim against the Debtors under the Bankruptcy Code or other applicable nonbankruptcy law; (b) a waiver of the Debtors' or any other party in interest's rights to dispute any particular claim on any grounds; (c) a promise or requirement to pay any particular claim; (d) an implication, admission, or finding that any particular claim is an administrative expense claim, other priority claim, or otherwise of a type specified or defined in this Motion or any order granting the relief requested by this Motion; (e) a request or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code or otherwise affect the Debtors' rights under section 365 of the Bankruptcy Code to assume or reject any executory contract or unexpired lease; (f) an admission by the Debtors as to the validity, priority, enforceability, or perfection of any lien (contractual, common law, statutory, or otherwise) on, security interest in, or other encumbrance on property of the Debtors' estates and the rights of all parties in interest are expressly reserved to contest the extent, validity, or perfection or seek avoidance of all such liens; (g) a waiver or limitation of the Debtors' or any other party in interest's claims, causes of action, or other rights under the Bankruptcy Code or any other applicable law; or (h) a waiver of the obligation of any party in interest to file a proof of claim.

30

**Notice**

69.     The Debtors will provide notice of this Motion to the following parties or their respective counsel:  (a) the Office of the United States Trustee for the Southern District of Texas; (b) the holders of the thirty largest unsecured claims against the Debtors (on a consolidated basis); (c)  Davis Polk & Wardwell LLP and Porter Hedges LLP, as counsel to the QVC Noteholder Group; (d)  the Consenting LINTA Noteholders; (e)  the Consenting RCF Lenders; (f) the United States Attorney's Office for the Southern District of Texas; (g) the Internal Revenue Service; (h) the United States Securities and Exchange Commission; (i) the state attorneys general for states in which the Debtors conduct business; and (j) any party that has requested notice pursuant to Bankruptcy Rule 2002.  In light of the nature of the relief requested, no other or further notice need be given.

*[Remainder of page intentionally left blank.]*

The Debtors request that the Court enter the Interim Order and the Final Order granting the relief requested herein and such other relief as the Court deems appropriate under the circumstances.

Dated:  April 17, 2026

*/s/ Jason S. Brookner*

**GRAY REED**
Jason S. Brookner (TX Bar No. 24033684)
Lydia R. Webb (TX Bar No. 24083758)
Emily F. Shanks (TX Bar No. 24110350)
1300 Post Oak Blvd.
Suite 2000
Houston, Texas 77056
Telephone:       (713) 986-7000
Facsimile:     (713) 986-7100
Email:          jbrookner@grayreed.com
                lwebb@grayreed.com
                eshanks@grayreed.com

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C. (*pro hac vice* pending)
Aparna Yenamandra, P.C. (*pro hac vice* pending)
601 Lexington Avenue
New York, New York 10022
Telephone:       (212) 446-4800
Facsimile:       (212) 446-4900
Email:           joshua.sussberg@kirkland.com
                 aparna.yenamandra@kirkland.com

- and -

Chad J. Husnick, P.C. (*pro hac vice* pending)
Gabriela Zamfir Hensley (*pro hac vice* pending)
333 West Wolf Point Plaza
Chicago, Illinois 60654
Telephone:       (312) 862-2000
Facsimile:       (312) 862-2200
Email:           chad.husnick@kirkland.com
                 gabriela.hensley@kirkland.com

*Proposed Co-Counsel for the Debtors and Debtors in Possession*

*Proposed Co-Counsel for the Debtors and Debtors in Possession*

**Certificate of Accuracy**

I certify that the foregoing statements are true and accurate to the best of my knowledge. This statement is being made pursuant to Bankruptcy Local Rule 9013-1(i).

/s/  Jason S. Brookner

Jason S. Brookner

**Certificate of Service**

I certify that on April 17, 2026, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

/s/  Jason S. Brookner

Jason S. Brookner