United States Bankruptcy Court
Southern District of Texas

**ENTERED**

April 17, 2026

Nathan Ochsner, Clerk

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| QVC GROUP, INC., *et al.*,[1] | ) | Case No. 26-90447 (ARP) |
|  | ) |  |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

**INTERIM ORDER
(I) AUTHORIZING THE QVC DEBTORS (A) TO
ENTER INTO THE DIP LC FACILITY (B) FUND THE LC
CASH COLLATERAL ACCOUNT, AND (C) GRANT LIENS AND PROVIDE
ADMINISTRATIVE EXPENSE CLAIMS, (II) MODIFYING THE AUTOMATIC STAY,
(III) SCHEDULING A FINAL HEARING, AND (IV) GRANTING RELATED RELIEF**

Upon the motion (the "Motion")[2] of the above-captioned debtors and debtors in possession

(collectively, the "Debtors") in the above-captioned cases (the "Chapter 11 Cases"), pursuant to

sections 105, 362, 363(b), 363(m), 364, and 503 of title 11 of the United States Code, 11 U.S.C.

§§ 101, *et seq.* (the "Bankruptcy Code"), rules 2002, 4001, 6003, 6004, and 9014 of the Federal

Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and 9013-1 of the Bankruptcy Local

Rules for the Southern District of Texas (the "Bankruptcy Local Rules"), and the *Procedures for

Complex Cases in the Southern District of Texas* (the "Complex Case Procedures") seeking entry

of this interim order (this "Interim Order") and the Final Order (as defined herein) as applicable,

among other things:

> (i)  authorizing QVC, Inc., in its capacity as borrower (the "DIP Borrower"), to enter
> into the debtor-in-possession letter of credit facility (the "DIP LC Facility" and the

---

[1]  A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors'
proposed solicitation agent at https://restructuring.ra.kroll.com/QVC.  The location of Debtor QVC Group, Inc.'s
corporate headquarters and the Debtors' service address in these chapter 11 cases is 1200 Wilson Drive, West
Chester, Pennsylvania 19380.

[2]  Capitalized terms used but not defined herein are given the meanings ascribed to such terms in the Motion or the
DIP LC Agreement (as defined herein), as applicable.

letters of credit issued thereunder, the "Letters of Credit") and for each subsidiary that is a party to the Subsidiary Guarantee (the "Subsidiary Guarantors") to guarantee unconditionally, on a joint and several basis, the DIP Borrower's obligations under the DIP LC Facility in an aggregate principal amount at any time outstanding not to exceed $300 million, all of which shall be made available upon entry of this Interim Order, subject to certain conditions set forth in that certain Debtor-In-Possession Letter of Credit Facility Agreement substantially in the form attached hereto as **Exhibit A** (as amended, restated, amended and restated supplemented, or otherwise modified from time to time, the "DIP LC Agreement" and, together with all other Letters of Credit applications, fee letters and other documents and instruments related to the DIP LC Facility (in each case, as amended, restated, supplemented, waived, or otherwise modified from time to time in accordance with the terms thereof and hereof), the "DIP Loan Documents"), by and among the DIP Borrower, JPMorgan Chase Bank, N.A. as administrative agent (the "Administrative Agent"), the lenders party thereto from time to time (the "DIP Lenders") and the issuing banks party thereto from time to time (collectively, the "Issuing Banks" and together with the Administrative Agent and DIP Lenders, the "DIP Secured Parties");

(ii)     authorizing the DIP Borrower and each Subsidiary Guarantor (collectively, the "DIP Loan Parties") to enter into the DIP Loan Documents, and to perform all such other and further acts as may be required in connection therewith, including funding the LC Cash Collateral Account (as defined in the DIP LC Agreement);

(iii)    granting to the DIP Secured Parties valid, enforceable, non-avoidable and automatically perfected first-priority liens and security interests pursuant to section 364(c)(2) of the Bankruptcy Code on the DIP Collateral (as defined below), on the terms described herein;

(iv)     vacating and modifying the automatic stay under section 362 of the Bankruptcy Code (the "Automatic Stay") to the extent set forth herein and as necessary to permit the Debtors and their affiliates, and the DIP Secured Parties to implement and effectuate the terms and provisions of the DIP Loan Documents and this Interim Order, and, upon entry, the Final Order, and to deliver any notices of termination described below and as further set forth herein;

(v)      waiving any applicable stay (including under Bankruptcy Rule 6004) and providing for immediate effectiveness of this Interim Order and, upon entry, the Final Order; and

(vi)     scheduling a final hearing (the "Final Hearing") to consider final approval of the DIP LC Facility pursuant to a proposed final order[3] (the "Final Order" and together with the Interim Order, the "DIP Orders"), as set forth in the Motion filed with this Court.

---

[3]     A proposed Final Order will be filed prior to the Final Hearing.

The Court having considered the interim relief requested in the Motion, the *Declaration of Jason Keyes in Support of the Motion (I) Authorizing the QVC Debtors (A) to Enter into the DIP LC Facility (B) Fund the LC Cash Collateral Account, and (C) Grant Liens and Provide Administrative Expense Claims, (II) Modifying the Automatic Stay, (III) Scheduling a Final Hearing, and (IV) Granting Related Relief* (the "Keyes Declaration"), and the *Declaration of Bill Wafford in Support of Debtors' Chapter 11 Petitions and First Day Motions* (the "First Day Declaration"), filed contemporaneously with the Motion, and the evidence submitted and arguments made at the interim hearing held on April 17, 2026 (the "Interim Hearing"); and notice of the Interim Hearing having been given in accordance with Bankruptcy Rules 2002, 4001(b), (c) and (d), 9014, and all applicable Bankruptcy Local Rules; and the Interim Hearing having been held and concluded; and all objections, if any, to the interim relief requested in the Motion having been withdrawn, resolved or overruled by the Court; and it appearing to this Court that, pursuant to Bankruptcy Rule 4001(c)(2), granting the interim relief requested in the Motion is necessary to avoid immediate and irreparable harm to the Debtors and their estates pending the Final Hearing, is fair and reasonable and in the best interests of the Debtors and their estates, is essential for the preservation of the value of the Debtors' assets, and is a sound and prudent exercise of the Debtors' business judgment; and after due deliberation and consideration, and good and sufficient cause appearing therefor.

**BASED UPON THE RECORD ESTABLISHED AT THE INTERIM HEARING, THE COURT MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:**[4]

A.      *Petition Date.*  On April 16, 2026 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the Southern District of Texas (the "Court").

B.      *Debtors in Possession*.  The Debtors are operating their business and managing their property as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No official committee, trustee or examiner has been appointed in the Chapter 11 Cases.

C.      *Jurisdiction and Venue*.  This Court has jurisdiction over the Chapter 11 Cases, the Motion, and the parties and property affected hereby pursuant to 28 U.S.C. § 1334 and the *Order of Reference to Bankruptcy Judges* from the United States District Court for the Southern District of Texas, entered May 24, 2012.  Consideration of the Motion constitutes a core proceeding pursuant to 28 U.S.C. § 157(b)(2). The Court may enter this Interim Order consistent with Article III of the United States Constitution.  Venue for the Chapter 11 Cases and proceedings on the Motion is proper before this Court pursuant to 28 U.S.C. §§1408 and 1409. The predicates for the relief sought herein are sections 105, 362, 363(b), 363(m), 364, and 503 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6003, 6004 and 9014, and Bankruptcy Local Rule 9013-1.

D.      *Notice*.  The Interim Hearing was held pursuant to Bankruptcy Rule 4001(b)(2) and (c)(2).  Proper, timely, adequate and sufficient notice of the Motion has been provided in accordance with the Bankruptcy Code, the Bankruptcy Rules, and the Bankruptcy Local Rules,

---

[4]     The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

and no other or further notice was required under the circumstances to enter this Interim Order. The interim relief granted herein is necessary to avoid immediate and irreparable harm to the Debtors and their estates pending the Final Hearing.

E.      *Findings Regarding Access to the DIP LC Facility.*

(i)      Good and sufficient cause has been shown for the entry of this Interim Order and for authorization of the Debtors to obtain financing pursuant to the DIP Loan Documents.

(ii)      The Debtors have an immediate and critical need to obtain the DIP LC Facility in order to permit, among other things, the Debtors to continue to issue and extend letters of credit to critical trade vendors and other critical counterparties of the Debtors.

(iii)      The Debtors are unable to obtain adequate unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense or without granting to the DIP Secured Parties the DIP Liens (as defined below) on the terms and subject to the conditions set forth in this Interim Order and in the DIP Loan Documents.

(iv)      The Debtors find it prudent, in the exercise of their business judgment, to enter into the DIP LC Facility and obtain debtor-in-possession financing and, in connection therewith, incur the DIP Obligations, as applicable, in each case as provided for herein under the terms and conditions set forth in this Interim Order and the DIP Loan Documents. The terms of DIP LC Facility are fair and reasonable, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties and constitute reasonably equivalent value and fair consideration.

(v)      Aside from the cash deposited in the LC Cash Collateral Account and the CB Cash Collateral Account, the Debtors' remaining cash on hand is unencumbered.  As such, subject to the terms of the RSA (as defined in the Plan) and the "first day" orders, the Debtors may

use cash on hand on a postpetition basis to make disbursements on account of their ordinary course operations as well as in order to perform under their existing obligations, including, for the avoidance of doubt, with respect to the payment of QVC Restructuring Expenses (as defined in the Plan).

(vi)    The Interim Order and the DIP LC Facility have been negotiated in good faith and at arm's length among the Debtors and the DIP Secured Parties, and all of the Debtors' obligations and indebtedness arising under, in respect of, or in connection with the DIP LC Facility and the DIP Loan Documents, including all reimbursement obligations and guarantees issued by the DIP Loan Parties pursuant to the DIP Loan Documents and all other obligations under the DIP Loan Documents or this Interim Order, including all interest, fees and expenses payable under the DIP LC Agreement (collectively, the "DIP Obligations") shall be deemed to have been extended by the DIP Secured Parties in good faith as that term is used in section 364(e) of the Bankruptcy Code and in express reliance upon the protections offered by section 364(e) of the Bankruptcy Code, and the DIP Secured Parties (and their respective successors and assigns) shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that this Interim Order or any provision hereof is vacated, reversed or modified, on appeal or otherwise.

(vii)    The DIP Secured Parties have acted in good faith and without negligence, misconduct, or violation of public policy or law, in respect of all actions taken by them in connection with or related in any way to negotiating, implementing, documenting, or obtaining requisite approvals of this Interim Order, the DIP LC Facility, including in respect of the granting of the DIP Liens, any challenges or objections to the DIP LC Facility, the DIP Loan Documents, and all other documents related to and all transactions contemplated by the foregoing.

F.      *Immediate Entry*.  Sufficient cause exists for immediate entry of this Interim Order pursuant to Bankruptcy Rules 4001(b)(2) and (c)(2) and Local Rule 4001-2(b). Absent granting the relief set forth in this Interim Order, the Debtors' estates will be immediately and irreparably harmed.

Based upon the foregoing findings and conclusions, the Motion and the record before the Court with respect to the Motion, and after due consideration and good and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED THAT:**

1.      *Motion Granted*.  The interim relief sought in the Motion is granted and the DIP LC Facility is approved on an interim basis, subject to the terms and conditions set forth in this Interim Order.  All objections to this Interim Order to the extent not withdrawn, waived, settled, or resolved are hereby denied and overruled on the merits.

2.      *Final Hearing*.  The Final Hearing on the Motion shall be held on May 8, 2026, at 11:00 a.m., prevailing Central Time. Any objections or responses to entry of a final order on the Motion shall be filed on or before 4:00 p.m., prevailing Central Time, on May 4, 2026. In the event no objections to entry of a final order on the Motion are timely received, this Court may enter such final order without need for the Final Hearing.

3.      *Authorization of the DIP LC Facility and the DIP Loan Documents*.

(a)     The DIP Borrower, the other DIP Loan Parties, and the DIP Secured Parties are hereby immediately authorized and empowered to enter into, and execute and deliver, the DIP Loan Documents and such additional documents, instruments, certificates, and agreements as may be reasonably required or requested by the DIP Secured Parties to implement the terms or effectuate the purposes of this Interim Order and the DIP Loan Documents.  Upon entry of this

Interim Order, the DIP Borrower, the other DIP Loan Parties, and the DIP Secured Parties shall be bound by (x) the terms and conditions and other provisions set forth in the DIP LC Agreement and other executed DIP Loan Documents, and (y) this Interim Order. Upon execution and delivery thereof, the DIP Loan Documents shall constitute valid and binding obligations of the Debtors party thereto enforceable in accordance with their terms. To the extent there exists any conflict among the terms and conditions of the DIP Loan Documents and this Interim Order, the terms and conditions of this Interim Order shall govern and control.

(b)     The DIP Loan Parties are hereby authorized to execute, deliver, enter into and perform all of their obligations under the DIP Loan Documents and perform such other acts as may be necessary, appropriate or desirable in connection therewith.

(c)     In furtherance of the foregoing and without further approval of this Court, each of the DIP Loan Parties are  authorized to, and the automatic stay imposed by section 362 of the Bankruptcy Code is hereby lifted solely to the extent necessary to, perform all acts and to make, execute, and deliver all instruments and documents (including, without limitation, the DIP Loan Documents) and, subject to the provisions of this Interim Order, to pay all DIP Obligations as and when such amounts become due and payable, including interest, fees, expenses and indemnities in connection with or that may be reasonably required or necessary for the DIP Loan Parties' performance of their obligations under the DIP LC Facility, including:

(i)     the execution and delivery of, and performance under, each of the DIP Loan Documents;

(ii)    the execution and delivery of, and performance under, one or more amendments, waivers, consents or other modifications to and under the DIP Loan Documents (in each case in accordance with the terms of the applicable DIP Loan Documents and in such form as the DIP Borrower and the DIP Secured Parties may reasonably agree), it being understood that no further approval of the Court shall be required for amendments, waivers, consents, or other modifications to and under the DIP Loan

8

Documents or the DIP Obligations that are not material or adverse to the Debtors;

(iii) the non-refundable payment to the Administrative Agent or the DIP Lenders or Issuing Banks, as the case may be, of all reasonable and documented fees and expenses payable under the DIP Loan Documents from time to time, whether arising prior to or after the Petition Date, including, for the avoidance of doubt, all reasonable and documented fees and expenses of counsel or professionals retained by the Administrative Agent and incurred in connection with the DIP LC Facility in accordance with the terms of the DIP LC Agreement and this Interim Order (the "Agent Professional Fees"), without the need to file retention motions or fee applications and consistent with the terms herein; and

(iv) the performance of all other acts required under or in connection with the DIP Loan Documents.

4. *DIP Obligations*. Upon execution and delivery of the DIP Loan Documents, the DIP Obligations shall constitute legal, valid, binding and non-avoidable obligations of the DIP Loan Parties enforceable against each of the DIP Loan Parties and their estates in accordance with their respective terms and this Interim Order, and any successors thereto, including any trustee appointed in the Chapter 11 Cases, or in any case under chapter 7 of the Bankruptcy Code upon conversion of any of these cases, or in any other proceedings superseding or related to any of the foregoing. The DIP Obligations shall include all reimbursement obligations, indemnities and fees and expenses (including letters of credit fees, draw fees, fronting fees, unused facility fees, and the Agent Professional Fees) and any other indebtedness or obligations, contingent or absolute, which may from time to time be owing by any of the DIP Loan Parties to the DIP Secured Parties under the DIP Loan Documents and this Interim Order. The DIP Loan Parties shall be jointly and severally liable for the DIP Obligations.

5. *DIP LC Facility*. Upon entry of this Interim Order, each Letter of Credit issued and outstanding, as of the Petition Date, under the *Fifth Amended and Restated Credit Agreement* dated as of October 27, 2021 among QVC, Inc. and QVC Global Corporate Holdings, LLC, as borrowers,

JPMorgan Chase Bank, N.A., as administrative agent, the lenders party thereto from time to time and the other parties thereto from time to time (as amended, restated or otherwise modified, the "Prepetition RCF Credit Agreement") and set forth on Schedule 1.01E of the DIP LC Agreement shall be automatically and without any further action by any party deemed outstanding under the DIP LC Facility (such existing letters of credit deemed to have been issued under the DIP LC Facility, collectively, "Continuing Letters of Credit"). Each Continuing Letter of Credit shall be deemed cancelled or otherwise retired under the Prepetition RCF Credit Agreement without any further obligation thereunder. Any Continuing Letter of Credit drawn fully or in part after the Petition Date but prior to the Closing Date shall be subject to the DIP Borrower's reimbursement obligations, which obligations shall be DIP Obligations, and shall be cash collateralized in accordance with the DIP Loan Documents. The Continuing Letters of Credit shall be deemed to constitute DIP Obligations, including, for the avoidance of doubt any and all fees, expenses, and other amounts payable in respect of such Continuing Letters of Credit (including any accrued and unpaid letter of credit fees, commitment fees, and/or fronting fees). The deemed issuance of such Continuing Letters of Credit under the DIP LC Facility as described in this paragraph 5 is indefeasible and is authorized as compensation for, in consideration for, as a necessary inducement for, and on account of the agreement of the Issuing Banks to replace, reissue, upsize, amend, extend, renew, and issue new Letters of Credit under the DIP LC Facility in accordance with the DIP Loan Documents and this Interim Order.

6.      *Cash Collateral.*   On the Closing Date and in accordance with the DIP Loan Documents, the DIP Loan Parties shall fund and maintain an amount of cash (such cash, the "DIP Collateral") in the LC Cash Collateral Account, which shall be interest-bearing and fully controlled by the Collateral Agent (as defined in the DIP LC Agreement) pursuant to documentation

10

reasonably satisfactory to the DIP Loan Parties and the Collateral Agent, equal at all times to $315 million in respect of Letters of Credit issued by the Issuing Banks and outstanding under the DIP LC Facility at any such time. The funding of the LC Cash Collateral Account shall be indefeasible, and irrevocable, and shall not be stayed, restrained, voidable, avoidable, or recoverable, under the Bankruptcy Code or under any applicable law (including under sections 502(d), 544, and 547 to 550 of the Bankruptcy Code or under any applicable state Uniform Voidable Transactions Act, Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, or similar statute or common law), or subject to any avoidance, reduction, setoff, recoupment, offset, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaim, cross-claim, defense, or any other challenge under the Bankruptcy Code or any applicable law or regulation by any person or entity.

7.      *DIP Liens*.   As security for the DIP Obligations, effective and automatically properly perfected on the date this Interim Order is entered, and without the necessity of execution, recordation or filing of any perfection document or instrument, or the possession or control by the DIP Secured Parties of, or over, any DIP Collateral, without any further action by the DIP Secured Parties, valid, binding, continuing, fully and automatically perfected, enforceable, non-avoidable, first priority senior security interests in and liens upon the DIP Collateral are hereby granted to the Administrative Agent for its own benefit and for the benefit of the other DIP Secured Parties (all such liens and security interests granted to the Administrative Agent, pursuant to this Interim Order and the DIP Loan Documents, the "DIP Liens"). For the avoidance of doubt, subject to the terms

of the DIP Loan Documents, no party other than the DIP Secured Parties shall have at any times any security interest in the DIP Collateral.

8.     *DIP Administrative Claims.*  Pursuant to section 364(b) of the Bankruptcy Code, all of the DIP Obligations relating to the DIP LC Facility shall constitute allowed administrative expense claims against the DIP Loan Parties (without the need to file any proof of claim), which allowed claims (the "DIP Administrative Claims") shall for purposes of section 1129(a)(9)(A) of the Bankruptcy Code be considered administrative expenses allowed under section 503(b) of the Bankruptcy Code, and which DIP Administrative Claims shall be payable from and have recourse to all prepetition and postpetition property of the DIP Loan Parties and all proceeds thereof.  All DIP Obligations, including, without limitation, the DIP Administrative Claims, shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that this Interim Order, or any provision hereof is vacated, reversed or modified, on appeal or otherwise.  To the extent any DIP Administrative Claim is not paid in accordance with the terms of the DIP Loan Documents, and notwithstanding anything to the contrary in section 362 of the Bankruptcy Code, the DIP Loan Parties shall be authorized without further notice to this Court to transfer cash in amount equal to such DIP Administrative Claim from the LC Cash Collateral Account.

9.     *Payment of Agent Professional Fees and QVC Restructuring Expenses.*  The DIP Loan Parties shall pay the Agent Professional Fees and, without duplication, the QVC Restructuring Expenses (as defined in the Plan), in each case, no later than five (5) business days (the "Review Period") after the receipt by counsel for the DIP Loan Parties, any statutory committee appointed in the Chapter 11 Cases, and the U.S. Trustee (the "Reviewing Parties") of each of the invoices therefor (the "Invoiced Fees") and without the necessity of filing formal fee applications, including any such amounts arising before the Petition Date.  Invoiced Fees shall be

in the form of an invoice summary for professional fees and categorized expenses incurred during the pendency of these Chapter 11 Cases, and such invoice summary shall not be required to contain time entries, but shall include a general, brief description of the nature of the matters for which services were performed, and which may be redacted or modified to the extent necessary to delete any information subject to the attorney-client privilege, any work product doctrine, privilege or protection, common interest doctrine privilege or protection, any other evidentiary privilege or protection recognized under applicable law, or any other confidential information, and the provision of such invoices shall not constitute any waiver of the attorney-client privilege, work product doctrine, privilege or protection, common interest doctrine privilege or protection, or any other evidentiary privilege or protection recognized under applicable law.  The Reviewing Parties may dispute the payment of any portion of the Invoiced Fees (the "Disputed Invoiced Fees") if, within the Review Period, a Reviewing Party notifies the submitting party in writing setting forth the specific objections to the Disputed Invoiced Fees (to be followed by the filing with the Court, if necessary, of a motion or other pleading, with at least ten (10) days prior written notice to the submitting party of any hearing on such motion or other pleading).  For avoidance of doubt, the DIP Loan Parties shall promptly pay in full all Invoiced Fees other than the Disputed Invoiced Fees.

10.    *Protection of DIP Secured Parties' Rights.*

(a)    The DIP Loan Parties shall not sell, transfer, lease, encumber or otherwise dispose of any portion of the DIP Collateral, except as otherwise permitted by the DIP Loan Documents.

(b)    *Events of Default & Remedies.*  Upon the occurrence of an Event of Default (as defined in the DIP LC Agreement) that has not been waived by the requisite DIP Secured

13

Parties, the Administrative Agent shall provide written notice (email correspondence being sufficient) (a "DIP Termination Notice") within  five (5) Business Days of such Event of Default (the "DIP Remedies Notice Period") to (a) the lead restructuring counsel to the Debtors, (b) lead counsel to the QVC Noteholder Group (as defined in the RSA), (c) any statutory committee appointed in these chapter 11 cases, and (d) the U.S. Trustee (collectively, the "Remedies Notice Parties"), that (i) declares the occurrence of a DIP Termination Event, (ii) terminates the DIP LC Facility and any DIP Loan Documents as to any future liability or obligation of the DIP Loan Parties but without affecting any of the DIP Obligations or the DIP Liens securing such DIP Obligations; (iii) declares all DIP Obligations to be immediately due and payable; (iv) terminates, reduces or restricts any further commitment to extend credit to the Debtors to the extent any such commitment remains under the DIP LC Facility; and (v) reimburses itself from the DIP Collateral for any drawn Letter of Credit and any fees and expenses thereon that have not been reimbursed by the DIP Loan Parties, in accordance with the terms of the DIP LC Agreement.; *provided,* that such DIP Remedies Notice Period may be extended with the consent of the Required DIP Lenders (including via e-mail).  The DIP Lenders shall be required to file a motion with the Court seeking emergency relief from the automatic stay (the "DIP Emergency Hearing") and the Court shall schedule an emergency hearing thereon at its earliest opportunity without the necessity of a motion to shorten.  Prior to the expiration of the DIP Remedies Notice Period, the Debtors and/or any Official Committee (if appointed) shall be entitled to seek an emergency hearing (solely to the extent such hearing is requested on an expedited basis) from the Court for the purpose of contesting whether an Event of Default has occurred and/or is continuing, and each of the DIP Lenders, the Debtors, and the Official Committee (if any), as applicable consent to such emergency hearing. At the DIP Emergency Hearing, the Court may fashion an appropriate remedy upon a

determination that an Event of Default has occurred and is continuing; provided that, other than with respect to exercise of any right set forth in clauses (i)-(v) in this paragraph 10(b), the automatic stay shall remain in effect until the Court has an opportunity to rule on the DIP Emergency Hearing. Upon entry of a final order at the DIP Emergency Hearing, any such reimbursement from the DIP Collateral shall be irreversible, irrevocable, non-avoidable and not subject to offset or other claims whatsoever.   During the DIP Remedies Notice Period, the DIP Borrower may not request any issuance, extension or increase to any Letters of Credit. As soon as reasonably practicable following receipt of a DIP Termination Notice, the Debtors shall file a copy of such notice on the docket.

11. *Payments Free and Clear*.  Any and all payments or proceeds remitted to the DIP Secured Parties pursuant to the provisions of this Interim Order, the DIP Loan Documents, or any subsequent order of the Court shall be irrevocable, received free and clear of any claim, charge, assessment or other liability.

12. *Preservation of Rights Granted Under This Interim Order.*

(a) Other than claims and liens expressly permitted by the DIP LC Agreement, (i) no claims having a priority superior to those granted by this Interim Order to the DIP Secured Parties and (ii) no liens shall be permitted on the DIP Collateral while any of the Letters of Credit or the DIP Obligations remain outstanding.

(b) Notwithstanding any order that may be entered dismissing any of the Chapter 11 Cases under section 1112 of the Bankruptcy Code or converting these Chapter 11 Cases to cases under chapter 7:  (i) the DIP Liens, the DIP Administrative Claims, and any claims related to the foregoing, shall continue in full force and effect and shall maintain their priorities as provided in this Interim Order until all Letters of Credit have been canceled, undrawn, the

15

commitments under the DIP LC Facility are terminated and all DIP Obligations shall have been paid in full in cash (and all such liens and claims shall, notwithstanding such dismissal, remain binding on all parties in interest); (ii) the other rights granted by this Interim Order shall not be affected; and (iii) this Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing the claims, liens, and security interests referred to in this paragraph and otherwise in this Interim Order.

(c)     If any or all of the provisions of this Interim Order are hereafter reversed, modified, vacated, or stayed, such reversal, modification, vacatur, or stay shall not affect: (i) the validity, priority or enforceability of any DIP Obligations (including contingent reimbursement obligations) incurred prior to the actual receipt of written notice by the DIP Secured Parties, of the effective date of such reversal, modification, vacatur, or stay; or (ii) the validity, priority or enforceability of the DIP Liens.  Notwithstanding any such reversal, modification, vacatur, or stay, any liens or claims granted to the DIP Secured Parties prior to the actual receipt of written notice by the DIP Secured Parties of the effective date of such reversal, modification, vacatur, or stay shall be governed in all respects by the original provisions of this Interim Order, and the DIP Secured Parties shall be entitled to, and are hereby granted, all the rights, remedies, privileges, and benefits arising under section sections 364(e) and 363(m) of the Bankruptcy Code and this Interim Order with respect to all DIP Obligations.

(d)     Except as expressly provided in this Interim Order or in the DIP Loan Documents, the DIP Liens, the DIP Obligations, DIP Administrative Claims and all other rights and remedies of the DIP Secured Parties granted by the provisions of this Interim Order and the DIP Loan Documents shall survive, and shall not be modified, impaired or discharged by: (i) the entry of an order converting any of the Chapter 11 Cases to a case under chapter 7 of the

Bankruptcy Code, dismissing any of the Chapter 11 Cases, or terminating the joint administration of these Chapter 11 Cases or by any other act or omission; (ii) the entry of an order approving the sale of any DIP Collateral pursuant to section 363(b) of the Bankruptcy Code; or (iii) the entry of an order confirming a chapter 11 plan in any of the Chapter 11 Cases; and, pursuant to section 1141(d)(4) of the Bankruptcy Code, the DIP Loan Parties have hereby waived any discharge as to any remaining DIP Obligations, as applicable.  The terms and provisions of this Interim Order shall continue in these Chapter 11 Cases, in any successor cases if these Chapter 11 Cases cease to be jointly administered and in any superseding chapter 7 cases under the Bankruptcy Code, and the DIP Liens, DIP Obligations, and DIP Administrative Claims and all other rights and remedies of the DIP Secured Parties, as applicable, shall continue in full force and effect until all Letters of Credit have been canceled, undrawn, the commitments under the DIP LC Facility are terminated and all DIP Obligations (including contingent reimbursement obligations) are indefeasibly paid in full in cash or, with respect to the DIP Obligations, otherwise satisfied in a manner agreed to by the DIP Secured Parties, as set forth herein and the DIP Loan Documents.

(e)       Notwithstanding anything herein to the contrary, the entry of this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly: (i) the DIP Secured Parties' rights to seek any other or supplemental relief in respect of the Debtors, or (ii) any rights of the DIP Secured Parties under the Bankruptcy Code or under non-bankruptcy law to (a) request modification of the Automatic Stay, (b) request dismissal of any of the Chapter 11 Cases or successor cases, (c) request conversion of any of the Chapter 11 Cases to cases under Chapter 7, (d) seek appointment of a chapter 11 trustee or examiner with expanded powers, (e) seek an injunction, (f) object to any sale of assets, or (g) propose a chapter 11 plan.  Other than as

17

expressly set forth in this Interim Order, any other rights, claims, and privileges (whether legal, equitable, or otherwise) of the DIP Secured Parties are fully preserved.

13.    *Citibank LC.*   Upon entry of this Order,  any amounts drawn under that certain Irrevocable Standby Letter of Credit No. 69635038 issued April 2, 2026 by Citibank N.A. ("Citibank") on account of QVC, Inc. (on behalf of HSN, Inc.) (the "Citibank LC") pursuant to that certain Agreement for Standby Letter of Credit (the "Citibank LC Agreement", and together with the Citibank LC, the "Citibank LC Documents") and all other obligations of the Debtors owing under or in respect of the Citibank LC Agreement, shall be deemed to be postpetition reimbursement obligations of QVC, Inc. and constitute allowed administrative expense claims against QVC, Inc. (without the need to file any proof of claim) with equal priority to the DIP Administrative Expense Claims granted hereunder (the "CB Administrative Expense Claims"). To the extent any CB Administrative Expense Claim is not paid within three (3) Business Days of such claim becoming due and payable pursuant to the Citibank LC Documents, and notwithstanding anything to the contrary in section 362 of the Bankruptcy Code, Citibank shall be authorized without further notice to this Court to transfer cash in amount equal to such CB Administrative Expense Claim from that certain cash collateral account, denominated as the QVC CBNA Cards Pledge Account A/C# 14696400, securing QVC, Inc.'s reimbursement obligations under the Citibank LC Documents (the "CB Cash Collateral Account"). Notwithstanding anything herein to the contrary, the entry of this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, Citibank's rights to seek any other or supplemental relief in respect of the Debtors. Without limiting any other obligations under the Citibank LC Documents, the Debtors shall reimburse the reasonable fees and expenses of counsel to Citibank

18

incurred in connection with the commencement of the Chapter 11 Cases and the entry of the DIP Orders, all in an amount not to exceed $75,000.

14.     *No Waiver for Failure to Seek Relief.*  The failure or delay of the DIP Secured Parties to seek relief or otherwise exercise their respective rights and remedies under this Interim Order, the DIP Documents, or applicable law, as the case may be, shall not constitute a waiver of their respective rights hereunder, thereunder, or otherwise.  No delay on the part of any party in the exercise of any right or remedy under this Interim Order shall preclude any other or further exercise of any such right or remedy or the exercise of any other right or remedy.

15.     *Binding Effect; Successors and Assigns.*  The DIP Loan Documents and the provisions of this Interim Order, including all findings herein, shall be binding upon all parties in interest in these Chapter 11 Cases, including, without limitation, the DIP Secured Parties, any statutory or non-statutory committees appointed or formed in these Chapter 11 Cases, the Debtors and their respective successors and assigns (including any chapter 7 or chapter 11 trustee hereinafter appointed or elected for the estate of any of the Debtors, an examiner appointed pursuant to section 1104 of the Bankruptcy Code, or any other fiduciary appointed as a legal representative of any of the Debtors or with respect to the property of the estate of any of the Debtors) and shall inure to the benefit of the DIP Secured Parties and the Debtors and their respective successors and assigns; *provided* that, except to the extent expressly set forth in this Interim Order, the DIP Secured Parties shall have no obligation to extend any financing to, any chapter 7 trustee, chapter 11 trustee or similar responsible person appointed for the estates of the Debtors.

16.     *No Requirement to File Claim for DIP Obligations.*  Notwithstanding anything to the contrary contained in any prior or subsequent order of the Court, including, without limitation,

any order establishing a deadline for the filing of proofs of claim or requests for payment of administrative expenses under section 503(b) of the Bankruptcy Code, the DIP Secured Parties shall not be required to file any proof of claim with respect to any of the DIP Obligations, all of which shall be due and payable in accordance with the DIP Loan Documents without the necessity of filing any such proof of claim or request for payment of administrative expenses, and the failure to file any such proof of claim or request for payment of administrative expenses shall not affect the validity, priority, or enforceability of any of the DIP Loan Documents or of any indebtedness, liabilities, or obligations arising at any time thereunder or prejudice or otherwise adversely affect the DIP Secured Parties' rights, remedies, powers, or privileges under any of the DIP Loan Documents, this Interim Order, or applicable law.  The provisions set forth in this paragraph are intended solely for the purpose of administrative convenience and shall not affect the substantive rights of any party-in-interest or their respective successors-in-interest.

17.     *Notice.*  Notwithstanding Bankruptcy Rule 2002(a)(2), to the extent applicable, the Debtors may limit service of the Motion only to the core service list and affected creditors.  Notice of the Motion as provided therein shall be deemed good and sufficient notice of such Motion, and the requirements of Bankruptcy Rule 6004(a), the Bankruptcy Local Rules, and the Complex Case Procedures are satisfied by such notice.

18.     *Effectiveness*.  This Interim Order shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and shall take effect and be enforceable immediately upon entry of this Interim Order.  Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062, or 9014 of the Bankruptcy Rules or any Bankruptcy Local Rule, or Rule 62(a) of the Federal Rules of Civil Procedure, this Interim Order shall be immediately effective and enforceable upon its entry and there shall be no stay of execution or effectiveness of this Interim Order.

19.     *Governing Order*.  In the event of any inconsistency between the provisions of this Interim Order or the DIP Loan Documents, the provisions of this Interim Order shall govern. Notwithstanding the relief granted in any other order by this Court, (i) all payments and actions by any of the Debtors pursuant to the authority granted therein shall be subject to this Interim Order and all terms and conditions hereof, and (ii) to the extent there is any inconsistency between the terms of such other order and this Interim Order or the DIP Loan Documents, this Interim Order shall control, in each case, except to the extent expressly provided otherwise in such other order.

20.     *Headings*.  Section headings used herein are for convenience only and are not to affect the construction of or to be taken into consideration in interpreting this Interim Order.

21.     *Bankruptcy Rules*.  The requirements of Bankruptcy Rules 4001, 6003 and 6004, in each case to the extent applicable, are satisfied by the contents of the Motion.

22.     *No Third-Party Rights*.  Except as explicitly provided for herein, this Interim Order does not create any rights for the benefit of any third party, creditor, equity holder or any direct, indirect or incidental beneficiary.

23.     *Retention of Jurisdiction*.  The Court shall retain jurisdiction to enforce the provisions of this Interim Order, and this retention of jurisdiction shall survive the confirmation and consummation of any chapter 11 plan for any one or more of the Debtors notwithstanding the terms or provisions of any such chapter 11 plan or any order confirming any such chapter 11 plan.

24.     The Debtors shall promptly serve copies of this Interim Order (which shall constitute adequate notice of the Final Hearing) to the parties having been given notice of the Interim Hearing and to any party that has filed a request for notices with this Court as of the date hereof.

Signed: April 17, 2026

Alfredo R Pérez
United States Bankruptcy Judge

**Exhibit A**

**DIP LC Agreement**

**Execution Version**

$300,000,000
DEBTOR-IN-POSSESSION LETTER OF CREDIT FACILITY AGREEMENT

Dated as of April 17, 2026,

among

QVC, INC.,

as Borrower,

THE LENDERS PARTY HERETO,

and

JPMORGAN CHASE BANK, N.A.,
as Administrative Agent

JPMORGAN CHASE BANK, N.A.,
as Lead Arranger and Bookrunner

4877-7275-1721.6

**TABLE OF CONTENTS**

Page

ARTICLE I
Definition

SECTION 1.01.    Defined Terms..................................................................................................6

SECTION 1.02.    [Reserved] .....................................................................................................31

SECTION 1.03.    Certain Calculations................................................ **Error! Bookmark not defined.**

SECTION 1.04.    Terms Generally.............................................................................................31

SECTION 1.05.    Accounting Terms; GAAP ............................................................................32

SECTION 1.06.    Change of Currency .......................................................................................32

SECTION 1.07.    Exchange Rates; Currency Equivalents ................... **Error! Bookmark not defined.**

SECTION 1.08.    Interest Rates; Benchmark Notification .......................................................32

SECTION 1.09.    Divisions ........................................................................................................33

SECTION 1.10.    [Reserved] .....................................................................................................33

SECTION 1.11.    [Reserved] .....................................................................................................33

ARTICLE II
The Credits

SECTION 2.01.    [Reserved]. .....................................................................................................33

SECTION 2.02.    [Reserved] .....................................................................................................33

SECTION 2.03.    [Reserved] .....................................................................................................33

SECTION 2.04.    [Reserved] .....................................................................................................33

SECTION 2.05.    [Reserved] .....................................................................................................33

SECTION 2.06.    Termination and Reduction of Commitments...............................................33

SECTION 2.07.    [Reserved] .....................................................................................................34

SECTION 2.08.    Prepayments ...................................................................................................34

SECTION 2.09.    Fees ................................................................................................................34

SECTION 2.10.    Interest............................................................................................................35

SECTION 2.11.    Alternative Rate of Interest ...........................................................................35

SECTION 2.12.    Increased Costs...............................................................................................37

SECTION 2.13.    [Reserved] .....................................................................................................38

SECTION 2.14.    Taxes ..............................................................................................................38

SECTION 2.15.    Pro Rata Treatment and Payments .................................................................38

SECTION 2.16.    Mitigation Obligations; Replacement of Issuing Banks................................42

SECTION 2.17.    Letters of Credit .............................................................................................43

SECTION 2.18.    Defaulting Issuing BankIssuing Banks ..........................................................46

SECTION 2.19.    [Reserved]. .....................................................................................................48

i

SECTION 2.20.    [Reserved] ....................................................................................................... 48

ARTICLE III
Representations and Warranties

SECTION 3.01.    Organization; Powers ...................................................................................... 48

SECTION 3.02.    Authorization; Enforceability........................................................................... 48

SECTION 3.03.    Governmental Approvals; No Conflicts............................................................ 48

SECTION 3.04.    Financial Position............................................................................................. 49

SECTION 3.05.    Properties ............................................................... **Error! Bookmark not defined.**

SECTION 3.06.    Litigation and Environmental Matters .............................................................. 49

SECTION 3.07.    Compliance with Laws and Agreements.................. **Error! Bookmark not defined.**

SECTION 3.08.    Investment Company Status............................................................................. 49

SECTION 3.09.    Taxes ..................................................................... **Error! Bookmark not defined.**

SECTION 3.10.    ERISA .................................................................... **Error! Bookmark not defined.**

SECTION 3.11.    Disclosure........................................................................................................ 49

SECTION 3.12.    Security Documents ......................................................................................... 49

SECTION 3.13.    Material Domestic Subsidiaries .............................. **Error! Bookmark not defined.**

SECTION 3.14.    Existing Liens.................................................................................................. 49

SECTION 3.15.    Anti-Corruption Laws, Anti-Money Laundering Laws and Sanctions ................... 50

SECTION 3.16.    Affected Financial Institution ......................................................................... 50

SECTION 3.17.    Margin Regulation ......................................................................................... 50

SECTION 3.18.    Orders.................................................................... **Error! Bookmark not defined.**

SECTION 3.19.    Bankruptcy Matters........................................................................................ 50

ARTICLE IV
Conditions

SECTION 4.01.    Closing Date.................................................................................................... 50

SECTION 4.02.    Each Credit Event ........................................................................................... 52

ARTICLE V
Affirmative Covenants

SECTION 5.01.    Financial Statements; Other Information ................. **Error! Bookmark not defined.**

SECTION 5.02.    Notices of Material Events............................................................................... 54

SECTION 5.03.    Existence; Conduct of Business....................................................................... 54

SECTION 5.04.    Payment of Obligations........................................... **Error! Bookmark not defined.**

SECTION 5.05.    Maintenance of Properties; Insurance ..................... **Error! Bookmark not defined.**

SECTION 5.06.    Books and Records; Inspection Rights..................... **Error! Bookmark not defined.**

SECTION 5.07.    Compliance with Laws............................................ **Error! Bookmark not defined.**

SECTION 5.08.    Use of Proceeds.............................................................................................. 54

SECTION 5.09.    Additional Guarantors and Collateral ...................... **Error! Bookmark not defined.**

ii

SECTION 5.10.   Post-Closing Covenant ............................................................................ 55

SECTION 5.11.   Additional Chapter 11 Reporting ............................ **Error! Bookmark not defined.**

SECTION 5.12.   Cash Management .................................................. **Error! Bookmark not defined.**

## ARTICLE VI
### Negative Covenants

SECTION 6.01.   [Reserved] ................................................................................................ 55

SECTION 6.02.   Liens ...................................................................... **Error! Bookmark not defined.**

SECTION 6.03.   [Reserved] ................................................................................................ 55

SECTION 6.04.   Disposition of Property ............................................................................ 55

SECTION 6.05.   [Reserved] ................................................................................................ 55

SECTION 6.06.   [Reserved] ................................................................................................ 55

SECTION 6.07.   [Reserved] ................................................................................................ 55

SECTION 6.08.   [Reserved] ................................................................................................ 55

SECTION 6.09.   Clauses Restricting Subsidiary Distributions ........... **Error! Bookmark not defined.**

SECTION 6.10.   [Reserved] ................................................................................................ 55

SECTION 6.11.   [Reserved] ................................................................................................ 55

SECTION 6.12.   Use of Proceeds ........................................................................................ 55

SECTION 6.13.   Chapter 11 Modifications .......................................................................... 56

SECTION 6.14.   Cash Collateral; DIP Financings ............................................................... 56

## ARTICLE VII
### Events of Default

SECTION 7.01.   ................................................................................................................. 56

## ARTICLE VIII
### The Administrative Agent

SECTION 8.01.   Appointment and Authorization ................................................................ 59

SECTION 8.02.   Administrative Agent and Affiliates .......................................................... 59

SECTION 8.03.   Action by Administrative Agent ............................................................... 59

SECTION 8.04.   Consultation with Experts ......................................................................... 60

SECTION 8.05.   Delegation of Duties ................................................................................. 60

SECTION 8.06.   Successor Administrative Agent ................................................................ 60

SECTION 8.07.   Credit Decision ......................................................................................... 61

SECTION 8.08.   Lead Arrangers; Bookrunners: Syndication Agents; Documentation Agents .......... 61

SECTION 8.09.   Certain ERISA Matters .............................................................................. 61

SECTION 8.10.   Acknowledgements of Issuing Banks ....................................................... 62

    ................................................................................................................................. 62

## ARTICLE IX
### Miscellaneous

SECTION 9.01.    Notices .................................................................................................... 63

SECTION 9.02.    Waivers; Amendments ................................................................................ 66

SECTION 9.03.    [Reserved] ................................................................................................. 67

SECTION 9.04.    Expenses; Indemnity; Damage Waiver ..................................................... 67

SECTION 9.05.    Successors and Assigns .............................................................................. 68

SECTION 9.06.    Survival ...................................................................................................... 71

SECTION 9.07.    Counterparts: Integration: Effectiveness .................................................. 72

SECTION 9.08.    Severability ................................................................................................ 72

SECTION 9.09.    Right of Setoff ........................................................................................... 72

SECTION 9.10.    Governing Law; Jurisdiction; Consent to Service of Process .................. 72

SECTION 9.11.    WAIVER OF JURY TRIAL ...................................................................... 73

SECTION 9.12.    Headings ..................................................................................................... 73

SECTION 9.13.    Confidentiality ........................................................................................... 73

SECTION 9.14.    Judgment Currency .................................................................................... 74

SECTION 9.15.    USA PATRIOT Act ................................................................................... 75

SECTION 9.16.    Releases of Guarantees and Liens .............................................................. 75

SECTION 9.17.    No Advisory or Fiduciary Responsibility .................................................. 75

SECTION 9.18.    Acknowledgement and Consent to Bail-In of Affected Financial Institutions ........ 76

SECTION 9.19.    [Reserved] ................................................................................................. 76

SECTION 9.20.    [Reserved] ................................................................................................. 76

SECTION 9.21.    Acknowledgement Regarding Any Supported QFCs ............................... 76

SECTION 9.22.    [Orders Control. ........................................................................................ 77

SCHEDULES:

Schedule 1.01A   --   Commitments
Schedule 1.01D   --   Material Domestic Subsidiaries
Schedule 1.01E   --   Existing Letters of Credit
Schedule 5.10    --   Post-Closing Requirements

EXHIBITS:

Exhibit A      --   Form of Assignment and Assumption
Exhibit B      --   [Reserved]
Exhibit C      --   [Reserved]
Exhibit D      --   [Reserved]
Exhibit E      --   Form of Certificate
Exhibit F-1    --   [Reserved]

iv

4877-7275-1721.6

Exhibit F-2    --  [Reserved]
Exhibit F-3    --  [Reserved]
Exhibit G      --  Form of U.S. Tax Compliance Certificate
Exhibit H      --  Form of Subsidiary Guarantee
Exhibit I      --  [Reserved]

4877-7275-1721.6

DEBTOR IN POSSESSION LETTER OF CREDIT FACILITY AGREEMENT, dated as of April 17, 2026 (as amended, supplemented or otherwise modified from time to time, this "Agreement"), among QVC, INC., a Delaware corporation ("QVC"), the LENDERS party hereto from time to time and JPMORGAN CHASE BANK, N.A., as administrative agent (in such capacity, the "Administrative Agent") and an Issuing Bank, and the other Issuing Banks party hereto.

WHEREAS, on April 16, 2026 (the "Petition Date"), the Borrower and certain direct and indirect Subsidiaries of the Borrower and Affiliates of the Borrower (each such entity that commences a Chapter 11 Case, a "Chapter 11 Debtor" and collectively, the "Chapter 11 Debtors") filed voluntary petitions with the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court") initiating their respective jointly administered cases under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") (Case No. 26-90447) (collectively, the "Chapter 11 Cases"), and each Chapter 11 Debtor has continued and is continuing in the possession of its assets and management of its business pursuant to Sections 1107 and 1108 of the Bankruptcy Code; and

WHEREAS, the Borrower have requested that the Lenders extend credit in the form of Letters of Credit at any time and from time to time during the Commitment Period, in an aggregate principal amount at any time outstanding not to exceed $300,000,000 for the continued operation of the Borrower's and its subsidiaries' businesses (including to backstop, roll or replace any Existing Letters of Credit) during the pendency of the Chapter 11 Cases, subject to the terms and conditions set forth in this Agreement and the DIP Order;

NOW, THEREFORE, the Lenders are willing to extend such credit to the Borrower on the terms and subject to the conditions set forth herein and the DIP Order. Accordingly, the parties hereto hereby agree as follows:

ARTICLE I

Definition

SECTION 1.01.    Defined Terms. As used in this Agreement, the following terms have the meanings specified below:

"Act" has the meaning specified in Section 9.15.

"Adjusted Term SOFR Rate" means an interest rate per annum equal to (a) the Term SOFR Rate for such Interest Period; provided that if the Adjusted Term SOFR Rate as so determined would be less than the 0.00%, such rate shall be deemed to be equal to 0.00% for the purposes of this Agreement.

"Administrative Agent" means JPMorgan Chase Bank, N.A. in its capacity as administrative agent for the Lenders hereunder and, as applicable, as Collateral Agent.

"Administrative Questionnaire" means an Administrative Questionnaire in a form supplied by the Administrative Agent.

"Affected Financial Institution" means (a) any EEA Financial Institution or (b) any UK Financial Institution.

"Affiliate" means, with respect to a specified Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified; provided, that such specified Person shall not be deemed to be an Affiliate of any

6

other Person solely because they share one or more common members of their respective board of managers, board of directors or other controlling governing body.

"Affiliated Persons" mean, with respect to any specified Person, (a) such specified Person's parents, spouse, siblings, descendants, step children, step grandchildren, nieces and nephews and their respective spouses, (b) the estate, legatees and devisees of such specified Person and each of the Persons referred to in clause (a) and in the event of the incompetence or death of any of the persons described in clause (a), such person's executor, administrator, committee or other personal representative or similar fiduciary, (c) any trusts or private foundations created primarily for the benefit of, or controlled at the time of creation by, any of the persons described in the above clause (a) or (b) of this definition, or any trusts or private foundations created primarily for the benefit of any such trust or private foundation or for charitable purposes, and (d) any company, partnership, trust or other entity or investment vehicle Controlled by any of the Persons referred to in clause (a), (b), (c) or the holdings of which are for the primary benefit of any of such Persons.

"Agent Party" means the Administrative Agent, the Issuing Banks, or any other Lender.

"Agreement Currency" has the meaning specified in Section 9.14.

"Agreed Currency" means Dollars.

"Alternate Base Rate" means, for any day, a rate per annum equal to the greatest of (a) the Prime Rate in effect on such day, (b) the NYFRB Rate in effect on such day plus ½ of 1% and (c) the Adjusted Term SOFR Rate for a one month Interest Period as published two U.S. Government Securities Business Days prior to such day (or if such day is not a U.S. Government Securities Business Day, the immediately preceding U.S. Government Securities Business Day) plus 1%; provided that for the purpose of this definition, the Adjusted Term SOFR Rate for any day shall be based on the Term SOFR Reference Rate at approximately 5:00 a.m. Chicago time on such day (or any amended publication time for the Term SOFR Reference Rate, as specified by the CME Term SOFR Administrator in the Term SOFR Reference Rate methodology). Any change in the Alternate Base Rate due to a change in the Prime Rate, the NYFRB Rate or the Adjusted Term SOFR Rate shall be effective from and including the effective date of such change in the Prime Rate, the NYFRB Rate or the Adjusted Term SOFR Rate, respectively. If the Alternate Base Rate is being used as an alternate rate of interest pursuant to Section 2.11 (for the avoidance of doubt, only until the Benchmark Replacement has been determined pursuant to Section 2.11(b)), then the Alternate Base Rate shall be the greater of clauses (a) and (b) above and shall be determined without reference to clause (c) above. Notwithstanding the foregoing, if the Alternate Base Rate as determined pursuant to the foregoing would be less than 1.00%, such rate shall be deemed to be 1.00% for purposes of this Agreement.

"Anti-Corruption Laws" means, with respect to any Person, all laws, rules and regulations of any jurisdiction applicable to such Person or its Affiliates from time to time concerning or relating to bribery or corruption.

"Anti-Money Laundering Laws" means, with respect to any Person, all laws, rules and regulations of any jurisdiction applicable to such Person or its Affiliates from time to time concerning or relating to money laundering.

"Applicable Rate" means 2.50 % per annum.

"Approved Fund" has the meaning assigned to such term in Section 9.05.

7

"Assignment and Assumption" means an assignment and assumption entered into by a Lender and an assignee (with the consent of any party whose consent is required by Section 9.05), and accepted by the Administrative Agent, in the form of Exhibit A or any other form approved by the Administrative Agent and the Borrower (such approval of the Borrower not to be unreasonably withheld or delayed).

"Available Tenor" means, as of any date of determination and with respect to the then-current Benchmark for the Agreed Currency, as applicable, any tenor for such Benchmark (or component thereof) or payment period for interest calculated with reference to such Benchmark (or component thereof), as applicable, that is or may be used for determining the length of an Interest Period for any term rate or otherwise, for determining any frequency of making payments of interest calculated pursuant to this Agreement as of such date and not including, for the avoidance of doubt, any tenor for such Benchmark that is then-removed from the definition of "Interest Period" pursuant to clause (f) of Section 2.11.

"Bail-In Action" means the exercise of any Write-Down and Conversion Powers by the applicable Resolution Authority in respect of any liability of an Affected Financial Institution.

"Bail-In Legislation" means (a) with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law, regulation rule or requirement for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule and (b) with respect to the United Kingdom, Part I of the United Kingdom Banking Act 2009 (as amended from time to time) and any other law, regulation or rule applicable in the United Kingdom relating to the resolution of unsound or failing banks, investment firms or other financial institutions or their affiliates (other than through liquidation, administration or other insolvency proceedings).

"Banking Services" means each and any of the following bank services provided to the Borrower or any of its subsidiaries by any Lender or any Affiliate of any Lender: (a) commercial credit cards, other commercial cards, purchase cards and merchant card services, (b) stored value cards, (c) treasury management services or other payment services (including, without limitation, electronic payment service, controlled disbursement, automated clearinghouse transactions, return items, overdrafts and interstate depository network services).

"Bankruptcy Code" has the meaning set forth in the recitals.

"Bankruptcy Court" has the meaning set forth in the recitals.

"Bankruptcy Event" means, with respect to any Lender, such Lender or any other Person as to which such Lender is a subsidiary (a "Parent Company") (i) is adjudicated as, or determined by any Governmental Authority having regulatory authority over it or its assets to be, insolvent, (ii) becomes the subject of a bankruptcy or insolvency proceeding, or the Administrative Agent has given written notice to such Lender and the Borrower of its good faith determination that such Lender or its Parent Company has taken any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any such proceeding or (iii) has had a receiver, conservator, trustee, administrator, custodian, assignee for the benefit of creditors or similar Person charged with the reorganization or liquidation of its business appointed for it, or the Administrative Agent has given written notice to such Lender and the Borrower of its good faith determination that such Lender or its Parent Company has taken any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any such appointment; provided that a Bankruptcy Event shall not result solely by virtue of any control of or ownership interest in, or the acquisition of any control of or ownership interest in, such Lender or its Parent Company by a Governmental Authority as long as such control or ownership interest does not result in or provide such Lender or its Parent Company with

8

immunity from the jurisdiction of courts within the United States or from the enforcement of judgments or writs of attachment on its assets or permit such Lender or its Parent Company (or such Governmental Authority) to reject, repudiate, disavow or disaffirm such Lender 's obligations under this Agreement.

"Basel III" has the meaning assigned to such term in the definition of Change in Law.

"Benchmark" means, initially, the Relevant Rate for the Agreed Currency; provided that if a Benchmark Transition Event and its related Benchmark Replacement Date have occurred with respect to the applicable Relevant Rate or the then-current Benchmark for such Agreed Currency, then "Benchmark" means the applicable Benchmark Replacement to the extent that such Benchmark Replacement has replaced such prior benchmark rate pursuant to clause (b) of Section 2.11.

"Benchmark Replacement" means, for any Available Tenor, the first alternative set forth in the order below that can be reasonably determined by the Administrative Agent in consultation with the Borrower for the applicable Benchmark Replacement Date:

(1)    [reserved];

(2)    the sum of: (a) the alternate benchmark rate that has been selected by the Administrative Agent and the Borrower as the replacement for the then-current Benchmark for the applicable Corresponding Tenor giving due consideration to (i) any selection or recommendation of a replacement benchmark rate or the mechanism for determining such a rate by the Relevant Governmental Body or (ii) any evolving or then-prevailing market convention for determining a benchmark rate as a replacement for the then-current Benchmark for syndicated credit facilities denominated in the applicable Agreed Currency at such time in the United States and (b) the related Benchmark Replacement Adjustment;

If the Benchmark Replacement as determined pursuant to clause (1) or (2) above would be less than the Floor, the Benchmark Replacement will be deemed to be the Floor for the purposes of this Agreement and the other Loan Documents

"Benchmark Replacement Adjustment" means, with respect to any replacement of the then-current Benchmark with an Unadjusted Benchmark Replacement for any applicable Interest Period and Available Tenor for any setting of such Unadjusted Benchmark Replacement, the spread adjustment, or method for calculating or determining such spread adjustment, (which may be a positive or negative value or zero) that has been selected by the Administrative Agent and the Borrower for the applicable Corresponding Tenor giving due consideration to (i) any selection or recommendation of a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of such Benchmark with the applicable Unadjusted Benchmark Replacement by the Relevant Governmental Body on the applicable Benchmark Replacement Date and/or (ii) any evolving or then-prevailing market convention for determining a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of such Benchmark with the applicable Unadjusted Benchmark Replacement for syndicated credit facilities denominated in the Agreed Currency at such time.

"Benchmark Replacement Conforming Changes" means, with respect to any Benchmark Replacement, any technical, administrative or operational changes (including changes to the definition of "Alternate Base Rate," the definition of "Business Day," the definition of "Interest Period," timing and frequency of determining rates and making payments of interest, timing of borrowing requests or prepayment, conversion or continuation notices, length of lookback periods, the applicability of breakage provisions, and other technical, administrative or operational matters) that the Administrative Agent (or, for purposes of clause (2) of the definition of "Benchmark Replacement", the Administrative Agent and the Borrower) decides may be appropriate in consultation with the Borrower to reflect the adoption and

9

implementation of such Benchmark Replacement (provided that any such change that is not substantially consistent with both (x) market practice and (y) other syndicated credit facilities for similarly situated borrowers denominated in the same currency as the Facility shall be reasonably determined by the Administrative Agent and the Borrower) and to permit the administration thereof by the Administrative Agent in a manner substantially consistent with both (x) market practice and (y) other syndicated credit facilities for similarly situated borrowers denominated in the same currency as this Agreement (or, if the Administrative Agent reasonably determines, in consultation with the Borrower, that adoption of any portion of such market practice is not administratively feasible or if the Administrative Agent reasonably determines in consultation with the Borrower that no market practice for the administration of such Benchmark Replacement exists, in such other manner of administration as the Administrative Agent and the Borrower reasonably determine are reasonably necessary in connection with the administration of this Agreement and the other Loan Documents).

"Benchmark Replacement Date" means, with respect to any Benchmark, the earliest to occur of the following events with respect to such then-current Benchmark:

(1)     in the case of clause (1) or (2) of the definition of "Benchmark Transition Event," the later of (a) the date of the public statement or publication of information referenced therein and (b) the date on which the administrator of such Benchmark (or the published component used in the calculation thereof) permanently or indefinitely ceases to provide all Available Tenors of such Benchmark (or such component thereof); or

(2)     in the case of clause (3) of the definition of "Benchmark Transition Event," the date on which such Benchmark (or the published component used in the calculation thereof) has been determined and announced by the regulatory supervisor for the administrator of such Benchmark (or such component thereof) to be no longer representative; provided, that such non-representativeness will be determined by reference to the most recent statement or publication referenced in such clause (3) and even if any Available Tenor of such Benchmark (or such component thereof) continues to be provided on such date.

For the avoidance of doubt, (i) if the event giving rise to the Benchmark Replacement Date occurs on the same day as, but earlier than, the Reference Time in respect of any determination, the Benchmark Replacement Date will be deemed to have occurred prior to the Reference Time for such determination and (ii) the "Benchmark Replacement Date" will be deemed to have occurred in the case of clause (1) or (2) with respect to any Benchmark upon the occurrence of the applicable event or events set forth therein with respect to all then-current Available Tenors of such Benchmark (or the published component used in the calculation thereof).

"Benchmark Transition Event" means, with respect to any Benchmark, the occurrence of one or more of the following events with respect to such then-current Benchmark:

(1) a public statement or publication of information by or on behalf of the administrator of such Benchmark (or the published component used in the calculation thereof) announcing that such administrator has ceased or will cease to provide all Available Tenors of such Benchmark (or such component thereof), permanently or indefinitely, provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide any Available Tenor of such Benchmark (or such component thereof);

(2) a public statement or publication of information by the regulatory supervisor for the administrator of such Benchmark (or the published component used in the calculation thereof), the Federal Reserve Board, the NYFRB, the CME Term SOFR Administrator, the central bank for the Agreed Currency

10

applicable to such Benchmark, an insolvency official with jurisdiction over the administrator for such Benchmark (or such component), a resolution authority with jurisdiction over the administrator for such Benchmark (or such component) or a court or an entity with similar insolvency or resolution authority over the administrator for such Benchmark (or such component), in each case, which states that the administrator of such Benchmark (or such component) has ceased or will cease to provide all Available Tenors of such Benchmark (or such component thereof) permanently or indefinitely; *provided* that, at the time of such statement or publication, there is no successor administrator that will continue to provide any Available Tenor of such Benchmark (or such component thereof); or

(3) a public statement or publication of information by the regulatory supervisor for the administrator of such Benchmark (or the published component used in the calculation thereof) announcing that all Available Tenors of such Benchmark (or such component thereof) are no longer, or as of a specified future date will no longer be, representative.

"Benchmark Unavailability Period" with respect to any Benchmark, the period (if any) (x) beginning at the time that a Benchmark Replacement Date pursuant to clauses (1) or (2) of that definition has occurred if, at such time, no Benchmark Replacement has replaced such then-current Benchmark for all purposes hereunder and under any Loan Document in accordance with Section 2.11 and (y) ending at the time that a Benchmark Replacement has replaced such then-current Benchmark for all purposes hereunder and under any Loan Document in accordance with Section 2.11.

"beneficial owner" shall be determined in accordance with Rule 13d-3 and Rule 13d-5 under the Exchange Act, as in effect on the Closing Date.  "Beneficially own," "beneficially owned" and "beneficial ownership" have meanings correlative to that of beneficial owner.

"Beneficial Ownership Certification" means a certification regarding beneficial ownership or control as required by the Beneficial Ownership Regulation.

"Beneficial Ownership Regulation" means 31 C.F.R. § 1010.230.

"Benefit Plan" means any of (a) an "employee benefit plan" (as defined in Section 3(3) of ERISA) that is subject to Title I of ERISA, (b) a "plan" as defined in Section 4975 of the Code to which Section 4975 of the Code applies, and (c) any Person whose assets include (for purposes of the Plan Asset Regulations or otherwise for purposes of Title I of ERISA or Section 4975 of the Code) the assets of any such "employee benefit plan" or "plan".

"BHC Act Affiliate" of a party means an "affiliate" (as such term is defined under, and interpreted in accordance with, 12 U.S.C. 1841(k)) of such party.

"Board" means the Board of Governors of the Federal Reserve System of the United States of America.

"Borrower" means QVC, Inc., a Delaware corporation.

"Business Day" means, any day that is not a Saturday, Sunday or other day on which commercial banks in New York City are authorized or required by law to remain closed.

"Capital Lease Obligations" of any Person means the obligations of such Person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations are required to be classified and accounted for as capital leases on a balance sheet of such Person under GAAP, and the amount of such obligations shall be

11

the capitalized amount thereof determined in accordance with GAAP; <u>provided</u> that, unless such Person elects otherwise, any obligations of any Person that are or would be characterized as operating lease obligations in accordance with GAAP on December 31, 2018 (whether or not such operating lease obligations were in effect on such date) shall be accounted for as operating lease obligations (and not as Capital Lease Obligations) for purposes of this Agreement regardless of any change in GAAP following such date that would otherwise require such obligations to be recharacterized (on a prospective or retroactive basis or otherwise) as Capital Lease Obligations.

"<u>Cash Equivalents</u>" means (a) marketable direct obligations issued by, or unconditionally guaranteed by, the United States Government or issued by any agency thereof and backed by the full faith and credit of the United States, in each case maturing within one year from the date of acquisition; (b) certificates of deposit, time deposits, eurodollar time deposits or overnight bank deposits having maturities of six months or less from the date of acquisition issued by any Lender or by any commercial bank organized under the laws of the United States or any state thereof; (c) commercial paper of an issuer rated at least A-1 by Standard & Poor's or P-1 by Moody's at the date of acquisition, or carrying an equivalent rating by a nationally recognized rating agency, if both of the two named rating agencies cease publishing ratings of commercial paper issuers generally, and maturing within six months from the date of acquisition; (d) repurchase obligations of any Lender or of any commercial bank satisfying the requirements of clause (b) of this definition, having a term of not more than 30 days, with respect to securities issued or fully guaranteed or insured by the United States government; (e) securities with maturities of one year or less from the date of acquisition issued or fully guaranteed by any state, commonwealth or territory of the United States, by any political subdivision or taxing authority of any such state, commonwealth or territory or by any foreign government, the securities of which state, commonwealth, territory, political subdivision, taxing authority or foreign government (as the case may be) are rated at least A by Standard & Poor's or A by Moody's at the date of acquisition; (f) securities with maturities of six months or less from the date of acquisition backed by standby letters of credit issued by any Lender or any commercial bank satisfying the requirements of clause (b) of this definition; (g) money market mutual or similar funds at least 95% of the assets of which constitute Cash Equivalents of the kinds described in clauses (a) through (f) of this definition; (h) money market funds that (i) comply with the criteria set forth in SEC Rule 2a-7 under the Investment Company Act of 1940, as amended, (ii) are rated AAA by Standard & Poor's or Aaa by Moody's at the date of acquisition and (iii) have portfolio assets of at least $5,000,000,000; and (i) in the case of any Foreign Subsidiary, (x) investments substantially comparable to any of the foregoing investments with respect to the country in which such Foreign Subsidiary is organized and (y) other short term investments utilized by Foreign Subsidiaries in accordance with normal investment practices for cash management in such foreign jurisdiction.

"<u>Cash Management Order</u>" means one or more orders of the Bankruptcy Court, including any interim and/or final orders, entered in the Chapter 11 Cases, together with all extensions, modifications and amendments thereto, in form and substance reasonably satisfactory to the Administrative Agent and Required Lenders, which, among other matters, authorizes the Chapter 11 Debtors to maintain their existing cash management system.

"<u>Cash Management Services Agreement</u>" means any agreement with respect to Banking Services.

"<u>Change in Control</u>" means any Change in Control Transaction.

"<u>Change in Control Transaction</u>" means (i) the acquisition of beneficial ownership by any person or group (such person or group, the "<u>Transferee</u>") (excluding any Permitted Holder or group Controlled by any Permitted Holder) of more than 30% of the aggregate voting power of all outstanding

12

classes or series of QVC's voting stock and such aggregate voting power exceeds the aggregate voting power of all outstanding classes or series of QVC's voting stock beneficially owned by the Permitted Holders collectively or (ii) one or more sales of all or substantially all of the assets of the Loan Parties have been consummated pursuant to the Chapter 11 Cases.

"Change in Law" means (a) the adoption of any law, rule or regulation after the Closing Date, (b) any change in any law, rule or regulation or in the interpretation or application thereof by any Governmental Authority after the Closing Date or (c) compliance by any Lender (or, for purposes of Section 2.12(b), by any lending office of such Lender or by such Lender's holding company, if any) with any request, guideline or directive (whether or not having the force of law) of any Governmental Authority made or issued after the Closing Date; provided that notwithstanding anything in this Agreement to the contrary, (i) all requests, rules, guidelines, requirements and directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or by United States or foreign regulatory authorities, in each case pursuant to Basel III ("Basel III"), and (ii) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines, requirements and directives thereunder or issued in connection therewith or in implementation thereof ("Dodd-Frank"), shall in each case be deemed to be a "Change in Law", regardless of the date enacted, adopted, issued or implemented.

"Chapter 11 Cases" has the meaning set forth in the recitals.

"Chapter 11 Debtors" has the meaning set forth in the recitals.

"Closing Date" means the date on which the conditions precedent set forth in Section 4.01 shall have been satisfied (or waived in accordance with Section 9.02).

"CME Term SOFR Administrator" means CME Group Benchmark Administration Limited as administrator of the forward-looking term Secured Overnight Financing Rate (SOFR) (or a successor administrator).

"Code" means the Internal Revenue Code of 1986, as amended from time to time.

"Collateral Agent" means JPMorgan Chase Bank, N.A. in its capacity as collateral agent for the Lenders and certain other holders of obligations of the Loan Parties.

"Commitment Fee Rate" means 0.50% per annum.

"Commitment Period" means the period from and including the Closing Date to the Termination Date.

"Commodity Exchange Act" means the Commodity Exchange Act (7 U.S.C. § 1 et seq.), as amended from time to time, and any successor statute.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise.  "Controlling" and "Controlled" have meanings correlative thereto.

"Corresponding Tenor" means, with respect to any Available Tenor means, as applicable, either a tenor (including overnight) or an interest payment period having approximately the same length (disregarding business day adjustment) as such Available Tenor.

13

"Covered Entity" means any of the following:

(i)      a "covered entity" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 252.82(b);

(ii)     a "covered bank" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 47.3(b); or

(iii)    a "covered FSI" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 382.2(b).

"Covered Party" has the meaning assigned to it in Section 9.22.

"Date of Full Satisfaction" means  as of any date, that on or before such date: (a) all amounts due and payable to the Administrative Agent and each Lender (including, for the avoidance of doubt, all interest accrued to all unreimbursed draws, fees and expenses due and payable on such date (other than, for the avoidance of doubt, LC Exposure addressed under clause (c) below)) shall have been paid in full in cash, and the Administrative Agent has received written confirmation from each Lender that (b) all LC Commitments shall have expired or been terminated with respect to such Lender, and (c) at the option of the Borrower, each applicable Issuing Bank shall, within two (2) Business Days of the Termination Date, have received (x) cash collateral in an amount equal to 105% of all contingent LC Exposure of such Issuing Bank (plus any additional accrued and unpaid fees, costs and expenses in respect thereof) and/or (ii) backstop letters of credit in form reasonably satisfactory to such Issuing Bank (including, without limitation, as to currency, identity of issuer, and other terms) (1) backstopping all contingent LC Exposure of such Lender in an amount that would otherwise satisfy the Minimum Cash Collateral Requirement with respect to such Lender plus additional applicable charges or expenses related to backstop letters of credit and (2) which are acceptable to each Lender based on any regulatory capital treatment for such Lender (as determined by Lender ).  Each of the parties hereto hereby authorize each Lender to take such actions as it reasonably deems necessary to effect the provisions of this definition, including, but not limited to, entering into or amending or otherwise modifying any Loan Document, and establishing or modifying any procedures set forth therein or herein, in each case without the consent of any other party hereto.  Each Lender may agree that the Date of Full Satisfaction has occurred with respect to such Lender under other circumstances in its sole discretion.

"Debtor Relief Laws" means the Bankruptcy Code of the U.S., and all other liquidation, conservatorship, bankruptcy, general assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization or similar debtor relief laws of the U.S. or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally.

"Default" means any event or condition which constitutes an Event of Default or which upon notice, lapse of time or both would, unless cured or waived, become an Event of Default.

"Default Right" has the meaning assigned to that term in, and shall be interpreted in accordance with, 12 C.F.R. §§ 252.81, 47.2 or 382.1, as applicable.

"Defaulting Lender" means any Lender that (a) has failed, within two Business Days of the date required to be funded or paid, to (i) fund any portion of its participations in Letters of Credit or (ii) pay over to any Agent Party any other amount required to be paid by it hereunder, or, in the case of clause (i) or clause (ii) above, such Lender notifies the Administrative Agent in writing that such failure is the result of a good faith dispute regarding its obligation to make such funding or payment; (b) has notified any Borrower or any Agent Party in writing, or has made a public statement to the effect, that it does not intend

14

or expect to comply with any of its funding or payment obligations under this Agreement (unless such writing or public statement indicates that such position is based on such Lender 's good faith determination that a condition precedent to such funding or payment (specifically identified and including the particular default, if any) under this Agreement cannot be satisfied); (c) has failed, within three Business Days after request by the Administrative Agent or Lender, acting in good faith, to provide a certification in writing from an authorized officer of such Lender that it will comply with its obligations under this Agreement and is financially able to meet such obligations as of the date of certification, provided that such Lender shall cease to be a Defaulting Lender pursuant to this clause (c) upon such Agent Party's receipt of such certification in form and substance satisfactory to it and the Administrative Agent; or (d) has become the subject of (A) a Bankruptcy Event or (B) a Bail-In Action.  Subject to Section 9.18, no reallocation hereunder shall constitute a waiver or release of any claim of any party hereunder against a Defaulting Lender arising from that Lender having become a Defaulting Lender, including any claim of a non-Defaulting Lender as a result of such non-Defaulting Lender 's increased exposure following such reallocation.

"Deficiency Notice" has the meaning specified in Section 2.17(k)(ii).

"Deposit Account": as defined in the Uniform Commercial Code; provided that each Deposit Account shall be an interest bearing account.

"DIP Order" means the Interim DIP Order and, upon its entry, the Final DIP Order, or either or both as the context requires.

"Disposition" means the sale, transfer, lease or other disposition (in one transaction or in a series of transactions and whether effected pursuant to a Division or otherwise) of any property by any Person (including any sale and leaseback transaction), including any sale, assignment, transfer or other disposal, with or without recourse, of any notes or accounts receivable or any rights and claims associated therewith, other than any sale, assignment, transfer, lease or other disposition (a) in the ordinary course of business or (b) by a Borrower or any subsidiary to another Borrower or another subsidiary.  The terms "Dispose" and "Disposed of have" shall correlative meanings.

For purposes of this definition, the term "Disposition" shall not include:

(a)     [reserved],

(b)     [reserved],

(c)     the creation of or realization on any Lien permitted under this Agreement,

(d)     sale, transfer, lease or other disposition of inventory and damaged, worn-out or obsolete equipment or assets that are no longer used or useful in the business of a Borrower or its subsidiaries,

(e)     sales or grants of licenses or sublicenses to use the patents, trade secrets, know-how and other intellectual property, and licenses, leases or subleases of other assets, of a Borrower or any subsidiary to the extent not materially interfering with the business of such Borrower and its subsidiaries,

(f)     terminations or unwinds of Swap Agreements in the ordinary course of business, and

(g)     Dispositions by a Borrower or any of its subsidiary to any other subsidiary of the Borrower or the Borrower.

15

"Dividing Person" has the meaning assigned to it in the definition of "Division".

"Division" means the division of the assets, liabilities and/or obligations of a Person (the "Dividing Person") among two or more Persons (whether pursuant to a "plan of division" or similar arrangement), which may or may not include the Dividing Person and pursuant to which the Dividing Person may or may not survive.

"Dodd-Frank" has the meaning assigned to such term in the definition of Change in Law.

"Dollar Amount" means, at any date, with respect to any LC Commitment denominated in Dollars, the principal amount thereof then outstanding.

"Dollars" or "$" refers to lawful money of the United States of America.

"Domestic Subsidiary" means, with respect to a Borrower, any subsidiary of such Borrower organized under the laws of any jurisdiction within the United States (including any state or territory thereof or the District of Columbia).

"EEA Financial Institution" means (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country which is a subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent.

"EEA Member Country" means any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"EEA Resolution Authority" means any public administrative authority or any Person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"Electronic Signature" shall have the meaning assigned to such term in Section 9.07.

"EMU" means the economic and monetary union in accordance with the Treaty of Rome 1957, as amended by the Single European Act 1986, the Maastricht Treaty of 1992 and the Amsterdam Treaty of 1998.

"EMU Legislation" means the legislative measures of the European Council for the introduction of, changeover to or operation of a single or unified European currency.

"Environmental Laws" means all laws, rules, regulations, codes, ordinances, orders, decrees, judgments, injunctions, notices or binding agreements issued, promulgated or entered into by any Governmental Authority, relating in any way to the environment, preservation or reclamation of natural resources, the management, release or threatened release of any Hazardous Material.

"Environmental Liability" means any liability, contingent or otherwise (including any liability for damages, costs of environmental remediation, fines, penalties or indemnities), directly or indirectly resulting from or based upon (a) violation of any Environmental Law, (b) the generation, use, handling, transportation, storage, treatment or disposal of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the release or threatened release of any Hazardous Materials into the environment

16

or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"Equity Interests" means shares of capital stock, partnership interests, membership interests in a limited liability company, beneficial interests in a trust or other equity ownership interests in a Person, and any warrants, options or other rights entitling the holder thereof to purchase or acquire any such equity interest, but excluding any debt securities convertible into any of the foregoing.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time, and the rules and regulations promulgated thereunder.

"ERISA Affiliate" means any trade or business (whether or not incorporated) that, together with a Borrower, is treated as a single employer under Section 414(b) or (c) of the Code or Section 4001(14) of ERISA or, solely for purposes of Section 302 of ERISA and Section 412 of the Code, is treated as a single employer under Section 414 of the Code.

"ERISA Event" means (a) any "reportable event" (as defined in Section 4043(c) of ERISA or the regulations issued thereunder with respect to a Plan) other than an event for which the 30-day notice period is waived; (b) any failure by any Plan to satisfy the minimum funding standards (within the meaning of Sections 412 or 430 of the Code or Section 302 of ERISA) applicable to such Plan, whether or not waived; (c) the filing pursuant to Section 412(c) of the Code or Section 302(c) of ERISA of an application for a waiver of the minimum funding standard with respect to any Plan; (d) the failure to make by its due date a required installment under Section 430(j) of the Code with respect to any Plan or the failure by a Borrower or any ERISA Affiliate to make any required contribution to a Multiemployer Plan; (e) the incurrence by a Borrower or any of its ERISA Affiliates of any liability under Title IV of ERISA with respect to the termination of any Plan, including but not limited to the imposition of any Lien in favor of the PBGC or any Plan; (f) a determination that any Plan is, or is expected to be, in "at risk" status (within the meaning of Section 430 of the Code or Title IV of ERISA); (g) the receipt by a Borrower or any ERISA Affiliate from the PBGC or a plan administrator of any notice relating to an intention to terminate any Plan or to appoint a trustee to administer any Plan; (h) the incurrence by a Borrower or any of its ERISA Affiliates of any liability with respect to the withdrawal or partial withdrawal from any Plan or Multiemployer Plan; or (i) the receipt by such Borrower or any ERISA Affiliate of any notice, or the receipt by any Multiemployer Plan from a Borrower or any of its ERISA Affiliates of any notice, concerning the imposition of Withdrawal Liability or a determination that a Multiemployer Plan is, or is expected to be, Insolvent or in endangered or critical status, within the meaning of Section 432 of the Code or Section 305 of ERISA.

"EU Bail-In Legislation Schedule" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor Person), as in effect from time to time.

"Event of Default" has the meaning assigned to such term in Article VII.

"Exchange Act" means the Securities Exchange Act of 1934, as amended.

"Excluded Subsidiary" means (a) any Immaterial Domestic Subsidiary, any Borrower or any Foreign Subsidiary, (b) each subsidiary that is prohibited from Guaranteeing the Obligations by any Requirement of Law or that would require consent, approval, license or authorization of a Governmental Authority or other third party (other than a Loan Party) to Guarantee the Obligations (unless such consent, approval, license or authorization has been received, it being understood that the Borrower and its subsidiaries shall have no obligation to obtain any such consent, approval, license or authorization), (c) each subsidiary acquired that, at the time of such acquisition, has assumed Indebtedness not incurred in

17

4877-7275-1721.6

contemplation of such acquisition and each subsidiary that is a subsidiary thereof that guarantees such Indebtedness, in each case, to the extent such Indebtedness prohibits such subsidiary from becoming a Subsidiary Guarantor, (d) any subsidiary with respect to which the Administrative Agent and the Borrower reasonably agree that the cost or other consequences of providing a Guarantee to secure the Obligations are likely to be excessive in relation to the value to be afforded thereby, (e) each subsidiary that is a non-wholly owned subsidiary (for so long as such subsidiary remains a non-wholly owned subsidiary), (f) [reserved] and (g) any subsidiary with respect to which providing a Guarantee to secure the Obligations could result in material adverse tax consequences (as determined in good faith by the Borrower in consultation with the Administrative Agent); *provided* that no Subsidiary that is a Chapter 11 Debtor shall be an Excluded Subsidiary.

"Excluded Taxes" means any of the following Taxes imposed on or with respect to a Lender or the Administrative Agent or required to be withheld or deducted from a payment to a Lender or the Administrative Agent, (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes, in each case, (i) imposed as a result of such Lender or the Administrative Agent being organized under the laws of, or having its principal office or, in the case of any Lender, its applicable lending office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes, (b) in the case of a Lender, U.S. federal or Luxembourg withholding Taxes imposed on amounts payable to or for the account of such Lender with respect to an applicable interest in an LC Commitment or Letter of Credit pursuant to a law in effect (i) on the date on which such Lender acquires such interest in the LC Commitment (other than pursuant to an assignment request by the Borrower under Section 2.16(b)) or Letter of Credit or, in the case of a Lender that is a Lender on the Closing Date, on the Closing Date, or (ii) on the date on which such Lender changes its lending office, except in each case to the extent that, pursuant to Section 2.14, amounts with respect to such Taxes were payable either to such Lender's assignor immediately before such Lender became a party hereto or to such Lender immediately before it changed its lending office, (c) U.S. or Luxembourg withholding Taxes imposed on fees for the account of the Administrative Agent pursuant to a law in effect on the Closing Date, (d) Taxes attributable to such Lender's or the Administrative Agent's failure to comply with Section 2.14(f) and (e) any withholding Taxes imposed under FATCA.

"Existing Indebtedness Payoff" has the meaning assigned to such term in Section 4.01(j).

"Existing Letters of Credit" means those letters of credit described on Schedule 1.01E that are outstanding on the Closing Date.

"Facility" means the LC Commitments and the LC Exposure thereunder.

"FATCA" means Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof, any agreement entered into pursuant to Section 1471(b)(1) of the Code and any fiscal or regulatory legislation, rules or practices adopted pursuant to any intergovernmental agreement, treaty or convention among Governmental Authorities and implementing such sections of the Code.

"Federal Funds Effective Rate" means, for any day, the rate calculated by the NYFRB based on such day's federal funds transactions by depositary institutions, as determined in such manner as the NYFRB shall set forth on its public website from time to time, and published on the next succeeding Business Day by the NYFRB as the effective federal funds rate; *provided* that if the Federal Funds Effective Rate as so determined would be less than zero, such rate shall be deemed to be zero for the purposes of this Agreement.

18

"Fee Payment Date" means (a) the fifteenth calendar day following the last day of each March, June, September and December during the Commitment Period and (b) the last day of the Commitment Period.

"Final DIP Order" means the final order of the Bankruptcy Court entered in the Chapter 11 Cases, which order (a) shall be satisfactory in form and substance to the Administrative Agent and Required Lenders and (b) subject to the foregoing, authorize and approve, on a final basis, among other things, entry into the DIP LC Facility and the transactions related thereto (including the funding of the LC Cash Collateral Account, among other things), and from which no appeal or motion to reconsider has been timely filed (or any such appeal or motion has been conclusively resolved in favor of the Borrower) and such order in any respect is not subject of a stay or injunction pending appeal (unless the Administrative Agent and the Required Lenders waive such requirement), together with all extensions, modifications, amendments or supplements thereto, in form and substance satisfactory to the Administrative Agent and Required Lenders.

"Financial Officer" means the chief financial officer, principal accounting officer, treasurer, controller or any other financial officer of the Borrower.

"Floor" means the benchmark rate floor, if any, provided in this Agreement initially (as of the execution of this Agreement, the modification, amendment or renewal of this Agreement or otherwise) with respect to the Adjusted Term SOFR Rate.

"Foreign Subsidiary" means, with respect to a Borrower, any subsidiary of such Borrower that is not a Domestic Subsidiary.

"GAAP" means generally accepted accounting principles in the United States of America as in effect from time to time.

"Governmental Authority" means the government of the United States of America, any other nation or any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"Guarantee" of or by any Person (the "guarantor") means any obligation, contingent or otherwise, of the guarantor guaranteeing or having the economic effect of guaranteeing any Indebtedness or other similar obligation of any other Person (the "primary obligor") in any manner, whether directly or indirectly, and including any obligation of the guarantor, direct or indirect, (a) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other similar obligation or to purchase (or to advance or supply funds for the purchase of) any security for the payment thereof, (b) to purchase or lease property, securities or services for the purpose of assuring the owner of such Indebtedness or other similar obligation of the payment thereof, (c) to maintain working capital, equity capital or any other financial statement condition or liquidity of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other similar obligation or (d) as an account party in respect of any letter of credit or letter of guaranty issued to support such Indebtedness or similar obligation; provided, that the term Guarantee shall not include endorsements for collection or deposit in the ordinary course of business or customary and reasonable indemnity obligations in effect on the Closing Date or entered into in connection with any acquisition or Disposition of assets permitted by this Agreement (other than such obligations with respect to Indebtedness).  The amount of any Guarantee of any guaranteeing person shall be deemed to be the lower of (a) an amount equal to the stated or determinable amount of the primary obligation in respect of which such Guarantee is made and (b) the maximum amount for which such guarantor may be liable pursuant to the terms of the instrument embodying such Guarantee in accordance with GAAP.

19

"Hazardous Materials" means all explosive or radioactive substances or wastes and all hazardous or toxic substances, wastes or other pollutants, including petroleum or petroleum distillates, asbestos or asbestos containing materials, polychlorinated biphenyls, radon gas, infectious or medical wastes and all other substances or wastes of any nature regulated pursuant to any Environmental Law.

"Immaterial Domestic Subsidiary" means any Domestic Subsidiary that is not a Material Domestic Subsidiary.

"Indebtedness" of any Person means, without duplication, (a) all obligations of such Person for borrowed money or with respect to deposits or advances of any kind, (b) all obligations of such Person evidenced by bonds, debentures, notes or similar instruments, (c) all obligations of such Person upon which interest charges are customarily paid, (d) all obligations of such Person under conditional sale or other title retention agreements constituting liens hereunder relating to property acquired by such Person (excluding obligations arising from inventory transactions in the ordinary course of business), (e) all obligations of such Person in respect of the deferred purchase price of property or services (excluding current accounts payable incurred in the ordinary course of business), (f) all Indebtedness of others secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien on property owned or acquired by such Person, whether or not the Indebtedness secured thereby has been assumed; *provided that* the amount of such Indebtedness will be the lesser of (x) the fair market value of such property at such date of determination and (y) the amount of such Indebtedness of such other Person, (g) all Guarantees by such Person of Indebtedness of others, (h) all Capital Lease Obligations of such Person, (i) all obligations, contingent or otherwise, of such Person as an account party in respect of letters of credit and letters of guaranty (other than letters of guaranty provided by such Person in the ordinary course of business) and (j) all obligations, contingent or otherwise, of such Person in respect of bankers' acceptances.  The amount of Indebtedness of any Person at any date shall be the outstanding balance at such date of all unconditional obligations (i.e., shall not take in account the fair value of such Indebtedness). Notwithstanding the foregoing, "Indebtedness" shall not include (i) any amounts payable under any deferred compensation plans of any Person relating to its or its subsidiaries' directors, management, employees or consultants, (ii) any indebtedness owed between or among the Loan Parties and any of their subsidiaries, (iii) any post-closing payment adjustments to which the seller may become entitled to the extent such payment is determined by a final closing balance sheet or such payment depends on the performance of the Person or assets acquired after the closing; provided, however, that to the extent such payment becomes fixed and determined, the amount is paid within ninety (90) days thereafter, (iv) any Indebtedness that has been defeased pursuant to the deposit of cash or Cash Equivalents (in any amount sufficient (in the good faith determination of the Borrower) to satisfy all such Indebtedness obligations at maturity or redemption, as applicable, and all payments of interest and premium, if any) in a trust or account created or pledged for the sole benefit of the holders of such Indebtedness pursuant to the applicable terms of the instrument governing such Indebtedness, (v) prepaid or deferred revenue, (vi) prepayments or deposits received from clients or customers in the ordinary course of business and (vii) all obligations, contingent or otherwise, of such Person in respect of letters of guaranty provided in the ordinary course of business.

"Indemnified Liabilities" has the meaning specified in Section 9.04(b).

"Indemnified Taxes" means (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of the Borrower under any Loan Document and (b) to the extent not otherwise described in (a), Other Taxes.

"Independent Assets or Operations" means, with respect to any Parent Reporter, that such Parent Reporter's total assets, revenues, income from continuing operations before income taxes and cash

20

flows from operating activities (excluding in each case amounts related to its investment in any Borrower and its subsidiaries), determined in accordance with GAAP and as shown on the most recent balance sheet of such Parent Reporter, is more than 5.0% of such Parent Reporter's corresponding consolidated amount.

"Information" has the meaning specified in Section 9.13.

"Insolvent" with respect to any Multiemployer Plan means the condition that such Multiemployer Plan is insolvent within the meaning of Section 4245 of ERISA.

"Interest Period" means a period that is one month, three months, six months or twelve months (only to the extent such twelve month period is agreed to by all Lenders under the Facility) (in each case, subject to the availability for the Benchmark applicable to the relevant LC Commitment for any Agreed Currency), as a Borrower may elect; provided, that (i) if any Interest Period would end on a day other than a Business Day, such Interest Period shall be extended to the next succeeding Business Day unless such next succeeding Business Day would fall in the next calendar month, in which case such Interest Period shall end on the next preceding Business Day, (ii) any Interest Period that commences on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the last calendar month of such Interest Period) shall end on the last Business Day of the last calendar month of such Interest Period, (iii) [reserved], (iv) [reserved] and (v) [reserved].

"Interim DIP Order" means the interim order of the Bankruptcy Court entered in the Chapter 11 Cases, which order (a) shall be satisfactory in form and substance to the Administrative Agent and Required Lenders and (b) subject to the foregoing, authorize and approve, on an interim basis, among other things, the DIP LC Facility and all other matters set forth in, and transactions contemplated by, the DIP Motion (including the DIP LC Facility, the funding of the LC Cash Collateral Account, and the incurrence of all other Obligations in accordance with the terms hereof), and from which no appeal or motion to reconsider has been timely filed (or any such appeal or motion has been conclusively resolved in favor of the Borrower) and such order in any respect is not subject of a stay or injunction pending appeal (unless the Administrative Agent and the Required Lenders waive such requirement), together with all extensions, modifications, amendments or supplements thereto, in form and substance satisfactory to the Administrative Agent and Required Lenders, which, among other matters but not by way of limitation, authorizes the Borrower to enter into this Agreement and the other Loan Documents.

"ISDA Definitions" means the 2006 ISDA Definitions published by the International Swaps and Derivatives Association, Inc. or any successor thereto, as amended or supplemented from time to time, or any successor definitional booklet for interest rate derivatives published from time to time by the International Swaps and Derivatives Association, Inc. or such successor thereto.

"Issuing Bank" means each of JPMorgan Chase Bank, N.A., Bank of America, N.A., BNP Paribas, Wells Fargo Bank, National Association and Citibank, N.A.  Any Borrower may, with the consent of the Administrative Agent (which consent shall not be unreasonably withheld), arrange for one or more Letters of Credit to be issued by other Issuing Banks, in which case the term "Issuing Bank" shall include such Issuing Bank with respect to the Letters of Credit issued by such Issuing Bank; provided that no such Issuing Bank shall have any obligation to be an Issuing Bank unless it agrees to do so in its sole discretion.

"Issuing Bank Commitment" has the meaning specified in Section 2.17(b).

"Judgment Currency" has the meaning specified in Section 9.14.

21

"<u>LC Cash Collateral</u>" means cash deposited in the LC Cash Collateral Account that is pledged as cash collateral to backstop LC Exposure of any Lender under this Agreement pursuant to the DIP Order.

"<u>LC Cash Collateral Account</u>" means the Deposit Account (current rate as of the Closing Date of approximately 3.25%) in the name of the Borrower, as the account holder, at the Collateral Agent (or any of its affiliates or branches), as the depositary bank, holding LC Cash Collateral. For the avoidance of doubt, the LC Cash Collateral Account shall be maintained at JPMorgan Chase Bank, N.A. (or any of its affiliates and branches).

"<u>LC Cash Collateral Account Bank</u>" means JPMorgan Chase Bank, N.A. (or any of its affiliates or branches in its capacity as depositary bank in respect of the LC Cash Collateral Account).

"<u>LC Commitment</u>" means, with respect to each Lender, the commitment of such Lender to issue and/or purchase participation interests in Letters of Credit in an aggregate principal amount not to exceed the amount set forth under the heading "LC Commitment" opposite such Lender's name on Schedule 1.01A or in the Assignment and Assumption pursuant to which such Lender became a party hereto, as the same may be changed from time to time pursuant to the terms of this Agreement.  The aggregate Dollar Amount of all LC Commitments on the Closing Date is $300,000,000.

"<u>LC Commitment Percentage</u>" means, with respect to any Lender at any time, the ratio (expressed as a percentage) of such Lender's "LC Commitment" opposite such Lender's name on Schedule 1.01A at such time to the Total Commitment of all Lenders at such time, or, at any time after the Total Commitment shall have expired or terminated, the LC Commitment Percentages shall be determined by dividing such Lender's LC Commitment as in effect immediately prior to such termination by the Total Commitment as in effect immediately prior to such termination (but also giving effect to any assignments made in accordance with Section 9.05 after the date on which the Total Commitment has terminated). Notwithstanding the foregoing, in the case of Section 2.18 when a Defaulting Lender shall exist, LC Commitment Percentages shall be determined without regard to any Defaulting Lender's LC Commitment.

"<u>LC Disbursement</u>" means a payment made by the Issuing Bank pursuant to a demand for payment or drawing under a Letter of Credit.

"<u>LC Exposure</u>" means, at any time, the sum of (a) the aggregate undrawn amount of all outstanding Letters of Credit at such time plus (b) the aggregate amount of all LC Disbursements that have not yet been reimbursed by or on behalf of a Borrower at such time.  The LC Exposure of any Lender at any time shall be its LC Commitment Percentage of the total LC Exposure at such time.

"<u>Lead Arranger and Bookrunner</u>" means JPMorgan Chase Bank, each acting in its capacity as a lead arranger and bookrunner.

"<u>Lender</u>" means the Persons listed on Schedule 1.01(A) that have an LC Commitment and any other Person that shall have become a party hereto pursuant to an Assignment and Assumption, other than any such Person that ceases to be a party hereto pursuant to an Assignment and Assumption. Unless the context requires otherwise, the term "Lenders" includes the Issuing Banks.

"<u>Letter of Credit</u>" has the meaning assigned to such term in Section 2.17(a).

"<u>Lien</u>" means, with respect to any asset, (a) any mortgage, deed of trust, lien, pledge, hypothecation, encumbrance, charge or security interest in, on or of such asset and (b) the interest of a vendor or a lessor under any conditional sale agreement, capital lease or title retention agreement (or any

22

4877-7275-1721.6

financing lease having substantially the same economic effect as any of the foregoing) relating to such asset.  "<u>Lien</u>" shall not, however, include any interest of a vendor in any inventory of a Borrower or any of its subsidiaries arising out of such inventory being subject to a "<u>sale or return</u>" arrangement with such vendor or any consignment by any third party of any inventory to any Borrower or any of its subsidiaries.

"<u>Loan Documents</u>" means the collective reference to this Agreement, the DIP Order and the Subsidiary Guaranty.

"<u>Loan Parties</u>" means the collective reference to the Borrower and the Subsidiary Guarantors.

"<u>Margin Stock</u>" means margin stock within the meaning of Regulations T, U and X, as applicable.

"<u>Material Adverse Effect</u>" means a material adverse effect on (a) the business, operations, property or condition, financial or otherwise, of the Borrower and its subsidiaries, taken as a whole, that results in a material impairment of the ability of the Borrower to perform any payment obligations hereunder or (b) the validity or enforceability of this Agreement or the other Loan Documents or the rights or remedies of the Administrative Agent (including in its capacity as Collateral Agent) or the Lenders hereunder or thereunder (other than the commencement of a proceeding under chapter 11 of the Bankruptcy Code and the commencement of the Chapter 11 Cases, the events that lead to the commencement of the Chapter 11 Cases, events that customarily and reasonably result from the commencement of the Chapter 11 Cases (in each case, other than matters affecting the Borrower and its subsidiaries that are not subject to the automatic stay) and the consummation of the transactions contemplated by the First Day DIP Order).

"<u>Material Domestic Subsidiary</u>" means, any Domestic Subsidiary (other than an Excluded Subsidiary or a Domestic Subsidiary that is a Borrower) of any Borrower, as of the last day of the fiscal quarter of the Borrower most recently ended for which financial statements have been delivered pursuant to Section 5.01, that has assets (including Equity Interests in subsidiaries) or revenues (including both third party revenue, but excluding intercompany revenues) with a value in excess of 7.50% of the consolidated assets of the Borrower and their Domestic Subsidiaries or 7.50% of the consolidated revenues of the Borrower and their Domestic Subsidiaries; <u>provided,</u> that in the event Domestic Subsidiaries (other than Excluded Subsidiaries or Domestic Subsidiaries that is a Borrower) that would otherwise not be Material Domestic Subsidiaries of the Borrower shall in the aggregate account for a percentage in excess of 10.00% of the sum of the consolidated assets of the Borrower and their Domestic Subsidiaries or 10.00% of the sum of the consolidated revenues of the Borrower and their Domestic Subsidiaries as of the end of such fiscal quarter, then one or more of such Domestic Subsidiaries (other than Excluded Subsidiaries or Domestic Subsidiaries that is a Borrower) of the Borrower designated by the Borrower (or, if the Borrower shall make no designation, one or more of such Domestic Subsidiaries (other than Excluded Subsidiaries or Domestic Subsidiaries that is a Borrower) in ascending order based on their respective contributions to the sum of the consolidated assets of the Borrower and their Domestic Subsidiaries) shall be included as Material Domestic Subsidiaries to the extent necessary to eliminate such excess; <u>provided</u> further that any Domestic Subsidiary that constitutes a Material Domestic Subsidiary pursuant to this sentence may subsequently be designated an Immaterial Domestic Subsidiary so long as the Borrower are in compliance with the foregoing.  Notwithstanding anything herein to the contrary, no Excluded Subsidiary shall be deemed or considered a Material Domestic Subsidiary.  As of the Closing Date, Schedule 1.01D lists all Material Domestic Subsidiaries of the Borrower.

"<u>Material Subsidiary</u>" means, any subsidiary of the Borrower, as of the last day of the fiscal quarter of the Borrower most recently ended for which financial statements have been delivered pursuant to Section 5.01, that has assets or revenues (on a consolidated basis including its subsidiaries) with a value

23

in excess of 2.5% of the sum of the consolidated assets of the Borrower and their subsidiaries or 2.5% of the sum of the consolidated revenues of the Borrower and their subsidiaries; provided, that in the event subsidiaries that would otherwise not be Material Subsidiaries of the Borrower shall in the aggregate account for a percentage in excess of 5.0% of the sum of the consolidated assets of the Borrower and their subsidiaries or 5.0% of the consolidated revenues of the Borrower and their subsidiaries as of the end of and for the most recently completed fiscal quarter, then one or more of such subsidiaries designated by the Borrower (or, if the Borrower shall make no designation, one or more of such subsidiaries in ascending order based on their respective contributions to the sum of the consolidated assets of the Borrower and its subsidiaries), shall be included as Material Subsidiaries to the extent necessary to eliminate such excess; provided further that any subsidiary that constitutes a Material Subsidiary pursuant to this sentence may subsequently be removed as a Material Subsidiaries so long as the Borrower is in compliance with the foregoing.

"Minimum Cash Collateral Amount" means $315,000,000.

"Minimum Cash Collateral Requirement" means a requirement that at any time the amount of LC Cash Collateral deposited in the LC Cash Collateral Account shall be equal to or greater than the Minimum Cash Collateral Amount applicable for such LC Cash Collateral Account.

"Moody's" means Moody's Investors Service, Inc. and any successor to its rating agency business.

"Multiemployer Plan" means a multiemployer plan as defined in Section 4001(a)(3) of ERISA.

"Non-Consenting Lender" has the meaning assigned to such term in Section 2.16(c).

"Non-U.S. Lender" means a Lender that is not a U.S. Person.

"NYFRB" means the Federal Reserve Bank of New York.

"NYFRB's Website" means the website of the NYFRB at http://www.newyorkfed.org, or any successor source.

"NYFRB Rate" means for any day, the greater of (a) the Federal Funds Effective Rate in effect on such day and (b) the Overnight Bank Funding Rate in effect on such day (or for any day that is not a Business Day, for the immediately preceding Business Day); provided that if none of such rates are published for any day that is a Business Day, the term "NYFRB Rate" means the rate for a federal funds transaction quoted at 11:00 a.m. on such day received by the Administrative Agent from a federal funds broker of recognized standing reasonably selected by it; provided, further, that if any of the aforesaid rates shall be less than zero, such rate shall be deemed to be zero for purposes of this Agreement.

"Obligations" means the unpaid principal of and interest on (including interest accruing after the maturity of any outstanding Letter of Credit and interest accruing after the filing of the Chapter 11 Cases or any other petition in bankruptcy, or the commencement of any insolvency, reorganization or like proceeding, relating to a Borrower, whether or not a claim for post-filing or post-petition interest is allowed in such proceeding) the issued and outstanding Letters of Credit, the Reimbursement Obligations and other the obligations of a Borrower to reimburse the Lenders for demands for payment or drawings under a Letter of Credit, and all other obligations and liabilities of a Borrower to the Administrative Agent or to any Lender, whether direct or indirect, absolute or contingent, due or to become due, or now existing or hereafter incurred, which may arise under, out of, or in connection with, this Agreement, any other Loan Document

24

or any other document made, delivered or given in connection herewith or therewith, whether on account of principal, interest, fees, indemnities, costs, expenses or otherwise (including all fees, charges and disbursements of counsel to the Administrative Agent or to any Lender that are required to be paid by a Borrower pursuant hereto).

"OFAC" means the U.S. Department of the Treasury's Office of Foreign Assets Control.

"Official Committee" means any statutory committee appointed in any of the Chapter 11 Cases.

"Other Connection Taxes" means with respect to any Lender or the Administrative Agent, Taxes imposed as a result of a present or former connection between such Lender or the Administrative Agent and the jurisdiction imposing such Tax (other than connections arising from such Lender or the Administrative Agent having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to, or enforced, any Loan Document, or sold or assigned an interest in any Loan or Loan Document).

"Other Taxes" means any and all present or future stamp, court or documentary intangible, recording, filing or similar Taxes arising from any payment made hereunder or from the execution, delivery, performance or enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Loan Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment (other than an assignment made pursuant to Section 2.16(b)).

"Overnight Bank Funding Rate" means for any day, the rate comprised of overnight federal funds borrowings denominated in Dollars by U.S.-managed banking offices of depository institutions, as such composite rate shall be determined by the NYFRB as set forth on the NYFRB's Website from time to time, and published on the next succeeding Business Day by the NYFRB as an overnight bank funding rate.

"Parent" means, with respect to QVC, the QVC Parent.

"Parent Reporter" means any Person that is a direct or indirect parent (which may be organized as, among other things, a partnership) of the Borrower.

"Participant" has the meaning assigned to such term in Section 9.05.

"Participant Register" has the meaning assigned to such term in Section 9.05.

"Participating Member State" means any member state of the European Union that has the euro as its lawful currency in accordance with legislation of the European Union relating to Economic and Monetary Union.

"Participating Member State" means any member state of the EMU which has the Euro as its lawful currency.

"Payment" has the meaning assigned to it in Section 8.10.

"Payment Notice" has the meaning assigned to it in Section 8.10.

"PBGC" means the Pension Benefit Guaranty Corporation referred to and defined in ERISA and any successor entity performing similar functions.

25

"Permitted Holders" means any one or more of (a) Qurate, (b) John C. Malone or Gregory B. Maffei (whether such persons are acting individually or in concert), (c) each of the respective Affiliated Persons of the Persons referred to in clause (b), (d) any publicly traded Person in which any of the Persons referred to in clauses (b) and (c) (whether individually or together with the other Persons in clause (b) and (c)) is the largest beneficial owner of (x) the Equity Interests of such Person or (y) the aggregate voting power of all the outstanding classes or series of the Equity Interests of such Person then outstanding and normally entitled (without regard to the occurrence of any contingency) to vote in the election of directors, (e) any Person a majority of the aggregate voting power of all the outstanding classes or series of the Equity Interests of which are beneficially owned by any one or more of the Persons referred to in clauses (a), (b), (c) or (d) and (f) any group consisting solely of persons described in clauses (a) through (e). For purposes of the definition of "Permitted Holders", "Person" and "group" have the meanings given to them for purposes of Section 13(d) and 14(d) of the Exchange Act or any successor provisions, and the term "group" includes any group acting for the purpose of acquiring, holding or disposing of securities within the meaning of Rule 13d-5(b)(1) under the Exchange Act, or any successor provision.

"Permitted Jurisdiction" means any member country of The Organisation for Economic Co-operation and Development (OECD) (or any successor thereto), as such list of member counties may be updated from time to time, and any other country as may be reasonably approved by the Administrative Agent.

"person" and "group" have the meanings given to them for purposes of Section 13(d) and 14(d) of the Exchange Act or any successor provisions, and the term "group" includes any group acting for the purpose of acquiring, holding or disposing of securities within the meaning of rule 13d-5(b)(1) under the Exchange Act, or any successor provision.

"Person" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"Petition Date" has the meaning set forth in the recitals.

"Plan" means any employee pension benefit plan (other than a Multiemployer Plan) subject to the provisions of Title IV of ERISA or Section 412 of the Code or Section 302 of ERISA, and in respect of which a Borrower or any ERISA Affiliate is (or, if such plan were terminated, would under Section 4069 of ERISA be deemed to be) an "employer" as defined in Section 3(5) of ERISA.

"Plan Asset Regulations" means 29 CFR § 2510.3-101 et seq., as modified by Section 3(42) of ERISA, as amended from time to time.

"Plan of Reorganization" means a plan of reorganization with respect to the Borrower and its subsidiaries pursuant to the Chapter 11 Cases.

"Pre-Petition Credit Agreement" means that certain Fifth Amended and Restated Credit Agreement, by and among the Borrower, the other borrowers party thereto, JPMorgan Chase Bank, N.A., as the administrative agent, the other financial institutions party thereto and the lenders and other parties from time to time party thereto, dated as of October 27, 2021 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time).

"Prime Rate" means the per annum rate of interest last quoted by The Wall Street Journal as the "Prime Rate" in the U.S. or, if The Wall Street Journal ceases to quote such rate, the per annum interest rate published by the Board in Federal Reserve Statistical Release H.15 (519) (Selected Interest Rates) as the "bank prime loan" rate or, if such rate is no longer quoted therein, any similar rate quoted

26

therein (as determined by the Administrative Agent) or any similar release by the Board (as determined by the Administrative Agent).  Each change in the Prime Rate shall be effective from and including the date such change is publicly announced or quoted as being effective.

"PTE" means a prohibited transaction class exemption issued by the U.S. Department of Labor, as any such exemption may be amended from time to time.

"QFC" has the meaning assigned to the term "qualified financial contract" in, and shall be interpreted in accordance with, 12 U.S.C. 5390(c)(8)(D).

"QFC Credit Support" has the meaning assigned to it in Section 9.22.

"Qurate" means Qurate Retail, Inc., a Delaware corporation, and any successor (by merger, consolidation, transfer or otherwise) to all or substantially all of its assets; and any subsequent successor (by merger, consolidation, transfer or otherwise) to all or substantially all of a successor's assets, provided, that if a Transferee Parent becomes the beneficial owner of all or substantially all of the equity securities of QVC then beneficially owned by Qurate as to which Qurate has dispositive power, the term "Qurate" shall also mean such Transferee Parent and any successor (by merger, consolidation, transfer or otherwise) to all or substantially all of its assets.  "Transferee Parent" for this purpose means, in the event of any transaction or series of related transactions involving the direct or indirect transfer (or relinquishment of control) by Qurate of a Person or Persons (a "Transferred Person") that hold equity securities of QVC beneficially owned by Qurate, such Transferred Person or its successor in such transaction or any ultimate parent entity (within the meaning of the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended) of such Transferred Person or its successor if immediately after giving effect to such transaction or the last transaction in such series, voting securities representing at least a majority of the voting power of the outstanding voting securities of such Transferred Person, successor or ultimate parent entity are beneficially owned by any combination of Qurate, Persons who prior to such transaction were beneficial owners of a majority of, or a majority of the voting power of, the outstanding voting securities of Qurate (or of any publicly traded class or series of voting securities of Qurate designed to track the economic performance of a specified group of assets or businesses) or Persons who are Control Persons as of the date of such transaction or the last transaction in such series.  "Control Person" for this purpose means each of (a) the Chairman of the Board of Qurate, (b) the President, Chief Executive Officer, Chief Financial Officer, Chief Legal Officer and Chief Corporate Development Officer of Qurate, (c) any Senior Vice President of Qurate, (d) each of the directors of Qurate and (e) the respective Affiliated Persons of the Persons referred to in clauses (a) through (d).

"QVC Parent" means Qurate Retail Group, Inc., a Delaware corporation.

"Reference Time" means, with respect to any setting of the then-current Benchmark means (1) if such Benchmark is the Term SOFR Rate, 5:00 a.m. (Chicago time) on the day that is two U.S. Government Securities Business Days preceding the date of such setting or (2) if such Benchmark is not the Term SOFR Rate, the time determined by the Administrative Agent in its reasonable discretion with the Borrower.

"Register" has the meaning assigned to such term in Section 9.05(b)(iv).

"Regulation D" means Regulation D of the Board, as in effect from time to time and all official rulings and interpretations thereunder or thereof.

27

4877-7275-1721.6

"Reimbursement Obligation" means the obligation of the Borrower to reimburse the Issuing Banks or other applicable Lenders pursuant to Section 2.17(f) for amounts drawn under Letters of Credit.

"Related Parties" means, with respect to any specified Person, such Person's Affiliates and the respective directors, officers, employees, agents and advisors of such Person and such Person's Affiliates.

"Relevant Governmental Body" means the Federal Reserve Board and/or the NYFRB, or a committee officially endorsed or convened by the Federal Reserve Board and/or the NYFRB or, in each case, any successor thereto.

"Relevant Rate" means the Adjusted Term SOFR Rate.

"Relevant Screen Rate" means the Term SOFR Reference Rate.

"Required Lenders" means, subject to Section 2.18(b), the Lenders whose LC Commitments (or, at any time after the Total Commitment has expired or terminated, such Lenders' LC Commitment Percentages of the total LC Exposure) represent an amount greater than 50% of the Total Commitment (or after the termination thereof, the total LC Exposure at such time); provided that, at any time that there is more than one Lender, the Required Lenders shall be comprised of at least two Lenders.

"Requirement of Law" means, as to any Person, any law, treaty, rule or regulation or determination of an arbitrator or a court or other Governmental Authority, in each case applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"Resolution Authority" means an EEA Resolution Authority or, with respect to any UK Financial Institution, a UK Resolution Authority.

"Restructuring Support Agreement" means the "Restructuring Support Agreement" dated as of April 16, 2026, among the Borrower, certain subsidiaries and affiliates party thereto and the Consenting Stakeholders (as defined therein) party thereto from time to time.

"Returned LC Disbursements" has the meaning specified in Section 9.17(k)(iii).

"Sanctioned Country" means, at any time, a country, region or territory which is itself the subject or target of any Sanctions (at the time of this Agreement, Crimea, Cuba, Iran, North Korea and Syria).

"Sanctioned Person" means, at any time, (a) any Person listed in any Sanctions-related list of designated Persons maintained by OFAC or the U.S. Department of State or by the United Nations Security Council, the European Union, any European Union member state or His Majesty's Treasury of the United Kingdom, (b) any Person operating, organized or resident in a Sanctioned Country, (c) any Person owned or controlled by any such Person or Persons described in the foregoing clauses (a) or (b), or (d) any Person otherwise the subject of any Sanctions.

"Sanctions" means all economic or financial sanctions or trade embargoes imposed, administered or enforced from time to time by (a) the U.S. government, including those administered by OFAC or the U.S. Department of State or (b) the United Nations Security Council, the European Union, any European Union member state or His Majesty's Treasury of the United Kingdom.

28

4877-7275-1721.6

"SEC" means the Securities and Exchange Commission, or any Governmental Authority succeeding to any of its principal functions.

"Secured Parties" has the meaning set forth in the DIP Order.

"SOFR" means a rate equal to the secured overnight financing rate as administered by the SOFR Administrator.

"SOFR Administrator" means the NYFRB (or a successor administrator of the secured overnight financing rate).

"SOFR Administrator's Website" means the NYFRB's website, currently at http://www.newyorkfed.org, or any successor source for the secured overnight financing rate identified as such by the SOFR Administrator from time to time.

"Standard & Poor's" means Standard & Poor's Financial Services LLC and any successor to its rating agency business.

"subsidiary" means, with respect to any Person (the "parent") at any date, any corporation, limited liability company, partnership, association or other entity of which securities or other ownership interests representing more than 50% of the ordinary voting power or, in the case of a partnership, more than 50% of the general partnership interests are, as of such date, owned, Controlled or held by the parent or one or more subsidiaries of the parent or by the parent and one or more subsidiaries of the parent.

"Subsidiary Guarantee" means the Subsidiary Guarantee Agreement, by the Subsidiary Guarantors that are subsidiaries of QVC in favor of the Collateral Agent, dated as of April 17, 2026 (as amended, amended and restated, supplemented or otherwise modified from time to time).

"Subsidiary Guarantor" means (i) each subsidiary that is a party to the Subsidiary Guarantee on the Closing Date and (ii) each other subsidiary that becomes a Subsidiary Guarantor after the Closing Date pursuant to the terms of this Agreement.

"Supported QFC" has the meaning assigned to it in Section 9.22.

"Swap Agreement" means any agreement with respect to any swap, forward, future or derivative transaction or option or similar agreement involving, or settled by reference to, one or more rates, currencies, commodities, equity or debt instruments or securities, or economic, financial or pricing indices or measures of economic, financial or pricing risk or value or any similar transaction or any combination of these transactions; provided that no phantom stock or similar plan providing for payments only on account of services provided by current or former directors, officers, employees or consultants of a Borrower or its subsidiaries shall be a Swap Agreement.

"Taxes" means any and all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"Term SOFR Determination Day" has the meaning assigned to it under the definition of Term SOFR Reference Rate.

"Term SOFR Rate" means the Term SOFR Reference Rate at approximately 5:00 a.m., Chicago time, two U.S. Government Securities Business Days prior to the commencement of such tenor

29

comparable to the applicable Interest Period, as such rate is published by the CME Term SOFR Administrator.

"Term SOFR Reference Rate" means, for any day and time (such day, the "Term SOFR Determination Day"), the rate per annum published by the CME Term SOFR Administrator and identified by the Administrative Agent as the forward-looking term rate based on SOFR.  If by 5:00 pm (New York City time) on such Term SOFR Determination Day, the "Term SOFR Reference Rate" for the applicable tenor has not been published by the CME Term SOFR Administrator and a Benchmark Replacement Date with respect to the Term SOFR Rate has not occurred, then, so long as such day is otherwise a U.S. Government Securities Business Day, the Term SOFR Reference Rate for such Term SOFR Determination Day will be the Term SOFR Reference Rate as published in respect of the first preceding U.S. Government Securities Business Day for which such Term SOFR Reference Rate was published by the CME Term SOFR Administrator, so long as such first preceding U.S. Government Securities Business Day is not more than five (5) U.S. Government Securities Business Days prior to such Term SOFR Determination Day.

"Termination Date" means the earliest of the following date:

(a)        October 16, 2026, unless earlier terminated pursuant to this Agreement,

(b)        the effective date of a Plan of Reorganization or liquidation in the Chapter 11 Cases,

(c)        the date the Bankruptcy Court orders the dismissal or conversion of the Chapter 11 Case of the Borrower and its subsidiaries to a case under chapter 7 of the Bankruptcy Code,

(d)        the closing of any sale of assets pursuant to Section 363 of the Bankruptcy Code, which when taken together with all other sales of assets since the Closing Date, constitutes a sale of all or substantially all of the assets of the Borrower and its subsidiaries, or

(e)        the occurrence of an Event of Default under this Agreement.

"Total Commitment" means the sum of the LC Commitments of each Lender. As of the Closing Date, the Total Commitment is $300,000,000.

"Total Unutilized Commitment" means, at any time, an amount equal to the remainder of (x) the Total Commitment then in effect less (y) the total LC Exposure at such time.

"Transactions" means, collectively, (a) the transactions contemplated by or in connection with the DIP Order or necessary to effectuate the DIP Orders and (b) the execution, delivery and performance by the Borrower of this Agreement, the execution, delivery and performance by the Loan Parties of the other Loan Documents, the issuance of Letters of Credit hereunder and the use of proceeds thereof.

"Transferee" has the meaning assigned to such term in the definition of "Change in Control Transaction".

"Transferee Parent" has the meaning assigned to such term in the definition of "Qurate".

"Unadjusted Benchmark Replacement" means the applicable Benchmark Replacement excluding the related Benchmark Replacement Adjustment.

"U.S. Government Securities Business Day" means any day except for (i) a Saturday, (ii) a Sunday or (iii) a day on which the Securities Industry and Financial Markets Association recommends that the fixed income departments of its members be closed for the entire day for purposes of trading in United States government securities.

"UK Financial Institutions" means any BRRD Undertaking (as such term is defined under the PRA Rulebook (as amended from time to time) promulgated by the United Kingdom Prudential Regulation Authority) or any person falling within IFPRU 11.6 of the FCA Handbook (as amended from time to time) promulgated by the United Kingdom Financial Conduct Authority, which includes certain credit institutions and investment firms, and certain affiliates of such credit institutions or investment firms.

"UK Resolution Authority" means the Bank of England or any other public administrative authority having responsibility for the resolution of any UK Financial Institution.

"U.S. Person" means "United States person" within the meaning of Section 7701(a)(30) of the Code.

"U.S. Special Resolution Regime" has the meaning assigned to it in Section 9.22.

"U.S. Tax Compliance Certificate" has the meaning assigned to such term in Section 2.14(f)(ii)(B)(3).

"Withdrawal Liability" means liability to a Multiemployer Plan as a result of a complete or partial withdrawal from such Multiemployer Plan, as such terms are defined in Part I of Subtitle E of Title IV of ERISA.

"Write-Down and Conversion Powers" means, (a) with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule, and (b) with respect to the United Kingdom, any powers of the applicable Resolution Authority under the Bail-In Legislation to cancel, reduce, modify or change the form of a liability of any UK Financial Institution or any contract or instrument under which that liability arises, to convert all or part of that liability into shares, securities or obligations of that person or any other person, to provide that any such contract or instrument is to have effect as if a right had been exercised under it or to suspend any obligation in respect of that liability or any of the powers under that Bail-In Legislation that are related to or ancillary to any of those powers.

SECTION 1.02.    [Reserved].

SECTION 1.03.    [Reserved].

SECTION 1.04.    Terms Generally.  The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation".  The word "will" shall be construed to have the same meaning and effect as the word "shall".  Unless the context requires otherwise (a) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein), (b) any reference herein to any Person shall be construed to include such Person's successors and assigns, (c) the words "herein", "hereof" and "hereunder", and words of similar import, shall be

31

4877-7275-1721.6

construed to refer to this Agreement in its entirety and not to any particular provision hereof, (d) all references herein to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, this Agreement, (e) any reference to any law, rule or regulation herein shall, unless otherwise specified, refer to such law, rule or regulation as amended, modified or supplemented from time to time and (f) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.  The foregoing standards shall also apply to the other Loan Documents.

SECTION 1.05.    Accounting Terms; GAAP.  Except as otherwise expressly provided herein, all terms of an accounting or financial nature shall be construed in accordance with GAAP, as in effect from time to time; provided that, unless the Borrower elects otherwise, for purposes of any determinations associated with leases, including, without limitation, determinations of whether such leases are capital leases, whether obligations under such leases are Capital Lease Obligations, the amount of any Capital Lease Obligations associated with such leases, and the amount of operating expenses associated with such leases, Consolidated EBITDA and Indebtedness, shall be determined based on generally accepted accounting principles in the United States of America in effect on December 31, 2018 as applicable to the Borrower; provided further that, if the Borrower notify the Administrative Agent that the Borrower requests an amendment to any provision hereof to eliminate the effect of any change occurring after the Closing Date in GAAP or in the application thereof on the operation of such provision (or if the Administrative Agent notifies the Borrower that the Required Lenders request an amendment to any provision hereof for such purpose), regardless of whether any such notice is given before or after such change in GAAP or in the application thereof, then such provision shall be interpreted on the basis of GAAP as in effect and applied immediately before such change shall have become effective until such notice shall have been withdrawn or such provision amended in accordance herewith.

SECTION 1.06.    Change of Currency.  Each provision of this Agreement also shall be subject to such reasonable changes of construction as the Administrative Agent may from time to time specify after consultation with the Borrower to be appropriate to the extent necessary to reflect a change in currency of any country and any relevant market conventions or practices relating to such change in currency.

SECTION 1.07.    [Reserved].

SECTION 1.08.    Interest Rates; Benchmark Notification.  The interest rate on a Reimbursement Obligations denominated in dollars may be derived from an interest rate benchmark that may be discontinued or is, or may in the future become, the subject of regulatory reform.  Upon the occurrence of a Benchmark Transition Event, Section 2.11(b) provides a mechanism for determining an alternative rate of interest.  The Administrative Agent does not warrant or accept any responsibility for, and shall not have any liability with respect to, the administration, submission, performance or any other matter related to any interest rate used in this Agreement, or with respect to any alternative or successor rate thereto, or replacement rate thereof, including without limitation, whether the composition or characteristics of any such alternative, successor or replacement reference rate will be similar to, or produce the same value or economic equivalence of, the existing interest rate being replaced or have the same volume or liquidity as did any existing interest rate prior to its discontinuance or unavailability.  The Administrative Agent and its affiliates and/or other related entities may engage in transactions that affect the calculation of any interest rate used in this Agreement or any alternative, successor or alternative rate (including any Benchmark Replacement) and/or any relevant adjustments thereto, in each case, in a manner adverse to the Borrower.  The Administrative Agent may select information sources or services in its reasonable discretion to ascertain any interest rate used in this Agreement, any component thereof, or rates referenced in the

32

definition thereof, in each case pursuant to the terms of this Agreement, and shall have no liability to the Borrower, any Lender or any other person or entity for damages of any kind, including direct or indirect, special, punitive, incidental or consequential damages, costs, losses or expenses (whether in tort, contract or otherwise and whether at law or in equity), for any error or calculation of any such rate (or component thereof) provided by any such information source or service.

SECTION 1.09.    Divisions.  For all purposes under the Loan Documents, in connection with any division or plan of division under Delaware law (or any comparable event under a different jurisdiction's laws): (i) if any asset, right, obligation, or liability of any Person becomes the asset, right, obligation, or liability of a different Person, then it shall be deemed to have been transferred from the original Person to the subsequent Person, and (ii) if any new Person comes into existence, such new Person shall be deemed to have been organized on the first date of its existence by the holders of its Equity Interest at such time.

SECTION 1.10.    [Reserved].

SECTION 1.11.    [Reserved].

ARTICLE II

The Credits

SECTION 2.01.    [Reserved].

SECTION 2.02.    [Reserved].

SECTION 2.03.    [Reserved].

SECTION 2.04.    [Reserved].

SECTION 2.05.    [Reserved].

SECTION 2.06.    Termination and Reduction of Commitments.

(a)    The Borrower shall have the right, upon not less than three Business Days' notice to the Administrative Agent, to terminate, or, from time to time, reduce the aggregate amount of the Total Unutilized Commitments; provided (i) any such reduction (x) shall be in an amount equal to an integral multiple of $1,000,000 and not less than $1,000,000, (y) shall be applied to the LC Commitment of each Lender according to its LC Commitment Percentage and (z) shall reduce permanently the Total Commitments then in effect and (ii) the Borrower may not terminate or permanently reduce the amount of the Total Unutilized Commitment if, after giving effect thereto and to any concurrent prepayments hereunder, the total LC Exposure would exceed the Total Commitment. A notice of reduction or termination may state that such notice is conditioned upon the occurrence of any event specified therein, in which case such notice may be revoked (by notice to the Administrative Agent on or prior to the specified effective date) if such condition is not satisfied.

(b)    Unless earlier terminated pursuant to Section 2.06(a), the Total Commitment shall terminate at 5:00 p.m. (New York time) on the Termination Date.

33

SECTION 2.07.     [Reserved].

SECTION 2.08.     Prepayments.

(a)     [Reserved].

(b)     If at any time for any reason the aggregate Dollar Amount of the LC Exposure exceeds the aggregate amount of the Total Commitments as then in effect, the Borrower shall, upon learning thereof, or upon the request of the Administrative Agent, immediately pay to the Administrative Agent an amount of cash equal to the amount of such excess, such cash to be held as security for all Obligations of the Borrower to the Lenders hereunder; provided that solely with respect to any excess described in the foregoing clause resulting from currency exchange rate fluctuations, this Section 2.08(b) shall not apply unless, on the last day of any fiscal quarter of the Borrower, the Dollar Amount of the LC Exposure exceeds the aggregate amount of the Total Commitments by more than 2.5% as a result of such fluctuations.

SECTION 2.09.     Fees.

(a)     The Borrower agrees to pay to the Administrative Agent for the account of each Lender a commitment fee in Dollars for the period from and including the Closing Date to the last day of the Commitment Period, computed at the Commitment Fee Rate on the average daily Dollar Amount of the Total Unutilized Commitments of such Lender during the period for which payment is made, payable on each Fee Payment Date, commencing on the first such date to occur after the Closing Date.

(b)     The Borrower agrees to pay (i) to the Administrative Agent for the account of each Lender a participation fee with respect to its participations in Letters of Credit, which shall accrue at the Applicable Rate on the average daily Dollar Amount of such Lender's LC Exposure (excluding any portion thereof attributable to unreimbursed LC Disbursements) during the period from and including the Closing Date to but excluding the later of the date on which such Lender's LC Commitment terminates and the date on which such Lender ceases to have any LC Exposure, and (ii) to the Lender a fronting fee to be agreed, which shall accrue at the rate that shall not exceed 0.125% per annum on the average daily amount of the LC Exposure of the Letters of Credit issued by it (excluding any portion thereof attributable to unreimbursed LC Disbursements) during the period from and including the Closing Date to but excluding the later of the date of termination of the LC Commitments and the date on which there ceases to be any such LC Exposure, as well as the fees agreed by the Lender and the Borrower with respect to the issuance, amendment, renewal or extension of any Letter of Credit or processing of drawings thereunder.  Participation fees and fronting fees will be payable quarterly in arrears on each Fee Payment Date, commencing on the first such date to occur after the Closing Date; provided that any such fees accruing after the date on which the applicable LC Commitments terminate shall be payable on demand.  Any other fees payable to the Lender pursuant to this paragraph shall be payable within 30 days after demand.  All participation fees and fronting fees shall be computed on the basis of a year of 360 days and shall be payable for the actual number of days elapsed (including the first day but excluding the last day).

(c)     The Borrower agrees to pay to the Administrative Agent the fees in the amounts and on the dates as set forth in any fee agreements with the Administrative Agent and to perform any other obligations contained therein.

(d)     All fees payable hereunder shall be paid on the dates due, in Dollars in immediately available funds, to the Administrative Agent for distribution, in the case of commitment fees, to the applicable Lenders.  Fees paid shall not be refundable under any circumstances.  All per annum fees shall be computed on the basis of a year of 360 days for actual days elapsed.

34

SECTION 2.10.    Interest.

(a)    [Reserved].

(b)    [Reserved].

(c)    Notwithstanding the foregoing, if any principal of or interest on any Reimbursement Obligation or any fee or other amount payable by a Borrower hereunder is not paid when due, whether at stated maturity, upon acceleration or otherwise, such overdue amount shall bear interest, after as well as before judgment, at a rate per annum equal to (i) in the case of overdue principal of any Reimbursement Obligation, 2% plus the Alternate Base Rate plus the Applicable Rate or (ii) in the case of any other amount, 2% plus the Alternate Base Rate plus the Applicable Rate.

(d)    (i) Interest accrued pursuant to paragraph (c) of this Section shall be payable on demand and (ii) if any payment hereunder shall be due on a day that is not a Business Day, the date for payment shall be extended to the next succeeding Business Day and no additional interest shall be payable for the period of such extension.

(e)    Interest computed by reference to the Term SOFR Rate and the Alternate Base Rate (except as set forth below) hereunder shall be computed on the basis of a year of 360 days.  Interest computed by reference to the Alternate Base Rate at times when the Alternate Base Rate is based on the Prime Rate shall be computed on the basis of a year of 365 days (or 366 days in a leap year); except that, with respect to Reimbursement Obligations or other amounts payable hereunder bearing interest based on the Alternate Base Rate, the interest thereon shall be calculated on the basis of 365 days (or 366 days in a leap year).  In each case interest shall be payable for the actual number of days elapsed (including the first day but excluding the last day).  The applicable Alternate Base Rate, Term SOFR Rate or Adjusted Term SOFR Rate shall be determined by the Administrative Agent, and such determination shall be conclusive absent manifest error.

(f)    Each Lender shall have the right to cause the Collateral Agent to apply proceeds on deposit in, or standing to the credit of, the LC Cash Collateral Account to make payments to, or for the account of, the Administrative Agent and/or such Lender, as applicable, for the purposes of (A) satisfying any Letter of Credit draw requests and Reimbursement Obligations, (B) payment of (x) any fees and reimbursable expenses related to the issuance, reimbursement or maintenance of the Letters of Credit and any additional costs fees and expenses reimbursable hereunder and (y) any Indemnified Liabilities under this Agreement or any other Loan Document and (C) to the extent such amounts are not satisfied by the Borrower, the payment of legal fees of Simpson Thacher & Bartlett LLP, as counsel to the Administrative Agent, in each case, without the consent of the Borrower or any other Person; *provided* that (1) the applicable Lender shall provide notice to the Borrower of any payments made pursuant to the foregoing as soon as reasonably practicable, (2) amounts paid pursuant to clauses (B) and (C) shall be made no earlier than two (2) Business Days after invoices with respect thereto are issued and delivered to the Borrower and (3) any payments made pursuant to clause (A) or clause (B) to the extent related to an LC Disbursement can be made by the applicable Lender substantially concurrently with the funding of any LC Disbursement by such Lender.

SECTION 2.11.    Alternative Rate of Interest. (a) Subject to clauses (b), (c), (d), (e) and (f) of this Section 2.11, if:

(i)  the Administrative Agent determines that adequate and reasonable means do not exist for ascertaining the Adjusted Term SOFR Rate or the Term SOFR Rate (including because the Relevant Screen Rate is not available or published on a current basis) for the Agreed Currency and such Interest Period;

35

then the Administrative Agent shall give notice thereof to the Borrower and the Lenders by telephone, telecopy or electronic mail as promptly as practicable thereafter and, until the Administrative Agent notifies the Borrower and the Lenders that the circumstances giving rise to such notice no longer exist with respect to the relevant Benchmark.

(b)    Notwithstanding anything to the contrary herein or in any other Loan Document, if a Benchmark Transition Event and its related Benchmark Replacement Date have occurred prior to the Reference Time in respect of any setting of the then-current Benchmark, then (x) if a Benchmark Replacement is determined in accordance with clause (1) of the definition of "Benchmark Replacement" with respect to Dollars for such Benchmark Replacement Date, such Benchmark Replacement will replace such Benchmark for all purposes hereunder and under any Loan Document in respect of such Benchmark setting and subsequent Benchmark settings without any amendment to, or further action or consent of any other party to, this Agreement or any other Loan Document and (y) if a Benchmark Replacement is determined in accordance with clause (2) of the definition of "Benchmark Replacement" with respect to the Agreed Currency for such Benchmark Replacement Date, such Benchmark Replacement will replace such Benchmark for all purposes hereunder and under any Loan Document in respect of any Benchmark setting at or after 5:00 p.m. (New York City time) on the fifth (5th) Business Day after the date notice of such Benchmark Replacement is provided to the Lenders without any amendment to, or further action or consent of any other party to, this Agreement or any other Loan Document so long as the Administrative Agent has not received, by such time, written notice of objection to such Benchmark Replacement from Lenders comprising the Required Lenders.

(c)    In connection with the implementation of a Benchmark Replacement, the Administrative Agent will have the right to make Benchmark Replacement Conforming Changes from time to time and, notwithstanding anything to the contrary herein or in any other Loan Document, any amendments implementing such Benchmark Replacement Conforming Changes will become effective without any further action or consent of any other party to this Agreement or any other Loan Document.

(d)    The Administrative Agent will promptly notify the Borrower and the Lenders of any occurrence of a Benchmark Transition Event, the implementation of any Benchmark Replacement, the effectiveness of any Benchmark Replacement Conforming Changes, the removal or reinstatement of any tenor of a Benchmark pursuant to clause (f) below and the commencement or conclusion of any Benchmark Unavailability Period.  Any determination, decision or election that may be made by the Administrative Agent or, if applicable, any Lender (or group of Lenders) pursuant to this Section 2.11, including any determination with respect to a tenor, rate or adjustment or of the occurrence or non-occurrence of an event, circumstance or date and any decision to take or refrain from taking any action or any selection, will be conclusive and binding absent manifest error and may be made in its or their sole discretion and without consent from any other party to this Agreement or any other Loan Document, except, in each case, as expressly required pursuant to this Section 2.11.

(e)    Notwithstanding anything to the contrary herein or in any other Loan Document, at any time (including in connection with the implementation of a Benchmark Replacement),  if the then-current Benchmark is a term rate (including the Term SOFR Rate) and either any tenor for such Benchmark is not displayed on a screen or other information service that publishes such rate from time to time as selected by the Administrative Agent in its reasonable discretion or the regulatory supervisor for the administrator of such Benchmark has provided a public statement or publication of information announcing that any tenor for such Benchmark is or will be no longer representative at of such date, then the Administrative Agent may modify (in consultation with the Borrower) the definition of "Interest Period" for any Benchmark settings at or after such time to remove such unavailable or non-representative tenor and if a tenor that was removed pursuant to clause (i) above either is subsequently displayed on a

36

screen or information service for a Benchmark (including a Benchmark Replacement) or is not, or is no longer, subject to an announcement that it is or will no longer be representative for a Benchmark (including a Benchmark Replacement), then the Administrative Agent shall modify the definition of "Interest Period" for all Benchmark settings at or after such time to reinstate such previously removed tenor.

(f)      During any Benchmark Unavailability Period or at any time that a tenor for the then-current Benchmark is not an Available Tenor, the affected component of the Alternate Base Rate based upon the then-current Benchmark or such tenor for such Benchmark, as applicable, will not be used in any determination of the Alternate Base Rate.

SECTION 2.12.      Increased Costs.

(a)      If any Change in Law shall:

(i)      impose, modify or deem applicable any reserve, special deposit or similar requirement against assets of, deposits with or for the account of, or credit extended by, any Lender (including any reserve for eurocurrency funding that may be established or reestablished under Regulation D of the Board);

(ii)      impose on any Lender or the London interbank market any other condition (other than Taxes) affecting this Agreement; or

(iii)      subject any Lender to any Tax (except for Excluded Taxes or Indemnified Taxes) on its loans, letters of credit, commitments, or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto;

and the result of any of the foregoing shall be to increase the cost to such Lender of participating in, issuing or maintaining any Letter of Credit or to reduce the amount of any sum received or receivable by such Lender hereunder (whether of principal, interest or otherwise), then the Borrower will pay to such Lender such additional amount or amounts as will compensate such Lender for such additional costs incurred or reduction suffered, it being understood and agreed, however, that a Lender shall not be entitled to such compensation as a result of such Lender's compliance with any Requirement of Law, or pursuant to any request, rule, guideline or directive to comply with, any Requirement of Law unless such Lender is imposing such charges on or requesting such compensation from other borrowers in the U.S. sub-investment grade loan market with respect to its similarly affected commitments, loans and/or participations under agreements with such borrowers having provisions similar to this Section 2.12(a).

(b)      If any Lender determines that any Change in Law regarding capital or liquidity requirements has or would have the effect of reducing the rate of return on such Lender's capital or on the capital of such Lender's holding company, if any, as a consequence of this Agreement to a level below that which such Lender or such Lender's holding company could have achieved but for such Change in Law (taking into consideration such Lender's policies and the policies of such Lender's holding company with respect to capital adequacy), then from time to time the Borrower will pay to such Lender such additional amount or amounts as will compensate such Lender or such Lender's holding company for any such reduction suffered, it being understood and agreed, however, that a Lender shall not be entitled to such compensation as a result of such Lender's compliance with any Requirement of Law, or pursuant to any request, rule, guideline or directive to comply with, any Requirement of Law unless such Lender is imposing such charges on or requesting such compensation from other borrowers in the U.S. sub-investment grade loan market with respect to its similarly affected commitments, loans and/or participations under agreements with such borrowers having provisions similar to this Section 2.12(b).

37

(c)        A certificate of a Lender setting forth the amount or amounts necessary to compensate such Lender or its holding company, as the case may be, as specified in paragraph (a) or (b) of this Section (and setting forth in reasonable detail the basis for such amount) shall be delivered to the Borrower and shall be conclusive absent manifest error.  The Borrower shall pay such Lender the amount shown as due on any such certificate within 30 days after receipt thereof.

(d)        Failure or delay on the part of any Lender to demand compensation pursuant to this Section shall not constitute a waiver of such Lender's right to demand such compensation; provided that the Borrower shall not be required to compensate a Lender pursuant to this Section for any increased costs or reductions incurred more than 180 days prior to the date that such Lender notifies the Borrower of the Change in Law giving rise to such increased costs or reductions and of such Lender's intention to claim compensation therefor; provided further that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the 180-day period referred to above shall be extended to include the period of retroactive effect thereof.

SECTION 2.13.      [Reserved].

SECTION 2.14.      Taxes.

(a)        Any and all payments by or on account of any obligation of any Loan Party under any Loan Document shall be made without deduction for any Taxes, except as required by applicable law.  If any applicable law (as determined in the good faith discretion of an applicable withholding agent) requires the deduction or withholding of any Tax from any such payment by a withholding agent, then the applicable withholding agent shall be entitled to make such deduction or withholding and shall timely pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with applicable law and, if such Tax is an Indemnified Tax, then the sum payable by the applicable Loan Party shall be increased as necessary so that, after such deduction or withholding has been made (including such deductions and withholdings applicable to additional sums payable under this Section 2.14(a)), the Administrative Agent or applicable Lender, as applicable, receives an amount equal to the sum it would have received had no such deduction or withholding been made.

(b)        Without duplication of Section 2.14(a), the Borrower shall timely pay any Other Taxes to the relevant Governmental Authority in accordance with applicable law, or at the option of the Administrative Agent timely reimburse it for Other Taxes.

(c)        Without duplication of Sections 2.14(a) and 2.14(b), the Borrower shall indemnify the Administrative Agent and each Lender, within 30 days after demand therefor, for the full amount of any Indemnified Taxes paid by the Administrative Agent or such Lender, as the case may be, on or with respect to any payment by or on account of any obligation of the Loan Parties hereunder (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section) and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability (and setting forth in reasonable detail the basis for such payment or liability) delivered to the Borrower by a Lender (with a copy to the Administrative Agent), or by the Administrative Agent on its own behalf or on behalf of a Lender, shall be conclusive absent manifest error.

(d)        As soon as practicable after any payment of Indemnified Taxes by the Borrower to a Governmental Authority pursuant to this Section 2.14, the Borrower shall deliver to the Administrative Agent a copy, or if reasonably available to the Borrower a certified copy, of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

38

4877-7275-1721.6

(e)      Each Lender shall severally indemnify the Administrative Agent, within 10 days after demand therefor, for (i) any Indemnified Taxes attributable to such Lender (but only to the extent that any Loan Paty has not already indemnified the Administrative Agent for such Taxes and without limiting the obligation of the Loan Parties to do so), (ii) any Taxes attributable to such Lender's failure to comply with the provisions of Section 9.05(c)(ii) relating to the maintenance of a Participant Register, and (iii) any Excluded Taxes attributable to such Lender, in each case, that are payable or paid by the Administrative Agent in connection with any Loan Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error.  Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under any Loan Document or otherwise payable by the Administrative Agent to the Lender from any other source against any amount due to the Administrative Agent under this paragraph (e).

(f)      Any Lender (which, solely for purposes of this Section 2.14(f), shall include the Administrative Agent) that is entitled to an exemption from or reduction of withholding with respect to any payments under any Loan Document shall deliver to the Borrower and the Administrative Agent, at the time or times prescribed by applicable law or reasonably requested by the Borrower or the Administrative Agent, such properly completed and executed documentation prescribed by applicable law or reasonably requested by the Borrower or the Administrative Agent as will permit such payments to be made without withholding or at a reduced rate of withholding.  In addition, any Lender, if reasonably requested by the Borrower or the Administrative Agent, shall deliver such other documentation prescribed by applicable law or reasonably requested by the Borrower or the Administrative Agent as will enable the Borrower or the Administrative Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements.  Notwithstanding anything to the contrary in the preceding two sentences, the completion, execution and submission of such documentation (other than such documentation set forth in Section 2.14(f)(ii)(A), (ii)(B) and (ii)(D) below) shall not be required if in the Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender.

(i)      Without limiting the generality of the foregoing,

(A)      any Lender that is a U.S. Person shall deliver to the Borrower and the Administrative Agent on or prior to the date on which such Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), executed copies of IRS Form W-9 (or any successor form) certifying that such Lender is exempt from U.S. Federal backup withholding tax;

(B)      any Non-U.S. Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Non-U.S. Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), whichever of the following is applicable:

(1)      in the case of a Non-U.S. Lender claiming the benefits of an income tax treaty to which the United States is a party (x) with respect to payments of interest under any Loan Document, executed copies of IRS Form W-8BEN or

39

IRS W-8BEN-E (or, in each case, any successor form), as applicable, establishing an exemption from, or reduction of, U.S. Federal withholding Tax pursuant to the "interest" article of such tax treaty and (y) with respect to any other applicable payments under any Loan Document, IRS Form W-8BEN or IRS Form W-8BEN-E (or, in each case, any successor form), as applicable, establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "business profits" or "other income" article of such tax treaty;

(2)     executed copies of IRS Form W-8ECI (or any successor form);

(3)     in the case of a Non-U.S. Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, (x) a certificate substantially in the form of Exhibit G-1 to the effect that such Non-U.S. Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, a "10 percent shareholder" of the Borrower (or if the Borrower is a disregarded entity for U.S. federal income tax purposes, the Borrower's regarded owner) within the meaning of Section 881(c)(3)(B) of the Code, or a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Code (a "U.S. Tax Compliance Certificate") and (y) executed originals of IRS Form W-8BEN or IRS Form W-8BEN-E (or, in each case, any successor form), as applicable; or

(4)     to the extent a Non-U.S. Lender is not the beneficial owner, executed copies of IRS Form W-8IMY, accompanied by IRS Form W-8ECI, IRS Form W-8BEN, IRS Form W-8BEN-E, a U.S. Tax Compliance Certificate substantially in the form of Exhibit G-2 or Exhibit G-3, IRS Form W-9, and/or other certification documents from each beneficial owner (or, in each case, any successor form), as applicable; provided that if the Non-U.S. Lender is a partnership and one or more direct or indirect partners of such Non-U.S. Lender are claiming the portfolio interest exemption, such Non-U.S. Lender may provide a U.S. Tax Compliance Certificate substantially in the form of Exhibit G-4 on behalf of each such direct and indirect partner;

(C)     any Non-U.S. Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Non-U.S. Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), executed copies of any other form prescribed by applicable law as a basis for claiming exemption from or a reduction in U.S. federal withholding Tax, duly completed, together with such supplementary documentation as may be prescribed by applicable law to permit the Borrower or the Administrative Agent to determine the withholding or deduction required to be made; and

(D)     if a payment made to a Lender under any Loan Document would be subject to U.S. Federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to the Borrower and the Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrower or the Administrative Agent such documentation prescribed by applicable law (including as prescribed by Section

40

1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by such Borrower or the Administrative Agent as may be necessary for the Borrower and the Administrative Agent to comply with their obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount, if any, to deduct and withhold from such payment.  Solely for purposes of this clause (D), "FATCA" shall include any amendment made to FATCA after the date of this Agreement.

(E)     For the avoidance of doubt, each person that shall become a Participant pursuant to Section 9.05 or a Lender pursuant to Section 9.05 shall, upon the effectiveness of the related transfer, be required to provide all of the forms and statements required pursuant to this Section 2.14(f).

Each Lender agrees that if any form or certification it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify the Borrower and the Administrative Agent in writing of its legal inability to do so.

(g)     If the Administrative Agent or a Lender determines, in its sole discretion exercised in good faith, that it has received a refund of any Taxes as to which it has been indemnified by a Loan Party or with respect to which a Loan Party has paid additional amounts pursuant to this Section 2.14, it shall pay over such refund to such Loan Party (but only to the extent of indemnity payments made, or additional amounts paid, by such Loan Party under this Section 2.14 with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) of the Administrative Agent or such Lender and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund); provided, that such Loan Party, upon the request of the Administrative Agent or such Lender, agrees to repay the amount paid over to such Loan Party pursuant to this paragraph (g) (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to the Administrative Agent or such Lender in the event the Administrative Agent or such Lender is required to repay such refund to such Governmental Authority.  Notwithstanding anything to the contrary in this paragraph (g), in no event will the Administrative Agent or Lender be required to pay any amount to such Loan Party pursuant to this paragraph (g) the payment of which would place the Administrative Agent or Lender in a less favorable net after-Tax position than the Administrative Agent or Lender would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid.  This Section shall not be construed to require the Administrative Agent or any Lender to make available its tax returns (or any other information relating to its Taxes which it deems confidential) to such Loan Party or any other Person.

(h)     For purposes of this Section, the term "applicable law" includes FATCA.

(i)     Each party's obligations under this Section 2.14 shall survive the resignation or replacement of the Administrative Agent or any assignment of rights by, or the replacement of, a Lender, the termination of the LC Commitments and the repayment, satisfaction or discharge of all obligations under any Loan Document.

SECTION 2.15.     Pro Rata Treatment and Payments.

(a)     Each reduction of the LC Commitments shall be made pro rata among the Lenders according to their respective LC Commitments.  Each payment by a Borrower on account of any commitment fee or any letter of credit fee owing with respect to the Facility shall be paid ratably to the Lenders according to the respective LC Commitment Percentage of the relevant Lenders.

41

(b)      [Reserved].

(c)      All payments (including prepayments) to be made by a Borrower hereunder, whether on account of interest, fees or otherwise, shall be made without setoff or counterclaim and shall be made prior to 3:00 p.m., New York City time on the date when due.  All payments received by the Administrative Agent after 3:00 p.m., New York City time, in the case of payments in Dollars, may, in the discretion of the Administrative Agent, be deemed to have been received on the next succeeding Business Day for purposes of calculating interest thereon.  All such payments shall be made to the Administrative Agent at its offices at 1111 Fannin Street, Houston, Texas, except that payments pursuant to Sections 2.12, 2.13, 2.14 and 9.04 shall be made directly to the Persons entitled thereto.  The Administrative Agent shall distribute such payments to the relevant Lenders promptly upon receipt in like funds as received.  If any payment hereunder becomes due and payable on a day other than a Business Day, such payment shall be extended to the next succeeding Business Day.

(d)      If at any time insufficient funds are received by and available to the Administrative Agent to pay fully all amounts of principal, interest and fees then due hereunder, such funds shall be applied (subject to the rights of the Administrative Agent to hold and apply amounts to be paid to a Defaulting Lender in accordance with Section 2.15(b)) towards payment of interest and fees then due hereunder, ratably among the parties entitled thereto in accordance with the amounts of interest and fees then due to such parties.  To the extent necessary, the Administrative Agent shall enter into foreign currency exchange transactions on customary terms to effect any such ratable payment and the payments made by the Administrative Agent following such transactions shall be deemed to be payments made by or on behalf of the Borrower hereunder.

SECTION 2.16.      Mitigation Obligations; Replacement of Lenders.

(a)      If any Lender requests compensation under Section 2.12, or if a Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 2.14, then such Lender shall use reasonable efforts to designate a different lending office for funding or booking participations in its Letters of Credit hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the judgment of such Lender, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to Section 2.12 or 2.14, as the case may be, in the future and (ii) would not subject such Lender to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender.  The Borrower hereby agrees to pay all reasonable costs and expenses incurred by any Lender in connection with any such designation or assignment.

(b)      If any Lender requests compensation under Section 2.12, or if a Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 2.14, or if any Lender is a Defaulting Lender, then such Borrower may, at its sole expense and effort, upon notice to such Lender and the Administrative Agent, require such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in Section 9.05), all its interests, rights and obligations under this Agreement to an assignee that shall assume such obligations (which assignee may be another Lender, if a Lender accepts such assignment); provided that (i) such Borrower shall have received the consent of the Administrative Agent and the Lender, as applicable, to the extent required by Section 9.05, which consent shall not unreasonably be withheld, (ii) such Lender shall have received payment of an amount equal to the outstanding participations in unreimbursed LC Disbursements, accrued interest thereon, accrued fees and all other amounts payable to it hereunder, from the assignee (to the extent of such outstanding participations and accrued interest and fees) or the Borrower (in the case of all other amounts) and (iii) in the case of any such assignment resulting from a claim for

42

compensation under Section 2.12 or payments required to be made pursuant to Section 2.14, such assignment will result in a reduction in such compensation or payments. A Lender shall not be required to make any such assignment and delegation if, prior thereto, as a result of a waiver by such Lender or otherwise, the circumstances entitling such Borrower to require such assignment and delegation cease to apply.

(c)     If any Lender (such Lender , a "Non-Consenting Lender ") has failed to consent to a proposed amendment, waiver, discharge or termination which pursuant to the terms of Section 9.02 requires the consent of all Lenders or all of the Lenders affected and with respect to which the Required Lenders shall have granted their consent, then the Borrower shall have the right (unless such Non-Consenting Lender grants such consent) to replace such Non-Consenting Lender by requiring such Non-Consenting Lender to assign its LC Commitments hereunder to one or more assignees reasonably acceptable to the Administrative Agent, provided that: (a) all amounts owing to such Non-Consenting Lender being replaced (other than principal and interest) shall be paid in full to such Non-Consenting Lender concurrently with such assignment, and (b) the replacement Lender shall purchase the foregoing by paying to such Non-Consenting Lender a price equal to the principal amount thereof plus accrued and unpaid interest thereon. In connection with any such assignment the Borrower, Administrative Agent, such Non-Consenting Lender and the replacement Lender shall otherwise comply with Section 9.05; provided that such Non-Consenting Lender need not be party to the Assignment and Assumption in order for such assignment to be effective.

SECTION 2.17.     Letters of Credit.

(a)     General. Subject to the terms and conditions set forth herein, the Borrower may request that standby or trade letters of credit be issued, amended, renewed or extended under the Facility for its own account or the account of any of its subsidiaries ("Letters of Credit") in a form reasonably acceptable to the Administrative Agent and the Issuing Bank, at any time and from time to time during the Commitment Period. In the event of any inconsistency between the terms and conditions of this Agreement and the terms and conditions of any form of letter of credit application or other agreement submitted by the Borrower to, or entered into by the Borrower with, the Issuing Bank relating to any Letter of Credit, the terms and conditions of this Agreement shall control. On the Closing Date, the Borrower and Issuing Banks agree that the Existing Letters of Credit shall be deemed issued and outstanding pursuant to, and shall constitute "Letters of Credit", for all purposes of, this Agreement and the other Loan Documents.

(b)     Notice of Issuance, Amendment, Renewal, Extension; Certain Conditions. To request the issuance of a Letter of Credit (or the amendment, renewal or extension of an outstanding Letter of Credit), the Borrower shall hand deliver or telecopy (or transmit by electronic communication, if arrangements for doing so have been approved by the Issuing Bank) to the Issuing Bank and the Administrative Agent (five Business Days in advance (or such shorter time as may be agreed by the applicable Issuing Bank) of the requested date of issuance, amendment, renewal or extension) a notice requesting the issuance of a Letter of Credit, or identifying the Letter of Credit to be amended, renewed or extended, and specifying the date of issuance, amendment, renewal or extension (which shall be a Business Day), the date on which such Letter of Credit is to expire (which shall comply with paragraph (c) of this Section), the amount and currency of such Letter of Credit, the name and address of the beneficiary thereof and such other information as shall be necessary to prepare, amend, renew or extend such Letter of Credit; provided that the foregoing shall not be required with respect to any Letters of Credit that are to be deemed issued in order to roll any Existing Letters of Credit. If requested by the Issuing Bank, the requesting Borrower also shall submit a letter of credit application on the Issuing Bank's standard form in connection with any request for a Letter of Credit. A Letter of Credit shall be issued, amended, renewed or extended only if, (x) after giving effect to such issuance, amendment, renewal or extension (i) the LC Exposure shall not exceed $300,000,000, (ii) with respect to any Issuing Bank that is an Issuing Bank on the Closing Date, the Letters

43

of Credit issued by such Issuing Bank shall not exceed the amount set forth under the heading "Issuing Bank Commitment" opposite such Issuing Bank's name on Schedule 1.01A or such greater amount as may be agreed by the Borrower and such Issuing Bank (each such amount, the "Issuing Bank Commitment") and (iii) with respect to any Issuing Bank that is not an Issuing Bank on the Closing Date, the Letters of Credit issued by such Issuing Bank shall not exceed an amount to be agreed between the Borrower and such Issuing Bank, and (y) the issuance, amendment, renewal or extensions of such Letter of Credit does not violate the applicable Issuing Bank's internal policies.

(c)      Expiration Date.  Each Letter of Credit shall expire at or prior to the close of business on a date that is no later one year following the issuance, renewal or extension of such Letter of Credit; provided that, solely with respect to any Letter of Credit with an expiry date after the Termination Date, the Borrower shall enter into arrangements to provide to the relevant Issuing Bank cash collateral in an amount equal to at least 105% of the face amount thereof or such other credit support or backstop arrangements as may be agreed between the Borrower and such Issuing Bank.

(d)      Participations.  By the issuance of a Letter of Credit (or an amendment to a Letter of Credit increasing the amount thereof) and without any further action on the part of the Issuing Bank or the Lenders, the Issuing Bank hereby grants to each Lender, and each Lender hereby acquires from the Issuing Bank, a participation in such Letter of Credit equal to such Lender's LC Commitment Percentage of the aggregate amount available to be drawn under such Letter of Credit.  In consideration and in furtherance of the foregoing, each Lender hereby absolutely and unconditionally agrees to pay to the Administrative Agent, for the account of the Issuing Bank, such Lender's LC Commitment Percentage of each LC Disbursement with respect thereto made by the Issuing Bank and not reimbursed by the Borrower on the date due as provided in paragraph (f) of this Section, or of any reimbursement payment required to be refunded to the Borrower for any reason.  Each Lender acknowledges and agrees that its obligation to acquire participations pursuant to this paragraph in respect of Letters of Credit is absolute and unconditional and shall not be affected by any circumstance whatsoever, including any amendment, renewal or extension of any Letter of Credit or the occurrence and continuance of a Default, and that each such payment shall be made without any offset, abatement, withholding or reduction whatsoever.

(e)      [Reserved]

(f)      Reimbursement.  If the Issuing Bank shall make any LC Disbursement in respect of a Letter of Credit, the Borrower shall reimburse such LC Disbursement by paying to the Administrative Agent an amount equal to such LC Disbursement not later than 12:00 noon, New York City time, on the date that such LC Disbursement is made, if such Borrower shall have received notice of such LC Disbursement prior to 10:00 a.m., New York City time, on such date, or, if such notice has not been received by such Borrower prior to such time on such date, then not later than 12:00 noon, New York City time, on the Business Day immediately following the day that such Borrower receives such notice.  If such Borrower fails to make such payment when due, the Administrative Agent shall notify each applicable Lender of the applicable LC Disbursement, the payment then due from such Borrower in respect thereof and such Lender's applicable LC Commitment Percentage thereof.  Promptly following receipt of such notice, each such Lender (or a foreign or domestic branch or Affiliate thereof) shall pay to the Administrative Agent such LC Commitment Percentage of the payment then due from such Borrower on the proposed date thereof by wire transfer of immediately available funds by 2:00 p.m., New York City time to the account of the Administrative Agent most recently designated by it for such purpose by notice to the Lenders, and the Administrative Agent shall promptly pay to the Issuing Bank the amounts so received by it from the Lenders.  Promptly following receipt by the Administrative Agent of any payment from the Borrower pursuant to this paragraph, the Administrative Agent shall distribute such payment to the Issuing Bank or, to the extent that Lenders have made payments pursuant to this paragraph to reimburse the Issuing Bank, then to such Lenders and the

44

Issuing Bank as their interests may appear.  Any payment made by a Lenders pursuant to this paragraph to reimburse the Issuing Bank for any LC Disbursement shall not relieve the Borrower of its obligation to reimburse such LC Disbursement.

(g)     Obligations Absolute.   The Borrower's obligation to reimburse applicable LC Disbursements as provided in paragraph (f) of this Section shall be absolute, unconditional and irrevocable, and shall be performed strictly in accordance with the terms of this Agreement under any and all circumstances whatsoever and irrespective of (i) any lack of validity or enforceability of any Letter of Credit or this Agreement, or any term or provision therein, (ii) any draft or other document presented under a Letter of Credit proving to be forged, fraudulent or invalid in any respect or any statement therein being untrue or inaccurate in any respect, (iii) payment by the Issuing Bank under a Letter of Credit against presentation of a draft or other document that does not comply with the terms of such Letter of Credit, or (iv) any other event or circumstance whatsoever, whether or not similar to any of the foregoing, that might, but for the provisions of this Section, constitute a legal or equitable discharge of, or provide a right of setoff against, such Borrower's obligations hereunder; provided that reimbursement obligations of such Borrower with respect to a Letter of Credit may be subject to avoidance by such Borrower to the extent of any direct damages (as opposed to consequential damages, claims in respect of which are hereby waived by such Borrower to the extent permitted by applicable law) suffered by such Borrower or any subsidiary that are caused by the Issuing Bank's failure to exercise care when determining whether drafts and other documents presented under a Letter of Credit comply with the terms thereof.  Neither the Administrative Agent, the Lenders nor any Issuing Bank, nor any of their respective Related Parties, shall have any liability or responsibility by reason of or in connection with the issuance or transfer of any Letter of Credit or any payment or failure to make any payment thereunder (irrespective of any of the circumstances referred to in the preceding sentence), or any error, omission, interruption, loss or delay in transmission or delivery of any draft, notice or other communication under or relating to any Letter of Credit (including any document required to make a drawing thereunder), any error in interpretation of technical terms or any consequence arising from causes beyond the control of the Issuing Bank; provided that the foregoing shall not be construed to excuse the Issuing Bank from liability to any Borrower to the extent of any direct damages (as opposed to consequential damages, claims in respect of which are hereby waived by such Borrower to the extent permitted by applicable law) suffered by such Borrower that are caused by the Issuing Bank's failure to exercise care when determining whether drafts and other documents presented under a Letter of Credit comply with the terms thereof. The parties hereto expressly agree that, in the absence of gross negligence or willful misconduct on the part of the Issuing Bank (as finally determined by a court of competent jurisdiction), such Issuing Bank shall be deemed to have exercised care in each such determination.  In furtherance of the foregoing and without limiting the generality thereof, the parties agree that, with respect to documents presented which appear on their face to be in substantial compliance with the terms of a Letter of Credit, the Issuing Bank may, in its sole discretion, either accept and make payment upon such documents without responsibility for further investigation, regardless of any notice or information to the contrary, or refuse to accept and make payment upon such documents if such documents are not in strict compliance with the terms of such Letter of Credit.

(h)     Disbursement Procedures.  The Issuing Bank shall, promptly following its receipt thereof, examine all documents purporting to represent a demand for payment under a Letter of Credit.  The Issuing Bank shall promptly notify the Administrative Agent and the Borrower by telephone (confirmed by telecopy) of such demand for payment and whether the Issuing Bank has made or will make an LC Disbursement thereunder; provided that any delay in giving such notice shall not relieve such Borrower of its obligation to reimburse the Issuing Bank and the applicable Lenders with respect to any such LC Disbursement.

4877-7275-1721.6

(i)        Interim Interest.  If the Issuing Bank shall make any LC Disbursement, then, unless the Borrower shall reimburse such LC Disbursement in full on the date set forth in paragraph (f) of this Section 2.17, the unpaid amount thereof shall bear interest, for each day from and including the date such LC Disbursement is required to be reimbursed to but excluding the date that such Borrower reimburses such LC Disbursement, at the rate per annum set forth in Section 2.10(c)(ii).  Interest accrued pursuant to this paragraph shall be for the account of the Issuing Bank, except that interest accrued on and after the date of payment by any applicable Lender pursuant to paragraph (e) of this Section to reimburse the Issuing Bank shall be for the account of such Lender to the extent of such payment.

(j)        Replacement of an Issuing Bank.  An Issuing Bank may be replaced at any time by written agreement among the Borrower, the Administrative Agent, the replaced Issuing Bank and the successor Issuing Bank.  The Administrative Agent shall notify the Lenders of any such replacement of an Issuing Bank.  At the time any such replacement shall become effective, the Borrower shall pay all unpaid fees accrued for the account of the replaced Issuing Bank pursuant to Section 2.09(b).  From and after the effective date of any such replacement, (a) the successor Issuing Bank shall have all the rights and obligations of an Issuing Bank under this Agreement with respect to Letters of Credit to be issued thereafter and (b) references herein to the term "Issuing Bank" shall be deemed to include such successor and any previous Issuing Bank, or such successor and all previous Issuing Banks, as the context shall require.  After the replacement of an Issuing Bank hereunder, the replaced Issuing Bank shall remain a party hereto and shall continue to have all the rights and obligations of an Issuing Bank under this Agreement with respect to Letters of Credit issued by it prior to such replacement, but shall not be required to issue additional Letters of Credit.

(k)        Cash Collateralization.

(i)        Subject to Section 5.10, the Borrower shall maintain LC Cash Collateral in the LC Cash Collateral Account in a manner that satisfies the Minimum Cash Collateral Requirement at all times.

(ii)        At any time that the Administrative Agent is aware that the Borrower is not in compliance with the Minimum Cash Collateral Requirement, the Administrative Agent may deliver a written notice describing the shortfall in LC Cash Collateral to the Borrower (such notice, a "Deficiency Notice") and failure to remedy such shortfall in a manner that would satisfy the Minimum Cash Collateral Requirement for three (3) Business Days following the date of receipt by the Borrower of such Deficiency Notice shall constitute a Default and an Event of Default; provided that, for the avoidance of doubt, a failure to comply with the Minimum Cash Collateral Requirement within three (3) Business Days after the delivery of a Deficiency Notice shall constitute a Default and an Event of Default.

SECTION 2.18.    Defaulting Lenders.    Notwithstanding any provision of this Agreement to the contrary, if any Lender becomes a Defaulting Lender, then the following provisions shall apply for so long as such Lender is a Defaulting Lender:

(a)        Fees shall cease to accrue on the unfunded portion of the LC Commitment of such Defaulting Lender pursuant to Section 2.09(a).

(b)        The LC Commitments of such Defaulting Lender shall not be included in determining whether the Required Lenders have taken or may take any action hereunder (including any consent to any amendment, waiver or other modification pursuant to Section 9.02); provided that this Section 2.18(b) shall not apply to the vote of a Defaulting Lender in the case of an amendment, waiver or other modification effecting (i) an increase or extension of any of such Defaulting Lender's LC Commitments or (ii) the

46

reduction or excuse of interest or fees payable on such Defaulting Lender's LC Commitments or the postponement of the scheduled date of payment of such interest or fees to such Defaulting Lender.

(c)      If any Letters of Credit exist at the time such Lender becomes a Defaulting Lender then:

(i)      Such Defaulting Lender's LC Exposure shall be reallocated among the non-Defaulting Lenders in accordance with their respective LC Commitment Percentages (but excluding the LC Commitments of all the Defaulting Lenders from both the numerator and the denominator); provided that (x) the sum of the LC Exposure of all non-Defaulting Lenders does not exceed the total of all non-Defaulting Lenders' LC Commitments, (y) the representations and warranties of each Loan Party set forth in the Loan Documents to which it is a party are true and correct at such time, except to the extent that any such representation and warranty relates to an earlier date (in which case such representation and warranty shall be true and correct as of such earlier date), and (z) no Default shall have occurred and be continuing at such time;

(ii)      If the reallocation described in clause (i) above cannot, or can only partially, be effected, the Borrower shall, within one Business Day following notice by the Administrative Agent, cash collateralize for the benefit of the Lender such Defaulting Lender's applicable LC Exposure (after giving effect to any partial reallocation pursuant to clause (i) above, as applicable) for so long as any Letters of Credit are outstanding;

(iii)      If a Borrower cash collateralizes any portion of such Defaulting Lender's LC Exposure under the Facility pursuant to clause (ii) above, the Borrower shall not be required to pay any fees to such Defaulting Lender pursuant to Section 2.09(b) with respect to such Defaulting Lender's LC Exposure under the Facility during the period such Defaulting Lender's LC Exposure is cash collateralized by such Borrower;

(iv)      If LC Exposures of the non-Defaulting Lenders are reallocated pursuant to clause (i) above, then the fees payable to the applicable Lenders pursuant to Section 2.09(a) and Section 2.09(b) shall be adjusted to reflect such non-Defaulting Lenders' LC Exposure as reallocated; and if any Defaulting Lender's LC Exposure is neither cash collateralized nor reallocated pursuant to clauses (i) or (ii) above, then, without prejudice to any rights or remedies of the Lender hereunder, all letter of credit fees payable under Section 2.09(b) with respect to such Defaulting Lender's LC Exposure shall be payable to the Lender until such LC Exposure is cash collateralized and/or reallocated.

(d)      So long as such Defaulting Lender is a Defaulting Lender, the each non-Defaulting Lender shall not be required to issue, amend or increase any Letter of Credit, unless it is satisfied that the related LC Exposure will be 100% covered by the LC Commitments of the applicable non-Defaulting Lenders and/or cash collateral will be provided by the Borrower in accordance with Section 2.18(c)(ii), and the LC Exposure in any such newly issued or increased Letter of Credit shall be allocated among applicable non-Defaulting Lender in a manner consistent with Section 2.18(c)(i) (and such Defaulting Lender shall not participate therein).

The rights and remedies against a Defaulting Lender under this Agreement are in addition to other rights and remedies that the Borrower may have against such Defaulting Lender with respect to any funding default and that the Administrative Agent or any Lender may have against such Defaulting Lender with respect to any funding default.  In the event that the Administrative Agent, the Borrower and the Lender each agrees that a Defaulting Lender has adequately remedied all matters that caused such Lender to be a Defaulting Lender, then the LC Exposure shall be readjusted to reflect the inclusion of such Lender's LC Commitment.  Except as set forth in this Agreement, no Borrower shall be excused from its obligations

47

under this Agreement and the other Loan Documents to which it is a party as a result of any Lender becoming a Defaulting Lender.

          SECTION 2.19.    [Reserved].

          SECTION 2.20.    [Reserved].

ARTICLE III

Representations and Warranties

The Borrower represents and warrants to the Lenders that:

SECTION 3.01.    Organization; Powers.  Each of such Borrower, its Material Subsidiaries and its Subsidiary Guarantors is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization, has, subject to the entry of the Interim DIP Order, all requisite power and authority to carry on its business as now conducted and, except where the failure to do so, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect, is qualified to do business in, and is in good standing in, every jurisdiction where such qualification is required.

SECTION 3.02.    Authorization; Enforceability.  Subject to the entry of the Interim DIP Order, the Transactions to be performed by the Borrower and its Subsidiary Guarantors (excluding use of proceeds) are within the corporate or other organizational powers of such Loan Parties and have been duly authorized by all necessary corporate or other organizational and, if required, stockholder action.  Each Loan Document to which such Borrower or any of its Subsidiary Guarantors are party has been duly executed and delivered by each such Loan Party and, subject to the entry of the Interim DIP Order, constitutes a legal, valid and binding obligation of each such Loan Party, enforceable in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law.

SECTION 3.03.    Governmental Approvals; No Conflicts.  The Transactions to be performed by such Borrower and its Subsidiary Guarantors (excluding use of proceeds) (a) subject to the entry of the Interim DIP Order, do not require any consent or approval of, registration or filing (other than routine tax filings) with, or any other action by, any Governmental Authority, except (i) such as have been obtained or made and are in full force and effect, (ii) [reserved] and (iii) consents, approvals, registrations, filings or actions which the failure to obtain or make would not reasonably be expected to result in a Material Adverse Effect, (b) except as a result of, and in connection with, the Chapter 11 Cases, will not violate any applicable law or regulation or the charter, by-laws or other organizational documents of such Borrower or any of its Material Subsidiaries or any order of any Governmental Authority, except, in the case of any such applicable law or regulation or order, for such violations that would not reasonably be expected to result in a Material Adverse Effect, (c) will not violate or result in a default under any indenture, agreement or other instrument binding upon such Borrower or any of its Material Subsidiaries or its assets, or give rise to a right thereunder to require any payment to be made by such Borrower or any of its Material Subsidiaries, except for such violations, defaults and payments that would not reasonably be expected to result in a Material Adverse Effect and (d) will not result in the creation or imposition of any Lien on the LC Cash Collateral (other than Liens securing the Obligations and Liens permitted by Section 6.02).

SECTION 3.04.     Financial Position.  Such Borrower has heretofore furnished to the Lenders its consolidated balance sheet and statements of income, stockholders' equity and cash flows as of and for the fiscal year ended December 31, 2025.  Such financial statements present fairly, in all material respects, the financial position and results of operations and cash flows of such Borrower and its consolidated subsidiaries as of such date and for such period in accordance with GAAP (except in connection with changes in accounting related to customer deliveries).

SECTION 3.05.     [Reserved].

SECTION 3.06.     Litigation and Environmental Matters. Except for the Chapter 11 Cases, there are no actions, suits or proceedings (including labor matters) by or before any arbitrator or Governmental Authority pending against or, to the knowledge of such Borrower, threatened in writing against or affecting such Borrower or any of its subsidiaries that involve this Agreement or the Transactions (excluding use of proceeds).

SECTION 3.07.     [Reserved].

SECTION 3.08.     Investment Company Status.  Neither such Borrower nor any of its subsidiaries is an "investment company" as defined in, or subject to regulation under, the Investment Company Act of 1940.

SECTION 3.09.     [Reserved]..

SECTION 3.10.     [Reserved].

SECTION 3.11.     Disclosure.  To the best of such Borrower's knowledge, as of the Closing Date, none of the reports, financial statements, certificates or other written information furnished by or on behalf of the Borrower to the Administrative Agent or any Lender in connection with the negotiation of this Agreement or delivered hereunder (as modified or supplemented by other written information so furnished), taken as a whole, contains any material misstatement of fact or omits to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading; provided that with respect to projected financial information, other forward-looking information and information of a general economic or industry-specific nature, such Borrower represents only that such information was prepared in good faith based upon assumptions believed by such Borrower to be reasonable at the time furnished.

SECTION 3.12.     Security Documents.

(a)     Upon the entry by the Bankruptcy Court of the Interim DIP Order or Final DIP Order, as applicable, the DIP Order is effective to create in favor of the Administrative Agent, for the benefit of the Secured Parties, a legal, valid, enforceable and automatically perfected exclusive security interest in the LC Cash Collateral.

(b)     Pursuant to the DIP Order, no filing or other action will be necessary to perfect or protect such Liens and security interests.

SECTION 3.13.     [Reserved].

SECTION 3.14.     Existing Letters of Credit.  All letters of credit issued under the Pre-Petition Credit Agreement that are outstanding as of the Closing Date are listed as Existing Letters of Credit on Schedule 1.01E.

49

4877-7275-1721.6

SECTION 3.15.    Anti-Corruption Laws, Anti-Money Laundering Laws and Sanctions. Such Borrower has implemented and maintains in effect policies and procedures designed to ensure compliance by such Borrower, its subsidiaries and their respective directors, officers, employees and agents with Anti-Corruption Laws, Anti-Money Laundering Laws and applicable Sanctions, and such Borrower, its subsidiaries, and to the knowledge of such Borrower, its directors, officers, employees  (in each case, in such roles), are in compliance with Anti-Corruption Laws, Anti-Money Laundering Laws and applicable Sanctions in all material respects and are not knowingly engaged in any activity that would reasonably be expected to result in such Borrower being designated as a Sanctioned Person.  None of (a) such Borrower, any of its subsidiaries or, to the knowledge of such Borrower or any such subsidiary, any of their respective directors, officers or employees, or (b) to the knowledge of such Borrower, any agent of such Borrower or any of its subsidiaries that will act in any capacity in connection with or benefit from the credit facility established hereby, is a Sanctioned Person.  No Loan or Letter of Credit incurred by such Borrower, use of proceeds thereof or other transaction contemplated by this Agreement will violate either Anti-Corruption Laws or Anti-Money Laundering Laws applicable to such Borrower or its subsidiaries or applicable Sanctions.

SECTION 3.16.    Affected Financial Institution.  Neither the Borrower nor any of its Subsidiary Guarantors is an Affected EEA Financial Institution.

SECTION 3.17.    Margin Regulation.  The Borrower is not engaged and will not engage, principally or as one of its important activities, in the business of purchasing or carrying Margin Stock, or extending credit for the purpose of purchasing or carrying Margin Stock.

SECTION 3.18.    [Reserved].

SECTION 3.19.    Bankruptcy Matters.

(a)    The Chapter 11 Cases were validly commenced on the Petition Date, and (x) proper notice under the circumstances of the motion seeking approval of the Loan Documents and entry of the DIP Order was given, and (y) the hearing for the approval of the Interim DIP Order has been held by the Bankruptcy Court.

(b)    After the entry of the DIP Order, the liens securing the Obligations shall be senior secured, valid, enforceable, having the priorities set forth in the DIP Order, subject in all respects to the exceptions set forth in the DIP Order and the Loan Documents.

(c)    The Interim DIP Order (with respect to the period prior to the entry of the Final DIP Order) or the Final DIP Order (with respect to the period on and after the entry of the Final DIP Order), as the case may be, is in full force and effect and has not been reversed, stayed (whether by statutory stay or otherwise), modified or amended without the Required Lenders' consent.

ARTICLE IV

Conditions

SECTION 4.01.    Closing Date.  This Agreement shall not become effective until the date on which each of the following conditions is satisfied (or waived in accordance with Section 9.02):

50

(a)      The Administrative Agent (or its counsel) shall have received (which, subject to Section 9.07, may include any Electronic Signatures transmitted by telecopy, emailed pdf. or any other electronic means that reproduces an image of an actual executed signature page) a counterpart of this Agreement signed on behalf of the Borrower and the Lenders party thereto.

(b)      The Administrative Agent (or its counsel) shall have received (which, subject to Section 4.7 of the Subsidiary Guarantee, may include any Electronic Signatures transmitted by telecopy, email or other electronic means) a counterpart of the Subsidiary Guarantee signed on behalf of each Subsidiary Guarantor and the Collateral Agent.

(c)      The Administrative Agent shall have received, for the ratable account of each Lender in accordance with such Lender's LC Commitment, a closing fee in an amount equal to 0.75% of the aggregate principal amount of the Total Commitment.

(d)      The Administrative Agent shall have received such documents and certificates as the Administrative Agent or its counsel may reasonably request relating to the organization, existence and good standing of the Loan Parties, the authorization of the Transactions (excluding use of proceeds) and any other legal matters relating to the Loan Parties, this Agreement or the Transactions (excluding use of proceeds), including a certificate of each Loan Party substantially in the form of Exhibit E, all in form and substance reasonably satisfactory to the Administrative Agent and its counsel.

(e)      The Administrative Agent shall have received a certificate of the Borrower, dated the Closing Date and signed by the President, a Vice President or a Financial Officer thereof, confirming that (a) the representations and warranties of such Borrower and its Subsidiary Guarantors set forth in the Loan Documents are true and correct in all material respects (and in all respects if qualified by materiality) as of the Closing Date and (b) as of the Closing Date, no Default by such Borrower or its Subsidiary Guarantors has occurred and is continuing.

(f)      [Reserved].

(g)      [Reserved].

(h)      Chapter 11 Cases.

(i)      The Chapter 11 Cases shall have been commenced by the Chapter 11 Debtors.

(ii)      The Interim DIP Order shall have been entered on the docket of the Bankruptcy Court no later than three (3) Business Days after the Petition Date, which Interim DIP Order shall be in full force and effect and shall not have been reversed, vacated or stayed, and shall not have been amended, supplemented or otherwise modified without the consent of the Administrative Agent and the Required Lenders.

(iii)      The Cash Management Order shall have been entered on the docket of the Bankruptcy Court which Cash Management Order shall be in full force and effect and shall not have been reversed, vacated or stayed, and shall not have been amended, supplemented or otherwise modified without the prior written consent of the Administrative Agent and the Required Lenders.

(iv)      The Restructuring Support Agreement in form and substance reasonably satisfactory to the Administrative Agent shall be in full force and effect and shall not have been amended or modified in a fashion other than in accordance with the Restructuring Support Agreement the terms thereof and no event that would permit the Required Consenting RCF Lenders

51

(as defined in the Restructuring Support Agreement) to terminate the Restructuring Support Agreement under Section 12.01 thereof shall have occurred and be continuing.

(i)       Other than the Chapter 11 Cases, there shall not exist any actions, suits, investigations or proceedings by or before any arbitrator or Governmental Authority pending against or, to the knowledge of the Chapter 11 Debtors, threatened in writing against or affecting any Chapter 11 Debtor, (i) that involve this Agreement or the transactions contemplated herein or (ii) which is not otherwise subject to the automatic stay as a result of the Chapter 11 Cases.

(j)       [reserved].

(k)       [reserved].

(l)       [reserved].

(m)       Each Loan Party shall have provided at least three Business Days prior to the Closing Date (to the extent reasonably requested at least 10 Business Days prior to the Closing Date) (i) the documentation and other information requested by the Lenders that is required by regulatory authorities under applicable "know your customer" and anti-money-laundering rules and regulations, including without limitation, the Act and (ii) to the extent a Borrower qualifies as a "legal entity customer" under the Beneficial Ownership Regulation, the Beneficial Ownership Certification in relation to such Borrower that has been requested by any Lender (provided that, such Beneficial Ownership Certification will not contain information regarding shareholders of publicly traded companies; provided further that, upon the execution and delivery by such Lender of its signature page to this Agreement, the condition set forth in this clause (ii) shall be deemed to be satisfied).

(n)       [Reserved].

(o)       All Obligations shall be secured by a perfected lien and security interest on all LC Cash Collateral pursuant to and with the priority set forth in, the Interim DIP Order.

(p)       Other than (and subject to the entry of) the Interim DIP Order, all necessary governmental and third party consents and approvals necessary in connection with the Facility and the Transactions shall have been obtained (without the imposition of any materially adverse conditions that are not acceptable to the Required Lenders) and shall remain in effect; and the making of the loans under the Facility shall not violate any material applicable requirement of law and shall not be enjoined temporarily, preliminarily or permanently.

The Administrative Agent shall notify the Borrower and the Lenders of the Closing Date, and such notice shall be conclusive and binding.

SECTION 4.02.     Each Credit Event. The obligation of each Lender to issue any Letter of Credit on the Closing Date or thereafter is subject to the satisfaction of the following conditions:

(a)       The representations and warranties of each of such Borrower and its Subsidiary Guarantors set forth in the Loan Documents to which it is a party shall be true and correct in all material respects (or in all respects if qualified by materiality) on and as of the date of such issuance, except to the extent that any such representation and warranty relates to an earlier date (in which case such representation and warranty shall be true and correct as of such earlier date).

52

4877-7275-1721.6

(b)        At the time of and immediately after giving effect to such issuance, no Default shall have occurred and be continuing.

(c)        Except with respect to the Existing Letters of Credit, the Administrative Agent or Lender shall have received a Letter of Credit request in accordance with Section 2.17(b).

(d)        Subject to Section 5.10, after giving effect to any issuance of any Letters of Credit (including, for the avoidance of doubt, the Existing Letters of Credit), the Minimum Cash Collateral Requirement shall be satisfied.

(e)        Solely with respect to issuances requested on or after thirty-five days after entry of the Interim Order, the Bankruptcy Court shall have entered the Final DIP Order, which Final DIP Order shall be in full force and effect and shall not have been reversed, vacated or stayed, and shall not have been amended, supplemented or otherwise modified without the consent of the Administrative Agent and the Required Lenders.

(f)        The Restructuring Support Agreement shall be in full force and effect and shall not have been amended or modified in a fashion other than in accordance with the Restructuring Support Agreement and no event that would permit the Required Consenting RCF Lenders (as defined in the Restructuring Support Agreement) to terminate the Restructuring Support Agreement under Section 12.01 thereof shall have occurred and be continuing.

Each issuance of a Letter of Credit hereunder on behalf of the Borrower shall be deemed to constitute a representation and warranty by such Borrower on the date thereof as to the matters specified in paragraphs (a) and (b) of this Section.

ARTICLE V

Affirmative Covenants

Until the LC Commitments have expired or been terminated and the interest on each Letter of Credit and all fees payable hereunder shall have been paid in full (other than in respect of contingent indemnification and expense reimbursement claims not then due) and all Letters of Credit have expired, the Borrower covenants and agrees with the Lenders that:

SECTION 5.01.        [Reserved].  The Borrower (other than any subsidiary of the Borrower that becomes a Borrower under this Agreement after the Closing Date) will furnish to the Administrative Agent and each Lender:

(a)        [reserved];

(b)        [reserved];

(c)        [reserved];

(d)        [reserved];

(e)        promptly after the same become publicly available, copies of all periodic and other reports, proxy statements and other materials filed by such Borrower or any of its subsidiaries with the SEC, or any Governmental Authority succeeding to any or all of the functions of the SEC, or with any national securities

4877-7275-1721.6

exchange, as the case may be; <u>provided that</u> the public filing of any such report, proxy statement or other materials with the SEC shall constitute delivery under this clause (e);

(f)        [reserved]; and

(g)        promptly following any reasonable request therefor, information and documentation reasonably requested by the Administrative Agent or any Lender for purposes of compliance with applicable "<u>know your customer</u>" and anti-money laundering rules and regulations, including the Act and the Beneficial Ownership Regulation.

SECTION 5.02.    <u>Notices of Material Events</u>.    The Borrower will furnish to the Administrative Agent for delivery to each Lender prompt written notice of the following:

(a)        the occurrence of any Default by such Borrower or any of its Subsidiary Guarantors;

(b)        [reserved];

(c)        [reserved] and;

(d)        upon reasonable request of a Lender or the Administrative Agent, any change in the information provided in the Beneficial Ownership Certification delivered to such Lender or the Administrative Agent that would result in a change in the list of beneficial owners identified in such certification.

Each notice delivered under this Section shall be accompanied by a statement of a Financial Officer or other executive officer of such Borrower setting forth the details of the event or development requiring such notice and any action taken or proposed to be taken with respect thereto.

SECTION 5.03.    <u>Existence; Conduct of Business</u>.

(a)        The Borrower will do or cause to be done all things necessary to preserve, renew and keep in full force and effect its legal existence and the rights, licenses, permits, privileges and franchises material to the conduct of its business.

(b)        Such Borrower will, and will cause each of its subsidiaries to, maintain in effect and enforce policies and procedures designed to ensure compliance by such Borrower, its subsidiaries and their respective directors, officers, employees and agents with Anti-Corruption Laws, Anti-Money Laundering Laws and applicable Sanctions.

SECTION 5.04.    <u>[Reserved]</u>.

SECTION 5.05.    <u>[Reserved]</u>.

SECTION 5.06.    <u>[Reserved]</u>.

SECTION 5.07.    <u>[Reserved]</u>.

SECTION 5.08.    <u>Use of Proceeds</u>.    The Letter of Credits issued on behalf of the Borrower will be used to (a) to backstop, replace or otherwise provide credit support for any letters of credit outstanding immediately prior to the Closing Date and (b) otherwise for general corporate purposes of the Borrower and its Subsidiaries and otherwise any other purpose not prohibited by this Agreement.

SECTION 5.09.    [Reserved].

SECTION 5.10.    Post-Closing Covenant.  The Borrower will take all necessary actions to satisfy the items described on Schedule 5.10 within the applicable period of time specified in such Schedule (or such longer period as the Administrative Agent may agree in its sole discretion).   All representations and warranties contained in this Agreement and the other Loan Documents shall be deemed modified (or waived on a limited basis) to the extent necessary to give effect to the foregoing (and to permit the taking of the actions described in this Section 5.10 within the time periods specified thereon), and, to the extent any provision of this Agreement or any other Loan Document would be violated or breached (or any non-compliance with any such provision would result in a Default or Event of Default hereunder) as a result of any such extension, such provision shall be deemed modified (or waived on a limited basis) to the extent necessary to give effect to this Section 5.10.

ARTICLE VI

Negative Covenants

Until the LC Commitments have expired or terminated and the interest on each Letter of Credit and all fees payable hereunder have been paid in full (other than in respect of contingent indemnification and expense reimbursement claims not then due) and all Letters of Credit have expired or have been cash collateralized, the Borrower covenants and agrees with the Lenders that:

SECTION 6.01.    [Reserved].

SECTION 6.02.    [Reserved].  .

SECTION 6.03.    [Reserved].

SECTION 6.04.    Disposition of Property. No Borrower will, nor will permit any of its subsidiaries to, transfer or Dispose of all or substantially all of the assets, property or business of the Borrower and its subsidiaries.

SECTION 6.05.    [Reserved].

SECTION 6.06.    [Reserved].

SECTION 6.07.    [Reserved].

SECTION 6.08.    [Reserved].

SECTION 6.09.    [Reserved].

SECTION 6.10.    [Reserved].

SECTION 6.11.    [Reserved].

SECTION 6.12.    Use of Proceeds.   Except as otherwise provided herein or approved by the Administrative Agent and each Lender (email to suffice), such Borrower shall not directly, or to the Borrower's knowledge, procure that its subsidiaries and its or their respective directors, officers, employees and agents (in each case, in such role) shall not use the proceeds of any Letters of Credit in a manner or for a purpose other than those consistent with this Agreement and the DIP Order.

55

4877-7275-1721.6

SECTION 6.13.     Chapter 11 Modifications.  Without the consent of the Administrative Agent and each Lender, no Borrower will, nor will permit any of its subsidiaries to:

(a)       make or permit to be made, any change, amendment or modification, to the DIP Order; or

(b)       file, propose, or support (i) a notice of appeal with respect to the DIP Order, (ii) a motion under Bankruptcy Rule 9023 or 9024 with respect to the DIP Order, (iii) any other motion or pleading seeking to amend, stay, reverse, vacate, or otherwise modify the DIP Order or the Facility, (iv) a plan of reorganization or plan of liquidation that does not provide for the occurrence of the Date of Full Satisfaction to occur on the effective date of such plan, or (v) a motion seeking to approve a sale of any LC Cash Collateral;

SECTION 6.14.     Cash Collateral; DIP Financings.

(a)       The Borrower will not, and will not permit any of its subsidiaries to, create, grant, incur, assume or suffer to exist any Liens on the LC Cash Collateral (other than (i) the Liens granted to the Collateral Agent for the benefit of the Lenders pursuant to the DIP Order, (ii) Liens imposed by law for Taxes that (A) are not yet due, (B) are being contested in good faith and by appropriate proceedings diligently conducted, if adequate reserves with respect thereto are maintained on the books of the applicable Person to the extent required in accordance with GAAP, or (C) arise as of the Petition Date to the extent the payment of such Taxes, assessments, or governmental charges are excused or prohibited by the Bankruptcy Code or not otherwise authorized by the Bankruptcy Court with respect to periods prior to the Closing Date, and (iii) Liens in favor of the Collateral Agent in its capacity as a depositary bank for the LC Cash Collateral Account).

(b)       Transfer, dispose or otherwise move any cash from the LC Cash Collateral Account to any other bank account of the Borrower or its subsidiaries or to any third party in a manner not expressly permitted by the terms hereunder.

ARTICLE VII

Events of Default

SECTION 7.01.

If any of the following events ("Events of Default") shall occur:

(a)       Solely to the extent there is insufficient LC Cash Collateral to pay any such amounts when due, the Borrower shall fail to pay any LC Disbursement or other Reimbursement Obligation, in each case, when and as the same shall become due and payable, whether at the due date thereof or at a date fixed for prepayment thereof or otherwise;

(b)       Solely to the extent there is insufficient LC Cash Collateral to pay any such amounts when due, the Borrower shall fail to pay any interest on any LC Disbursement or other Reimbursement Obligation or shall fail to pay any other amount (other than an amount referred to in clause (a) of this Article) payable by it when and as the same shall become due and payable, and such failure shall continue unremedied for a period of three Business Days;

(c)       any representation or warranty made or deemed made by or on behalf of the Borrower or any other Loan Paty in this Agreement or any other Loan Document or any amendment, modification or waiver in respect thereof, or in any certificate or in or as to any financial statements furnished pursuant to

56

this Agreement or any other Loan Document or any amendment, modification or waiver in respect thereof, shall prove to have been incorrect in any material respect when made or deemed made and, to the extent capable of being cured, such incorrect representation and warranty shall remain incorrect in any material respect for a period of 30 days after written notice thereof from the Administrative Agent to the Borrower or such other Loan Pary;

(d)       any Loan Party shall fail to observe or perform any covenant, condition or agreement contained in Section 5.02, 5.03 (with respect to a Borrower's existence) or 5.08 or in Article VI;

(e)       any Laon Party shall fail to observe or perform any covenant, condition or agreement contained in this Agreement or any other Loan Document to which it is a party (other than those specified in clause (a), (b), (c) or (d) of this Article), and such failure shall continue unremedied for a period of 30 days after notice thereof from the Administrative Agent to the Borrower (which notice will be given at the request of any Lender);

(f)       [reserved];

(g)       [reserved];

(h)       the occurrence of any of the following in any of the Chapter 11 Cases, except to the extent consented to by the Required Lenders or if Required Lenders seek or support any such action:

(i)       the termination of the Restructuring Support Agreement with respect to the Consenting RCF Lenders (in each case, as defined therein) in accordance with the terms thereof;

(ii)       (A) the Interim DIP Order is not entered on the docket of the Bankruptcy Court within three (3) Business Days after the Petition Date, (B) the Final DIP Order is not entered on the docket of the Bankruptcy Court within thirty-five (35) after the Petition Date, (C) the entry of an order amending, supplementing, staying, vacating or otherwise modifying the Loan Documents or the DIP Order, (D) the filing by a Chapter 11 Debtor of a motion for reconsideration with respect to the DIP Order or (E) any Chapter 11 Debtor shall fail to comply with the DIP Order and such default shall continue unremedied for a period of three (3) Business Days after notice thereof from the Administrative Agent to the Borrower;

(iii)       the appointment of an interim or permanent trustee in the Chapter 11 Cases or the appointment of an examiner in the Chapter 11 Cases with expanded powers to operate or manage the financial affairs, the business, or reorganization of the Borrower and its subsidiaries;

(iv)       (A) the dismissal or conversion of any Chapter 11 Case or (B) any Chapter 11 Debtor shall file a motion or other pleading seeking the dismissal or conversion of the Chapter 11 Cases under Section 1112 of the Bankruptcy Code or otherwise;

(v)       the entry of an order in the Chapter 11 Cases avoiding or requiring the disgorgement of any portion of the payments made on account of the Obligations owing under this Agreement or the other Loan Documents;

(vi)       other than in respect of this Agreement and the other Loan Documents, or as otherwise permitted under the applicable Loan Documents, the DIP Order or the Cash Management Order, (A) the existence of any claims or charges, or the entry of any order of the Bankruptcy Court authorizing any claims or charges entitled to super-priority administrative expense claim status in any Chapter 11 Case pursuant to Section 364(c)(1), clause (b) of Section 503 or clause (b) of

57

4877-7275-1721.6

Section 507 of the Bankruptcy Code *pari passu* with or senior to the claims of the Administrative Agent and the Secured Parties under this Agreement and the other Loan Documents or (B) there shall arise or be granted by the Bankruptcy Court any Lien on the LC Cash Collateral;

(vii)     the DIP Order shall cease to be in full force and effect or shall have been reversed, modified, amended, stayed, vacated, or subject to stay pending appeal;

(viii)     an order in the Chapter 11 Cases shall be entered charging any of, or authorizing the recovery of any amount from, or a claim or claims shall be allowed against, the LC Cash Collateral under Section 506(c) of the Bankruptcy Code or otherwise;

(ix)     any Loan Party shall deny in writing that such Loan Party has liability or obligation under this Agreement for the Obligations or seek to recover any monetary damages from the Administrative Agent or any of Issuing Bank in their capacity as such; or

(x)     the filing of a motion by any Chapter 11 Debtor requesting, or the entry of any order by the Bankruptcy Court granting, any superpriority claim which is senior or pari passu with the Issuing Banks' claim;

(xi)     the DIP Order shall cease, for any reason, to be in full force and effect, or any Loan Party or any Affiliate of any Loan Party shall so assert, or any Lien created by the DIP Order shall cease to be enforceable and of the same effect and priority purported to be created thereby (except, in each case, in accordance with the DIP Order);

(xii)     the confirmation of a Plan of Reorganization by the Borrower and its subsidiaries that rejects any Loan Document under Section 365 of the Bankruptcy Code or files a list of contracts to be so-rejected that includes any Loan Document or otherwise publicly notices its intent to reject any Loan Document;

(i)     [reserved];

(j)     [reserved];

(k)     an ERISA Event shall have occurred that, in the opinion of the Required Lenders, when taken together with all other ERISA Events that have occurred, would reasonably be expected to result in a Material Adverse Effect;

(l)     any Loan Party shall default in the observance or performance of any agreement contained in Section 2.17(k)(i), Section 2.17(k)(ii) (solely after giving effect to the three (3) Business Day cure period as specified in Section 2.17(k)(ii) following the delivery of a Deficiency Notice), Section 5.02(a), Section 5.03(a) or Section 6 of this Agreement;

(m)     any material portion of any Subsidiary Guarantee shall cease, for any reason, to be in full force and effect or any Loan Party or any Affiliate of any Loan Party shall so assert;

(n)     relief shall be granted from any stay of proceeding (including, without limitation, the automatic stay) in the Chapter 11 Cases so as to allow a third party to proceed with foreclosure (or granting of a deed in lieu of foreclosure) or other remedy against any LC Cash Collateral;

58

(o)      Liens or applicable priority of claims granted by the Bankruptcy Court with respect to any of the LC Cash Collateral securing the Loan Parties' obligations in respect of the Facility shall cease to be valid, perfected and enforceable in all respects with the priority described herein; or

(p)      a Change in Control shall occur;

then, and in every such event, and at any time thereafter during the continuance of such event, the Administrative Agent may, and at the request of the Required Lenders shall, by notice to the Borrower, take any or all of the following actions, at the same or different times: (i) terminate the Total Commitments, and thereupon the Total Commitments shall terminate immediately, (ii) declare all amounts (including all fees and other obligations accrued hereunder) owing under this Agreement and the other Loan Documents (including all LC Exposure, whether or not the beneficiaries of the then outstanding Letters of Credit shall have presented the documents required thereunder to be immediately due and payable in whole, without presentment, demand, protest or other notice of any kind (other than notice from the Administrative Agent), all of which are hereby waived by the Borrower and (iii) to the extent applicable, require all outstanding Letters of Credit to be cash collateralized in accordance with Section 2.17(k)(iv). Amounts held as cash collateral pursuant to the Minimum Cash Collateral Requirement, together with all other amounts held pursuant to Section 2.17(k), shall be applied by the Administrative Agent to the payment of LC Disbursements under such Letters of Credit, and the unused portion thereof after all such Letters of Credit shall have expired or been fully drawn upon, if any, shall be applied to repay other obligations of the Borrower hereunder and under the other Loan Documents. After all such Letters of Credit shall have expired or been fully drawn upon, all Reimbursement Obligations shall have been satisfied and all other obligations of the Borrower hereunder and under the other Loan Documents shall have been paid in full, the balance, if any, in such cash collateral account shall be returned to the Borrower (or such other Person as may be lawfully entitled thereto).  Except as expressly provided above in this Section, presentment, demand, protest and all other notices of any kind are hereby expressly waived by the Borrower.

## ARTICLE VIII

### The Administrative Agent

SECTION 8.01.    Appointment and Authorization.    Each of the Lenders hereby irrevocably appoints the Administrative Agent as its agent and authorizes the Administrative Agent to take such actions on its behalf and to exercise such powers as are delegated to the Administrative Agent by the terms hereof and the other Loan Documents, together with such actions and powers as are reasonably incidental thereto.

SECTION 8.02.    Administrative Agent and Affiliates.    The bank serving as the Administrative Agent hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not the Administrative Agent, and such bank and its Affiliates may accept deposits from, lend money to and generally engage in any kind of business with the Borrower or any of their respective subsidiaries or other Affiliate thereof as if it were not the Administrative Agent hereunder.

SECTION 8.03.    Action by Administrative Agent. The Administrative Agent shall not have any duties or obligations except those expressly set forth herein and the other Loan Documents. Without limiting the generality of the foregoing, (a) the Administrative Agent shall not be subject to any fiduciary or other implied duties, regardless of whether a Default has occurred and is continuing, (b) the Administrative Agent shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby that the Administrative

Agent is required to exercise in writing as directed by the Required Lenders (or such other number or percentage of the Lenders as shall be necessary under the circumstances as provided in Section 9.02), and (c) except as expressly set forth herein, the Administrative Agent shall not have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Borrower or any of their respective subsidiaries that is communicated to or obtained by the bank serving as Administrative Agent or any of its Affiliates in any capacity.  The Administrative Agent shall not be liable for any action taken or not taken by it with the consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary under the circumstances as provided in Section 9.02) or otherwise, in the absence of its own gross negligence or willful misconduct.  The Administrative Agent shall be deemed not to have knowledge of any Default unless and until written notice thereof is given to the Administrative Agent by a Borrower or a Lender, and the Administrative Agent shall not be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with this Agreement or any other Loan Document, (ii) the contents of any certificate, report or other document delivered under or in connection with this Agreement or any other Loan Document, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or in any other Loan Document, (iv) the validity, enforceability, effectiveness or genuineness of this Agreement, the other Loan Documents or any other agreement, instrument or document, or (v) the satisfaction of any condition set forth in Article IV or elsewhere herein or in any other Loan Document, other than to confirm receipt of items expressly required to be delivered to the Administrative Agent.

SECTION 8.04.    Consultation with Experts.  The Administrative Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing believed by it to be genuine and to have been signed or sent by the proper Person.  The Administrative Agent also may rely upon any statement made to it orally or by telephone and believed by it to be made by the proper Person, and shall not incur any liability for relying thereon.  The Administrative Agent may consult with legal counsel (who may be counsel for the Borrower), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

SECTION 8.05.    Delegation of Duties.

(a)    The Administrative Agent may perform any and all its duties and exercise its rights and powers by or through any one or more sub-agents appointed by the Administrative Agent.  The Administrative Agent and any such sub-agent may perform any and all its duties and exercise its rights and powers through their respective Related Parties.  The exculpatory provisions of the preceding paragraphs shall apply to any such sub-agent and to the Related Parties of the Administrative Agent and any such sub-agent, and shall apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as Administrative Agent.

SECTION 8.06.    Successor Administrative Agent.  Subject to the appointment and acceptance of a successor Administrative Agent as provided in this paragraph, the Administrative Agent may resign at any time by notifying the Lenders and the Borrower.  Upon any such resignation, the Required Lenders shall have the right, in consultation with the Borrower, to appoint a successor.  If no successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within 30 days after the retiring Administrative Agent gives notice of its resignation, then the retiring Administrative Agent may, on behalf of the Lenders, appoint a successor Administrative Agent which shall be a bank with an office in New York, New York, or an Affiliate of any such bank.  Upon the acceptance of its appointment as Administrative Agent hereunder by a successor, such successor shall succeed to and become vested with all the rights, powers, privileges and duties of the retiring Administrative Agent, and the retiring Administrative Agent shall be discharged from its duties and obligations hereunder.  The fees payable by

60

the Borrower to a successor Administrative Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Borrower and such successor.  After the Administrative Agent's resignation hereunder, the provisions of this Article and Section 9.04 shall continue in effect for the benefit of such retiring Administrative Agent, its sub-agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while it was acting as Administrative Agent.

SECTION 8.07.    Credit Decision.  Each Lender acknowledges that it has, independently and without reliance upon the Administrative Agent, the Lead Arranger and Bookrunner, any other Lender or any of their respective Affiliates and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement.  Each Lender also acknowledges that it will, independently and without reliance upon the Administrative Agent, the Lead Arranger and Bookrunner, any other Lender or any of their respective Affiliates and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any other Loan Document, any related agreement or any document furnished hereunder or thereunder.

SECTION 8.08.    Lead Arrangers; Bookrunners: Syndication Agents; Documentation Agents.  Notwithstanding anything to the contrary herein, the Lead Arranger and Bookrunner shall not have any powers, duties or responsibilities under this Agreement or any of the other Loan Documents, except in its capacity, if applicable, as the Administrative Agent, the Collateral Agent, a Lender or a Lender.

SECTION 8.09.    Certain ERISA Matters.  (a) Each Lender (x) represents and warrants, as of the date such Person became a Lender party hereto, to, and (y) covenants, from the date such Person became a Lender party hereto to the date such Person ceases being a Lender party hereto, for the benefit of, the Administrative Agent and its respective Affiliates, and not, for the avoidance of doubt, to or for the benefit of the Borrower or any other Loan Party, that at least one of the following is and will be true:

(i)        such Lender is not using "plan assets" (within the meaning of the Plan Asset Regulations) of one or more Benefit Plans in connection with the Letters of Credit or the LC Commitments,

(ii)       the transaction exemption set forth in one or more PTEs, such as PTE 84-14 (a class exemption for certain transactions determined by independent qualified professional asset managers), PTE 95-60 (a class exemption for certain transactions involving insurance company general accounts), PTE 90-1 (a class exemption for certain transactions involving insurance company pooled separate accounts), PTE 91-38 (a class exemption for certain transactions involving bank collective investment funds) or PTE 96-23 (a class exemption for certain transactions determined by in-house asset managers), is applicable with respect to such Lender's entrance into, participation in, administration of and performance of the Letters of Credit or the LC Commitments and this Agreement,

(iii)      (A) such Lender is an investment fund managed by a "Qualified Professional Asset Manager" (within the meaning of Part VI of PTE 84-14), (B) such Qualified Professional Asset Manager made the investment decision on behalf of such Lender to enter into, participate in, administer and perform the Letters of Credit, the LC Commitments and this Agreement, (C) the entrance into, participation in, administration of and performance of the Letters of Credit, the LC Commitments and this Agreement satisfies the requirements of sub-sections (b) through (g) of Part I of PTE 84-14, (D) to the best knowledge of such Lender , the requirements of subsection (a) of Part I of PTE 84-14 are satisfied with respect to such Lender's entrance into, participation in, administration of and performance of the Letters of Credit, the LC Commitments and this Agreement and (E) all of the conditions for exemptive relief are, and will continue to be, satisfied

61

in connection with such Lender's entrance into, participation in, administration of and performance of the Letters of Credit, the LC Commitments and this Agreement, or

(iv)     such other representation, warranty and covenant as may be agreed in writing between the Administrative Agent, in its sole discretion, and such Lender.

(b)     In addition, unless sub-clause (i) in the immediately preceding clause (a) is true with respect to a Lender or such Lender has not provided another representation, warranty and covenant as provided in sub-clause (iv) in the immediately preceding clause (a), such Lender further (x) represents and warrants, as of the date such Person became a Lender party hereto, to, and (y) covenants, from the date such Person became a Lender party hereto to the date such Person ceases being a Lender party hereto, for the benefit of, the Administrative Agent and its respective Affiliates, and not, for the avoidance of doubt, to or for the benefit of the Borrower or any other Loan Party, that neither the Administrative Agent nor any of its respective Affiliates is a fiduciary with respect to the LC Cash Collateral or the assets of such Lender (including in connection with the reservation or exercise of any rights by the Administrative Agent under this Agreement, any Loan Document or any documents related to hereto or thereto).

SECTION 8.10.     Acknowledgements of Lenders .

(a)  Each Lender hereby agrees that (x) if the Administrative Agent notifies such Lender that the Administrative Agent has determined in its sole discretion that any funds received by such Lender from the Administrative Agent or any of its Affiliates (whether as a payment, prepayment or repayment of principal, interest, fees or otherwise; individually and collectively, a "Payment") were erroneously transmitted to such Lender (whether or not known to such Lender), and demands the return of such Payment (or a portion thereof), such Lender shall promptly, but in no event later than one Business Day thereafter, return to the Administrative Agent the amount of any such Payment (or portion thereof) as to which such a demand was made in same day funds, together with interest thereon in respect of each day from and including the date such Payment (or portion thereof) was received by such Lender to the date such amount is repaid to the Administrative Agent at the greater of the NYFRB and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation from time to time in effect, and (y) to the extent permitted by applicable law, such Lender shall not assert, and hereby waives, as to the Administrative Agent, any claim, counterclaim, defense or right of set-off or recoupment with respect to any demand, claim or counterclaim by the Administrative Agent for the return of any Payments received, including without limitation any defense based on "discharge for value" or any similar doctrine.  A notice of the Administrative Agent to any Lender under this Section 8.10 shall be conclusive, absent manifest error.

(i) Each Lender hereby further agrees that if it receives a Payment from the Administrative Agent or any of its Affiliates (x) that is in a different amount than, or on a different date from, that specified in a notice of payment sent by the Administrative Agent (or any of its Affiliates) with respect to such Payment (a "*Payment Notice*") or (y) that was not preceded or accompanied by a Payment Notice, it shall be on notice, in each such case, that an error has been made with respect to such Payment.  Each Lender agrees that, in each such case, or if it otherwise becomes aware a Payment (or portion thereof) may have been sent in error, such Lender shall promptly notify the Administrative Agent of such occurrence and, upon demand from the Administrative Agent, it shall promptly, but in no event later than one Business Day thereafter, return to the Administrative Agent the amount of any such Payment (or portion thereof) as to which such a demand was made in same day funds, together with interest thereon in respect of each day from and including the date such Payment (or portion thereof) was received by such Lender to the date such amount is repaid to the Administrative Agent at the greater of the NYFRB and a rate

62

determined by the Administrative Agent in accordance with banking industry rules on interbank compensation from time to time in effect.

(ii) The Borrower and each other Loan Party hereby agrees that (x) in the event an erroneous Payment (or portion thereof) are not recovered from any Lender that has received such Payment (or portion thereof) for any reason, the Administrative Agent shall be subrogated to all the rights of such Lender with respect to such amount and (y) an erroneous Payment shall not pay, prepay, repay, discharge or otherwise satisfy any Obligations owed by the Borrower or any other Loan Party, except, in each case, to the extent such erroneous Payment is, and solely with respect to the amount of such erroneous Payment that is, comprised of funds received by the Administrative Agent from the Borrower or any other Loan Party for the purpose of paying, prepaying, repaying, discharging or otherwise satisfying any Obligations owed by the Borrower or any other Loan Party.

(iii) Each party's obligations under this Section 8.10 shall survive the resignation or replacement of the Administrative Agent or any transfer of rights or obligations by, or the replacement of, a Lender , the termination of the LC Commitments or the repayment, satisfaction or discharge of all Obligations under any Loan Document.

ARTICLE IX

Miscellaneous

SECTION 9.01.    Notices.    All notices, requests and demands to or upon the respective parties hereto to be effective shall be in writing (including by telecopy or other electronic submission) (unless otherwise specifically permitted in this Agreement), and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when delivered, or three Business Days after being deposited in the mail, postage prepaid, or, in the case of telecopy, other electronic submission or telephone notice, when received, addressed as follows in the case of the Borrower (with a copy to Qurate, which copy shall not constitute notice hereunder) and the Administrative Agent, and as set forth in an administrative questionnaire delivered to the Administrative Agent in the case of the Lenders, or to such other address as may be hereafter notified by the respective parties hereto:

QVC:

QVC, Inc.
Studio Park, 1200 Wilson Drive, MC 203
West Chester, Pennsylvania 19382
Attention: Chief Financial Officer
Telecopy: (484) 701-1380
Telephone: (484) 701-1000

4877-7275-1721.6

With a copy to (which copy shall
not constitute notice):

QVC, Inc.
Studio Park, 1200 Wilson Drive, MC 207
West Chester, Pennsylvania 19382
Attention: General Counsel
Telecopy: (484) 701-1021
Telephone: (484) 701-1000

and

Qurate Retail, Inc.
12300 Liberty Boulevard
Englewood, Colorado 80112
Attention: Treasurer
Telecopy: (720) 875-5401
Telephone: (720) 875-5017
E-mail: boren@libertymedia.com

and

Qurate Retail, Inc.
12300 Liberty Boulevard
Englewood, Colorado 80112
Attention: Chief Legal Officer
Telecopy: (720) 875-5401
Telephone: (720) 875-5400
E-mail: legalnotices@libertymedia.com

and

Kirkland & Ellis LLP
601 Lexington Avenue
New York, NY 10022
Attention: Austin Witt
Telephone No.: 212-446-4674
Email: Austin.witt@kirkland.com

64

4877-7275-1721.6

| With a copy to (which copy shall not constitute notice): | Qurate Retail, Inc.<br>12300 Liberty Boulevard<br>Englewood, Colorado 80112<br>Attention: Treasurer<br>Telecopy: (720) 875-5401<br>Telephone: (720) 875-5017<br>E-mail: boren@libertymedia.com |
|---|---|
| | and |
| | Qurate Retail, Inc.<br>12300 Liberty Boulevard<br>Englewood, Colorado 80112<br>Attention: Chief Legal Officer<br>Telecopy: (720) 875-5401<br>Telephone: (720) 875-5400<br>E-mail: legalnotices@libertymedia.com |
| | and |
| | Kirkland & Ellis LLP<br>601 Lexington Avenue<br>New York, NY 10022<br>Attention: Austin Witt<br>Telephone No.: 212-446-4674<br>Email: Austin.witt@kirkland.com |
| To the Administrative Agent from the Borrower: | Address or addresses separately provided to the Borrower. |
| To the Administrative Agent from the Lenders: | JPMorgan Chase Bank, N.A.<br>500 Stanton Christiana Rd.<br>NCC5 / 1st Floor<br>Newark, DE 19713<br>Attention: Loan & Agency Services Group<br><br>*Agency Withholding Tax Inquiries:*<br>Email: agency.tax.reporting@jpmorgan.com<br><br>*Agency Compliance/Financials/Virtual Data rooms:*<br>Email: agency.dataroom@jpmorgan.com |

(a)    Notices, financial statements and similar deliveries and other communications to the Lenders hereunder may be delivered or furnished by electronic communications pursuant to procedures approved by the Administrative Agent (including by posting on Intralinks); provided that the foregoing shall not apply to notices pursuant to Article II unless otherwise agreed by the Administrative Agent and the applicable Lender.  The Administrative Agent or any Borrower may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it, provided that approval of such procedures may be limited to particular notices or communications.

4877-7275-1721.6

SECTION 9.02.    <u>Waivers; Amendments</u>.

(a)    No failure or delay by the Administrative Agent or any Lender in exercising any right or power hereunder or under any other Loan Document shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power.  The rights and remedies of the Administrative Agent and the Lenders under any Loan Document are cumulative and are not exclusive of any rights or remedies that they would otherwise have.  No waiver of any provision of any Loan Document or consent to any departure by any Borrower therefrom shall in any event be effective unless the same shall be permitted by paragraph (b) of this Section, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given.  Without limiting the generality of the foregoing, the making of a Loan shall not be construed as a waiver of any Default, regardless of whether the Administrative Agent or any Lender may have had notice or knowledge of such Default at the time.

(b)    No Loan Document or any provision thereof may be waived, amended or modified except pursuant to an agreement or agreements in writing entered into by the Loan Parties that are party thereto and the Required Lenders or by the Loan Parties that are party thereto and the Administrative Agent with the consent of the Required Lenders; <u>provided</u> that no such agreement shall (i) increase the LC Commitment of any Lender or the Issuing Bank Commitment of any Issuing Bank without the written consent of such Lender or such Issuing Bank, as applicable, (ii) reduce the rate of interest thereon, reduce the Reimbursement Obligations or other reimbursement obligations of any Borrower hereunder or reduce any fees payable hereunder, without the written consent of each Lender directly affected thereby; provided that only the consent of the Required Lenders shall be necessary to reduce or waive any obligation of the Borrower to pay interest or fees at the applicable default rate set forth in Section 2.10(c), (iii) postpone (a) the scheduled date of payment of any interest or fees payable hereunder, or reduce the amount of, waive or excuse any such payment, or postpone the Termination Date or any other scheduled date of expiration of the LC Commitments, without the written consent of each Lender directly affected thereby or (b) the scheduled date of expiration of any Letter of Credit under Section 2.17(c) without the written consent of each Issuing Bank directly affected thereby; provided that only the consent of the Required Lenders shall be necessary to reduce or waive any obligation of the Borrower to pay interest or fees at the applicable default rate set forth in Section 2.10(c), (iv) change Section 2.15 in a manner that would alter the pro rata distribution or sharing of payments required thereby or any provision requiring the pro rata funding of participations in Letters of Credit, without the written consent of each Lender adversely affected thereby, (v) release all or substantially all of the LC Cash Collateral (except as provided in Section 9.16) without the consent of each Lender, (vi) release all or substantially all of the Material Domestic Subsidiaries as Subsidiary Guarantors without the consent of each Lender , (vii) change any of the provisions of this Section or the definition of "<u>Required Lenders</u>" or any other provision hereof specifying the number or percentage of Lenders required to waive, amend or modify any rights hereunder or make any determination or grant any consent hereunder, without the written consent of each Lender or (viii) change the Minimum Cash Collateral Amount, Minimum Cash Collateral Requirement or Section 2.17(k)(i) in any way without the written consent of each Lender adversely affected thereby.

(c)    [Reserved].

(d)    Notwithstanding the foregoing, (i) the Administrative Agent, with the consent of the Borrower, may amend, modify or supplement any Loan Document without the consent of any Lender or the Required Lenders in order to correct, amend or cure any ambiguity, inconsistency or defect or correct any typographical error or other manifest error in any Loan Document, (ii) [reserved], (iii) subject to Section

9.02(b)(iii) above, the Termination Date may be extended with the consent of only the Administrative Agent, the Borrower and the Required Lenders and (iv) [reserved].

SECTION 9.03.     [Reserved].

SECTION 9.04.     Expenses; Indemnity; Damage Waiver.

(a)     The Borrower shall pay (i) all reasonable and documented out-of-pocket expenses incurred by the Administrative Agent and its Affiliates, including the reasonable and documented fees, charges and disbursements of one primary counsel for the Administrative Agent, solely in connection with the administration of this Agreement or any other Loan Document or any amendments, modifications or waivers of the provisions hereof or thereof and (ii) all reasonable and documented out-of-pocket expenses incurred by the Administrative Agent or any Lender, including the fees, charges and disbursements of one primary counsel for the Administrative Agent or Lender in their respective capacities as such, solely in connection with the enforcement or protection of its rights in connection with this Agreement or any other Loan Document, including its rights under this Section, or in connection with the Letters of Credit issued hereunder, including all such reasonable and documented out-of-pocket expenses incurred during any workout, restructuring or negotiations in respect of such Letters of Credit.

(b)     The Borrower shall indemnify the Administrative Agent and each Lender, and each Related Party of any of the foregoing Persons (each such Person being called an "Indemnitee") against, and hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities and related expenses, including the reasonable and documented fees, charges and disbursements of counsel (excluding the allocated costs of in house counsel and limited to not more than one counsel for all such Indemnitees, taken as a whole, and, if necessary, a single local counsel in each applicable jurisdiction (and, in the case of an actual or potential conflict of interest where the Indemnitee affected by such conflict informs the Borrower of such conflict and thereafter retains its own counsel, of another firm of counsel for such affected Indemnitee)), for any Indemnitee, incurred by or asserted against any Indemnitee arising out of, in connection with, or as a result of (i) the execution or delivery of this Agreement, any other Loan Document or any agreement or instrument contemplated hereby or thereby by such Borrower and its Subsidiary Guarantors the performance by such parties of their respective obligations hereunder or thereunder or the consummation of the Transactions to be performed by such Borrower and its Subsidiary Guarantors or any other transactions contemplated hereby or thereby to be performed by such Borrower and its Subsidiary Guarantors, (ii) any issued Letter of Credit or the use of the proceeds therefrom, (iii) any actual or alleged presence or release of Hazardous Materials on or from any property owned or operated by such Borrower or any of its subsidiaries, or any Environmental Liability related in any way to such Borrower or any of its subsidiaries or (iv) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory, whether brought by a third party or by a Borrower, and regardless of whether any Indemnitee is a party thereto (all of the foregoing, collectively, the "Indemnified Liabilities"; provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses (i) are determined by a court of competent jurisdiction by final and nonappealable judgment to have (x) resulted from the gross negligence or willful misconduct of such Indemnitee or (y) arisen from a material breach of a Loan Document in bad faith by such Indemnitee or (ii) result from a dispute solely among Indemnitees (other than any disputes involving claims against any agent, arranger or bookrunner, in each case in their respective capacities as such) that did not involve actions or omissions of any Borrower or any of its subsidiaries.  Each Indemnitee shall give prompt notice to the Borrower of any claim that may give rise to a claim against such Borrower hereunder and shall consult with such Borrower in the conduct of such Indemnitee's legal defense of such claim; provided, however, than an Indemnitee's failure to give such prompt notice to such Borrower or to seek such consultation with such Borrower shall not constitute a defense to any claim for indemnification

67

by such Indemnitee unless, and only to the extent that, such failure materially prejudices such Borrower. Paragraph (b) of this Section shall not apply with respect to Taxes other than any Taxes that represent losses, claims, damages, etc. arising from any non-Tax claim.

(c)    To the extent that a Borrower fails to pay any amount required to be paid by it to the Administrative Agent under paragraph (a) or (b) of this Section, each Lender severally agrees to pay to the Administrative Agent such Lender's LC Commitment Percentage (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought) of such unpaid amount; provided that the unreimbursed expense or indemnified loss, claim, damage, liability or related expense, as the case may be, was incurred by or asserted against the Administrative Agent in its capacity as such.

(d)    To the extent permitted by applicable law, the parties shall not assert, and each hereby waives, any claim against any other party, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement or any agreement or instrument contemplated hereby, the Transactions, any Loan or the use of the proceeds thereof; provided that nothing contained in this clause (d) shall limit the Borrower's indemnification obligations above to the extent such special, indirect, consequential and punitive damages are included in any third party claim in connection with which any Indemnitee is entitled to indemnification hereunder.

(e)    All amounts due under this Section shall be payable promptly after written demand therefor.

SECTION 9.05.    Successors and Assigns.

(a)    The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that (i) no Borrower may assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of each Lender (and any attempted assignment or transfer by such Borrower without such consent shall be null and void) and (ii) no Lender may assign or otherwise transfer its rights or obligations hereunder except in accordance with this Section.  Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants (to the extent provided in paragraph (c) of this Section) and, to the extent expressly contemplated hereby, the Related Parties of each of the Administrative Agent and the Lenders) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)    Subject to the conditions set forth in paragraph (b)(ii) below, any Lender may assign to one or more assignees (other than a natural person, any Borrower or the Affiliates or subsidiaries of any Borrower (except as provided in Section 9.05(e)), a Defaulting Lender or a Sanctioned Person) all or a portion of its rights and obligations under this Agreement (including all or a portion of its LC Commitments) with the prior written consent of:

(A)    the Borrower (each such consent not to be unreasonably withheld or delayed, provided that (i) the Borrower shall be deemed to have consented to any such assignment unless it (or either of them) shall have objected thereto by written notice to the Administrative Agent within 10 Business Days after having received written notice thereof and (ii) no consent of any Borrower shall be required for an assignment to a Lender, an Affiliate of a Lender, an Approved Fund or, if an Event of Default under clause (a), (b), (h) or (i) of Article VII has occurred and is continuing, any other assignee;

68

(B)      the Administrative Agent (such consent not to be unreasonably withheld or delayed), provided that no consent of the Administrative Agent shall be required for an assignment of any LC Commitment to an assignee that is a Lender or an Affiliate of a Lender or any Approved Additional LC Issuers or any Affiliate thereof; and

(C)      each Issuing Bank (such consent not to be unreasonably withheld or delayed); provided that no consent of any Issuing Bank shall be required for an assignment of any LC Commitment to an assignee that is a Lender or an Affiliate of a Lender or any Approved Additional LC Issuers or any Affiliate thereof.

(ii)      Assignments shall be subject to the following additional conditions:

(A)      except in the case of an assignment to a Lender or an Affiliate of a Lender or an assignment of the entire remaining amount of the assigning Lender's LC Commitment, the amount of the LC Commitments of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent) shall not be less than $5,000,000, unless the Borrower and the Administrative Agent otherwise consent, provided that no such consent of the Borrower shall be required if an Event of Default under clause (a), (b), (h) or (i) of Article VII has occurred and is continuing;

(B)      each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement;

(C)      the parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Assumption, together with a processing and recordation fee of $3,500 (which fee is hereby waived for any assignment to which Wells Fargo Bank, N.A.  or any of its Affiliates is a party); and

(D)      the assignee, if it shall not be a Lender, shall deliver to the Administrative Agent an Administrative Questionnaire.

For the purposes of this Section 9.05(b), the term "Approved Fund" means any Person (other than a natural person) that is engaged in making, purchasing, holding or investing in bank loans and similar extensions of credit in the ordinary course of its business and that is administered or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers or manages a Lender.

(iii)      Subject to acceptance and recording thereof pursuant to paragraph (b)(iv) of this Section, from and after the effective date specified in each Assignment and Assumption the assignee thereunder shall be a party hereto and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of Sections 2.12, 2.13, 2.14 and 9.04).  Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this Section 9.05 shall be null and void.

69

(iv)     The Administrative Agent, acting for this purpose as a non-fiduciary agent of the Borrower, shall maintain at one of its offices a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Lenders, and the LC Commitments of each Lender pursuant to the terms hereof from time to time (the "Register").  The entries in the Register shall be conclusive absent manifest error, and the Borrower, the Administrative Agent and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary.  The Register shall be available for inspection by any Borrower and any Lender, at any reasonable time and from time to time upon reasonable prior notice. This Section 9.05(b)(iv) shall be construed so that the LC Commitments are at all times maintained in "registered form" within the meanings of Code Section 163(f), 871(h)(2) and 881(c)(2) and any related regulations (and successor provisions).

(v)     Upon its receipt of a duly completed Assignment and Assumption with respect to a permitted assignment executed by an assigning Lender and an assignee, the assignee's completed Administrative Questionnaire (unless the assignee shall already be a Lender hereunder), the processing and recordation fee referred to in paragraph (b) of this Section (unless waived), and any written consent to such assignment required by paragraph (b) of this Section, the Administrative Agent shall accept such Assignment and Assumption and record the information contained therein in the Register.  No assignment shall be effective for purposes of this Agreement unless it has been recorded in the Register as provided in this paragraph.

(c)     Any Lender may, without the consent of the Borrower, the Administrative Agent or any Lender, sell participations to one or more banks, institutions or other entities (other than a natural person (or a holding company, investment vehicle or trust for, or owned and operated for the primary benefit of, a natural person) except as provided in Section 9.05(e), any Borrower or the Affiliates or subsidiaries of any Borrower, a Defaulting Lender or a Sanctioned Person) (a "Participant") in all or a portion of such Lender's rights and obligations under this Agreement (including all or a portion of its LC Commitments); provided that (A) such Lender's obligations under this Agreement shall remain unchanged, (B) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (C) the Borrower, the Administrative Agent and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement and the other Loan Documents.  Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and the other Loan Documents and to approve any amendment, modification or waiver of any provision of this Agreement and the other Loan Documents; provided that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver described in the first proviso to Section 9.02(b) that affects such Participant.  Subject to paragraph (c)(ii) of this Section, the Borrower agrees that each Participant shall be entitled to the benefits of Sections 2.12, [reserved] and 2.14 (subject to the requirements and limitations therein) to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to paragraph (b) of this Section.

(i)     A Participant shall not be entitled to receive any greater payment under Section 2.12 or 2.14 than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, except (i) to the extent such entitlement to receive a greater payment results from any Change in Law that occurs after the Participant acquired the applicable participation or (ii) if the sale of the participation to such Participant is made with the Borrower's prior written consent.  A Participant shall not be entitled to the benefits of Section 2.14 unless such Participant (i) complies with Section 2.14(f) as though it were a Lender (it being understood that the documentation required under Section 2.14(f) shall be delivered to the participating Lender)

70

and (ii) agrees to be subject to the provisions of Section 2.16 as if it were a Lender and had acquired its interest by assignment pursuant to paragraph (b) of this Section.  Each Lender that sells a participation agrees, at the Borrower's request and expense, to use reasonable efforts to cooperate with the Borrower to effectuate the provisions of Section 2.16(b) with respect to any Participant.  Each Lender that sells a participation shall, acting solely for this purpose as a non-fiduciary agent of the Borrower, maintain a register on which it enters the name and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in the LC Commitments or other obligations under the Loan Documents (the "Participant Register"); provided that no Lender shall have any obligation to disclose all or any portion of the Participant Register to any Person (including the identity of any Participant or any information relating to a Participant's interest in any LC Commitments, Letters of Credit or its other obligations under any Loan Document) except to the extent that such disclosure is necessary to establish that such LC Commitment, Letter of Credit or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations.  The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary.  For the avoidance of doubt, the Administrative Agent (in its capacity as Administrative Agent) shall have no responsibility for maintaining a Participant Register.

(d)     Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including without limitation any pledge or assignment to secure obligations to a Federal Reserve Bank or any other central bank or governmental authority, and this Section shall not apply to any such pledge or assignment of a security interest; provided that no such pledge or assignment of a security interest shall release a Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

(e)     [Reserved].

(f)     In the event that a Lender assigns all of its rights and obligations as a Lender under this Agreement pursuant to this Section 9.05, such Lender may resign by providing 30 days prior written notice to the Borrower, the Administrative Agent and the Lenders.  For the avoidance of doubt, such resigning Lender shall retain all rights and obligations provided under this Agreement with respect to any Letters of Credit issued by it and outstanding under this Agreement at the time of such resignation.

SECTION 9.06.     Survival.  All covenants, agreements, representations and warranties made by the Loan Parties herein, in the other Loan Documents and in the certificates or other instruments delivered in connection with or pursuant to this Agreement or the other Loan Documents shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of this Agreement and the other Loan Documents and issuance of any Letters of Credit, regardless of any investigation made by any such other party or on its behalf and notwithstanding that the Administrative Agent or any Lender may have had notice or knowledge of any Default or incorrect representation or warranty at the time any credit is extended hereunder, and shall continue in full force and effect as long as the principal of or any accrued interest on any Letter of Credit or any fee or any other amount payable under this Agreement is outstanding and unpaid and so long as the LC Commitments have not expired or terminated.  The provisions of Sections 2.12, [reserved], 2.14 and 9.04 and Article VIII shall survive and remain in full force and effect regardless of the consummation of the transactions contemplated hereby, the repayment of the Letters of Credit, the expiration or termination of the LC Commitments or the termination of this Agreement or any provision hereof.

71

4877-7275-1721.6

SECTION 9.07.    Counterparts: Integration: Effectiveness.    This Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. This Agreement, the other Loan Documents and any separate letter agreements with respect to fees payable to the Administrative Agent constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof. This Agreement shall become effective as provided in Section 4.01, and thereafter shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.    Delivery of an executed counterpart of a signature page of this Agreement by email or telecopy shall be effective as delivery of a manually executed counterpart of this Agreement.   Delivery of an executed signature page of this Agreement by facsimile or other electronic transmission (including by portable document format ("ḍpdf") or similar format) shall be effective as delivery of a manually executed counterpart hereof. The words "execution," "signed," "signature," "delivery," and words of like import in or relating to this Agreement shall be deemed to include Electronic Signatures (as defined below), deliveries or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature, physical delivery thereof or the use of a paper-based recordkeeping system, as the case may be. "Electronic Signature" means any electronic symbol or process attached to, or associated with, any contract or other record and adopted by a person with the intent to sign, authenticate or accept such contract or record.

SECTION 9.08.    Severability.    Any provision of this Agreement held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions hereof; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.

SECTION 9.09.    Right of Setoff.    If an Event of Default shall have occurred and be continuing, each Lender and each of its Affiliates is hereby authorized at any time and from time to time, to the fullest extent permitted by law, to set off and apply any and all deposits (general or special, time or demand, provisional or final) (but excluding any payroll, trust, or tax withholding accounts) at any time held and other obligations at any time owing by such Lender or Affiliate to or for the credit or the account of the Borrower against any of and all the obligations of such Borrower now or hereafter existing under this Agreement held by such Lender, irrespective of whether or not such Lender shall have made any demand under this Agreement and although such obligations may be unmatured; provided that such Lender shall notify the Administrative Agent that it intends to exercise its right of setoff pursuant to this Section 9.09 and shall provide the Administrative Agent with other information that it reasonably requests relating thereto.   The rights of each Lender under this Section are in addition to other rights and remedies (including other rights of setoff) which such Lender may have. Notwithstanding anything herein to the contrary or otherwise, Pledgor expressly agrees that any Collateral posted or other security granted to secure Pledgor's Obligations under this Agreement or in respect of any Letter of Credit shall not be available to satisfy any other obligation of Pledgor or any affiliate thereof to the Bank or any other creditor of Pledgor, including pursuant to any right of setoff (or any similar right) under the Pre-Petition Credit Agreement.

SECTION 9.10.    Governing Law; Jurisdiction; Consent to Service of Process.    This Agreement shall be construed in accordance with and governed by the law of the State of New York.

(a)    Each party hereby irrevocably and unconditionally submits, for itself and its property, to the exclusive jurisdiction of the United States District Court for the Southern District of New York sitting in the Borough of Manhattan (or if such court lacks subject matter jurisdiction, the Supreme Court of the State of New York sitting in the Borough of Manhattan), and any appellate court from any thereof, in any

72

4877-7275-1721.6

action or proceeding arising out of or relating to this Agreement or the other Loan Documents or the transactions relating hereto or thereto, or for recognition or enforcement of any judgment, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may (and any such claims, cross-claims or third party claims brought against any party hereto may only) be heard and determined in such Federal (to the extent permitted by law) or New York State court.  Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.  Nothing in this Agreement or any other Loan Document shall affect any right that any Lender or Administrative Agent may otherwise have to bring any action or proceeding to enforce any award or judgment or exercise any right under the Loan Documents or against any LC Cash Collateral or any other property of any Loan Party in any other forum in which jurisdiction can be established.

(b)      Each party hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement or the other Loan Documents in any court referred to in paragraph (b) of this Section.  Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(c)      Each party to this Agreement irrevocably consents to service of process in the manner provided for notices in Section 9.01.  Nothing in this Agreement or any other Loan Document will affect the right of any party to this Agreement to serve process in any other manner permitted by law.

SECTION 9.11.      WAIVER OF JURY TRIAL.  EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE OTHER LOAN DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).  EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED TO IT, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

SECTION 9.12.      Headings.  Article and Section headings and the Table of Contents used herein are for convenience of reference only, are not part of this Agreement and shall not affect the construction of, or be taken into consideration in interpreting, this Agreement.

SECTION 9.13.      Confidentiality.  Each of the Administrative Agent, each Lender and the Lenders agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (a) to its and its Affiliates' directors, officers, employees and agents, including accountants, legal counsel and other advisors (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential and the disclosing party will be responsible for any disclosure by such Persons), (b) to the extent requested by any regulatory or self-regulatory authority, (c) to the extent required by applicable laws or regulations or by any subpoena or similar legal process, (d) to any other party to this Agreement, (e) in connection with the exercise of any remedies hereunder or any other Loan Document or any suit, action or proceeding relating to this Agreement or any other Loan Document or the enforcement

73

of rights hereunder or thereunder, (f) subject to an agreement containing provisions substantially the same as those of this Section, to (i) any assignee of or Participant in, or any prospective assignee of or Participant in, any of its rights or obligations under this Agreement or (ii) any actual or prospective counterparty (or its advisors) to any swap or derivative transaction, or to any credit insurance provider, in each case, relating to a Borrower and its obligations, (g) with the consent of the Borrower, (h) to the extent such Information (i) becomes publicly available other than as a result of a breach of this Section or an agreement described in clause (f) hereof or (ii) becomes available to the Administrative Agent or any Lender on a non-confidential basis from a source other than the Borrower (other than a source actually known by such disclosing Person to be bound by confidentiality obligations with respect thereto) or (i) to data service providers, including league table providers, that serve the lending industry (but, in the case of this clause (i), solely to the extent that (x) such Information is information about the terms of the financing contemplated hereby routinely provided by arrangers to data services providers and (y) such Information is provided to such data service providers no earlier than the fifth Business Day after the Closing Date. In addition, each Lender shall comply with each of its other confidentiality arrangements applicable to any particular Information covered therein and furnished by such Lender in its capacity as a Lender in connection with this Agreement (whether such confidentiality arrangements are agreed to before or after the Closing Date) unless the Borrower otherwise consents to the disclosure of such Information to any Person in connection with such Person becoming a Lender or Participant hereunder (such consent not to be unreasonably conditioned or withheld in the event that such Person is willing to agree to enter into substantially similar confidentiality arrangements. "Information" means all information received from the Borrower or its Affiliates relating to the Borrower, its subsidiaries or its business, other than any such information that is available to the Administrative Agent or any Lender on a non-confidential basis prior to disclosure by the Borrower (other than from a source actually known by such party to be bound by confidentiality obligations).

Each Lender acknowledges that information furnished to it pursuant to this Agreement or the other Loan Documents may include material non-public information concerning the Borrower and its Affiliates and their related parties or their respective securities, and confirms that it has developed compliance procedures regarding the use of material nonpublic information and that it will handle such material non-public information in accordance with those procedures and applicable law, including Federal and state securities laws.

All information, including requests for waivers and amendments, furnished by the Borrower or the Administrative Agent pursuant to, or in the course of administering, this Agreement or the other Loan Documents will be syndicate-level information, which may contain material non-public information about the Borrower and its Affiliates and their related parties or their respective securities. Accordingly, each Lender represents to the Borrower and the Administrative Agent that it has identified in its administrative questionnaire a credit contact who may receive information that may contain material non-public information in accordance with its compliance procedures and applicable law, including Federal and state securities laws.

SECTION 9.14.    Judgment Currency. If, for the purposes of obtaining judgment or filing a claim in any court, it is necessary to convert a sum due hereunder or claim in one currency into another currency, the rate of exchange used shall be that at which in accordance with normal banking procedures the Administrative Agent could purchase the first currency with such other currency on the Business Day preceding that on which final judgment is given. The obligation of the Borrower in respect of any such sum due from it to the Administrative Agent or the Lenders hereunder shall, notwithstanding any judgment in a currency (the "Judgment Currency") other than that in which such sum is denominated in accordance with the applicable provisions of this Agreement (the "Agreement Currency"), be discharged only to the extent that on the Business Day following receipt by the Administrative Agent of any sum

74

adjudged to be so due in the Judgment Currency, the Administrative Agent may in accordance with normal banking procedures purchase the Agreement Currency with the Judgment Currency.  If the amount of the Agreement Currency so purchased is less than the sum originally due to the Administrative Agent from a Borrower in the Agreement Currency, such Borrower agrees, as a separate obligation and notwithstanding any such judgment, to indemnify the Administrative Agent or the Person to whom such obligation was owing against such loss.  If the amount of the Agreement Currency so purchased is greater than the sum originally due to the Administrative Agent in such currency, the Administrative Agent agrees to return the amount of any excess to the Borrower (or to any other Person who may be entitled thereto under applicable law).

SECTION 9.15.    USA PATRIOT Act.  Each Lender subject to the Act hereby notifies the Borrower that pursuant to the requirements of the USA PATRIOT Act (Title III of Pub.  L.  107-56 (signed into law October 26, 2001)) (the "Act"), it is hereby required to obtain, verify and record information that identifies the Borrower, which information includes the name and address of the Borrower and other information that will allow such Lender to identify the Borrower in accordance with the Act.

SECTION 9.16.    Releases of Guarantees and Liens.

(a)    At such time as the Reimbursement Obligations and the other Obligations (other than in respect of contingent indemnification and expense reimbursement claims not then due) shall have been paid in full, the LC Commitments have been terminated and all Letters of Credit have expired or been cash collateralized, the LC Cash Collateral shall be released from the Liens created by the DIP Order (it being understood that LC Cash Collateral may be released substantially simultaneously with the satisfaction of the foregoing in order to cash collateralize Letters of Credit having an expiry after the Termination Date in accordance with Section 2.17(c)) and all obligations (other than those expressly stated to survive such termination) of the Administrative Agent and the Borrower under the DIP Order shall terminate, all without delivery of any instrument or performance of any act by any Person.

(b)    The Lenders hereby authorize the Administrative Agent and the Collateral Agent, as applicable, to execute and deliver any instruments, documents, and agreements necessary or desirable to evidence and confirm the release of any Subsidiary Guarantor or LC Cash Collateral pursuant to the foregoing provisions of this Section 9.16, all without the further consent or joinder of any Lender.  Upon the effectiveness of any such release, any representation, warranty or covenant contained in any Loan Document relating to any such LC Cash Collateral or Subsidiary Guarantor shall no longer be deemed to be made.  In connection with any release hereunder, the Administrative Agent and the Collateral Agent shall promptly (and the Lenders hereby authorize the Administrative Agent and the Collateral Agent to) take such action and execute any such documents as may be reasonably requested by the Borrower and at the Borrower's expense in connection with the release of any Liens created by any Loan Document.

SECTION 9.17.    No Advisory or Fiduciary Responsibility.  In connection with all aspects of each transaction contemplated hereby (including in connection with any amendment, waiver or other modification hereof or of any other Loan Document), the Borrower acknowledges and agrees that: (i) (A) the arranging and other services regarding this Agreement provided by the Administrative Agent, the Lead Arranger and Bookrunner and the Lenders are arm's-length commercial transactions between the Borrower and its Affiliates, on the one hand, and the Administrative Agent, the Lead Arranger and Bookrunner and the Lenders, on the other hand, (B) such Borrower has consulted its own legal, accounting, regulatory and tax advisors to the extent it has deemed appropriate, and (C) such Borrower is capable of evaluating, and understands and accepts, the terms, risks and conditions of the transactions contemplated hereby and by the other Loan Documents; (ii) (A) the Administrative Agent, the Lead Arranger and Bookrunner and each Lender is and has been acting solely as a principal and, except as expressly agreed in

75

writing by the relevant parties, has not been, is not, and will not be acting as an advisor, agent or fiduciary for such Borrower or any of its Affiliates, or any other Person and (B) neither the Administrative Agent, the Lead Arranger and Bookrunner nor any Lender has any obligation to such Borrower or any of its Affiliates with respect to the transactions contemplated hereby except those obligations expressly set forth herein and in the other Loan Documents; and (iii) the Administrative Agent, the Lead Arranger and Bookrunner and the Lenders and their respective Affiliates may be engaged in a broad range of transactions that involve interests that differ from those of such Borrower and its Affiliates, and none of the Administrative Agent, the Lead Arranger and Bookrunner or any Lender has any obligation to disclose any of such interests to the Borrower or its Affiliates.  The Borrower further agrees that it will not assert any claim against the Administrative Agent, the Lead Arranger and Bookrunner or any Lender based on an alleged breach of fiduciary duty by such Person in connection with the Loan Documents or the transactions contemplated hereby.

SECTION 9.18.    Acknowledgement and Consent to Bail-In of Affected Financial Institutions.  Notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any Affected Financial Institution arising under any Loan Document may be subject to the Write-Down and Conversion Powers of the applicable Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a)    the application of any Write-Down and Conversion Powers by the applicable Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an Affected Financial Institution; and

(b)    the effects of any Bail-In Action on any such liability, including, if applicable:

(i)    a reduction in full or in part or cancellation of any such liability;

(ii)    a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such Affected Financial Institution, its parent entity, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document; or

(iii)    the variation of the terms of such liability in connection with the exercise of the Write-Down and Conversion Powers of the applicable Resolution Authority.

SECTION 9.19.    [Reserved].

SECTION 9.20.    [Reserved].

SECTION 9.21.    Acknowledgement Regarding Any Supported QFCs.  To the extent that the Loan Documents provide support, through a guarantee or otherwise, for any agreement or instrument that is a QFC (such support "*QFC Credit Support*" and each such QFC a "*Supported QFC*"), the parties acknowledge and agree as follows with respect to the resolution power of the Federal Deposit Insurance Corporation under the Federal Deposit Insurance Act and Title II of the Dodd-Frank Wall Street Reform and Consumer Protection Act (together with the regulations promulgated thereunder, the "*U.S. Special Resolution Regimes*") in respect of such Supported QFC and QFC Credit Support (with the provisions below applicable notwithstanding that the Loan Documents and any Supported QFC may in fact be stated to be governed by the laws of the State of New York and/or of the United States or any other state of the United States):

4877-7275-1721.6

In the event a Covered Entity that is party to a Supported QFC (each, a "***Covered Party***") becomes subject to a proceeding under a U.S. Special Resolution Regime, the transfer of such Supported QFC and the benefit of such QFC Credit Support (and any interest and obligation in or under such Supported QFC and such QFC Credit Support, and any rights in property securing such Supported QFC or such QFC Credit Support) from such Covered Party will be effective to the same extent as the transfer would be effective under the U.S. Special Resolution Regime if the Supported QFC and such QFC Credit Support (and any such interest, obligation and rights in property) were governed by the laws of the United States or a state of the United States.  In the event a Covered Party or a BHC Act Affiliate of a Covered Party becomes subject to a proceeding under a U.S. Special Resolution Regime, Default Rights under the Loan Documents that might otherwise apply to such Supported QFC or any QFC Credit Support that may be exercised against such Covered Party are permitted to be exercised to no greater extent than such Default Rights could be exercised under the U.S. Special Resolution Regime if the Supported QFC and the Loan Documents were governed by the laws of the United States or a state of the United States.  Without limitation of the foregoing, it is understood and agreed that rights and remedies of the parties with respect to a Defaulting Lender shall in no event affect the rights of any Covered Party with respect to a Supported QFC or any QFC Credit Support.

SECTION 9.22.    DIP Order Controls. To the extent that any specific provision hereof or of any Loan Document is inconsistent with the DIP Order, the DIP Order shall control.

**[Signature Pages Follow.]**

77

4877-7275-1721.6

      **IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be duly executed and delivered by their proper and duly authorized officers as of the day and year first above written.

                            **BORROWER:**

                            **QVC, INC.**

                            By: _____

                            Name:

                            Title:

**Error! Unknown document property name.**

**ADMINISTRATIVE AGENT:**

JPMORGAN CHASE BANK, N.A., as Administrative Agent, Collateral Agent, a Lender and an Issuing Bank


By: _____
Name:
Title:

Signature Page to Credit Agreement

**Error! Unknown document property name.**

[LENDER],
as a Lender [and an Issuing Bank]


By: _____
Name:
Title:

**DIP LC Facility – Fee Letter**

[Filed Under Seal]