**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

|  |  |
|---|---|
| In re | ) Chapter 11 |
|  | ) |
| QVC GROUP, INC., *et al*.,[1] | ) Case No. 26-90447 (ARP) |
|  | ) |
| Debtors. | ) (Jointly Administered) |
|  | ) (Emergency Hearing Requested) |
|  | ) |

**EMERGENCY MOTION OF CERTAIN PREFERRED EQUITY HOLDERS
FOR ENTRY OF AN ORDER DIRECTING THE APPOINTMENT
OF AN OFFICIAL COMMITTEE OF PREFERRED EQUITY SECURITY HOLDERS**

> **Emergency relief has been requested.  Relief is requested not later than May 1, 2026.**
>
> **If you object to the relief requested or you believe that emergency consideration is not warranted, you must appear at the hearing if one is set, or file a written response prior to the date that relief is requested in the preceding paragraph. Otherwise, the Court may treat the pleading as unopposed and grant the relief requested.**

Cygnus Capital, William Pulman, and Kevin Barnes (collectively, the "Requesting Preferred Shareholders"), as beneficial holders (or investment managers or advisors acting on behalf of funds and/or accounts that are beneficial holders) of the 8.0% Series A Cumulative Redeemable Preferred Stock (the "Preferred Stock" and holders of the Preferred Stock, the "Preferred Shareholders") issued by QVC Group, Inc. ("QVCG" and, together with its subsidiaries and affiliates in the above-captioned Chapter 11 Cases, the "Debtors"), by and through their undersigned counsel, hereby submit this motion (the "Motion") for the entry of an order, substantially in the form attached as **Exhibit A**, directing the United States Trustee (the "U.S. Trustee") to appoint an official committee

---

[1] A complete list of each of the Debtors in these Chapter 11 Cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://restructuring.ra.kroll.com/QVC.  The location of Debtor QVC Group, Inc.'s corporate headquarters and the Debtors' service address in these Chapter 11 Cases is 1200 Wilson Drive, West Chester, Pennsylvania 19380.

of Preferred Shareholders (the "Official Preferred Equity Committee") in these Chapter 11 Cases. In support thereof, the Requesting Preferred Shareholders respectfully state as follows:

**PRELIMINARY STATEMENT**

1. Unlike most requests for an equity committee, which typically turn on the need for a complex valuation analysis, the basis for an Official Preferred Equity Committee in these Chapter 11 Cases is straightforward. It is undisputed that QVCG has hundreds of millions of dollars of assets. It is further undisputed that QVCG has no funded debt of its own and is not liable whatsoever for the debt of its subsidiaries. And yet, the Debtors, with the consent of various creditor groups whose claims are against Debtors *other than QVCG*, have proposed an unconfirmable prepackaged chapter 11 plan of reorganization that would siphon off the 100% of the distributable value of QVCG for the benefit of creditors of the QVC, Inc. subsidiary and leave Preferred Shareholders with nothing.[2]

2. The only basis for the Debtors' determination that Preferred Shareholders are not entitled to any recovery under the Plan is a questionable (at best) and newly-created $400 million "potential intercompany claim" by QVC, Inc. against QVCG (the "Intercompany Claim"). The Debtors never previously disclosed the Intercompany Claim or any facts that would support such a claim, including in the Form 10-K filed by the Debtors just one day prior to the Petition Date, and, beyond some general platitudes about the "Disinterested Directors"[3] at QVCG undertaking an investigation and a description of certain intercompany transactions from the prior six years, the Debtors' disclosure statement makes almost no attempt to justify or explain it with any particularity. Indeed, it is hard to fathom how an intercompany "settlement" results in zero

---

[2] *See Joint Prepackaged Plan of Reorganization of QVC Group, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* (ECF No. 15) (as it may be amended, supplemented or otherwise modified from time to time, the "Plan").

[3] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Plan.

recovery to the constituency on whose behalf the "Disinterested Directors" are negotiating.  Of course, it cannot be ignored that the Plan that is the result of "nearly eight months of creditor engagement" benefits all those parties at the expense of the one key stakeholder group that did not have a seat at the negotiating table—the Preferred Shareholders.

3.      As described further herein, every factor generally considered by courts strongly weighs in favor of appointing an Official Preferred Equity Committee: (a) there is a substantial likelihood that QVCG is solvent and that Preferred Shareholders are entitled to a distribution; (b) no other party in the Chapter 11 Cases is adequately aligned with the Preferred Shareholders to provide adequate representation; (c) given the crucial need for adequate representation, the benefits associated with an Official Preferred Equity Committee are justified and far outweigh the additional costs; (d) the Chapter 11 Cases are undoubtedly complex; and (e) the request for appointment is being made at the nascency of these Chapter 11 Cases, when such an Official Preferred Equity Committee can still meaningfully participate in and oppose confirmation of the Debtors' Plan.

4.      The Preferred Shareholders have a substantial stake in the outcome of these Chapter 11 Cases and deserve meaningful representation in these proceedings.  Unfortunately, no other fiduciary can adequately fill this role.  In these circumstances—particularly given the accelerated timeline on which the Debtors seek to confirm the Plan—the immediate appointment of an Official Preferred Equity Committee is necessary to safeguard Preferred Shareholders' legitimate interests, facilitate their meaningful participation in the Chapter 11 Cases and maximize value for all stakeholders.

## **RELIEF REQUESTED**

5.      By this Motion, the Requesting Preferred Shareholders seek, pursuant to section 1102(a)(2) of title 11 of the United States Code (the "Bankruptcy Code"), entry of an order,

substantially in the form attached hereto as **Exhibit A**, directing the appointment of an Official Preferred Equity Committee.

### JURISDICTION AND VENUE

6. The United States Bankruptcy Court for the Southern District of Texas (the "Court") has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157, 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b).

7. Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408, 1409.

8. The statutory bases for the relief requested herein are section 1102(a) of the Bankruptcy Code, Rule 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 9013-1 of the Bankruptcy Local Rules for the Southern District of Texas (the "Local Rules").

### FACTUAL BACKROUND

**A.      The Chapter 11 Cases**

9. On April 16, 2026, (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code, commencing these Chapter 11 Cases. The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. A detailed description of the relevant facts and circumstances is set forth in the *Declaration of Bill Wafford in Support of Debtors' Chapter 11 Petitions and First Day Motions* (ECF No. 4) (the "First Day Declaration").

10. As set forth in the First Day Declaration, the Debtors commenced these Chapter 11 Cases to consummate a prepackaged chapter 11 plan of reorganization that reflects "nearly eight months of creditor engagement" consistent with the terms of a signed Restructuring Support Agreement (the "RSA"). First Day Decl. ¶ 6. In contrast with the Debtors' active engagement

with creditor groups prior to the Petition Date, the First Day Declaration makes no mention of engagement between the Debtors and any holder of the Preferred Stock.[4]

11.     On April 17, 2026, the Debtors filed the Plan and accompanying *Disclosure Statement for the Joint Prepackaged Plan of Reorganization of QVC Group, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* (ECF No. 14) (the "Disclosure Statement").  The Plan contemplated by the RSA provides, among other things, that the Preferred Stock will be cancelled and that Preferred Shareholders "shall not receive any distribution, property, or other value under this Plan on account of [the Preferred Stock]."  Plan, Art. III.B.5.

12.     On April 17, 2026, the Debtors also filed the *Debtors' Emergency Motion for Entry of an Order (I) Scheduling a Combined Hearing, (II) Approving the Solicitation Procedures, (III) Approving the Deadlines and Notices Related Thereto; (IV) Waiving Certain Requirements in Connection Therewith, and (V) Granting Related Relief* (ECF No. 41) (the "Solicitation Motion"), seeking approval of an expedited schedule that "provides for confirmation 40 days after the Petition Date and emergence 13 days thereafter."  Solicitation Mot. ¶ 2.  Following the Debtors' first day hearing on April 17, 2026, the Court entered an order (the "Solicitation Order") approving the Solicitation Motion, including the proposed confirmation schedule (the "Confirmation Schedule").  *See* ECF No. 70.  Among other things, the Confirmation Schedule sets a May 19, 2026 deadline (the "Objection Deadline") for objections to Plan confirmation and approval of the Disclosure Statement and schedules a combined hearing on May 26, 2026.  Solicitation Order ¶ 2.

---

[4]     On the contrary, Cygnus Capital, through its undersigned counsel, sent a letter, dated as of February 27, 2026, to QVCG's board of directors to, among other things, urge the board to prevent the diversion of value from QVCG to support any debt restructuring involving QVCG's subsidiaries and to encourage the board to engage in a constructive dialogue.  Cygnus Capital did not receive a response from QVCG's board.

**B.      Prior Requests to Form an Official Preferred Equity Committee**

13.      On April 20, 2026, Cygnus Capital, through its undersigned counsel, submitted a letter to the U.S. Trustee requesting the appointment of an Official Preferred Equity Committee. On April 21, 2026, William Pulman, on his own behalf, independently sent an email to the U.S. Trustee with a request for the same relief.  The Requesting Preferred Shareholders are aware of at least six other Preferred Shareholders who have made similar requests to the U.S. Trustee to date.

14.      As of the filing of this Motion, the U.S. Trustee is still considering, and has not yet taken a position on, the Preferred Shareholders' requests to appoint an Official Preferred Equity Committee.  Given the accelerated timeline contemplated by the Confirmation Schedule, including the impending Objection Deadline on May 19, 2026, time is of the essence to safeguard Preferred Shareholders' legitimate interests in these Chapter 11 Cases.  Accordingly, the Requesting Preferred Shareholders are filing this Motion for emergency relief.

## BASIS FOR RELIEF

15.      Pursuant to section 1102(a)(2), "[o]n request of a party in interest, the court may order the appointment of additional committees . . . of equity security holders if necessary to assure adequate representation of . . . equity security holders.  The United States Trustee shall appoint any such committee."  11 U.S.C. § 1102(a)(2).  The Court's determination of the need for an Official Preferred Equity Committee is conducted *de novo*, without regard to whether the U.S. Trustee has previously decided to appoint such a committee.  *See In re Enron Corp.*, 279 B.R. 671, 684 (Bankr. S.D.N.Y. 2002) ("Therefore, this Court must necessarily conduct an independent review of whether there is adequate representation by an existing committee by the mandate of 11 U.S.C. § 1102(a)(2).");  *In re Pilgrim's Pride Corp.*, 407 B.R. 211, 217 (Bankr. N.D. Tex. 2009) (appointing an equity committee over the objection of the U.S. Trustee).

16.     In determining whether to appoint an official committee of equity holders, courts generally consider the following factors:

    a.  whether the debtors are likely to prove solvent;

    b.  whether equity is adequately represented by stakeholders already at the table;

    c.  whether the cost of appointing an equity committee significantly outweighs the concern for adequate representation;

    d.  the complexity of the debtors' cases, including the number of shareholders involved; and

    e.  the ability to or the timing of the motion relative to the status of the Chapter 11 cases.

7 COLLIER ON BANKR. § 1102.03[2] (16th ed.); *Pilgrim's Pride*, 407 B.R. at 216; *see also In re Williams Commc'ns Grp., Inc.*, 281 B.R. 216, 220 (Bankr. S.D.N.Y. 2002); *In re Kalvar Microfilm Inc.*, 195 B.R. 599 (Bankr. D. Del. 1996).

17.     For the reasons set forth herein, each of these factors weighs strongly in favor of the prompt appointment of an Official Preferred Equity Committee.

**A.     There Is a Substantial Likelihood that QVCG Is Solvent and that Preferred Shareholders Are Entitled to a Distribution.**

18.     The threshold consideration in determining whether to appoint an equity committee is whether there is sufficient equity in the estate for a meaningful distribution to shareholders. *See, e.g., Pilgrim's Pride*, 407 B.R. at 217 n. 15 ("Much of the authority suggests—and the court agrees—that appointment of an equity committee should be denied in cases where there is no doubt about the debtor's insolvency.") (citing *Williams Commc'ns*, 281 B.R. 216; *In re Wang Lab'ys, Inc.*, 149 B.R. 1, 4 (Bankr. D. Mass. 1992))); *Williams Commc'ns*, 281 B.R. at 220 (describing solvency as a "major factor"); *Exide Techs. v. Wis. Inv. Bd.*, No. 02-11125-KJC, 2002 WL 32332000, at *1-2 (D. Del. Dec. 23, 2002) (noting that courts only "consider . . . additional factors in determining whether equity holders are adequately represented without the appointment of an

official committee" when a debtor is not deemed to be "hopelessly insolvent"); *Kalvar Microfilm,* 195 B.R. at 601; *In re Emons Indus., Inc.*, 50 B.R. 692, 694 (Bankr. S.D.N.Y. 1985) ("[G]enerally no equity committee should be appointed when it appears that a debtor is hopelessly insolvent[.]").

19.     If a debtor is "hopelessly insolvent", holders of equity interests in such debtor are not entitled to any distribution under a chapter 11 plan—in such cases, the appointment of a committee to represent equity would accomplish little more than to burden the estate with incremental expenses.  In contrast, if a debtor is potentially solvent, equity holders retain a substantial legal and economic interest entitled to adequate representation during the chapter 11 process.

20.     The debtor's solvency—and, by extension, its equity holders' entitlement to a distribution—need not be conclusively established in connection with a request to appoint an equity committee.  Rather, appointment of an equity committee may rest on preliminary indicia of value that suggest a "substantial likelihood" that equity security holders are entitled to a "meaningful distribution" under the absolute priority rule.  *See*, *e.g.*, *In re Spansion, Inc.*, 421 B.R. 151, 156 (Bankr. D. Del. 2009) (quoting *Exide Techs. v. Wis. Inv. Bd.*, Case No. 02-1572–SLR, 2002 WL 32332000, at *1 (D. Del. Dec. 23, 2002)); *see also In re SunEdison, Inc.*, 556 B.R. 94, 103–04 (Bankr. S.D.N.Y. 2016) (denying a motion to appoint an equity committee where "it is substantially unlikely that equity will receive a distribution"); Notice of Appointment of Official Committee of Equity Security Holders, *In re Overseas Shipholding Grp. Inc.*, Case No. 12-20000 (PJW) (Bankr. D. Del. Mar. 17, 2014), ECF No. 2641 (appointing an official committee of equity security holders, which ultimately resulted in recoveries for such holders); *In re Eastman Kodak Co.*, No. 12-10202 ALG, 2012 WL 2501071, at *4 (Bankr. S.D.N.Y. June 28, 2012) (denying a motion to appoint an equity committee because, "based on the instant record, there is no substantial

evidence that equity will be entitled to a meaningful distribution in this case"); *In re Nat'l R.V. Holdings, Inc.*, 390 B.R. 690, 698 (Bankr. C.D. Cal. 2008) (denying motion to appoint equity committee based, inter alia, on the fact that equity security holders will not receive a meaningful distribution); *In re Leap Wireless Int'l, Inc.*, 295 B.R. 135, 140 (Bankr. S.D. Cal. 2003) ("Shareholders committees should be appointed when equity holders establish there is a substantial likelihood that they will receive a meaningful distribution in the case [.]"); *Williams Commc'ns*, 281 B.R. at 223 (holding that an equity committee "should not be appointed unless equity holders establish that . . . there is a substantial likelihood that they will receive a meaningful distribution in the case under a strict application of the absolute priority rule[.]").

21.     There is substantial reason to believe that QVCG is solvent (and certainly is not "hopelessly insolvent"), such that QVCG's Preferred Shareholders should be entitled to a significant recovery.  As the Debtors acknowledge in their first day pleadings, QVCG held significant assets as of April 10, 2026, including, without limitation, approximately $195 million in cash and 62% stake in Cornerstone Brands, Inc. ("CBI").[5]  First Day Decl. ¶ 37, Ex. B1; *see also* QVC Group, Inc., Annual Report (Form 10-K) (Apr. 15, 2026), Ex. 99.1.

22.     Moreover, while the other Debtors have a heavy debt burden, with approximately $6.53 billion in total outstanding funded debt obligations as of the Petition Date, *neither QVCG nor CBI themselves has any funded indebtedness*—a fact that the Debtors repeatedly acknowledged during their first day hearing.  *See, e.g.*, First Day Presentation at 11, 22, 34–37.

---

[5]     QVCG's stake in CBI has significant value.  The Debtors acknowledge in the First Day Declaration that CBI held approximately $74 million in cash as of April 10, 2026 and, per QVCG's 2025 Form 10-K, CBI's 2025 revenue and OIBDA were $937 million and $16 million, respectively.  In addition, QVCG may have additional assets relating to tax attributes and tariff refund claims.  Cleansing materials attached at Exhibit 99.3 to QVCG's Form 8-K (the "Cleansing Materials") indicate expectations of meaningful operating improvement, with CBI projected to generate $30 million of OIBDA in 2026, growing to $42 million in 2029.  *See* QVC Group, Inc., Current Report (Form 8-K) (Apr. 17, 2026), Ex. 99.3.

Indeed, the Debtors' First Day Declaration makes clear that, other than QVCG's shares of QVC, Inc., "no obligations of the Debtors are secured by any assets of [QVCG]."  First Day Decl. ¶ 36.

23.     Despite uncontroverted evidence that QVCG holds significant asset value and has no funded debt, the Debtors and various creditor groups have crafted a plan—without the participation of the Preferred Shareholders—where all of QVCG's asset value would be diverted to QVC, Inc. to fund the subsidiary Debtors' overall restructuring (and recoveries to subsidiary creditors), while making no distributions whatsoever to Preferred Shareholders.  Plan, Art. III.B.6. The Debtors are attempting to accomplish this apparent grab through an "intercompany settlement" between QVCG and QVC, Inc.  The proposed settlement would create a new $400 million Intercompany Claim against QVCG in favor of QVC, Inc., which Intercompany Claim would be entitled to receive all QVCG Distributable Cash.  Plan, Art. III.B.4.

24.     Although the intercompany settlement purportedly reflects the agreement of QVCG's "Disinterested Directors", Disclosure Statement, Art. VII.B., there are serious reasons to question the validity of the Intercompany Claim created by the settlement.  First, there are no references in the Debtors' prepetition public disclosures, including the Annual Reports (Form 10-K) filed by QVCG and QVC, Inc. just one day prior to the Petition Date, to a liability potentially owing from QVCG to QVC, Inc., let alone one that could justify granting QVC, Inc. a $400 million claim.  Second, despite the massive transfer of value that would be accomplished by the intercompany settlement, the Disclosure Statement provides scant detail on the proposed settlement and no explanation of the basis for the settlement other than generalities about parallel investigations "into potential claims and related defenses . . . that might be asserted with respect to historical intercompany transactions by and between the Debtor entities, on the one hand, and any related party."  Disclosure Statement, Art. VII.B.1.  Tellingly, the Disclosure Statement says

little about what consideration or benefit, if any, QVCG is supposedly receiving in exchange for giving away all of its available assets—the interests of QVCG's stakeholders (i.e., its shareholders) appear to be little more than an afterthought.[6]  Finally, it is notable that Intercompany Claim is somehow the *only intercompany claim amongst the Debtors that is receiving a recovery.*  The Debtors' proposed plan specifies that, other than the Intercompany Claim, "there shall be no recovery, Reinstatement or distribution of any kind on account of any Intercompany Claim or Interest from one Debtor grouping . . . to another Debtor grouping." Plan, Art. IV.B.  This includes a $1.74 billion unsecured intercompany claim held by a subsidiary of QVC, Inc. against Liberty Interactive LLC ("LINTA") pursuant to a promissory note that LINTA issued as part of an out-of-court restructuring in 2020 (the "QVC-LINTA Claim").  Plan, Art. I.A.150; Disclosure Statement, Art. VII.B.3.a.  Under the Plan, the QVC-LINTA Claim will not receive any distribution.  Plan, Art. IV.B.

25.     Absent the purported Intercompany Claim, the Debtors' own liquidation analysis makes clear that QVCG is solvent and there would be significant value for the Preferred Shareholders even in a hypothetical chapter 7 liquidation.  Disclosure Statement, Ex. D.  After accounting for $6 million of wind-down expenses and $13 million of general unsecured claims, the liquidation analysis shows that there would be approximately $168 million of cash remaining

---

[6]     At the first day hearing, Debtors' counsel alluded to QVCG shareholders benefiting from the proposed plan releases.  This purported benefit is unpersuasive.  First, dividend payments for public shareholders are clearly protected by the safe harbor provisions under section 546 of the Bankruptcy Code.  Second, given that QVCG has zero debt, it is far from clear what avoidance actions could be asserted.  Third, the value of any such releases pales in comparison to QVCG's agreement to grant a $400 million claim to QVC, Inc. while giving zero distributions to Preferred Shareholders.  Lastly, given that QVCG's preferred and common shares are widely held, including by retail investors, it is hard to imagine that pursuing avoidance actions against such shareholders would be a value-enhancing use of estate resources.  Indeed, the purported intercompany settlement only appears to provide a meaningful benefit to QVCG's insiders.  Courts in the Fifth Circuit subject such insider settlements to heightened scrutiny.  *See In re Foster Mortg. Corp.*, 68 F.3d 914, 919 (5th Cir. 1995) (finding that "scrutiny must be great when the settlement is between insiders and an overwhelming majority of [stakeholders] in interest oppose such settlement").

for Preferred Shareholders if the Intercompany Claim is not allowed.[7]  The appointment of an official preferred equity committee at this stage in the Chapter 11 Cases is crucial to ensure that this value is preserved for the Preferred Shareholders and is not unfairly diverted to fund recoveries for other stakeholders.

**B.     An Official Preferred Equity Committee Is Necessary to Ensure Adequate Representation of Preferred Shareholders in the Chapter 11 Cases.**

26.     Only an Official Preferred Equity Committee can protect the Preferred Shareholders' substantial legal and economic interests and ensure their meaningful participation in these Chapter 11 Cases.  Preferred Shareholders cannot rely on either the Debtors, the purported "Disinterested Directors" or an unsecured creditors' committee to adequately represent their interests.

27.     Although the Company's board of directors has a fiduciary duty to the Company and its stockholders by law, courts have recognized that a board is not necessarily an adequate representative of stockholders' interests in a chapter 11 proceeding because the board must advance the interests of the estate generally, rather than the specific interests of stockholders.  *See*, *e.g.*, *Pilgrim's Pride*, 407 B.R. at 218 ("While it is unquestionably true that Debtors' officers and directors have a duty to maximize Debtors' estates to the benefit of shareholders as well as creditors . . . the reorganization process is not so simple that that ensures shareholders are

---

[7]      Note that this value should be viewed as the floor, as the Debtors' liquidation analysis ascribes *zero* value to QVCG's non-cash assets, including its 62% stake in CBI.  Per QVCG's 2025 Form 10-K, CBI's 2025 revenue and OIBDA were $937 million and $16 million, respectively, and CBI had no debt and $101 million of cash as of December 31, 2025.  In addition, although the Debtors repeatedly cited tariff-related costs, including at CBI, in their public disclosures and earnings calls in 2025, the Disclosure Statement provides no information on which Debtor entities may now hold valuable tariff refund claims in the wake of the U.S. Supreme Court's decision in February 2026 to strike down the tariffs that had been imposed through executive orders issued under the International Emergency Economic Powers Act.  However, the Cleansing Materials did note that CBI paid $37,542,854 in tariffs in 2025 and that QVCG is "importer of record".  Additionally, the liquidation analysis may understate the amount of cash that the Debtors expect QVCG to have as of August 31, 2026, as the Cleansing Materials note that QVCG should have $201,388,805 of cash on August 31, 2025.

adequately represented by even equity-owning management. The principal concern of Debtors and their managers . . . must be preservation of Debtors' going concern value and their successful emergence from chapter 11.").

28.     That concern is particularly acute here.  As discussed in the section above, the QVCG directors' actions to date have made it clear that they have not acted in the interests of *any* preexisting, undisputed stakeholder in QVCG (let alone QVCG's Preferred Shareholders). Not only have such directors agreed to transfer away all of QVCG's assets to QVC, Inc. in exchange for mere releases (which such directors also stand to benefit from under the Debtors' proposed plan) and payment of their director fees as an administrative claim, but they also apparently agreed to the filing of a Disclosure Statement that makes almost no attempt to so much as explain such a seismic shift in value away from QVCG's Preferred Shareholders or any consideration purportedly supporting such transfer.  Further, QVCG's directors, who had previously approved all the intercompany transactions, are now trying to whitewash their previous approvals by giving up all of QVCG's value through the Intercompany Claim and seeking a full release in the process.

29.     Shareholders are also not presumed to be adequately represented by an official creditors' committee.  *See In re Mirant Corp.*, 334 B.R. 800, 815 (Bankr. N.D. Tex. 2005) (noting that it is unlikely that creditors will be disposed to value Debtors so liberally that equity may be sure to receive its due); *see also In re Saxon Indus., Inc.*, 29 B.R. 320, 321 (Bankr. S.D.N.Y. 1983) (providing that unsecured creditors' committees and equity committees "are separate and distinct entities with the members of the unsecured creditors and equity creditors class possessing variant priorities and interests with respect to their relationship with the debtor"); *In re Evans Prods. Co.*, 58 B.R. 572, 575 (S.D. Fla. 1985) (noting "[t]he interests of creditors and shareholders are likely to conflict over the course of a Chapter 11 proceeding").

13

30.     Neither the Debtors nor any official committee of unsecured creditors, if appointed, will sufficiently advocate for the Preferred Shareholders' interests.  Given the Debtors' corporate structure and separate business assets, creditors' interests in maximizing value will actually likely conflict with the interests of the Preferred Shareholders to the extent that creditors look to assets at QVCG to fund recoveries for creditors with claims against other Debtor entities.  Indeed, at least three creditor groups, each represented by its own sophisticated restructuring professionals, have already exerted significant influence over the Debtors' restructuring process, including by negotiating the RSA and proposed plan.  Given the disparity in representation and access between these organized creditor groups, on the one hand, and widely dispersed preferred shareholders, on the other hand, it is no surprise that the Debtors' proposed plan attempts to strip value away from the Preferred Shareholders to fund recoveries for the constituents of such creditor groups.  The appointment of an Official Preferred Equity Committee is essential to correct that imbalance during these Chapter 11 Cases.  Absent the appointment of an Official Preferred Equity Committee, no fiduciary in these Chapter 11 Cases will be standing up to the Debtors or the well-represented creditor groups to ensure that Preferred Shareholders receive the value to which they are entitled.

## C.     The Appointment of an Official Preferred Equity Committee Adds Value to the Chapter 11 Cases.

31.     The administrative costs of an equity committee alone cannot bar appointment of an official equity committee.  *See In re McLean Indus., Inc.*, 70 B.R. 852, 860 (Bankr. S.D.N.Y. 1987) ("Cost alone cannot, and should not, deprive . . . security holders of representation."); *see also Enron Corp.*, 279 B.R. at 694 ("Added cost alone does not justify the denial of appointment of an additional committee where it is warranted.").  Instead, courts are required to balance "the cost of the additional committee against the value of the representation to be provided." *Wang*

*Lab'ys*, 149 B.R. at 3; *see also In re Beker Indus. Corp.*, 55 B.R. 945, 951 (Bankr. S.D.N.Y. 1985) (holding that the opponents to the motion were unable to show that "the cost [of an equity committee] is so burdensome to deny official representation"). Additional costs must be weighed against the need for adequate representation of public shareholders. *See Wang Lab'ys*, 149 B.R. at 3-4; *Beker Indus.*, 55 B.R. at 949–51.

32.    In light of all the facts and circumstances described herein, it is clear that the appointment of an Official Preferred Equity Committee will ensure that all stakeholders entitled to a recovery are able to meaningfully participate in the Chapter 11 Cases. Giving the Preferred Shareholders a meaningful role is the only way to ensure that the bankruptcy process works fairly and justly to maximize value for all stakeholders. The added value of giving the Preferred Shareholders a seat at the table, particularly where hundreds of millions of dollars of value are at stake, far outweighs the costs to the Debtors' estates of appointing an additional committee.[8] Moreover, because the Preferred Shareholders' interests in these Chapter 11 Cases are distinct from those of other stakeholders, the Official Preferred Equity Committee would not duplicate the efforts of the other parties. Finally, the cost of an Official Preferred Equity Committee would be borne solely by QVCG and there is nothing in the Plan or the RSA that requires a certain amount of QVCG Distributable Cash to be recovered by QVC, Inc. in respect of the purported intercompany settlement. Accordingly, the other parties in interest in these Chapter 11 Cases will not be meaningfully affected by the appointment of an Official Preferred Equity Committee, in contrast with the significant prejudice that Preferred Shareholders will face if they do not have adequate representation.

---

[8]    Pursuant to the RSA and the Plan, the non-QVCG Debtors have already agreed to use their own estate resources to pay the fees and expenses of three sets of creditor professionals, the QVC Notes Professionals, the RCF Lender Professionals and the LINTA Notes Professionals (each as defined in the RSA). RSA § 7.01(n); Plan, Art. II.D.

33. The Bankruptcy Code provides the Court and parties in interest with adequate means for controlling costs. *See*, *e.g.*, 11 U.S.C. §§ 330, 1103(a); *see also In re Oneida Ltd.*, No. 06-10489 (ALG), 2006 WL 1288576, at *3 (Bankr. S.D.N.Y. May 4, 2006) ("An official equity committee would take on a fiduciary duty to all current shareholders and its compensation would be subject to the approval of the Court."). At all times, the costs of the Official Preferred Equity Committee, if appointed, would be subject to review by the Court and such parties in interest.

**D.      The Chapter 11 Cases Are Large and Complex, with Preferred Stock that Is Widely Held and Actively Traded.**

34. "[A]ppointment of [an equity committee] is more appropriate where the complexities of the case make it more difficult for another—here management—to protect equity interests as well as those of creditors." *Pilgrim's Pride*, 407 B.R. at 220. Courts in this circuit have appointed official equity committees in numerous large and complex cases. *See, e.g., In re Sorrento Therapeutics Inc.*, Case No. 23-90085 (Bankr. S.D. Tex. 2023), ECF No. 325; *In re Core Scientific, Inc.*, Case No. 22-90341 (Bankr. S.D. Tex. 2023), ECF No. 642; *In re Energy XXI Ltd.*, Case No. 16-31928 (Bankr. S.D. Tex. 2016), ECF No. 510; *In re Spectrum Jungle Labs Corp.*, Case No. 09-50455 (Bankr. W.D. Tex. 2009), ECF No. 254; *Pilgrim's Pride*, Case No. 08-45664 (Bankr. N.D. Tex. 2008), ECF No. 2352; *In re Gadzooks, Inc.*, Case No. 04-31486 (Bankr. N.D. Tex. 2004), ECF No. 599; *In re Mirant Corp.*, Case No. 03-46590 (Bankr. N.D. Tex. 2003), ECF No. 840.

35. It is undisputed that the Chapter 11 Cases are sufficiently large and complex to justify the appointment of an Official Preferred Equity Committee. The Chapter 11 Cases involve seventy-four (74) debtors operating across several states, which entities collectively "make up a *giant* direct to consumer retail enterprise." First Day Declaration ¶ 1, n. 2. Accordingly, both the

16

Debtors and the Court have concluded that these Chapter 11 Cases are complex chapter 11 cases. *See Order Granting Complex Chapter 11 Bankruptcy Case Treatment* (ECF No. 18).

36. The Debtors' balance sheet and broad shareholder base further evidence the size and complexity of these Chapter 11 Cases. As of the Petition Date, the QVC, Inc. and LINTA had over $6.53 billion in total outstanding funded debt obligations, and QVCG has issued approximately $1.272 billion in Preferred Stock. First Day Decl. ¶ 36. The Preferred Stock consisted of 12,723,158 shares issued and outstanding as of December 31, 2025, which Preferred Stock is publicly traded under the ticker symbol "QVCPQ" and was listed on the NASDAQ until April 24, 2026. QVC Group, Inc., Annual Report (Form 10-K) (Apr. 15, 2026).

37. At the first day hearing, the Debtors sought, and received, a waiver of the requirement to file a list of, and to provide notice directly to, equity security holders. *See Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to (A) Redact Certain Confidential Information of Customers, and (B) Redact Certain Personally Identifiable Information of Natural Persons, (II) Waiving the Requirement to File a List of, and Provide Notice Directly to, Equity Security Holders, (III) Approving the Manner of Notifying Creditors of the Commencement of the Chapter 11 Cases and Other Information, and (IV) Granting Related Relief* (ECF No. 7). In support of such relief, the Debtors acknowledged that QVCG's equity holders are "widely dispersed" and, as such, ownership of the Preferred Shares cannot be readily traced to specific individual holders. *Id.*

38. The broad-based ownership of the Preferred Stock underscores the importance of, and value added by, appointing an Official Preferred Equity Committee in these Chapter 11 Cases. Without a dedicated representative in these Chapter 11 Cases, it will be difficult, if not impossible,

to effectively communicate with the Preferred Shareholders, many of whom may be retail investors.

## EMERGENCY CONSIDERATION

39.     The Requesting Preferred Shareholders request emergency consideration of this Motion, on or before May 1, 2026, pursuant to Bankruptcy Local Rule 9013-1(i).  This request seeks the appointment of an Official Preferred Equity Committee at the outset of these Chapter 11 Cases, when an Official Preferred Equity Committee can most effectively protect the interests of Preferred Shareholders and before it is too late to improve, or challenge, the terms of the Debtors' Plan.  In light of the expedited Confirmation Schedule, which requires objections to confirmation of the Plan and approval of the Disclosure Statement to be submitted in less than a month on May 19, 2026, Solicitation Order ¶ 2, it is essential that an Official Preferred Equity Committee be constituted and begin its work as soon as possible so that it can adequately represent the interests of Preferred Shareholders.  Time is particularly of the essence in a complex case like this one, involving 74 debtors with operations across several states and where significant alleged intercompany claims have the potential to meaningfully shift value among stakeholder constituencies.

40.     As set forth above, the Debtors' Plan contemplates no recovery for Preferred Shareholders on the basis of "potential intercompany claims", about which there has been limited disclosure and no justification.  To ensure that Preferred Shareholders are able to meaningfully participate in the Chapter 11 Cases, including investigating the basis for the Intercompany Claim and, if needed, filing an objection to the Plan and Disclosure Statement, immediate appointment of an Official Preferred Equity Committee is critically important.

18

**NOTICE**

41.    Notice of this Motion will be served on any party entitled to notice pursuant to Bankruptcy Rule 2002 and any other party entitled to notice pursuant to Bankruptcy Rule 9013-1(d), including the Debtors' counsel.

**NO PRIOR REQUEST**

42.    No prior request for the relief sought in this Motion has been made to this or any other court.

[*The remainder of this page is left blank intentionally.*]

## CONCLUSION

**WHEREFORE**, the Requesting Preferred Shareholders respectfully request that the Court

enter an order, substantially in the form attached hereto as **Exhibit A**, directing the appointment of

an Official Preferred Equity Committee.

Dated:  April 27, 2026                                     Respectfully Submitted,

*/s/   S. Margie Venus*
**MCKOOL SMITH, PC**
S. Margie Venus (SBN 20545900)
John J. Sparacino (SBN 18873700)
600 Travis Street, Suite 7000
Houston, Texas 77002
Telephone: (713) 485-7300
Facsimile (713) 485-7344
Email:   mvenus@mckoolsmith.com
           jsparacino@mckoolsmith.com

-and-

**CLEARY GOTTLIEB STEEN & HAMILTON
LLP**
David H. Botter (*pro hac vice* pending)
Luke A. Barefoot (*pro hac vice* pending)
Joshua Brody (*pro hac vice* pending)
One Liberty Plaza
New York, New York 10006
Telephone: (212) 225-2000
Facsimile: (212) 225-3999
Email:   dbotter@cgsh.com
           lbarefoot@cgsh.com
           jbrody@cgsh.com

*Counsel to Cygnus Capital, William Pulman and
Kevin Barnes*

20

## CERTIFICATE OF ACCURACY

I certify that the foregoing statements are true and accurate to the best of my knowledge. This statement is being made pursuant to Local Rule 9013-1(i).

*/s/ David H. Botter*
David H. Botter

## CERTIFICATE OF SERVICE

I certify that, on April 27, 2026, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/  S. Margie Venus*
S. Margie Venus

21