

**The New York Times Company**

620 8th Avenue
New York, NY 10018
nytimes.com

# PROOF OF PUBLICATION

April 23, 2026

I, Larnyce Tabron, in my capacity as a Principal Clerk of the Publisher of The New York Times, a daily newspaper of general circulation printed and published in the City, County, and State of New York, hereby certify that the advertisement annexed hereto was published in the editions of The New York Times on the following date or dates, to wit on.

4/23/2026, NY/NATL, pg B3

*Larnyce Tabron*



ROWENA SORIANO
NOTARY PUBLIC
REG. # 00351915
MY COMMISSION EXPIRES
06302029
COMMONWEALTH OF VIRGINIA

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS, HOUSTON DIVISION**

In re: Chapter 11
QVC GROUP INC., et al., Case No 26-90447 (ARP)
Debtors (Jointly Administered)

**NOTICE OF COMMENCEMENT OF PREPACKAGED CHAPTER 11 BANKRUPTCY CASES AND HEARING ON THE DISCLOSURE STATEMENT AND CONFIRMATION OF THE JOINT PREPACKAGED CHAPTER 11 PLAN**

**POLICY | COMPANIES | PHILANTHROPY**

# Trump's Fed Pick Tries to Shed Label: 'Sock Puppet'

FROM FIRST BUSINESS PAGE

meaningful deliberation and unclouded decision-making." And he made clear that stamping out inflation would be a top priority during his tenure, saying that stable prices must be pursued "without excuse or equivocation."

But shaking off the perception that he will be pliable to the president's pressure campaign will not be easy for Mr. Warsh, especially given his ambitions to overhaul the institution he soon hopes to lead. Nor will it be easy for him to actually deliver what Mr. Trump wants if he tries to do so, setting up a potential clash that risks keeping tensions elevated between the White House and the Fed.

"Since he was picked by a president who clearly wants lower rates, he's coming in with a cloud over his head of not being credible," said Priya Misra, a portfolio manager at J.P. Morgan Asset Management. "He has his work cut out for him."

Mr. Trump did not help Mr. Warsh's cause on Tuesday, quipping hours before the hearing started that Mr. Warsh might need to have an office next to him in the White House if the Fed's renovations of its headquarters in Washington are not completed soon. That project is at the center of a criminal investigation that the Justice Department opened into Mr. Powell and the central bank, a move that has faced significant opposition from lawmakers on the Senate Banking Committee and is now holding up Mr. Warsh's confirmation process.

Mr. Trump on Tuesday also made clear that he would be disappointed if his pick for chair did not cut rates right away.

The rationale for rate cuts, however, has become all the more tenuous in the wake of the Iran war. Energy prices have shot higher, causing a sharp jump in inflation in March. The longer the conflict drags on, the larger the economic impact will be, resulting in higher inflation across a wider range of goods and services as well as a bigger hit to growth. The fear for officials is that Americans may start questioning the Fed's willingness to return inflation to its 2 percent target, something the central bank has missed for roughly five years.

Officials at the Fed already seem less inclined to support rate cuts in the coming months. Christopher J. Waller, a Fed governor who once was in the running to become the next chair, said in a speech last week that the Fed needed to be "cautious" about cuts amid the war. The continued closure of the Strait of Hormuz, a vital shipping pathway, could mean maintaining rates at the current range of 3.5 percent to 3.75 percent for longer "if the risks to inflation outweigh those to the labor market," he said.

Matthew Luzzetti, chief U.S. economist at Deutsche Bank, expects the Fed to remain on hold for the remainder of the year given his forecast for inflation to stay elevated and for the labor market to remain stable. Even Treasury Secretary Scott Bessent said last week that the Fed should "wait and see" before lowering rates again, a rare endorsement of the central bank's current approach.

Mr. Warsh on Tuesday declined to signal exactly how he saw rates evolving, but he did call for "regime change in the conduct of policy."

That would include a new inflation framework to redress one that he said led to a "fatal policy error" in the aftermath of the pandemic. Back then, officials misjudged the extent of resurgent price pressures, causing a delay in shifting to rate increases. Mr. Warsh said he was most focused on the "underlying inflation rate, not what's the one-time change in prices because of a change in geopolitics or a change in beef."

In that vein, he called for a rethink of the economic data the Fed most closely tracks and changes to how policymakers communicate.

He criticized his future colleagues for talking too much and for boxing themselves in by openly sharing their forecasts. He talked on Tuesday about his opposition to communication tools like the "dot plot," which aggregates what policymakers think will happen with rates and various economic metrics. Mr. Warsh, who previously served as a Fed governor between 2006 and 2011, said he also wanted the discussions in



Kevin M. Warsh, the president's nominee for Federal Reserve chair, told senators on Tuesday that he would defend the central bank's autonomy.

KENNY HOLSTON/THE NEW YORK TIMES

the room during policy meetings to be "messier," relying less on "rehearsed scripts." He said he would welcome a "good family fight."

If the economic backdrop does not look drastically different by the time Mr. Warsh is confirmed and yet he pursues lower rates, he is likely to get exactly that kind of fight.

As chair, Mr. Warsh will confer just one vote on the 12-person policy-setting committee. If he is to get his way on rates, he will have

*A nominee is under presidential pressure to cut interest rates.*

to convince the bulk of the remaining six members of the board of governors, the president of the Federal Reserve Bank of New York and presidents from four of the other regional reserve banks to vote alongside him.

Already, one of his leading arguments for lower rates has faced resistance. Mr. Warsh has suggested that a boom in artificial intelligence would unleash massive productivity gains that accelerate growth without pushing up prices. He has said the technology would be "structurally disinflationary," giving the Fed space to cuts rates. On Tuesday, he acknowledged that "considerable work" was needed to evaluate the productivity wave.

Insiders at the Fed and lawmakers at the confirmation hearing appear skeptical, however. Mr. Kennedy on Tuesday warned Mr. Warsh to be "careful" of buying into the A.I. "hype" from people trying to stoke interest before taking their companies public. Central bankers, meanwhile, seem concerned that A.I. could drive up inflation at least in the short-term before falling, while also raising the level of rates that are seen as neither stoking growth nor stymieing it. There is also deep uncertainty about just how big the overall long-run A.I. productivity gains will be.

With inflation still not back to the Fed's target and new price pressures mounting with the war in Iran, Sarah House, an economist at Wells Fargo, said Mr. Warsh's approach was likely to be perceived as too risky.

"They are getting weary of the prolonged overshoot of inflation, and that's limiting how much they're willing to go out on a limb that, from a more theoretical framework, you should see inflation fall later," she said.

Amassing broad-based support for that argument, and any others that move policy in the direction the president wants, is also likely to be harder if Mr. Warsh drastically reduces how much he speaks publicly as chair.

Throughout his tenure, Mr. Powell has delivered speeches and participated in various moderated discussions while also answering questions at eight news conferences a year, after each of the Fed's rate-setting meetings. Other officials, especially presidents from the regional banks, have spoken with significantly more frequency. While sometimes that has resulted in a cacophony of opinions around the Fed's policy settings and economic views, it has greatly reduced misunderstandings about the central bank's stance and limited the degree to which financial markets are surprised by policymakers' next steps.

Mr. Warsh sidestepped a question on Tuesday about whether he would scale back how much the Fed communicates, a move that Mr. Luzzetti warned could be counterproductive to his cause.

"The news conferences offer the chair an important platform for establishing the narrative coming out of the meeting," Mr. Luzzetti said. "I don't see the benefits of Warsh giving that up, particularly if he welcomes 'messier' debates and decisions."

Ms. Misra said that returning to a world in which the Fed was more impenetrable, with the debates behind its policy actions more obscure, would also undermine Mr. Warsh's efforts to be seen in a different light.

"More transparency is better because if you are in the midst of change, you actually want people to understand why you took a certain policy action," she said. "It's helpful in getting the public to perceive the Fed as independent and credible."

---

By DAVID YAFFE-BELLANY

## Investor Sues Trump Family Over Crypto, Claiming Fraud

Not long after the 2024 presidential election, the cryptocurrency entrepreneur Justin Sun bought $75 million in digital coins from World Liberty Financial, the Trump family's crypto start-up.

World Liberty said it was "honored" to work with Mr. Sun, known for his globe-trotting promotion of the crypto industry, called World Liberty an "excellent project."

Now that partnership has imploded. On Tuesday, Mr. Sun sued World Liberty in U.S. District Court in the Northern District of California, claiming that the company had tried to pressure him into buying another of its digital coins and threatened to report him to law enforcement.

The lawsuit represented an extraordinary break in a business partnership that once seemed mutually beneficial. Mr. Sun backed World Liberty when the company was struggling. The investment put him into business with the Trump family while he was fighting a fraud lawsuit by the Securities and Exchange Commission, creating a public outcry about conflicts of interest.

Mr. Sun paid a $10 million penalty to resolve the S.E.C. suit. World Liberty has denied that any of its deal making was part of a political quid pro quo, and Mr. Sun has said he bought the coins because he believed in the "potential for this project's growth."

In the lawsuit filed Tuesday, Mr. Sun said World Liberty had prevented him from selling the coins he purchased. World Liberty restricted his access after he resisted pressure to buy a new digital currency, the lawsuit said.

Accusing World Liberty of "egregious misconduct," Mr. Sun said the company's leaders "see the project as a golden opportunity to leverage the Trump brand to profit through fraud."

A representative for Mr. Sun did not respond to a request for comment. On social media, World Liberty's chief executive, Zach Witkoff, called Mr. Sun's claims "entirely meritless."

The Trump family unveiled World Liberty in September 2024. It teamed up with President Trump's friend Steve Witkoff, Mr. Witkoff's sons Zach and Alex, and two little-known entrepreneurs, Chase Herro and Zak Folkman.

World Liberty began selling a cryptocurrency called $WLFI, with a slice of the revenue allocated to the Trumps. The coin was a "governance token" designed to give its buyers some voting power over the firm's development.

But the coins would be "locked," meaning that buyers would not be able to resell them on the open market, at least for a while.

Initial demand for $WLFI was underwhelming. But after Mr. Sun made his purchase, World Liberty went on to record a total of more than $500 million in sales, a significant windfall for the Trumps.

Early last year, World Liberty created a second cryptocurrency, a so-called stablecoin, USD1, that was designed to maintain a price of $1. According to the lawsuit, World Liberty engaged in "a sustained and escalating campaign to pressure" Mr. Sun to buy $200 million of USD1 and make an equity investment in World Liberty.

When it became clear that Mr. Sun did not want to invest, the lawsuit said, the leaders of World Liberty "became hostile toward Mr. Sun."

---

Michael Gold contributed reporting.

# Gates Foundation Authorizes External Review of Ties to Epstein

By THEODORE SCHLEIFER

The Gates Foundation has authorized an outside review of its ties to Jeffrey Epstein, escalating the scrutiny on Bill Gates, the foundation's co-founder, and his relationship with the convicted sex offender.

The release of the Epstein files has unsettled the Seattle-based foundation, one of the largest philanthropies in the world. Mr. Gates and some former advisers are frequently mentioned in the files, and Mr. Gates apologized to foundation staff members in an all-hands meeting this year for his associations to the financier.

The foundation said on Tuesday that it sent an email in March to employees informing them of the review, which was reported earlier by The Wall Street Journal.

"Early this year, Gates Foundation C.E.O. Mark Suzman commissioned an external review to assess past foundation engagement with Epstein, and our current policies for vetting and developing new philanthropic partnerships," the foundation said in a statement. "That review is underway, and we expect the board and management will receive an update this summer."

The foundation did not give details about who is conducting the review, which would typically be

*Released files name Bill Gates and some former advisers.*

handled by a corporate law firm; when the review began; or whether the results would be made public.

Mr. Gates's ties to Mr. Epstein, including after the sex offender's criminal conviction, have been

well documented since 2021. But the Justice Department's release of millions of pages of emails have brought new controversy to the foundation and threatened to overshadow its work on global health.

In February, amid the uproar, Mr. Gates suddenly canceled a high-profile speech in India. There is little sign of the attention's fading: Mr. Gates is scheduled to appear before the House Oversight Committee in June as part of its investigation into Mr.

Epstein.

The foundation in February put out a statement that said it "regrets having any employees interact with Epstein in any way." Mr. Gates's role, as chair of the foundation's board, has not changed.

The foundation told The New York Times on Tuesday that the review had been authorized by the board, including Mr. Gates.

---

**Legal notices — United States Bankruptcy Court, Southern District of Texas, Houston Division**

IN THE UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF TEXAS HOUSTON DIVISION — In re: ASCEND ELEMENTS, INC., et al., Chapter 11, Case No. 26-90040 (CML) (Jointly Administered). NOTICE OF AUCTION FOR THE SALE OF THE DEBTORS' ASSETS FREE AND CLEAR OF ANY AND ALL CLAIMS, INTERESTS AND ENCUMBRANCES.

UNITED STATES BANKRUPTCY COURT, SOUTHERN DISTRICT OF TEXAS, HOUSTON DIVISION — In re: QVC GROUP, INC., et al., Chapter 11, Case No. 26-90447 (ARP) (Jointly Administered). NOTICE OF INTERIM ORDER (I) APPROVING NOTIFICATION AND HEARING PROCEDURES FOR CERTAIN TRANSFERS OF AND DECLARATIONS OF WORTHLESSNESS WITH RESPECT TO STOCK, (II) DIRECTING THAT ANY SUCH TRANSFER OR DECLARATION OF WORTHLESSNESS IN VIOLATION OF THE PROCEDURES BE NULL AND VOID AB INITIO, AND (III) GRANTING RELATED RELIEF.

UNITED STATES BANKRUPTCY COURT, SOUTHERN DISTRICT OF TEXAS, HOUSTON DIVISION — In re: QVC GROUP, INC., et al., Chapter 11, Case No. 26-90447 (ARP) (Jointly Administered). NOTICE OF COMMENCEMENT OF PREPACKAGED CHAPTER 11 BANKRUPTCY CASES AND HEARING ON THE DISCLOSURE STATEMENT AND CONFIRMATION OF THE JOINT PREPACKAGED CHAPTER 11 PLAN.

UNITED STATES BANKRUPTCY COURT, SOUTHERN DISTRICT OF TEXAS, HOUSTON DIVISION — In re: QVC GROUP, INC., et al., Chapter 11, Case No. 26-90447 (ARP) (Jointly Administered).