**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

|  |  |
|---|---|
| In re: | Chapter 11 |
| QVC GROUP, INC., *et al.*,[1] | Case No. 26-90447 (ARP) |
| Debtors. | (Jointly Administered) |
|  | (Emergency Hearing Requested) |

**EMERGENCY MOTION FOR ENTRY OF AN ORDER
DIRECTING THE APPOINTMENT OF AN OFFICIAL COMMITTEE
OF EQUITY SECURITY HOLDERS PURSUANT TO 11 U.S.C. § 1102**

> **EMERGENCY RELIEF HAS BEEN REQUESTED. RELIEF IS REQUESTED NOT LATER THAN MAY 5, 2026.**
>
> **IF YOU OBJECT TO THE RELIEF REQUESTED OR YOU BELIEVE THAT EMERGENCY CONSIDERATION IS NOT WARRANTED, YOU MUST APPEAR AT THE HEARING IF ONE IS SET, OR FILE A WRITTEN RESPONSE PRIOR TO THE DATE THAT RELIEF IS REQUESTED IN THE PRECEDING PARAGRAPH. OTHERWISE, THE COURT MAY TREAT THE PLEADING AS UNOPPOSED AND GRANT THE RELIEF REQUESTED.**

The holders of common and preferred stock of QVC Group, Inc. ("**QVC Group**" and, together with its debtor subsidiaries, the "**Debtors**") identified on **Schedule 1** annexed hereto (collectively, the "**Moving Shareholders**"), who collectively represent 865,696 shares (or approximately 10.92%) of the issued and outstanding Series A common stock, and 3,310 shares (or approximately .03%) of the issued and outstanding preferred stock, of QVC Group, by and

---

[1]	A complete list of each of the Debtors in these Chapter 11 Cases may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/QVC. The location of Debtor QVC Group, Inc.'s corporate headquarters and the Debtors' service address in these Chapter 11 Cases is 1200 Wilson Drive, West Chester, Pennsylvania 19380.

through their undersigned counsel, respectfully submit this emergency motion ("**Motion**") requesting entry of an Order, substantially in the form attached hereto as **Exhibit A**, directing the appointment an Official Committee of Equity Security Holders (the "**Official Equity Committee**") in these cases comprised of holders of both QVC Group's Series A common stock and its preferred stock.  In support of this Motion, the Moving Shareholders state as follows:

**PRELIMINARY STATEMENT**

1.       QVC Group's bankruptcy case is deeply troubling.  QVC Group is a non-operating parent holding company whose sole business is owning direct and indirect equity interests in its operating subsidiaries, including QVC, Inc. and Cornerstone Brands, Inc. ("**Cornerstone**"). QVC, Inc. and its intermediate parent entity, Liberty Interactive LLC ("**LINTA**"), have sizeable funded debt obligations eclipsing $6 billion dollars.  QVC Group, however, does not.  Indeed, QVC Group has a remarkably clean balance sheet.  This is purposeful.  It is how QVC Group's and its subsidiaries' corporate and capital structures were designed.  It is uncontroverted that QVC Group has no meaningful third-party debt obligations, including zero funded debt and no guarantee obligations.  It is further uncontroverted that QVC Group has substantial unencumbered assets (*e.g.*, almost $200 million in cash, majority (62%) equity stake in Cornerstone).

2.       It is no surprise, then, that QVC Group's stock was trading at around $2.50/share, implying tens of millions of dollars in equity value, immediately prior to the bankruptcy filing (and after widespread media reports respecting QVC's contemplated bankruptcy).



(Bloomberg trading data for QVC Group's Series A common stock.)

3.        Despite the foregoing, the Debtors' Chapter 11 plan proposes to entirely wipe out the equity held by QVC Group's shareholders for no value.  All value within QVC Group would, instead, flow to QVC, Inc. and its creditors – *e.g.*, the QVC, Inc. Noteholders, among the principal architects of the Chapter 11 plan – none of whom have direct claims or liens against QVC Group. How could this be?  This enormous value transfer is premised entirely on a purported $400 million inter-company claim against QVC Group and in favor of QVC, Inc.  Prior to the bankruptcy filing, this purported claim had never been disclosed by QVC Group, had never been disclosed by QVC, Inc., and had otherwise never been disclosed to the markets or to QVC Group's equity holders.  Its disclosure in the Debtors' first day pleadings was, in short, shocking.

4.        The Debtors' initial wave of bankruptcy submissions provided little detail respecting the merits of the inter-company claim – which, it bears repeating, is the predicate for effectively stripping QVC Group's equity holders of all of their value entitlements.  The Debtors indicated that various Debtor entities may hold claims against each other; special board committees were constituted for each of the principal Debtor entities to investigate; the special committees

ultimately negotiated a global "settlement;" and the $400 million allowed claim awarded to QVC, Inc. against QVC Group – conspicuous among the various "settlements" in both its amount and enormous economic impact – was a product of these negotiations.

5.       Subsequent statements filed by each of the Special Committees, while providing some additional information, raise more questions than they answer.  For example, the statement filed by QVC Group's special committee (Dkt. No. 149) references potential indemnity obligations under a tax sharing agreement, but that tax sharing agreement is not disclosed; it references potential claims held by QVC Group against QVC, Inc., but provides no information about such claims; it references written submissions by QVC, Inc.'s counsel asserting QVC, Inc.'s position vis a vis its alleged claims, but does not disclose such submissions; it references multiple rounds of term sheets exchanged between QVC Group and QVC, Inc., but does not disclose such term sheets or the substance of such proposals.

6.       Notwithstanding the recent statements, there remains a cloak of secrecy shrouding the negotiations and deal-making that produced the controversial inter-company claim.  And, this secrecy is unsettling to QVG Group's equity holders, who were completely excluded from the month's-long negotiations between the Debtors and their funded debt creditors.  The exceptionally truncated confirmation timeline (driven, it appears, not by liquidity constraints, but instead by RSA milestones agreed to among the RSA parties) only heightens concerns regarding this Chapter 11 process.  That is, it appears designed to hurriedly rush through plan confirmation before equity holders have a meaningful opportunity or ability to vet the settlements and negotiations undergirding the plan.

7.       In light of QVC Group's clear solvency as of the bankruptcy filing, the Moving Shareholders promptly submitted a letter to the Office of the United States Trustee requesting the

4

appointment of an Official Equity Committee.  That letter is attached as **Exhibit B**.  As of the filing of this Motion, the U.S. Trustee had not yet responded to that request.  Since then, an ad hoc group of preferred equity holders has filed a motion seeking the appointment of an official committee of only preferred stockholders.  The Moving Shareholders agree that an Official Equity Committee is needed, but as discussed herein, such committee should consist of both common and preferred stockholders.

8.      The Debtors and other RSA parties will presumptively oppose these requests.  They will likely contend that QVC Group is insolvent as a result of the inter-company claim (thus, equity is "out of the money"), and the inter-company claim was agreed to by an independent special committee appointed on behalf of QVC Group (thus, equity holders' interests are "adequately represented").  These contentions miss the mark.

9.      Arguing that an Official Equity Committee is not warranted because equity is "out of the money" is merely begging the question.  Are equity holders truly "out of the money"?  Or, is the inter-company settlement materially flawed?  These bankruptcy cases should provide answers to these important questions in a full, fair, and transparent way.  And those answers are unlikely to come unless an Official Equity Committee is appointed.

10.     The reason is simple.  Obtaining answers to these questions will require an effective adversary process.  In bankruptcy, the adversary process functions best when an estate fiduciary appointed pursuant to the Bankruptcy Code acts as a fiduciary counterweight to the Debtors and advocates exclusively for the economic interests of those at or below the "fulcrum" point.  Here,

with unsecured creditors unimpaired under the proposed Chapter 11 plan, the "checks and balances" role is best served by an Official Equity Committee.[2]

12. The Special Committee cannot and should not undertake this role. Unlike an Official Equity Committee, the Special Committee's fiduciary obligations extend beyond the interests of equity holders. It does not and cannot serve as a fiduciary exclusively for equity holders. Further, it is not comprised of equity holders or individuals appointed by equity holders. The Special Committee was, instead, formed by the Debtors' board, with no input from equity holders. An Official Equity Committee, in contrast, will consist of equity holders themselves appointed by the U.S. Trustee through a fair selection process. Perhaps most importantly, the Special Committee is ill-suited to scrutinize and, if appropriate, challenge the inter-company settlement, as it negotiated and agreed to the settlement and, under the RSA, is committed to obtaining its approval.

12. Lastly, the Official Equity Committee should include both common and preferred stockholders. An Official Equity Committee's mandate is to serve as a fiduciary for all equity holders and ensure that the interests of all equity holders are represented in the bankruptcy case. Where there are "different classes of equity, such as preferred and common stock, it would be appropriate to choose representatives from the various classes," thereby ensuring that "different types of holders with differing interests" are all adequately represented. 7 Collier on Bankruptcy P 1102.03[3][b]. It also bears observing that both common and preferred equity had implied equity values of tens of millions of dollars immediately prior to the bankruptcy filing. This makes sense, as there remain questions respecting, among other things, whether the liquidation preference –

---

[2] Even if an Official Creditors Committee were appointed, its economics incentives would be to confirm the Chapter 11 plan, not test the assumptions, settlements, or value allocation undergirding it.

which, under the certificate of designations, would be due only upon the "liquidation, dissolution, or winding-up" of QVC Group – would be triggered through this reorganization. But, that is a question for another day.

13. In sum, an Official Equity Committee should be appointed and that Committee should consist of holders of both preferred and common stock to ensure that the interests of all equity holders are adequately represented in this case.

## JURISDICTION, VENUE, AND STATUTORY PREDICATES

14. The United States Bankruptcy Court for the Southern District of Texas (this "**Court**") has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334. This Motion is a core proceeding within the meaning of 28 U.S.C. § 157(b). Venue for this Motion is proper under 28 U.S.C. §§ 1408 and 1409. The statutory predicate for the relief requested herein is 11 U.S.C. § 1102(a)(2).

## RELEVANT BACKGROUND

A.      **General Case Background.**

15. On April 16, 2026 (the "**Petition Date**"), the Debtors each filed a voluntary petition for Chapter 11 relief commencing these Chapter 11 cases (the "**Chapter 11 Cases**"). The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to Bankruptcy Code Sections 1107(a) and 1108.

16. The Chapter 11 Cases have been consolidated for procedural purposes only and are jointly administered under the above-captioned case number.[3] No Official Committee of Unsecured Creditors has been appointed in these Chapter 11 Cases as of the date of this filing.

---

[3]      *Order (I) Directing Joint Administration of the Debtors' Chapter 11 Cases and (II) Granting Related Relief* [Dkt. No. 17].

7

17.     The Debtors commenced these Cases to confirm and execute a prepackaged Chapter 11 plan based on a restructuring support agreement (the "**RSA**", and the "**RSA Plan**"[4]) and which reflects "eight months of creditor engagement," which in turn follows almost six years of attempts to restructure the Debtors' balance sheet involving numerous parties.  *Declaration of Bill Wafford in Support of Debtors' Chapter 11 Petitions and First Day Motions* [Dkt. No. 4] ("**Wafford Decl.**") ¶¶ 6, 40-63.  By contrast, the Debtors have not actively engaged with equity holders before or since the Petition Date.

18.     On April 17, 2026, the Debtors filed the RSA Plan and attendant Disclosure Statement.[5]  The RSA Plan provides that, among other things, preferred and common equity will be cancelled, and equity holders shall receive no recovery.  *See* RSA Plan Art. III.B.

19.     On April 17, 2026, the Debtors also filed the Solicitation Motion,[6] seeking a severely curtailed plan process and confirmation schedule, including a May 19 deadline for objections to confirmation and Disclosure Statement approval and a combined hearing on May 26. The Court granted the Solicitation Motion and approved the confirmation schedule following the April 17 first day hearing.  *See* Dkt. No. 70.

---

[4]     *Joint Prepackaged Plan of Reorganization of QVC Group, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Dkt. No. 15].

[5]     *Disclosure Statement for the Joint Prepackaged Plan of Reorganization of QVC Group, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Dkt. No. 14] (the "**Disclosure Statement**").

[6]     *Debtors' Emergency Motion for Entry of an Order (I) Scheduling a Combined Hearing, (II) Approving the Solicitation Procedures, (III) Approving the Deadlines and Notices Related Thereto; (IV) Waiving Certain Requirements in Connection Therewith, and (V) Granting Related Relief* [Dkt. No. 41] (the "**Solicitation Motion**").

20.     On April 27, 2026, certain preferred shareholders of QVC Group filed an emergency motion seeking an order directing the United States Trustee to appoint an official committee of preferred equity holders.[7]

**B.      Moving Shareholders' Prompt Requests To Appoint An Official Equity Committee.**

21.     Given the evidence of equity value in these cases – contained in market data and the Debtors' own securities filings and bankruptcy pleadings – the Moving Shareholders promptly organized and, on April 24, 2026, submitted a request to the Office of the United States Trustee to appoint an Official Equity Committee.[8]  As of the date of the Motion, the U.S. Trustee had not responded to the Moving Shareholders' request.

## LEGAL ARGUMENT

22.     Bankruptcy Code Section 1102(a)(2) provides that, on request of a party in interest, the Court may direct the appointment of an Official Equity Committee.  11 U.S.C. § 1102(a)(2). When determining whether to direct such appointment, Courts consider the following factors:

  (i)     whether the debtors are likely to prove solvent;

  (ii)    whether equity is adequately represented by the stakeholders already at the table;

  (iii)   the complexity of the debtors' cases; and

  (iv)    the likely cost to the debtor's estates of an equity committee.

*See In re Pilgrim's Pride Corp.*, 407 B.R. 211, 216 (Bankr. N.D. Tex. 2009) (citing *In re Williams Commc'ns Grp., Inc.*, 281 B.R. 216 (Bankr. S.D.N.Y. 2002)); *Albero v. Johns–Manville Corp. (In re Johns–Manville Corp.)*, 68 B.R. 155 (S.D.N.Y. 1986), *appeal dismissed*, 824 F.2d 176 (2d Cir.

---

[7]     *Emergency Motion of Certain Preferred Equity Holders for Entry of an Order Directing the Appointment of an Official Committee of Preferred Equity Security Holders* [Dkt. No. 133].

[8]     Two of the Moving Shareholders, Salil Rajadhyaksha and Anirudha Sudhir Kamat, submitted a similar request to the United States Trustee's office on April 21, 2026.

1987); *In re Kalvar Microfilm*, 195 B.R. 599 (Bankr. D. Del. 1996); *In re Wang Laboratories, Inc.*, 149 B.R. 1 (Bankr. D. Mass. 1992); *In re Oneida Ltd.*, Case No. 06–10489, 2006 WL 1288576 (Bankr. S.D.N.Y. May 4, 2006). Courts also consider the number of shareholders involved and the ability to or the timing of the motion relative to the status of the cases. 7 Collier on Bankruptcy P 1102.03[2] (citing *In re SunEdison*, 556 B.R. 94, 102 (Bankr. S.D.N.Y 2016)). No single factor is dispositive, and the weight attributed to each factor is determined based on the facts and circumstances of the Chapter 11 case. *See In re Celsius Network LLC*, 645 B.R. 165, 172 (Bankr. S.D.N.Y. 2022).

23.     These factors, individually and collectively, weigh heavily in favor of appointment of an Official Equity Committee in these Chapter 11 Cases.

A.     **QVC Group Is Clearly Solvent.**

24.     The debtor's potential solvency is often the most important factor in determining whether to appoint an official equity committee. *See, e.g., National R.V. Holdings*, 390 B.R. 690, 696 (Bankr. C.D. Cal. 2008); *In re Ampex Corp.*, No. 08-11094, 2008 WL2051128, at *1, (Bankr. S.D.N.Y. 2008).

25.     This standard asks "whether Debtors are likely to prove insolvent." *Pilgrim's Pride*, 407 B.R. at 216. Variations in the jurisprudence ask whether the debtors "appear to be hopelessly insolvent," *Williams Commc'ns*, 281 B.R. at 220-21, or whether "there is a substantial likelihood that [shareholders] will receive a meaningful distribution in the case," *In re Spansion, Inc.*, 421 B.R. 151, 156 (Bankr. D. Del. 2009); *see also Wang Labs, Inc.*, 149 B.R. 1, at 3 (bankruptcy court appointed committee even though debtor was operating "at a loss" because debtor was not "hopelessly" insolvent).

26.     The standard is **not** whether the Debtor **is** adjudicated to be solvent at the time of the request.  Rather, the inquiry looks forward, focusing on what seems "likely" based on the available data.

27.     The standard is not a rigid formulation.  The Court, instead, is tasked with making a "practical conclusion, based upon a confluence of factors."  *Williams Commc'ns*, 281 B.R. at 221; *Wang Labs*, 149 B.R. at 3 ("[Insolvency] is not a simple matter of statutory construction where the Court can rest with citation to the balance sheet test of 11 U.S.C. § 101(32).").  The "confluence of factors" here overwhelmingly favors appointment of an Official Equity Committee.

28.     Market data demonstrates QVC Group's equity value.  On April 15th, the day before bankruptcy filing, its Series A common stock (QVCGA) and preferred stock (QVCGP) closed at approximately $2.49/share and $2.55/share, respectively, implying a market capitalization of tens of millions of dollars for each security.  In other words, the public market has determined QVC Group has significant equity value – despite reporting as far back as this February that the Debtors were negotiating a restructuring with creditors and contemplating a Chapter 11 filing.[9]  Courts regularly look to market data as instructive and relatively objective guides to a business's value.  *See, e.g.*, *In re Iridium Operating LLC*, 373 B.R. 283, 291 (Bankr. S.D.N.Y. 2007) ("the public markets constitute a better guide to fair value than the opinions of hired litigation experts whose valuation work is performed … from an advocate's point of view.").  The market, presumptively informed by all public information, has determined that QVC Group is likely solvent.

---

[9]     *See QVC Is in Creditor Talks to Restructure Debt in Bankruptcy*, Feb. 11, 2026, available at https://www.bloomberg.com/news/articles/2026-02-10/qvc-is-in-talks-with-creditors-to-restructure-debt-in-bankruptcy?embedded-checkout=true

29.     The facts back up the market's judgment.  QVC Group has substantial assets from which equity can recover and *zero* funded debt.  QVC Group, the ultimate parent of the Debtors, holds $195 million in cash, and a 62% equity stake in unencumbered operating subsidiary Cornerstone.  Wafford Decl., ¶ 37, Exs. B1 – B2.  The remaining 38% interest in Cornerstone is owned by QVC Group's wholly-owned subsidiary LINTA. *See* Wafford Decl. at Exs. B1 – B2.

30.     Cornerstone in turn has $74 million in cash on its balance sheet and substantial operations.  It generates approximately 10% (around $920 million) of the Debtors' $9.2 billion in consolidated net revenue,[10] and adjusted OIBDA of $36 million and $16 million in fiscal years 2024 and 2025, respectively.[11]

31.     By contrast, QVC Group has no funded debt obligations, and its assets are entirely unencumbered.  *See* Wafford Decl. ¶ 36.  Cornerstone, too (and its intermediate parent company) have no funded debt obligations, and its assets are entirely unencumbered.  *See* Wafford Decl. ¶ 36.  Moreover, QVC Group's historical securities filings have never referenced or suggested any meaningful intercompany claims against QVC Group; nor have QVC, Inc.'s securities filings referenced or suggested any meaningful intercompany claims benefiting it or any other QVC Group subsidiary.[12]

32.     The *only* claimants against QVC Group are it preferred and common equity holders. *See* Wafford Decl. Ex. B1.

---

[10]     *See* Wafford Decl. ¶¶ 31, 37; *Disclosure Statement for the Joint Prepackaged Plan of Reorganization of QVC Group, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Dkt. No. 14] (the "**Disclosure Statement**"), at 34-35.

[11]     *See* QVC Group, Inc., Annual Report on Form 10-K for the Fiscal Year ended December 31, 2025, at II-8, *available at* https://www.sec.gov/Archives/edgar/data/1355096/000135509626000010/qvcga-20251231.htm.

[12]     *See generally* QVC Group, Inc., Annual Report on Form 10-K for the Fiscal Year ended December 31, 2025; QVC, Inc., Annual Report on Form 10-K for the Fiscal Year ended December 31, 2025, available at https://www.sec.gov/Archives/edgar/data/1254699/000125469926000004/qvc-20251231.htm.

33.      Market data, securities disclosures, and the Debtor's pleadings confirm QVC Group's value, available to provide meaningful recoveries to equity holders.  But for the recently-created "QVC-QVCG Settlement Claim," QVC Group's equity interests would obviously be the "fulcrum" security at QVC Group.  In other words, equity would be on a clear path to recover substantially absent an opaque settlement resulting from a years-long process which equity holders played no part in.

34.      Equity holders deserve a spot at the table.

**B.      Equity Holders Are Not Adequately Represented In These Chapter 11 Cases.**

35.      In determining whether equity already has "adequate representation" in the Chapter 11 process, courts consider whether "the usual checks and balances" are present – that is, whether parties currently in the case are adequately motivated to challenge the assumptions undergirding the debtor's plan.  *See, e.g., Pilgrim's Pride,* 407 B.R. at 211 ("While it is unquestionably true that Debtors' officers and directors have a duty to maximize Debtors' estates to the benefit of shareholders as well as creditors, the reorganization process is not so simple that that ensures shareholders are adequately represented by even equity-owning management….  An equity committee would provide a counterweight by, presumably, being as optimistic in valuing Debtors as creditors are pessimistic.").  The bankruptcy process functions properly when the parties with an economic interest in the Debtors' affairs have an officially-mandated, fiduciary seat at the table when issues critical to those interests are being negotiated.

36.      Here, the true "fulcrum" economic interest at QVC Group is its equity holders, who had no "seat at the table" during prepetition negotiations of the RSA Plan.  An Official Equity Committee should be appointed to enable shareholders to participate fully and actively in these Chapter 11 Cases.

37.     The Debtors' management, including the "Special Committee" it appointed at QVC Group, cannot serve this function.  QVC Group's equity holders had no say in the appointment of the Special Committee; it was appointed by the Debtors' board without shareholder input.  Our jurisprudence recognizes that management face conflicting, multifaceted responsibilities and pressures that, despite best intentions, may prompt it to make strategic case decisions that do not further equity's interests: "[T]he reorganization process is not so simple that it ensures shareholders are adequately represented by even equity-owning management.  The principal concern of Debtors and their managers … must be preservation of the Debtors' going concern value and their successful emergence from chapter 11.  That will occur through confirmation of a plan of reorganization.  Confirmation of a plan, in turn, is heavily dependent upon Debtors reaching an accord with the [Official Creditors Committee] and the Banks." *Pilgrim's Pride*, 407 B.R. at 218 (citations omitted).  That is the case here.  The Special Committee's principal concern will be confirming and consummating the RSA Plan, as required under the RSA.

38.     Moreover, the terms of the RSA prohibit the Special Committee and the Debtors from investigating or challenging any facet of the RSA Plan, including the "QVC-QVCG Settlement Claim."  Management, for its part, is heavily incentivized to confirm the RSA Plan, which allocates up to 10% of QVC's reorganized equity (fully diluted) to management and provides management with broad releases and exculpations.  *See* RSA Plan Art.1.A.108, Art.IV.C and Q, Art.VIII.

39.     Nor could an Official Creditors Committee provide the necessary "checks and balances."  The law recognizes that creditor fiduciaries are not equity fiduciaries.  The Creditors Committee has a fiduciary duty to maximize returns for unsecured creditors.  But, once solvency

14

is shown, the Creditors Committee's incentives are no longer focused on maximizing the value of the estate. *See, e.g., Pilgrim's Pride*, 407 B.R. at 218.

40.     Here, the RSA Plan pays unsecured creditors in full and leaves them unimpaired. Thus, Chapter 11's adversary process will not work even if a creditors committee is appointed. *See Oneida*, 2006 WL 1288576 (Bankr. S.D.N.Y. Mary 4, 2006) (When "all general unsecured claims … will be paid in full under the Debtors' plan, … the [Official Creditors] Committee [is] the least likely party in interest to challenge the *status quo* [and] the usual checks and balances are not present."). An Official Equity Committee must be appointed to ensure the Chapter 11 process functions as intended.

**C.     The Complexity Of These Chapter 11 Cases
Merits Appointing An Official Equity Committee.**

41.     Appointment of an Official Equity Committee "is more appropriate where the complexities of the case make it more difficult for another—[e.g.,] management—to protect equity interests as well as those of creditors." *Pilgrim's Pride*, 407 B.R. at 220. This factor weighs heavily in favor of an Official Equity Committee.

42.     These Cases are undoubtedly complex. "The scale of the [Debtors'] business today is massive. QVC group: shipped more than 190 million units to customers in fiscal year 2025; sells approximately 400,000 products in its retail ecosystem from thousands of brand partners like Nike, Tempur-Pedic, and Whirlpool; and creates more than 40,000 hours of content on 20-plus soundstages." Wafford Decl. ¶ 15. These Cases involve 74 different Debtors operating across the country, comprising a "giant" enterprise "trusted in households around the world." *Id.* ¶ 1, n.2. Different corporate layers are independently represented by committees, each with separate counsel and professionals, as part of a restructuring process that has been ongoing for many years.

15

Thus, the Court has recognized these Cases as complex Chapter 11 cases. *See Order Granting Complex Chapter 11 Bankruptcy Case Treatment* [Dkt. No. 18].

43.     This complexity is exacerbated by the RSA Plan's vanishingly short timeline. The Court has approved a confirmation schedule with a May 19 objection deadline for the RSA Plan and disclosure statement, which are to be heard and determined at the combined hearing on May 26. In other words, the Debtors and their professionals have been assessing the situation and formulating a plan over a prolonged period, while stakeholders uninvolved in the prepetition process (like equity holders) have mere weeks to get up to speed, evaluate, and take action. Moreover, that timeline does not appear to be driven by liquidity constraints, market forces, or outside pressure, but rather by the apparent strategic desire of the Debtors and the RSA parties to rush the RSA Plan through an expedited confirmation process.

44.     The Debtors' capital structure further evidences thees cases' size and complexity. The Debtors have over $6.5 billion in outstanding funded debt obligations. Wafford Decl. ¶ 26. QVC Group has issued 12,723,158 shares of preferred stock, 7,903,233 shares of Series A common stock, and 182,233 shares of Series B common stock as of December 31, 2025. This stock was publicly traded on the NASDAQ until April 24, 2026. *See* QVC Group, Inc., Annual Report on Form 10-K for the Fiscal Year ended December 31, 2025. Thus, as the Debtors' acknowledge, QVC Group's equity holders are "widely disbursed[.]" Dkt. No. 7 ¶ 29. Such a large and diffuse shareholder pool means it will be nearly impossible for shareholder interests to be properly represented outside an Official Equity Committee.

**D.     The Cost Of An Equity Committee Is Justified, Subject To Controls To Prevent Inefficiency, And Outweighed By The Benefit To The Estate.**

45.     Courts have made it clear that the administrative costs of a statutory equity committee alone must not bar its appointment. *See, e.g., In re Enron Corp.*, 279 B.R. 671, 694

(Bankr. S.D.N.Y. 2002) ("Added cost alone does not justify the denial of appointment of an additional committee where it is warranted") (citing *In re Hills Stores*, 137 B.R. 4, 8 (Bankr. S.D.N.Y. 1992)); *In re McLean Indus.*, 70 B.R. 852, 860 (Bankr. S.D.N.Y. 1987) ("Cost alone cannot, and should not, deprive public debt and security holders of representation.") (citing *In re Beker Indus. Corp.*, 55 B.R. 945, 951 (Bankr. S.D.N.Y. 1985)).  Courts "employ a balancing test to weigh the cost of any equity committee" against the need for "adequate representation." *Williams Commc'ns*, 281 B.R. at 220 (citing *Wang*, 149 B.R. at 3).

46.     Where, as here, creditors expect to be repaid in full, equity holders have the strongest incentive to keep costs low so as not to diminish their recoveries.  Moreover, committee costs in these Cases will be modest compared to the amounts, and the principles, at stake.  *In re Beker Indus. Corp.*, 55 B.R. 945, 949 (Bankr. S.D.N.Y. 1985) (once the need for adequate representation is established, "the burden shifts to the opponent of the motion [to appoint an official equity committee] to show that the cost of the additional committee sought significantly outweighs the concern for adequate representation and cannot be alleviated in other ways.").

47.     An Official Equity Committee will ensure that the scope of the engagement will be tailored to the circumstances and that any fees will be necessary and based on the prevailing market for such services.  Moreover, given that incentive, establishing an Official Equity Committee at this critical juncture will provide additional oversight of other parties' costs to ensure the efficiency of the proceedings.  The anticipated cost of the professionals is small when compared to the value of the equity to be preserved for shareholders (tens of millions).  The Bankruptcy Code also contains adequate means for controlling costs.  Fees and expenses of the Official Equity Committee will be subject to review and, if appropriate, objection by other parties in interest.  The

17

Court will also have the final say over the Official Equity Committee's fee requests. *See, e.g.*, 11 U.S.C. §§ 330, 1103(a).

48.    The interests of QVC Group's equity holders clearly require adequate representation. Ensuring a fair, reliable Chapter 11 process and thus maximizing recoveries for the benefit of all stakeholders far outweighs the comparably modest cost to the Debtors' estates of appointing an Official Equity Committee.

### E.    Given The Artificially Truncated Timeline Of These Cases, An Official Equity Committee Should Be Appointed Now.

49.    The current objection deadline for the RSA Plan and disclosure statement is ***less than three weeks away***. Time is of the essence. This case is two weeks old. Two weeks from today, the case outcome may very well be determined (and without any independent analysis of the intercompany claim which forms the linchpin of these cases). Under such circumstances, an Official Equity Committee must be appointed as soon as possible in order for equity to be adequately represented.

50.    The Court cannot wait for the case to essentially end before deciding whether to allow equity to have a voice in the Chapter 11 process. Official Equity Committees are routinely appointed in bankruptcy cases where, as here, the legal requirements have been met, and the committee can provide significant input in the case's ultimate outcome. *See, e.g., In re Lordstown Motors Corp.*, No. 23-10831 (Bankr. D. Del.); *In re Washington Prime Grp.*, 21-31948 (Bankr. S.D. Tex.); *In re ADPT DFW Holdings LLC* (a/k/a Adeptus Health), No. 17-31432 (Bankr. N.D. Tex.); *In re Azure Midstream Partners, LP*, No. 17-30461 (Bankr. S.D. Tex.); *In re Tidewater Inc.*, No. 17-11132 (Bankr. D. Del.); *In re BPS US Holdings Inc. (a/k/a Performance Sports Group)*, No. 16-12373 (Bankr. D. Del.); *In re IMX Acquisition Corp.*, No. 16-12238 (Bankr. D. Del.); *In re The Dolan Company*, No. 14-10614 (Bankr. D. Del.); *In re KIT Digital, Inc.*, No. 13-11298

(Bankr. S.D.N.Y.); *In re Overseas Shipholding Grp.*, No. 12-20000 (Bankr. D. Del.); *In re Pilgrims' Pride Corp.*, No. 08-45664 (Bankr. N.D. Tex.); *In re Oneida Ltd.*, No. 06-10489 (Bankr. S.D.N.Y.); *In re Riverstone Networks, Inc.*, No. 06-10110 (Bankr. D. Del.); *In re Global Power Equipment Grp.*, No. 06-11045 (Bankr. D. Del.); *In re Mirant Corp.*, No. 03-46590 (Bankr. N.D. Tex.); *In re Comdisco Ventures, Inc.*, No. 01-24795 (Bankr. N.D. Ill.); *In re Mercury Finance Co.*, 98-20763 (Bankr. N.D. Ill.); *In re A.H. Robins Co.*, No. 85-2183 (Bankr. E.D. Va.).

## F.       The Committee Should Represent All Equity Holders.

51.       Finally, the Official Equity Committee should include both common and preferred stockholders.  An Official Equity Committee's mandate is to serve as a fiduciary for all equity holders and ensure that the interests of all equity holders are represented in the bankruptcy case. The Bankruptcy Code speaks of official committees of equity holders, not committees of preferred and/or common equity.  Rather, "[i]f there are different classes of equity, such as preferred and common stock, it would be appropriate to choose representatives from the various classes.  If there are different types of holders with differing interests, or different factions among such holders, it may [be] appropriate to choose representatives of the different groups" or expand the committee beyond the normal seven members.  7 Collier on Bankruptcy P 1102.03[3][b].

52.       Both common and preferred equity interests had implied equity values of tens of millions of dollars immediately prior to the bankruptcy filing.  Moreover, there are significant questions respecting, among other things, whether the liquidation preference – which, under the certificate of designations, would be triggered only upon the "liquidation, dissolution, or winding-up" of QVC Group – would be triggered through this reorganization.  The Official Equity Committee should represent and champion the interests of all equity holders, with questions of allocation between the common and preferred stock resolved in due course.

19

**EMERGENCY CONSIDERATION**

53.     The Moving Shareholders request emergency consideration of this Motion, on or before May 5, 2026, pursuant to Bankruptcy Local Rule 9013-1(i).  Given the expedited plan confirmation schedule, and the stakes involved for equity holders (*i.e.*, potentially losing all value entitlements on account of their stock), it is critical that an Official Equity Committee be appointed to commence its work as soon as practicable.  The Debtors and other RSA parties have been negotiating and structuring the Chapter 11 plan for approximately eight months.  Given the complexity of the issues implicated by the Chapter 11 plan, the Official Equity Committee will require as much time as it can to analyze and respond.  Accordingly, the immediate appointment of an Official Equity Committee is vital.

**NOTICE**

54.     Notice of this Motion shall be served on any party entitled to notice pursuant to Bankruptcy Rule 2002 and any other party entitled to notice pursuant to Local Bankruptcy Rule 9013-1(d), including the Debtors' counsel.

**NO PRIOR REQUEST**

55.     No prior request for the relief sought in this Motion has been made to this or any other court.

*[Remainder of page intentionally left blank.]*

**WHEREFORE**, based on the foregoing, the Moving Shareholders request that the Court order the appointment of an Official Equity Committee, comprised of holders of both common and preferred stock, and that the Moving Shareholders have such other or further relief to which they may justly be entitled.

Dated: May 1, 2026
      Houston, TX

Respectfully submitted,

*/s/ Adam Schiffer*

**BROWN RUDNICK LLP**
Adam Schiffer
609 Main Street, Suite 3550
Houston, TX 77002
Telephone: (281) 815-0511
Email: aschiffer@brownrudnick.com

-and-

Robert J. Stark (*pro hac vice* forthcoming)
Bennett S. Silverberg (*pro hac vice* forthcoming)
Andrew M. Carty (*pro hac vice* forthcoming)
Alexander F. Kasnetz (*pro hac vice* forthcoming)
Seven Times Square
New York, NY 10036
Telephone: (212) 209-4800
Email: rstark@brownrudnick.com
      bsilverberg@brownrudnick.com
      acarty@brownrudnick.com
      akasnetz@brownrudnick.com

*Counsel to the Moving Shareholders*

**SCHEDULE 1**

| Name | Address | QVCGA (Common) | QVCGP (Preferred) |
|------|---------|----------------|-------------------|
| Salil Rajadhyaksha | 212, Total Environment Greensleeves, John Avenue, Bengaluru 560068, India | 72,799 | 100 |
| Anirudha Sudhir Kamat | Indraprastha, No. 9, Kingston Road, Richmond Town, Bengaluru 560025, Karnataka, India | 19,250 | 100 |
| Vatsala Sudhir Kamat | Indraprastha, No. 9, Kingston Road, Richmond Town, Bengaluru 560025, Karnataka, India | 12,750 | - |
| Diksha Kamat Nayak | Indraprastha, No. 9, Kingston Road, Richmond Town, Bengaluru 560025, Karnataka, India | 16,800 | - |
| Mysore Kaveri Bai | Indraprastha, No. 9, Kingston Road, Richmond Town, Bengaluru 560025, Karnataka, India | 51,200 | 100 |
| Tarun Appanna | Shanti Gruha, 7 Berlie Street, Langford Town, Bengaluru 560025, Karnataka, India | 6,302 | 10 |
| Artawat Udompholkul | BLK 27A, Adam Road, #03-15, Singapore [postal code to confirm] | 37,340 | - |
| Modern Credit Ventures Limited Partnership | 107 Stanwich Rd Greenwich, CT 06830 | 90,000 | 2,000 |
| Parker Detweiler | 200 SE 15th Rd Apt 11I Miami, FL 33129 | 50,000 | 1,000 |
| Tejashkumar Patel | 27072 Carronade Drive Suite A100 Perrysburg, OH 43551 | 26,004 | - |
| Binta Patel | 27072 Carronade Drive Suite A100 Perrysburg, OH 43551 | 5,005 | - |
| Matt Ellington | 11266 River Moorings Rd Jacksonville, FL 32225 | 12,870 | - |
| Kai Xu | c/o Ryan J. Benincasa 107 Stanwich Rd Greenwich, CT 06830 | 173,089 | - |

| Kingbird Ventures LLC | 30 N Gould St Suite R Sheridan, WY 82801 | 290,675 | - |
|---|---|---|---|
| **TOTAL** | | **864,084** | **3,310** |

**EXHIBIT A**

**Proposed Order**

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| QVC GROUP, INC.., *et al.*,[1] | Case No. 26-90447 (ARP) |
| Debtors. | (Jointly Administered) |

**[PROPOSED] ORDER GRANTING**
**MOTION FOR ENTRY OF AN ORDER DIRECTING**
**THE APPOINTMENT OF AN OFFICIAL COMMITTEE**
**OF EQUITY SECURITY HOLDERS PURSUANT TO 11 U.S.C. § 1102**

Upon the motion (the "**Motion**")[2] of the Moving Shareholders for entry of an order appointing an official committee of the equity holders of QVC Group Inc. (an "**Official Equity Committee**"), as more fully set forth in the Motion; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; and this Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and that this Court may enter a final order consistent with Article III of the United States Constitution; and this Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the relief requested in the Motion is appropriate pursuant to Bankruptcy Code Section 1102(a)(2); and it appearing that notice of the Motion has been given as set forth in the Motion and that such notice is adequate under the circumstances and no other or

---

[1]     A complete list of each of the Debtors in these Chapter 11 Cases may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/QVC. The location of Debtor QVC Group, Inc.'s corporate headquarters and the Debtors' service address in these Chapter 11 Cases is 1200 Wilson Drive, West Chester, Pennsylvania 19380.

[2]     Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Motion.

further notice need be given; and the Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; upon all of the proceedings had before the Court and after due deliberation and sufficient cause appearing therefore, it is hereby ORDERED THAT:

1. The Motion is granted as set forth herein.

2. All objections that have not been withdrawn, waived, or otherwise resolved, if any, are hereby denied or overruled on the merits with prejudice. All withdrawn objections are deemed withdrawn with prejudice.

3. The United States Trustee is directed to appoint an Official Equity Committee in these cases consisting of holders of both QVC Group's Series A common stock and its preferred stock as expeditiously as possible.

4. This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, or enforcement of this Order.

Dated: _____, 2026
Houston, Texas

                    _____
                    Hon. Alfredo R. Perez
                    United States Bankruptcy Judge

**EXHIBIT B**

**brown**rudnick

ROBERT J. STARK
DIRECT DIAL: 212.209.4862
EMAIL: rstark@brownrudnick.com

April 24, 2026

<u>VIA EMAIL</u>

Kevin M. Epstein, Esq.
Jana Smith Whitworth, Esq.
Office of the United States Trustee, Region 7
515 Rusk Street, Suite 3516
Houston, Texas 77002
Kevin.M.Epstein@usdoj.gov
Jana.Whitworth@usdoj.gov

RE:    **In re QVC Group, Inc., et al., Case No. 26-90447 (Bankr. S.D. Tex.)**

Dear Mr. Epstein and Ms. Whitworth:

We write on behalf of the individuals set forth on **Schedule 1** hereto (collectively, the "***Requesting Equity Holders***"), who collectively own, manage, and/or control (directly or indirectly) 881,342 shares (11.14%) of QVC Group, Inc.'s ("***QVC Group***") Series A common stock, and 3,310 shares of its preferred stock.   The Requesting Equity Holders respectfully request the appointment of an Official Equity Committee in QVC Group's Chapter 11 proceeding comprised of holders of both common and preferred stock.[1]   Further, we respectfully request that the Official Equity Committee be appointed as soon as practicable, given the Debtors' stated intention to fast-track plan confirmation, with a confirmation hearing presently scheduled for May 26, 2026.

The Chapter 11 plan proposed by the Debtors, the RSA Noteholders, and RSA Lenders is predicated on a number of controversial transactions and "settlements," the sum of which eliminates QVC Group's equity interests for no consideration.[2]   QVC Group's equity (which, at the time of the filing, traded publicly on the New York Stock Exchange) had a market value of tens of millions of dollars the evening before the bankruptcy filing, notwithstanding widespread media coverage of QVC's potential Chapter 11 filing.   This made economic sense, as QVC Group (the ultimate parent of QVC, Inc. and the other Debtors) has significant assets ($195 million of cash, plus a 62% equity stake in unencumbered operating subsidiary Cornerstone Bands, Inc.), and few meaningful liabilities.   Notably, ***none*** of the Debtors' funded debt obligations – neither the QVC Notes, RCF Claims, nor LINTA Notes – have direct claims or security

---

[1]    An Official Equity Committee's mandate is to serve as a fiduciary for all equity holders and ensure that the interests of all equity holders are represented in the bankruptcy case.   Here, there are significant questions respecting the allocation of value as between QVC Group's common and preferred stockholders (*e.g.*, whether any liquidation preference is due and owing under the preferred stock's certificate of designations), which militates in favor of, at a minimum, a mixed Committee representing all equity interests.   Accordingly, the interests of both common and preferred stockholders should be represented on the Committee.

[2]    *See Joint Prepackaged Plan of Reorganization of QVC Group, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Dkt. No. 15] (the "***RSA Plan***").



interests against QVC Group; rather, they all exist further down the corporate structure (*e.g.*, at the QVC, Inc. and Liberty Interactive LLC levels) and are secured solely by the stock in QVC, Inc.

A linchpin of the Debtors'/RSA Noteholders'/RSA Lenders' case strategy is the so-called "QVC-QVCG Settlement Claim." That "settlement" creates an enormous ($400 million) liability on QVC Group's previously clean balance sheet in favor of subsidiary QVC, Inc. and would function to transfer essentially all of the value of QVC Group – ***hundreds of millions of dollars of cash and other asset value*** – from QVC Group (where the RSA Noteholders/Lenders have ***no*** value entitlement) to QVC, Inc. (where those parties' claims exist). All of this would be accomplished without any meaningful input from affected equity holders, who were excluded from the months-long prepetition negotiating, planning, and strategizing among the Debtors and the RSA parties.

These cases desperately require an adequate fiduciary counterweight to test, and if appropriate challenge, the Debtors'/RSA Noteholders'/RSA Lenders' restructuring thesis. Unsecured creditors are unimpaired under the proposed RSA Plan; thus, an Official Creditors Committee is unlikely to be appointed or, if one is, to meaningfully scrutinize the proposed transactions (given that its constituency would be paid in full under the Plan). QVC Group's equity holders are the constituency with the "fulcrum" economic interests at stake, and they deserve an independent, fiduciary voice in QVC Group's case.

## INTRODUCTION

On April 15th, the day before QVC Group's bankruptcy filing, its Series A common stock (QVCGA) and preferred stock (QVCGP) closed at approximately $2.49/share and $2.55/share, respectively, implying a market capitalization of tens of millions of dollars for each security. The market, in sum, had determined that both tranches of QVC Group's equity had significant value. This, despite reports dating back to February 2026 that the collective QVC entities were in negotiations with funded debt holders respecting a restructuring and were contemplating a Chapter 11 filing.[3]

That market determination was consistent with, and presumptively informed by, all publicly available information up to the point. As set forth in QVC Group's securities filings and confirmed in the first day submissions, QVC Group owns substantial assets, to wit, the company has $195 million in balance sheet cash, and ultimately owns a 62% equity stake in operating subsidiary Cornerstone Brands, Inc.[4] ("***Cornerstone***"). Cornerstone, itself, has $74 million in balance sheet cash and significant operations, generating approximately 10% (*i.e.*, about $920 million) of the Debtors' $9.2 billion in consolidated net revenue,[5] and adjusted OIBDA of $36 million and $16 million in FY 2024 and 2025, respectively.[6]

---

[3]    *See QVC Is in Creditor Talks to Restructure Debt in Bankruptcy*, Feb. 11, 2026, available at https://www.bloomberg.com/news/articles/2026-02-10/qvc-is-in-talks-with-creditors-to-restructure-debt-in-bankruptcy?embedded-checkout=true

[4]    *See Declaration of Bill Wafford in Support of Debtors' Chapter 11 Petitions and First Day Motions* [Dkt. No. 4] ("***Wafford Decl.***"), ¶ 37, Exhs. B1 – B2. The remaining 38% interested in Cornerstone is owned by QVC Group subsidiary LI LLC. *See* Wafford Decl. at Exhs. B1 – B2.

[5]    *See* Wafford Decl. ¶¶ 31, 37; *Disclosure Statement for the Joint Prepackaged Plan of Reorganization of QVC Group, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Dkt. No. 14] (the "***Disclosure Statement***"), at 34-35.

[6]    *See* QVC Group, Inc., Annual Report on Form 10-K for the Fiscal Year ended December 31, 2025, at II-8, available at https://www.sec.gov/Archives/edgar/data/1355096/000135509626000010/qvcga-20251231.htm.



Notably, QVC Group has no funded debt obligations, and the foregoing assets are entirely unencumbered.[7]   Likewise, Cornerstone (and its intermediate parent company) have no funded debt obligations, and its assets are entirely unencumbered.[8]

Moreover, QVC Group's historical securities filings have never referenced or suggested any meaningful intercompany claims against QVC Group, nor have QVC, Inc.'s securities filings referenced or suggested any meaningful intercompany claims benefiting it or any other QVC Group subsidiary.[9]

Yet, despite QVC Group's substantial assets and comparatively modest liabilities, the RSA Plan wipes out QVC Group's equity interests without any recovery.  This is accomplished through the "QVC-QVCG Settlement Claim," which creates a heretofore undisclosed $400 million liability of QVC Group in favor of QVC, Inc.  The Debtors offer little regarding the substance of this enormous liability; rather, the Debtors' submissions vaguely allude to "historical intercompany transactions" that "could give rise to potential intercompany claims."[10] Notably, the "QVC-QVCG Settlement Claim" is the only allowed intercompany claim receiving a distribution under the RSA Plan.[11]

The net effect of this newly-minted liability is to wedge a "claim" onto QVC Group's balance sheet that enables QVC, Inc. (and, thus, the RSA Noteholders) to soak up all of QVC Group's cash before it can be distributed to QVC Group's equity holders, as illustrated by the Debtors' liquidation analysis of QVC Group.

| Liquidation Analysis - QVC GROUP, INC. | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | | Recovery % | | Recovery $ | | |
| *In $millions* | Note: | Estimated NBV | | Low | High | Low | | High |
| Cash and Cash Equivalents | [A] | $ | 187 | 100.0% | 100.0% | $ 187 | $ | 187 |
| Other Non-Current Assets | [B] | | - | n.a. | n.a. | - | | - |
| **Total Assets** | | **$** | **187** | **100.0%** | **100.0%** | **$ 181** | **$** | **187** |
| **Wind-Down Expenses** | | | | | | | | |
| Total Wind-Down Expenses | [C] | | | | | $ 6 | $ | 6 |
| Wind-Down Expenses Recovery $ | | | | | | 6 | | 6 |
| *Priority Recovery %* | | | | | | *100.0%* | | *100.0%* |
| **Net Proceeds from Liquidation** | | | | | | **$ 181** | **$** | **181** |
| General Unsecured Claims | | | | | | $ 13 | $ | 13 |
| Potential Intercompany Claims | | | | | | 400 | | 400 |
| **General Unsecured Claims** | [D] | | | | | **$ 413** | **$** | **413** |
| General Unsecured Claims Recovery | | | | | | 181 | | 181 |
| *General Unsecured Claims Recovery %* | | | | | | *43.9%* | | *43.9%* |
| **Preferred Equity Claims** | [E] | | | | | **$ 1,387** | **$** | **1,387** |
| Preferred Equity Recovery | | | | | | - | | - |
| *Preferred Equity Recovery %* | | | - | | | *0.0%* | | *0.0%* |
| Remaining Value to Equity Interests | | | | | | - | | - |
| **Total Creditor Recovery** | | | | | | **$ 181** | **$** | **181** |

---

[7]      *See* Wafford Decl. at ¶ 36.

[8]      *See* Wafford Decl. at ¶ 36.

[9]      *See generally* QVC Group, Inc., Annual Report on Form 10-K for the Fiscal Year ended December 31, 2025; QVC, Inc., Annual Report on Form 10-K for the Fiscal Year ended December 31, 2025, available at https://www.sec.gov/Archives/edgar/data/1254699/000125469926000004/qvc-20251231.htm.

[10]     *See* Wafford Decl. ¶ 61; Disclosure Statement at 45, 48.

[11]     *See* RSA Plan Art.III.B.



Further, as noted above, in addition to nearly $200 million in cash, QVC Group also owns a majority interest in its profitable and valuable subsidiary Cornerstone. Through unexplained plan alchemy, Cornerstone will be stripped from QVC Group and transformed into a subsidiary of QVC, Inc.,[12] with no compensation flowing to QVC Group or its equity holders for such transfer.[13]

### BASES FOR THE REQUESTED APPOINTMENT

Bankruptcy Code Section 1102(a)(1) authorizes the appointment of an Official Equity Committee as the United States Trustee "deems appropriate." 11 U.S.C. § 1102(a)(1). In considering a request for the appointment of an Official Equity Committee, case precedent focuses on the following considerations:

(1)     Whether the Debtor is hopelessly insolvent;

(2)     Whether the interests of equity holders are adequately represented by stakeholders already at the table;

(3)     The complexity of the Debtor's case; and

(4)     Whether the costs associated with such committee significantly outweigh the need for adequate representation.

*In re Pilgrim's Pride Corp.*, 407 B.R. 211, 216 (Bankr. N.D. Tex. 2009) (citing *In re Williams Commc'ns Grp., Inc.*, 281 B.R. 216 (Bankr. S.D.N.Y. 2002); *Albero v. Johns–Manville Corp. (In re Johns–Manville Corp.)*, 68 B.R. 155 (S.D.N.Y. 1986), *appeal dismissed*, 824 F.2d 176 (2d Cir. 1987); *In re Kalvar Microfilm*, 195 B.R. 599 (Bankr. D. Del. 1996); *In re Wang Laboratories, Inc.*, 149 B.R. 1 (Bankr. D. Mass. 1992).

No single factor is dispositive, and the weight attributed to each factor is determined based on the facts and circumstances of the Chapter 11 case. *See In re Celsius Network LLC,* 645 B.R. 165, 172 (Bankr. S.D.N.Y. 2022).

Each of these factors strongly favors the appointment of an Official Equity Committee in QVC Group's case.

### I.     QVC Group Is Plainly Solvent.

The jurisprudence in this area asks whether the debtor is "hopelessly" insolvent. *See In re Williams Commc'ns Group, Inc.*, 281 B.R. 216, 220-21 (Bankr. S.D.N.Y. 2002); *see also In re Wang Labs., Inc.*, 149 B.R. 1, 3 (Bankr. D. Mass. 1992) (bankruptcy court appointed committee even though debtor was operating "at a loss" because debtor was not "hopelessly" insolvent). Many courts consider the debtor's potential solvency to be the most important factor in determining whether to appoint an official equity committee. *See, e.g.*, *National R.V. Holdings*, 390 B.R. 690, 696 (Bankr. C.D. Cal. 2008); *In re Ampex Corp.*, No. 08-11094, 2008 WL 2051128, at *1, (Bankr. S.D.N.Y. 2008).

---

[12]     *See* Wafford Decl. ¶ 68.

[13]     QVC Group's liquidation analysis ascribes no value to its Cornerstone interests, despite Cornerstone's $74 million in balance sheet cash and other substantial operations.



Kevin M. Epstein, Esq.
Jana Smith Whitworth, Esq.
April 24, 2026
Page 5

There is no litmus test for determining when a debtor appears "hopelessly" insolvent. *Williams Commc'ns*, 281 B.R. at 220. "[Insolvency] is not a simple matter of statutory construction where the Court can rest with citation to the balance sheet test of 11 U.S.C. § 101(32)." *Wang Labs.*, 149 B.R. at 3. Instead, the determination is a "practical conclusion, based upon a confluence of factors." *Williams Commc'ns*, 281 B.R. at 221.

QVC Group is plainly solvent. Available market data, securities disclosures, and the Debtors' bankruptcy submissions all confirm this. QVC Group has significant unencumbered cash holdings, owns a majority interest in an enormously valuable (and unencumbered) operating subsidiary, and has no funded debt obligations. But for the recently-created "QVC-QVCG Settlement Claim," QVC Group's equity interests would obviously be the "fulcrum" security at QVC Group, as the Debtors' own submissions confirm.

## II.   Equity Holders Are Not Adequately Represented In These Chapter 11 Cases.

In determining whether equity already has "adequate representation" in the Chapter 11 process, courts consider whether "the usual checks and balances" are present – that is, whether there are parties in the case that are motivated to challenge the assumptions undergirding the debtor's plan. *See, e.g., In re Pilgrim's Pride Corp.,* 407 B.R. 211, 218-19 (Bankr. N.D. Tex. 2009) ("While it is unquestionably true that Debtors' officers and directors have a duty to maximize Debtors' estates to the benefit of shareholders as well as creditors, the reorganization process is not so simple that that ensures shareholders are adequately represented by even equity-owning management…. An equity committee would provide a counterweight by, presumably, being as optimistic in valuing Debtors as creditors are pessimistic.").

Indeed, the bankruptcy process functions properly only if the parties with an economic interest in the Debtors' affairs have an officially-mandated, fiduciary seat at the table when issues critical to those interests are being negotiated. Here, the true "fulcrum" economic interest at QVC Group is its equity holders, who had no "seat at the table" during prepetition negotiations of the RSA Plan. An Official Equity Committee should be appointed to enable shareholders to participate fully and actively in QVC Group's Chapter 11 case.

The Debtors' management, including the "Special Committee" appointed at QVC Group, cannot serve this function. First, QVC Group's shareholders never had a say in the appointment of the Special Committee; rather, the Special Committee was appointed by the Debtors' board without any shareholder input. Second, the jurisprudence recognizes that management has conflicting/multifaceted responsibilities and pressures that may prompt it to make strategic case decisions that do not further equity's interests. As explained by Judge Lynn in *Pilgrim's Pride*: "[T]he reorganization process is not so simple that it ensures shareholders are adequately represented by even equity-owning management. The principal concern of Debtors and their managers … must be preservation of the Debtors' going concern value and their successful emergence from chapter 11. That will occur through confirmation of a plan of reorganization. Confirmation of a plan, in turn, is heavily dependent upon Debtors reaching an accord with [lenders and creditors]." 407 B.R. at 218 (citations omitted). Such is the case here, where the Special Committee's principal concern will be confirming and consummating the RSA Plan, as required under the RSA. Third, under the terms of the RSA, the Special Committee and the Debtors are contractually prohibited from investigating or challenging any facet of the RSA Plan, including the "QVC-QVCG Settlement Claim." Finally, the Debtors' management is economically incentivized to confirm the RSA Plan, which allocates



up to 10% of QVC's reorganized equity (fully diluted) to management and provides management with broad releases and exculpations.[14]

Nor can an Official Creditors Committee serve the "checks and balances" role. As Judge Gropper observed in *Oneida*, when "all general unsecured claims … will be paid in full under the Debtors' plan, … the [Official Creditors] Committee [is] the least likely party in interest to challenge the *status quo*." *See* 2006 WL 1288576 (Bankr. S.D.N.Y. Mary 4, 2006). In such circumstances, "the usual checks and balances are not present." *Id*. Stated differently, absent an Official Equity Committee to represent shareholders, Chapter 11's adversary process simply doesn't work.

### III. Additional Legal Principles Supporting The Appointment Of An Official Equity Committee.

These cases are undoubtedly complex. As the Debtors state, "[t]he scale of the business today is massive. QVC group: shipped more than 190 million units to customers in fiscal year 2025; sells approximately 400,000 products in its retail ecosystem from thousands of brand partners like Nike, Tempur-Pedic, and Whirlpool; and creates more than 40,000 hours of content on 20-plus soundstages."[15] The Debtors have an intricate corporate structure, consisting of scores of individual Debtors operating a variety of interconnected businesses, some of which operate internationally, and each involving various types of regulatory oversight. Different corporate layers are independently represented by committees, each with separate counsel and professionals, as part of a restructuring process that has been ongoing for many years.

That complexity is greatly exacerbated by the heavily truncated RSA Plan timeline. The Debtors seek confirmation of the RSA Plan at a combined hearing scheduled just 40 days after the petition date, only a few weeks away. In other words, the Debtors and their professionals have been assessing the situation and formulating a plan over a prolonged period, while stakeholders uninvolved in the prepetition process have mere weeks to get up to speed, evaluate, and take action. Moreover, that timeline does not appear to be driven by liquidity constraints, market forces, or outside pressure, but rather by the apparent strategic desire of the Debtors and the RSA parties to rush the RSA Plan through an expedited confirmation process.

Time is therefore of the essence. Given that this case is only a week old, the timing of this request is prompt, ripe, and appropriate. We are mindful of concerns regarding the additional expense associated with the formation of an Official Equity Committee, but "[c]ost alone cannot, and should not, deprive . . . security holders of representation." *In re McLean Indus., Inc.*, 70 B.R. 852, 860 (Bankr. S.D.N.Y. 1987); *see also In re Enron Corp.*, 279 B.R. 671, 694 (Bankr. S.D.N.Y. 2002) ("[a]dded cost alone does not justify the denial of appointment of an additional committee where it is warranted."). However, in the context of this case, such costs will be comparatively modest and plainly justified given the stakes. Moreover, once the need for adequate representation is established, "the burden shifts to the opponent of the motion [to appoint an official equity committee] to show that the cost of the additional committee sought significantly outweighs the concern for adequate representation and cannot be alleviated in other ways." *In re Beker Indus. Corp.*, 55 B.R. 945, 949 (Bankr. S.D.N.Y. 1985); *see also* 4 Norton Bankr. L.& Prac. § 78:5 (2d ed. 2005) ("Should the moving party be successful in showing that an additional committee is required, the

---

14      *See* RSA Plan Art.1.A.108, Art.IV.C and Q, Art.VIII.

15      Wafford Decl. ¶ 15.



Kevin M. Epstein, Esq.
Jana Smith Whitworth, Esq.
April 24, 2026
Page 7

burden then shifts to the opponent to demonstrate that the cost of such an additional committee notably outweighs the interest in adequate representation.").

As set forth above, it is abundantly clear that the interests of QVC Group's equity holders require adequate representation. Ensuring a fair, reliable Chapter 11 process and thus maximizing recoveries for the benefit of all stakeholders far outweighs the comparably modest cost to the Debtors' estates of appointing an Official Equity Committee.

Finally, the Official Equity Committee should consist of both common and preferred stockholders. Both equity interests had implied equity values of tens of millions of dollars immediately prior to the bankruptcy filing. Moreover, there are significant questions respecting, among other things, whether the liquidation preference – which, under the certificate of designations, would be triggered only upon the "liquidation, dissolution, or winding-up" of QVC Group – would be triggered through this reorganization. The Official Equity Committee should represent and champion the interests of all equity holders, with questions of allocation between the common and preferred stock resolved in due course.

\*     \*     \*

For the foregoing reasons, we respectfully request that the United States Trustee promptly appoint an Official Equity Committee of both common . Thank you for your consideration and prompt attention to this matter. We are available to address any questions or concerns you may have.

Very truly yours,

Robert J. Stark

cc: joshua.sussberg@kirkland.com
   aparna.yenamandra@kirkland.com

**Schedule 1**

| Name* | Common Stock | Preferred Stock |
|---|---|---|
| Ryan J. Benincasa* | 130,113 | 2,000 |
| Parker Detweiler* | 388,413 | 1,000 |
| Kai Xu* | 173,089 | |
| Salil Rajadhyaksha* | 176,857 | 310 |
| Matt Ellington | 12,870 | |
| **Total** | **881,342** | **3,310** |
| | | |
| *% of Total (as of March 31, 2026)* | *11.14%* | *0.03%* |

---

*      Includes shares held, managed, or controlled (directly or indirectly) by such person or affiliated individual(s), entity, or entities.