**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| QVC GROUP, INC., *et al.*,[1] | Case No. 26-90447 (ARP) |
| Debtors. | (Jointly Administered) |

**EMERGENCY MOTION OF THE PREFERRED SHAREHOLDERS
TO TERMINATE EXCLUSIVITY UNDER 11 U.S.C. § 1121(d)**

> **Emergency relief has been requested.  Relief is requested not later than May 26, 2026.**
>
> **If you object to the relief requested or you believe that emergency consideration is not warranted, you must appear at the hearing if one is set, or file a written response prior to the date that relief is requested in the preceding paragraph.  Otherwise, the Court may treat the pleading as unopposed and grant the relief requested.**

Certain Preferred Shareholders (the "Preferred Shareholders")[2] of QVC Group, Inc. ("QVCG" and, together with its subsidiaries and affiliates in the above-captioned Chapter 11 Cases, the "Debtors"), by and through their undersigned counsel, Glenn Agre Bergman & Fuentes LLP, Cleary Gottlieb Steen & Hamilton LLP, and Kane Russell Coleman Logan PC, respectfully submit this motion (the "Motion") pursuant to Section 1121(d) of title 11 of the United States Code (the "Bankruptcy Code") for entry of an order terminating the exclusive periods during which only

---

[1]   A complete list of each of the Debtors in these Chapter 11 cases (the "Chapter 11 Cases") may be obtained on the website of the Debtors' proposed claims and noticing agent at https://restructuring.ra.kroll.com/QVC.  The location of Debtor QVC Group, Inc.'s corporate headquarters and the Debtors' service address in these Chapter 11 Cases is 1200 Wilson Drive, West Chester, Pennsylvania 19380.

[2]   The Preferred Shareholders are certain institutional and individual holders of the 8.000% Series A Cumulative Redeemable Preferred Stock (the "Preferred Stock") issued by QVCG identified in the amended Verified Statement pursuant to Bankruptcy Rule 2019 filed concurrently herewith.

QVCG may file a plan of reorganization and solicit acceptances thereof (the "Exclusive Periods") for itself,[3] and in support thereof, respectfully state as follows:

**PRELIMINARY STATEMENT**

The Debtors' proposed Chapter 11 plan of reorganization (the "Plan")[4] rises—but ultimately falls—on one fatally flawed premise: that "settling" an affiliate's unfiled litigation claims *against QVCG* (the "Alleged Intercompany Claims"), without the support of any economic QVCG stakeholder, is somehow appropriate because *QVCG's* cost of defending the potential litigation does not justify the return on that investment *to QVCG and its stakeholders*. The proposed "settlement"—which would cancel approximately $1.4 billion in QVCG's preferred stock with no recovery and no litigation trust for QVCG stakeholders—is predicated on Debtor QVC, Inc. ("QVC") being granted an allowed $400 million intercompany claim (the "QVC-QVCG Settlement Claim"). Under the Plan, the QVC-QVCG Settlement Claim will be deemed unimpaired and discharged after receiving substantially all of QVCG's distributable cash. Moreover, despite the limited distributions to which the QVC-QVCG Settlement Claim is entitled, the Plan somehow allows QVC to also annex all of QVCG's distributable non-cash assets, including QVCG's valuable 62% equity stake in Cornerstone (a solvent debtor with approximately $74 million in cash, no debt, and positive cash flow generation).[5]

While the proposed transaction clearly enriches stakeholders of other Debtors, it is not, in fact, a "settlement." The reality is that the Plan makes QVCG the sacrificial lamb to increase the

---

[3]   For the avoidance of doubt, this Motion does not seek to terminate the Exclusive Periods for any of the Debtors, other than for QVCG.

[4]   Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Plan.

[5]   Cornerstone generated approximately $937 million in revenue and $16 million in OIBDA in 2025, and is projected to generate $30 million to $42 million of OIBDA through 2029. *See* QVC Group, Inc., Annual Report (Form 10-K) (Apr. 15, 2026); QVC, Inc., Current Report (Form 8-K), Ex. 99.3 (Apr. 16, 2026). Cornerstone is also expected to receive substantial IEPPA tariff refunds. *See* QVC, Inc., Current Report (Form 8-K), Ex. 99.3 (Apr. 16, 2026).

distributable value of other Debtors.  To accomplish this goal, QVCG would simply capitulate to an unfiled litigation by stripping away ***all of QVCG's value*** that otherwise would be paid to QVCG Preferred Shareholders.  And unlike the Plan (which mysteriously gifts QVCG's valuable 62% equity stake in Cornerstone to QVC for no consideration), the Alternative Plan would ███████ ████████████████████████████████.  The Plan would transfer nearly all of QVCG's value to QVC solely on the basis of a mere threat of future litigation of claims that have never been publicly disclosed or threatened (despite both QVCG and QVC being SEC filers) without accounting for the litigation cost that QVC would incur.  There is no basis to approve the proposed settlement under Bankruptcy Rule 9019, and the Preferred Shareholders intend to contest the settlement if the Debtors proceed with their flawed Plan.

But the Preferred Shareholders have a better solution.  They have formulated a plan █ ███████ that will obviate the need for this draconian settlement by instead financing QVCG's defense of these purported claims at no cost to QVCG's creditors.  ██████████████



To accomplish this goal, the Preferred Shareholders respectfully request that the Court terminate QVCG's Exclusive Periods, and have the Preferred Shareholders' proposed plan for QVCG (the "<u>Alternative Plan</u>") considered in tandem with that proposed by QVCG.  The Alternative Plan would:



- fund QVCG's defense against, and prosecution of, intercompany claims at no cost to the QVCG creditors;



The Alternative Plan balances the Preferred Shareholders' rights to defend QVCG against potential intercompany claims, while preserving the distributable value for stakeholders in the Debtors' Plan. It allows the result of the parties' disputes to be determined on the merits, not by a rushed settlement that automatically extinguishes $1.4 billion in preferred equity without any recovery and without any support from any undisputed prepetition stakeholder. █████████████ █████████████████████████████████████████[6] And it allows all Debtors other than QVCG to proceed with their restructuring as currently proposed.

\* \* \* \* \*

Settlements are often expedient in bankruptcy proceedings. But settlements like the one proposed here cast doubt on the integrity of bankruptcy proceedings where they prejudice the due process rights of economic stakeholders that are willing to accept the risk (and cost) of the litigation to be settled to their detriment. For all of the reasons set forth herein, the Exclusive Periods should

---

[6]  Indeed, under the Debtors' Plan, no class of claims against QVCG is entitled to vote on the Plan. All claims against QVCG are curiously deemed unimpaired (other than Section 510(b) Claims which are impaired and deemed to reject), despite the fact that the $400 million QVCI-QVCG Settlement Claim would receive as distributions the QVCG Distributable Cash, which covers less than 50% of the purported claim amount.

be terminated to give the Preferred Shareholders the right to defend their economic rights at no cost to creditors.

## JURISDICTION AND VENUE

1.      The Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory predicate for the relief requested herein is Section 1121(d) of the Bankruptcy Code.

## BACKGROUND

### I.      The Chapter 11 Cases

2.      Simultaneously with the filing of their petitions, the Debtors filed the Plan and the accompanying disclosure statement (ECF No. 14) (the "Disclosure Statement"), reflecting a prepackaged restructuring that was negotiated prepetition pursuant to a restructuring support agreement (ECF No. 14, Ex. B) (the "RSA") among the Debtors and certain of their creditor constituencies, including holders of QVC Notes Claims and RCF Claims.  The Plan provides, among other things, that the Preferred Stock will be cancelled and that Preferred Shareholders "shall not receive any distribution, property, or other value under this Plan on account of [the Preferred Stock]."  Plan, Art. III.B.6(b).  The confirmation hearing is currently scheduled for May 26, 2026, with an objection deadline of May 19, 2026. *See Order (I) Scheduling A Combined Disclosure Statement and Plan Confirmation Hearing, (II) Approving the Solicitation Procedures, (III) Approving the Deadlines and Notices Related Thereto; (IV) Waiving Certain Requirements in Connection Therewith, and (V) Granting Related Relief* (ECF No. 70) ¶ 2.

### II.      The Corporate Structure and the QVCG Preferred Equity

3.      QVCG is the ultimate parent holding company in the Debtors' corporate structure. As of April 10, 2026, QVCG had approximately $195 million in cash.  Disclosure Statement, Art.

IV.D.3.  Critically, QVCG has zero funded indebtedness of its own.  *Declaration of Bill Wafford in Support of Debtors' Chapter 11 Petitions and First Day Motions* (ECF No. 4) (the "First Day Decl.") ¶ 36.  In SEC filings submitted shortly before the Petition Date, QVCG did not disclose the existence of any indebtedness or known litigation claims against it and in favor of any of its affiliates.  QVC Group, Inc., Annual Report (Form 10-K) (Apr. 15, 2026).

4.      QVCG has issued approximately $1.272 billion in face amount of Preferred Stock. Disclosure Statement, Art. IV.D.2(e).  The Preferred Stock consisted of 12,723,158 shares issued and outstanding as of December 31, 2025.  QVC Group, Inc., Annual Report (Form 10-K) (Apr. 15, 2026).  It is publicly traded under the ticker symbol "QVCPQ" and was listed on the NASDAQ until April 24, 2026.  *See* QVC Group, Inc., Current Report (Form 8-K) (Apr. 20, 2026).  The Preferred Stock is subject to a mandatory redemption on March 15, 2031, and holders are entitled to receive quarterly cash dividends at a fixed rate of 8% of face amount per year (increasing to 9.5% for any period in which cash dividends are not paid).  Disclosure Statement, Art. IV.D.V.2(e). In June 2025, QVC suspended paying cash dividends.  *Id.*  As a result, including accrued and unpaid dividends, the aggregate liquidation preference of the Preferred Stock exceeds $1.4 billion as of the Petition Date.  *See* Certificate of Designations of 8.0% Series A Cumulative Redeemable Preferred Stock of Qurate Retail, Inc. § 4 (Aug. 24, 2020) (defining "Liquidation Price" as "$100.00 per share, plus an amount equal to all accrued and unpaid dividends thereon").

5.      On the day before the bankruptcy filing, the QVCG Preferred Stock closed at approximately $2.55 per share with a market capitalization in the tens of millions of dollars.[7]

---

[7]     *See* Reshmi Basu, *QVC Is in Creditor Talks to Restructure Debt in Bankruptcy*, BLOOMBERG (Feb. 11, 2026), https://www.bloomberg.com/news/articles/2026-02-10/qvc-is-in-talks-with-creditors-to-restructure-debt-in-bankruptcy.

III.     **The Plan's Treatment of QVCG Equity**

6.      Under the Plan, QVCG's claims and interests are classified as follows: Classes A1 through A4 comprise classes of claims which are all purportedly Unimpaired and presumed to accept the Plan.  Plan, Art. III.B.1-4.  Classes A6 and A7 (QVCG Preferred Equity Interests and QVCG Common Equity Interests), and Class A8 (Section 510(b) Claims against QVCG) are Impaired and deemed to reject the Plan, receiving no distribution.  *Id.*, Art. III.B.6-8.[8]

7.      The Plan guts the QVCG estate of all value by (a) allowing in Class A4 the QVC-QVCG Settlement Claim in the amount of $400 million and paying it with all "QVCG Distributable Cash" (defined as the QVCG cash remaining after satisfaction of administrative claims, priority claims, secured claims, and general unsecured claims) (*see id.*, Art. III.B.4(c)(i), Art. I.A.154); (b) mysteriously gifting QVCG's valuable 62% Cornerstone equity interest to QVC; (c) releasing all intercompany claims that QVCG has against its affiliates (*see id.*, Art. VIII.C); (d) releasing claims against virtually all relevant non-Debtors against whom QVCG has claims (*see id.*); and (e) somehow making disappear, without reference or consideration to QVCG, any of its other valuable non-cash assets.[9]  In effect, after paying QVCG's relatively modest third-party obligations (which the Debtors estimate will total approximately $13 million, (*see* Disclosure Statement, Ex. D (Liquidation Analysis) at 9)), the entire value of QVCG's estate flows downstream to QVC and its creditors, leaving the preferred shareholders—who hold over $1.4 billion in senior equity claims—with nothing.

---

[8]     Notably, the only intercompany claim among all Debtor groupings that receives any recovery under the Plan is the QVC-QVCG Settlement Claim.  *See* Plan, Art. IV.B (providing that, "other than the QVC-QVCG Settlement Claim, there shall be no recovery, Reinstatement or distribution of any kind on account of any Intercompany Claim or Interest from one Debtor grouping . . . to another Debtor grouping").

[9]     The only reference to this gift in the Plan is in the definition of "Reorganized CBI Debtors", which notes that as "further detailed in the Restructuring Steps Plan, the Reorganized CBI Debtors shall be subsidiaries of Reorganized QVC on and after the Effective Date."  *Id.*, Art. I.A.175.  The "Restructuring Steps Plan" has not yet been filed.  With respect to CBI, the Plan includes conflicting language about whether interests in the CBI Debtors will be unimpaired or impaired, reinstated or cancelled.  *Id.*, Art. III.B.28(c).

IV.     **The Intercompany Settlement**

8.      The settlement purports to resolve Alleged Intercompany Claims identified by the QVC Board through its "Independent Investigation" (with the assistance of Katten Muchin Rosenman LLP), and evaluated by the directors of QVCG through a parallel investigation (with the assistance of Kobre & Kim LLP).  *See Statement of Disinterested Directors of QVC, Inc. in Support of Joint Prepackaged Chapter 11 Plan of Reorganization of QVC Group, Inc. and Its Debtor Affiliates* ("QVC Board Statement") (ECF No. 147) ¶¶ 7-14; *Statement of the Special Committee of Debtor QVC Group, Inc. in Support of Intercompany Settlement in Joint Prepackaged Chapter 11 Plan of Reorganization of QVC Group, Inc. and Its Debtor Affiliates* ("QVCG Board Statement") (ECF No. 149) ¶¶ 3-8.

9.      The QVC Board concluded that QVC had potentially viable claims against QVCG relating to (i) amounts distributed to QVCG in connection with the 2022 Cash Management Plan, (ii) Post-2022 Dividends transferred from QVC to QVCG, and (iii) potential claims arising from the Intercompany Tax Sharing Agreement (each as defined in the QVC Board Statement).  *See* QVC Board Statement ¶ 16.

10.     The QVC Board estimated that the value of these claims could range from approximately $1 billion to approximately $3 billion.  *Id*. at ¶ 22.  This is an astonishing revelation. If these claims do, in fact, exist, the officers and directors of QVC and QVCG failed to disclose them in their SEC filings for years.  Yet the Plan would release all of the officers and directors that oversaw the Debtors' participation in these transfers.

11.     This range includes approximately $800 million distributed from QVC to QVCG in connection with the 2022 Cash Management Plan, roughly $343 million in post-2022 Dividends, approximately $1.3 billion in payments under the Intercompany Tax Sharing Agreement, and potential tax indemnification claims.  *Id*. at ¶ 23.

8

12.     QVC and QVCG agreed to settle these claims in the Plan for $400 million (the "Intercompany Settlement"), an arbitrary number for which the Debtors offer no explanation but which, coincidentally, is enough to sweep all of the cash available at QVCG.  Indeed, the Debtors' own liquidation analysis confirms that, absent the Alleged Intercompany Claims, QVCG is solvent: in a hypothetical Chapter 7 liquidation and after accounting for approximately $6 million of winddown expenses and $13 million of general unsecured claims, there would be approximately $168 million of cash remaining for Preferred Shareholders.  *See* Disclosure Statement, Ex. D at 9. This figure should be viewed as a floor, as the liquidation analysis inexplicably ascribes **zero** value to QVCG's non-cash assets, including its 62% stake in Cornerstone, IEPPA tariff refunds and potential value stemming from QVC's tax attributes.  The Debtors' own numbers demonstrate that the only barrier to equity recovery is the contested intercompany settlement itself.

13.     The Preferred Shareholders vigorously dispute the Alleged Intercompany Claims. Among other things:

(a)     QVC was a solvent company at the time of the 2022 Cash Management Plan, with QVCG having an equity market capitalization of over $1 billion at the time—a fact that would completely undermine any fraudulent transfer theory.[10]

(b)     QVC remained solvent for many years thereafter, having refinanced or defeased more than $2.4 billion of debt after the 2022 transactions, and numerous other business activities occurred that are inconsistent with insolvency.  *See* Disclosure

---

[10]     As of December 31, 2022, QVCG's split-adjusted common share count (Series A and Series B) was approximately 7.66 million shares (adjusted for the May 2025 1-for-50 reverse stock split).  *See* Qurate Retail, Inc., Annual Report (Form 10-K), at I-1 (March 1, 2023).  Bloomberg reports a split-adjusted closing price of $81.50 per share for the Series A common stock on December 31, 2022, yielding a common equity market capitalization of approximately $624 million.  In addition, the 2022 Form 10-K reports 13.5 million shares of the Preferred Stock outstanding as of December 31, 2022, at a Bloomberg-reported closing price of $34.26 per preferred share, yielding a preferred equity market value of approximately $463 million.  *See id.* at II-60.  Total equity market capitalization was therefore approximately $1.087 billion.

Moreover, on a March 1, 2023 earnings call, management disclosed that as of December 31, 2022, QVCG had total cash of $1.3 billion, and that the QVC revolving credit facility leverage ratio remained well within its 4.5x covenant ceiling throughout 2022.  *See* QVC Group, Inc. (f/k/a Qurate Retail, Inc.), Earnings Call Tr., Q4 2022 at 8 (Mar. 1, 2023); *see also id.* ("[w]e believe our debt level is manageable and have sufficient cushion relative to the 4.5 times the maximum net leverage covenant threshold in our credit facility").

> Statement, Art. V.B.1(d) (describing Notes Retirements from 2022-2025, including the 2024 Capital Contribution and Exchange).

(c)     To the extent the intercompany tax sharing payments are at issue, QVCG served as a conduit to pay taxes generated by the subsidiary's income. *See id.*, Art. VII.B.3(e) (describing the Intercompany Tax Sharing Agreements and payments from QVC to QVCG). If QVCG provided reasonably equivalent value by acting as a paying agent for taxes that the subsidiaries would have had to pay in any event, there can be no viable fraudulent transfer claim.

(d)     The declarations filed in support of the settlement do not even mention a $277 million capital contribution from QVCG to QVC (funded through an intermediate transfer to LINTA) made in September 2024. While the declarations state that **LINTA** could have a potential claim against QVC for that amount (QVC Board Statement ¶ 17), they completely ignore the fact that this cash was distributed by QVCG to LINTA. *Compare* QVC, Inc., Annual Report (Form 10-K), at II-39 (Apr. 15, 2026) (stating that QVC repaid $605 million in 2029 Notes with cash consideration, "including $277 million contributed by [QVCG]"), *with* Disclosure Statement, Art. VII.B.3(h) (characterizing the same funds as "a LINTA capital contribution to QVC"). Additionally, the Disclosure Statement suggests that, of the $800 million of distributions that QVCG received as part of the December 2021 Transfers, QVCG transferred $301 million to LINTA. Thus, while the Debtors eagerly annex value from QVCG based on theoretical claims, they ignore potential claims belonging to QVCG.

14.     The parallel investigations conducted by QVC and QVCG do not provide meaningful assurance that the Alleged Intercompany Claims were fairly evaluated. Despite solvency being a critical question in assessing the potential intercompany claims, it appears that **QVCG's** Disinterested Directors relied entirely on the advice of Evercore, **which has been advising QVC since the second quarter of 2023**, and obtained no independent financial advice of its own. QVCG Board Statement ¶ 8; Disclosure Statement, Art. V.D. The sharing of advisors to assess a settlement raises serious questions about whether this was done at an arm's length and in good faith. *See, e.g.*, *Kahn v. Tremont Corp.*, 694 A.2d 422, 429-30 (Del. 1997) (finding lack of independence where special committee's financial advisor had derived significant fees from controlling shareholder's companies, finding "advisors did little to bolster the independence of the principals"); *City of Sarasota Firefighters' Pension Fund v. Inovalon Holdings, Inc.*, 319 A.3d

271, 291-95 (Del. 2024) (finding Evercore's concurrent engagement advising the buyer was a material conflict, as financial advisor conflicts are "uniquely important considerations for minority stockholders"); *see also* Andrew Brownstein *et al.*, *Use of Special Committees in Conflict Transactions*, 19 M&A J. 1 (2019) ("Where a special committee is properly deployed, the committee should exclude anyone with a direct or indirect interest in the transaction, and the committee should engage its own unconflicted legal and financial advisors").

15.     The same Disinterested Directors who approved the settlement stand to receive releases, creating a conflict of interest.   *See* Plan, Arts. II.C.5(a), I.A.59, I.A.154, VIII.C. Moreover, the substantive analysis underlying both investigations remains entirely opaque.  The procedural descriptions are largely conclusory (*e.g.,* the parties "conducted a thorough factual and legal analysis," reviewed tens of thousands of documents, and concluded that settlement was appropriate).  *See* QVC Board Statement ¶¶ 9-10; QVCG Board Statement ¶¶ 6-7.  The Debtors have not disclosed the actual claim valuations, legal conclusions, or analytical methodology that produced the $400 million figure*.  See* QVC Board Statement ¶¶ 9-11; QVCG Board Statement ¶¶ 9-14.  Preferred shareholders (who stand to lose over $1.4 billion) have been given no basis on which to evaluate whether the settlement amount is fair and equitable.  The truncated timeline for these Chapter 11 Cases—approximately five weeks from commencement to confirmation—would wipe out the Preferred Shareholders' recovery without meaningful due process or even basic disclosure.  The Fifth Circuit has noted that "scrutiny must be great when the settlement is between insiders and an overwhelming majority of creditors in interest oppose such settlement of claims." *Connecticut Gen. Life Ins. Co. v. United Cos. Fin. Corp.* (*In re Foster Mortgage Corp.*), 68 F.3d 914, 919 (5th Cir. 1995).  Indeed, the court must at least consider the reasonable views of a majority of affected stakeholders (which would here be preferred shareholders).  *See In re Cajun Elec.*

11

*Power Co-Op., Inc.*, 119 F.3d 349, 358 (5th Cir. 1997) (citing *In re Foster Mortgage Corp.*, 68 F.3d at 917). QVCG failed to engage with its preferred shareholders before agreeing to the settlement.

16. Critically, the Disinterested Directors of the QVC Board justified the settlement on the grounds that litigating these issues would create "significant expense, inconvenience, delay, and uncertainty, without a guarantee of success on the merits." QVC Board Statement ¶ 19.

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████ attached hereto as **<u>Exhibit A</u>**. In other words, representatives of QVC creditors believe that the Alleged Intercompany Claims are worth less to QVC than the cost of litigating them. Yet rather than recognizing this fact—as would be expected in a true arms' length negotiation—QVCG has simply gifted all of its value to these QVC creditors with no discount for the cost of litigation. Rather than using a portion of the approximately $195 million in cash held by QVCG to preserve the value of QVCG's assets for the benefit of QVCG stakeholders, the QVCG Disinterested Directors have effectively capitulated by agreeing to transfer 100% of said assets to QVC in exchange for releases blessing their conduct. By contrast, the Preferred Shareholders are prepared to assume the burden (and the risk) of litigation to preserve the value of QVCG's assets on their own dime.

## V.    <u>The Preferred Shareholders' Proposed Alternative</u>

17. The Preferred Shareholders' superior Alternative Plan would be structured as ███ ██████████ with the following principal terms:



(e)     **Post-Effective Date Funding**: Certain of the Preferred Shareholders are prepared to fund QVCG's defense against the Alleged Intercompany Claims through a funding arrangement at no cost to QVCG's creditors (such funding would be deducted from any recoveries to QVCG Preferred Shareholders).  By bearing all costs of litigation, the Preferred Shareholders eliminate the cost-of-litigation factor that the Debtors rely upon to justify the Settlement.





18.     The Alternative Plan is indisputably superior to the Debtors' Plan. █████████

████████████████████████████████████████████████████████████████████

████ rather than accepting a rushed settlement that extinguishes their interests. ████████

████████████████████████████████████████████████████████████████████

██████████████ rather than having them gifted through a prepackaged settlement. ████████

██████████████████████████████████ And it does all of this without any

cost to the subsidiary estates or any disruption to their restructuring, because the Preferred

Shareholders are bearing the entirety of the litigation costs, ███████████████████████

████████████████████████████.

19.     To avoid any concerns regarding unauthorized solicitation, the Preferred

Shareholders have not attached the Alternative Plan to this Motion.  The Preferred Shareholders

intend to seek appropriate relief to present the Alternative Plan to the Court and appropriate parties

under seal in advance of the hearing on this Motion, or to file the Alternative Plan promptly upon

the termination of exclusivity.

**ARGUMENT**

I.      **Legal Standard**

20.      Section 1121 of the Bankruptcy Code provides that, during the first 120 days following the entry of the order for relief, only the debtor may file a plan of reorganization.  11 U.S.C. § 1121(b).  However, "on request of a party in interest," the court "may for cause reduce or increase the 120-day period or the 180-day period referred to in this section."  11 U.S.C. § 1121(d)(1).

21.      The Bankruptcy Code does not define "cause" for purposes of Section 1121(d). Courts have developed a flexible, multi-factor test that balances the competing interests of debtors and stakeholders in light of the totality of the circumstances.  *See In re Adelphia Commc'ns Corp.*, 352 B.R. 578, 586 (Bankr. S.D.N.Y. 2006) ("*Adelphia*") ("A decision to extend or terminate exclusivity for cause is within the discretion of the bankruptcy court, and is fact-specific.").

22.      Courts typically consider the following non-exclusive factors (the "*Adelphia* Factors*"): (1) the size and complexity of the case; (2) the necessity for sufficient time to permit the debtor to negotiate a plan of reorganization and prepare adequate information; (3) the existence of good faith progress toward reorganization; (4) the fact that the debtor is paying its bills as they become due; (5) whether the debtor has demonstrated reasonable prospects for filing a viable plan; (6) whether the debtor has made progress in negotiations with its creditors; (7) the amount of time which has elapsed in the case; (8) whether the debtor is seeking an extension of exclusivity in order to pressure creditors to submit to the debtor's reorganization demands; and (9) whether an unresolved contingency exists.  *Adelphia*, 352 B.R. at 587; *see also In re Express One Int'l, Inc.*, 194 B.R. 98, 100 (Bankr. E.D. Tex. 1996) (applying the *Adelphia* Factors); *In re Dow Corning Corp.*, 208 B.R. 661, 664-65 (Bankr. E.D. Mich. 1997) (same).

15

23.     The "primary consideration" in the analysis is "whether terminating exclusivity would move the case forward materially, to a degree that wouldn't otherwise be the case." *Adelphia*, 352 B.R. at 590; *see also Dow Corning*, 208 B.R. at 670.

24.     The legislative history of Section 1121(d) makes clear that a debtor's exclusive right to propose and solicit acceptances of a plan "should not be employed as a tactical device to put pressure on parties in interest to yield to a plan they consider unsatisfactory." S. REP. NO. 95-989, at 118 (1978); *see also In re Curry Corp.*, 148 B.R. 754, 756 (Bankr. S.D.N.Y. 1992) (denying debtors' motion to extend exclusivity pursuant to Section 1121(d), holding that exclusivity "should not be employed as a tactical device to put pressure on creditors to yield to a plan that they might consider unsatisfactory."). The Fifth Circuit has recognized that Section 1121 is "a congressional acknowledgement that creditors, whose money is invested in the enterprise no less than the debtor's, have a right to a say in the future of that enterprise " and "was designed, and should be faithfully interpreted, to limit the delay that makes creditors the hostages of Chapter 11 debtors." *In re Timbers of Inwood Forest Assocs., Ltd.*, 808 F.2d 363, 372 (5th Cir. 1987), *aff'd sub nom. United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assocs.*, 484 U.S. 365 (1988).

## II.     Cause Exists to Terminate the Exclusive Periods

25.     The *Adelphia* Factors overwhelmingly support termination of the Exclusive Periods with respect to QVCG. The Preferred Shareholders address the factors most pertinent to this case below.

### A.     The Debtors Have Failed to Negotiate with the Preferred Shareholders (*Adelphia* Factors 3 and 6).

26.     The Debtors have made no progress in negotiations with the Preferred Shareholders—the only constituency harmed by the Plan's treatment of QVCG. Under the Plan, holders of approximately $1.4 billion in Preferred Stock receive nothing, yet the Debtors never

16

engaged the Preferred Shareholders in any negotiations regarding the treatment of their interests or the terms of the intercompany settlement.

27.     The Plan was presented as a *fait accompli*.  The Debtors negotiated a restructuring support agreement with certain creditor groups—the holders of QVC Notes Claims and RCF Claims—and wrapped the Intercompany Settlement into that prepackaged structure without input from the Preferred Shareholders.  The Disinterested Directors of QVC acknowledged that the intercompany settlement was supported by "key QVC creditor groups," but made no reference to any engagement with the preferred shareholders, as the only party that would be adversely affected thereby.  QVC Board Statement ¶ 39.  Indeed, the Special Committee of Cornerstone has indicated that the Intercompany Settlement was crucial to advance the restructuring with the stakeholders invited to the table.  *See Statement of Disinterested Directors of Cornerstone, Inc. in Support of Proposed Intercompany Settlement in the  Joint Prepackaged Plan of Reorganization of QVC Group, Inc. and Its Debtor Affiliates* (ECF No. 150) ¶ 8 ("[I]n conjunction with substantial progress towards a consensual chapter 11 plan, which encompassed both inter-debtor and inter-creditor negotiations, it became clear that mutual inter-debtor releases would be an important element of such plan.").

28.     Indeed, no existing fiduciary at QVCG has the ability or incentive to challenge the intercompany settlement.  The terms of the RSA contractually prohibit the Special Committee and the Debtors from challenging any facet of the Plan, including the intercompany settlement.  *See* RSA §§ 7.01(h), 7.02(a)-(c), (p)-(q).  Management, for its part, is heavily incentivized to confirm the Plan, which allocates them up to 10% of QVC's reorganized equity (fully diluted) and provides them with broad releases and exculpations.  *See* Plan, Arts. I.A.108, IV.C, IV.Q, VIII.  The only

17

path to testing the merits of the Alleged Intercompany Claims is to terminate exclusivity and permit a party with both the economic interest and the litigation funding to do so.

29.     Courts terminate exclusivity where, as here, debtors have failed to negotiate with their key stakeholders. *See, e.g.*, *In re New Millennium Mgmt., LLC*, No. 13-35719-H3-11, 2014 WL 792115, at *7 (Bankr. S.D. Tex. Feb. 25, 2014) (denying extension of exclusivity where debtor had sufficient time to negotiate a plan but had not done so); *In re Texas Extrusion Corp.*, 68 B.R. 712, 725 (N.D. Tex. 1986), *aff'd sub nom. In re Texas Extrusion Corp.*, 836 F.2d 217 (5th Cir. 1988), and *aff'd sub nom. In re Texas Extrusion Corp.*, 844 F.2d 1142 (5th Cir. 1988) (reducing exclusivity period where there is a "major obstacle in the path of a successful reorganization" because of the "principal parties' acrimonious relations"); *In re New Meatco Provisions, LLC*, No. 2:13-BK-22155-PC, 2014 WL 917335, at *3 (Bankr. C.D. Cal. Mar. 10, 2014) (terminating exclusivity for a non-operating entity where "there is little credible evidence upon which the court can base a finding that [the debtor] will . . . make further progress in negotiating with creditors").

30.     The Debtors have intentionally excluded the Preferred Shareholders from their process.  Months before filing for bankruptcy, in February 2026, QVCG ignored the request of Cleary Gottlieb Steen & Hamilton LLP, as counsel to and on behalf of certain Preferred Shareholders, to be included in the restructuring negotiation discussions in order to preserve the value of QVCG for its stakeholders and prevent the diversion of value from QVCG to support any debt restructuring involving its subsidiaries.  That request went unanswered by QVCG's board. Even after the filing of these Chapter 11 cases, the Debtors have disregarded the Preferred Shareholders, opposing formation of an official committee of preferred equity security holders and rebuffing counsel's efforts to consensually resolve the Preferred Shareholders' concerns with the Plan.

B.      **The Debtors Have Not Demonstrated Reasonable Prospects for Filing a Confirmable Plan (*Adelphia* Factor 5)**

31.     The Plan, as it relates to QVCG, is patently unconfirmable on multiple grounds that the Preferred Shareholders will litigate in connection with the confirmation process.

32.     <u>First</u>, the Plan cannot be confirmed because it does not satisfy Section 1129(a)(10)'s requirement that at least one impaired class vote to accept the plan where any class is impaired. All classes of claims against QVCG are deemed unimpaired under the Plan. Accepting for purposes of argument that QVC has an allowed $400 million claim against QVCG, that claim—which will receive Distributable Cash that covers less than 50% of the claim amount—is clearly not being unimpaired. And the Debtors cannot assert that QVC can vote to satisfy Section 1129(a)(10) because it is indisputably the claim of an "insider." *See* 11 U.S.C. § 101(31)(E) (defining "insider" to include, *inter alia*, an "affiliate" of the debtor), *id.* § 101(2) (defining "affiliate" to include an entity that "directly or indirectly owns, controls, or holds with power to vote, 20 percent or more of the outstanding voting securities of the debtor"); *see also* First Day Decl., Ex. B1 (Simplified Corporate Structure Chart). Because QVC's newly created claim is itself impaired, there must be a separate impaired accepting class at QVCG for the Plan to be confirmed. Given the absence of such a class, the Debtors' efforts to pursue confirmation of their Plan will fail as a matter of law. *See In re Anderson (Phase I), Ltd. P'ship*, 77 B.R. 108, 112-13 (Bankr. W.D. Tex. 1987) (addressing plan prosecuted with support of just a single class of impaired, insider creditors and holding that "[t]he requirement of at least one impaired class of creditors who have affirmatively voted for the plan *and who are not insiders* must be met in order to invoke the 'cram-down' provisions of Section 1129(b). In short, there must be someone other than the debtor, other than the insiders, and other than the target of the cram down, who cares enough about the reorganization and whose rights must also be considered to invoke the equitable grounds that

19

justify resort to cramdown.  If cramdown is not available, it is pointless to further consider a plan which requires cramdown for its success."); *see also In re Vitro S.A.B. de CV*, 701 F.3d 1031, 1066 n.39, 1067 (5th Cir. 2012) (noting "it is surely the case that in the United States insider voters cannot themselves push through a plan where there is a class of dissenting creditors" and that "Vitro cannot rely on the fact that a substantial majority of unsecured creditors voted in favor of the Plan. Vitro's majority depends on votes by insiders. To allow it to use this as a ground to support enforcement would amount to letting one discrepancy between our law and that of Mexico (approval of a reorganization plan by insider votes over the objections of creditors) make up for another (the discharge of non-debtor guarantors)."); *In re 266 Wash. Assocs.*, 141 B.R. 275, 287 (Bankr. E.D.N.Y. 1992) ("The policy underlying Section 1129(a)(10) is that before embarking upon the tortuous path of cram down and compelling the target of cram down to shoulder the risks of error necessarily associated with a forced confirmation, there must be some other properly classified group that is also hurt and nonetheless favors the plan.").

33.     Second, the Plan cannot satisfy the "best interests" test because the Plan itself provides QVC with a recovery far exceeding the allowed amount of its $400 million claim—at the expense of the Preferred Shareholders.  Under the Plan's own terms, the QVC-QVCG Settlement Claim is satisfied through "QVCG Distributable Cash" (*i.e.*, cash).  Plan, Art. III.B.4(b)-(c).  Yet the Plan simultaneously transfers QVCG's 62% equity interest in Cornerstone to QVC without any credit against the QVC-QVCG Settlement Claim.  *See* QVCG Board Statement ¶ 20(iii).  The Preferred Shareholders believe that the aggregate value of QVCG's assets (including Cornerstone) exceeds $400 million, meaning any excess must flow to the Preferred Shareholders.  The Debtors have submitted no Cornerstone valuation whatsoever, despite the fact that Cornerstone has no

funded debt, approximately $74 million in cash, and is projected to generate approximately $940 million in net revenue and $30 million in OIBDA in 2026.

34.     Third, the Plan does not satisfy Section 1129(a)(3)'s good faith requirement.  Good faith under Section 1129(a)(3) "must be viewed in light of the totality of the circumstances" and is satisfied only "[w]here the plan is proposed with the legitimate and honest purpose to reorganize and has a reasonable hope of success." *In re T-H New Orleans Ltd. P'ship*, 116 F.3d 790, 802 (5th Cir. 1997).  Courts assess whether the plan promotes results consistent with the Code's objectives, was proposed with honesty and good intentions, and whether the debtor exhibited "fundamental fairness" in dealing with its creditors. *In re Los Trece Texas, LLC*, No. 24-10768-SMR, 2025 WL 2793109, at \*13 (Bankr. W.D. Tex. Sept. 30, 2025).  Here, the Debtors' conduct fails on all counts. The unnecessarily rushed process to confirm this "prepackaged plan" that sacrifices all Preferred Shareholder rights with no due process through approval of a "settlement" concocted outside of bankruptcy without any input from the Preferred Shareholders is ridiculous.   The opaque disclosure regarding the settlement of claims at the heart of these Chapter 11 Cases is atrocious. Moreover, the unexplained gift of QVCG's equity stake in Cornerstone to QVC and its other stakeholders, along with robust and unsupportable releases, cannot be sustained.  Put simply, the Debtors' attempt to raid assets of the QVCG estate for the benefit of their continuing business and other stakeholders through a Chapter 11 locomotive express train is the opposite of good faith.  It is "fundamentally unfair conduct that casts doubt on the basis for the plan and the integrity of the plan process." *Id.*[11]

---

[11]   For the avoidance of doubt, nothing in this Motion shall be deemed to constitute a waiver, release, or relinquishment of any right, claim, or objection that the Preferred Shareholders may have with respect to confirmation of the Plan.  The Preferred Shareholders expressly reserve all rights to assert any and all further objections to confirmation of the Plan on any and all grounds.

35.     Courts have found cause to terminate exclusivity where, as here, a debtor is unable or unlikely to propose a confirmable plan. *See In re Situation Mgmt. Sys.*, 252 B.R. 859, 863 (Bankr. D. Mass. 2000) (recognizing that cause exists where a debtor uses its exclusivity period "to force creditors to accept an unsatisfactory or unconfirmable plan"); *In re DN Assocs.*, 144 B.R. 195, 197 n.9 (Bankr. D. Me. 1992) (finding that cause existed where the debtor's plan had "unlikely prospects for gaining acceptances by significant creditor interests" and "the promise of a competing 100% plan").

## A.     Size and Complexity of the Case (*Adelphia* Factor 1)

36.     This factor weighs in favor of termination.  While the broader QVC restructuring is undoubtedly complex, the QVCG-specific issues are not.  QVCG is a non-operating holding company with approximately $195 million in available cash, a 62% equity interest in Cornerstone, certain other non-cash assets, modest third-party obligations (and no prepetition funded debt), and a single central dispute: whether the QVC-QVCG Settlement Claim should be allowed.  *See Adelphia*, 352 B.R. at 587 (finding case complex and of overwhelming size where there were "231 debtors, 6 different prepetition credit facilities, approximately 30 issuances of outstanding public indebtedness . . . [and] numerous and exceedingly complex Intercreditor Dispute issues" among other things).  The Preferred Shareholders' proposed Alternative Plan is ███████████████ ██████ that would not affect the complexity of the subsidiaries' restructuring.

## B.     Exclusivity Is Being Used to Pressure Stakeholders (*Adelphia* Factor 8)

37.     Section 1121's exclusivity provisions "should not be employed as a tactical device to put pressure on parties in interest to yield to a plan they consider unsatisfactory."  S. REP. NO. 95-989, at 118 (1978); *see also In re Texaco Inc.*, 76 B.R. 322, 326 (Bankr. S.D.N.Y. 1987).

38.     Here, exclusivity is being wielded as a sword rather than a shield.  The Debtors' prepackaged Plan was negotiated with a select group of creditors (none of whom have claims against QVCG), locked in through the RSA, and presented to the Court on the Petition Date with the expectation that confirmation would follow in approximately five weeks.  These Chapter 11 Cases were filed on April 17, 2026—less than three weeks ago—and the confirmation hearing is set for May 26, 2026.  This timeline was strategically designed to deprive Preferred Shareholders— the only harmed class under the Plan—any meaningful opportunity to investigate the Settlement, object to the Plan, or propose alternatives before their $1.4 billion investment is extinguished.  The Preferred Shareholders have not been given a seat at the table or any voice in the process. Exclusivity, under these circumstances, serves not to give the Debtors time to formulate a plan (they already have one), but to prevent the Preferred Shareholders from defending their substantial financial interests or to propose a superior alternative before the confirmation hearing.  That is precisely the abuse that Section 1121(d) is designed to address.

39.     Moreover, no other party in these Chapter 11 Cases has the incentive or mandate to challenge the intercompany settlement on its merits.  The Plan provides that all general unsecured claims against QVCG will be paid in full and left unimpaired.  Even though an official unsecured creditors committee has been appointed, its economic incentive will be to confirm the Plan, not to test the assumptions undergirding it.  *See In re Oneida Ltd.*, No. 06-10489 (ALG), 2006 WL 1288576, at *3 (Bankr. S.D.N.Y. May 4, 2006) (observing that when unsecured claims are paid in full, the creditors' committee is "the least likely party in interest to challenge the *status quo*" and "the usual checks and balances are not present").  Termination of exclusivity is thus the only mechanism by which the intercompany dispute can be resolved with basic due process.

23

**III.   Termination of Exclusivity Will Move the Case Forward**

40.     The primary consideration in the Section 1121(d) analysis is whether terminating exclusivity would "facilitate moving the case forward." *Dow Corning*, 208 B.R. at 670; *Adelphia*, 352 B.R. at 590.  Termination of exclusivity here would unquestionably advance the case by providing the Court and all parties in interest with a competing framework that (a) provides Code-compliant creditor treatment including an impaired accepting class of general unsecured claims via a partial initial distribution, (b) provides a mechanism for adjudicating the Alleged Intercompany Claims on the merits, (c) is funded entirely by private parties at no cost to the estate, (d) preserves all existing estate cash pending the outcome of litigation, and (e) does not disturb the subsidiaries' restructuring.  The only difference between the status quo and a scenario in which exclusivity is terminated is that the Alleged Intercompany Claims must be proven on the merits rather than accepted through an uncontested settlement.

41.     Courts have recognized that a competing plan provides powerful benefits to the reorganization process, even if the competing plan is ultimately not confirmed.  "The ability of a creditor to compare the debtor's proposals against other possibilities is a powerful tool by which to judge the reasonableness of the proposals." *Century Glove, Inc. v. First Am. Bank of N.Y.*, 860 F.2d 94, 102 (3d Cir. 1988); *see also In re EUA Power Corp.*, 130 B.R. 118, 119 (Bankr. D.N.H. 1991) ("it is sufficient for [the Court] to recognize and express the judgment that opening up the process to those alternative approaches in this particular case is desirable").

**IV.   Termination of Exclusivity Will Not Prejudice the Debtors**

42.     Terminating exclusivity will not prejudice the Debtors in any respect.  Termination does not prevent the other Debtors from continuing to pursue their own Plan; it merely opens the process for competing proposals and levels the playing field.  *See In re R.G. Pharm., Inc.*, 374 B.R. 484, 488 (Bankr. D. Conn. 2007) ("The fact that the debtor no longer has the exclusive right

to file a plan does not affect its concurrent right to file a plan."); *In re Sw. Oil Co. of Jourdanton, Inc.* 84 B.R. 448, 454 (Bankr. W.D. Tex. 1987) (ending exclusivity "does not prejudice the debtors' coexistent right . . . to file a plan"); *In re All Seasons Indus., Inc.*, 121 B.R. 1002, 1005 (Bankr. N.D. Ind. 1990).

43.  If the Debtors believe that their settlement is fair and that the Alleged Intercompany Claims are meritorious, they should welcome the opportunity to prove as much.

44. If the Debtors contend that the Alternative Plan would disrupt the RSA or require re-solicitation, such arguments ultimately amount to an admission that the subsidiaries' restructuring depends on extracting value from QVCG's equity holders—further demonstrating that the current Plan uses QVCG as a sacrificial lamb for the benefit of the subsidiary estates, rather than treating each debtor entity on its own merits.

**RESERVATION OF RIGHTS**

45.     The Preferred Shareholders expressly reserve all rights to supplement the arguments set forth herein, to object to confirmation of the Plan on any and all grounds, and to seek any other relief that may be appropriate in these Chapter 11 Cases.

**MOTION PRACTICE**

46.     This Motion includes citations to the applicable rules and statutory authorities upon which the relief requested herein is predicated and a discussion of its application to this Motion. Accordingly, the Preferred Shareholders submit that the Motion satisfies Local Rule 9013-1(a).

**EMERGENCY CONSIDERATION**

47.     The Preferred Shareholders request emergency consideration of this Motion, on or before May 26, 2026, pursuant to Bankruptcy Local Rule 9013-1(i).  Emergency consideration is necessary because the Debtors' confirmation hearing is currently scheduled for May 26, 2026, with an objection deadline of May 19, 2026.  These Chapter 11 Cases were filed on April 17, 2026—barely five weeks before the scheduled confirmation hearing.  Unless the Exclusive Periods are terminated on an expedited basis, the Debtors will seek to confirm the Plan (which extinguishes approximately $1.4 billion in Preferred Stock with no recovery) before the Preferred Shareholders have any meaningful opportunity to propose a competing plan for QVCG.  The harm is irreparable: once the Plan is confirmed and the Preferred Stock is cancelled, the Preferred Shareholders will have permanently lost any ability to contest the validity of the Alleged Intercompany Claims on the merits or to realize value from their equity interests.  Absent emergency relief, the compressed timeline designed by the Debtors will effectively deprive the Preferred Shareholders of due process and render this Motion moot.

## NOTICE

48.     Notice of this Motion will be served on any party entitled to notice pursuant to Bankruptcy Rule 2002 and any other party entitled to notice pursuant to Bankruptcy Rule 9013-1(d), including the Debtors' counsel.

## NO PRIOR REQUEST

49.     No prior motion for the relief requested herein has been made to this or any other court.

## CONCLUSION

WHEREFORE, the Preferred Shareholders respectfully request that this Court enter an order, substantially in the form attached hereto as **Exhibit B**: (a) terminating the Debtors' Exclusive Periods with respect to QVCG to permit the Preferred Shareholders to file a competing plan for QVCG and to solicit acceptances thereof; and (b) granting such other and further relief as the Court deems just and proper.

[*Remainder of Page Intentionally Left Blank*]

Dated: May 8, 2026

**KANE RUSSELL COLEMAN LOGAN PC**

By: /s/ *Mark C. Taylor*
Mark C. Taylor
Texas Bar No. 19713225
401 Congress Ave., Suite 2100
Austin, Texas 78701
Telephone: (512) 487-6650
Email: mtaylor@krcl.com

-and-

**GLENN AGRE BERGMAN & FUENTES LLP**

Andrew K. Glenn (admitted *pro hac vice*)
Kurt A. Mayr (admitted *pro hac vice*)
Agustina G. Berro (admitted *pro hac vice*)
1185 Avenue of the Americas
New York, New York 10036
Telephone: (212) 970-1601
Email: aglenn@glennagre.com
         kmayr@glennagre.com
         aberro@glennagre.com

-and-

**CLEARY GOTTLIEB STEEN & HAMILTON LLP**

David H. Botter (admitted *pro hac vice*)
Joshua Brody (admitted *pro hac vice*)
One Liberty Plaza
New York, New York 10006
Telephone: (212) 225-2000
Facsimile: (212) 225-3999
Email: dbotter@cgsh.com
         jbrody@cgsh.com

*Counsel to the Preferred Shareholders*

**CERTIFICATE OF SERVICE**

I hereby certify that, on May 8, 2026, I caused a true and correct copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas to all parties registered to receive electronic notice in this case.

By: */s/ Mark C. Taylor*