**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

|  |  |  |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| QVC GROUP, INC., *et al.*,[1] | ) | Case No. 26-90447 (ARP) |
| | ) | |
| | ) | (Jointly Administered) |
| Debtors. | ) | |
| | ) | |

**DEBTORS' OPPOSITION TO THE EMERGENCY MOTION**
**OF THE PREFERRED SHAREHOLDERS TO TERMINATE EXCLUSIVITY**
**[DOCKET NO. 205]**

The above-captioned debtors and debtors in possession (collectively, the "Debtors") file

this objection (this "Objection") to the *Emergency Motion of the Preferred Shareholders to*

*Terminate Exclusivity Under 11 U.S.C. § 1121(d)* [Docket No. 205] (the "Termination Motion")

filed by certain preferred shareholders of QVC Group, Inc. (the "Preferred Shareholders").

**PRELIMINARY STATEMENT**

1.      The relief requested in the Termination Motion should be denied.  The Preferred

Shareholders do not satisfy the *Adelphia* factors to warrant the extraordinary relief they request—

terminating exclusivity forty days[2] after the Petition Date in an undeniably complex case in which

the Debtors have demonstrated tremendous progress towards a value-maximizing outcome.

This is exactly the reason why the Preferred Shareholders have sought to avoid reaching the merits

in each of their requests for relief—because the evidence presented to defend their attacks on the

---

[1]      A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors'
proposed claims and noticing agent at https://restructuring.ra.kroll.com/QVC.  The location of Debtor QVC
Group, Inc.'s corporate headquarters and the Debtors' service address in these chapter 11 cases is 1200 Wilson
Drive, West Chester, Pennsylvania 19380.

[2]      Calculated with reference to May 26, 2026, the date by which the Preferred Shareholders requested relief in their
emergency motion.  The Combined Hearing is now scheduled to begin forty-nine days after the Petition Date.

Intercompany Settlement, which was negotiated over many months by disinterested directors represented by independent counsel, will demonstrate the settlement's reasonableness and result in confirmation of the Plan.[3]

2.      Even in a scenario where the Court denies confirmation of the Plan, the Termination Motion should be denied and the Debtors should be afforded an opportunity within their initial exclusive periods to address the Court's findings from the Combined Hearing.  The alternative "plan" proposed by the Preferred Shareholders, prior to conducting any diligence and with no understanding of the facts whatsoever, would only lead to a litigation frenzy, to the detriment of all stakeholders, including QVCG's stakeholders.

3.      The Preferred Shareholders' suggestion that QVCG can be "carved out" of the Debtors' Plan and left behind while the rest of the Debtors confirm the Plan and emerge from chapter 11 is fantastical.  First, the Debtors' plan is a holistic plan and settlement.  The recoveries to creditors (including the unimpairment of all third-party general unsecured claims and CBI's emergence from chapter 11 as a going-concern) and the Intercompany Settlement are intricately entwined as part of a comprehensive package deal.  Second, under all circumstances, QVC is QVCG's single largest creditor.  But for resolving all of QVC's claims against QVCG by settlement or by final, non-appealable order, QVCG has no path out of chapter 11.  As detailed below, this outcome is a worse result for all QVCG stakeholders.

4.      The Preferred Shareholders' "plan" is premised on a structure in which QVCG: (a) remains stranded in chapter 11 indefinitely, defending claims brought by QVC (and, potentially

---

[3]   Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the *First Amended Joint Prepackaged Plan of Reorganization of QVC Group, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 289] (as further amended, restated, supplemented or otherwise modified from time to time in accordance with its terms, the "Plan").

other Debtors) while remaining exposed to consolidated tax liability considerations (with respect to both the IRS and QVC) for historic positions as well as for the current tax year, (b) rapidly depletes its own cash between defending such claims and bearing the brunt of shared estate professional fees (none of which it is obligated to bear under the Intercompany Settlement),[4] (c) threatens the CBI Debtors' emergence as a going concern by trapping them in chapter 11 during the pendency of the dispute without certainty regarding their future, and (d) exposes preferred shareholders to clawback risk on the receipt of historical dividends.

5.      Moreover, while the alternative "plan" purports to preserve the unimpaired treatment of QVCG's general unsecured creditors, such a fate presumes that the Intercompany Claims asserted against QVCG (at over $1 billion and potentially up to $3 billion)[5] are adjudicated to be between zero and $200 million (*i.e.*, the cash at QVCG as of the Petition Date).  In reality, during the pendency of any protracted dispute on Intercompany Claims asserted against QVCG, QVCG's cash will be depleted by the administrative costs of remaining in chapter 11 <u>and</u> QVCG's general unsecured creditors will remain in purgatory on whether their claims will be unimpaired or receive any recovery at all.

---

[4]    Despite having filed multiple pleadings in these cases to date, none of the Preferred Shareholders have disclosed any committed financing for their proposed alternatives.

[5]    *See Statement of Disinterested Directors of QVC, Inc. in Support of Joint Prepackaged Chapter 11 Plan of Reorganization of QVC Group, Inc. and its Debtor Affiliates* [Docket No. 147], ¶ 22 ("The QVC Board concluded that the QVCG Claims could, in the aggregate, be asserted for approximately $1 billion at the low end and up to approximately $3 billion at the highest end."); *Statement of the Special Committee of Debtor QVC Group, Inc. in Support of Intercompany Settlement in Joint Prepackaged Chapter 11 Plan of Reorganization of QVC Group, Inc. and its Debtor Affiliates* [Docket No. 149], ¶ 14 ("[T]he cash that flowed upstream from QVC to QVCG and could potentially be subject to fraudulent conveyance claims totaled more than $1 billion . . . .")

6.      The Preferred Shareholders' proposal is a bridge to nowhere, except potentially a future chapter 7 conversion for QVCG upon reaching a point of administrative insolvency. The Preferred Shareholders evidently do not care because they have nothing to lose.[6]

7.      The Court is slated to consider confirmation of the Debtors' Plan beginning June 4, 2026.  At that hearing, the Court will hear from disinterested directors from each of QVCG, QVC, LINTA, and CBI, as well as representatives from the Debtors' management team, investment banker, and financial advisor regarding the process to build the Plan, the respective "gives" and "gets" underpinning the Intercompany Settlement, the satisfaction of the 1129 elements, the massive levels of consensus supporting the Plan, and the size and complexity of these cases.  If the Court confirms the Debtors' Plan, the relief requested in the Termination Motion will be rendered moot.  If the Court denies confirmation of the Debtors' Plan as to QVCG, then the relief requested in the Termination Motion should nevertheless be denied.

8.      As the evidence will show, in all circumstances, the *Adelphia* factors heavily weigh in favor of denying the relief requested in the Termination Motion.  The Debtors would be well within their initial exclusive period, and the alternative proposed in the Termination Motion—filed less than a month into the Chapter 11 Cases and seeking to mire QVCG in protracted litigation that would jeopardize recoveries for QVCG's unsecured creditors—should not serve as a distraction for any of the Debtors as they work to rebuild consensus on a plan that accords with the Court's ruling.  For those reasons, and those discussed below, to the extent the relief requested

---

[6]   The "notion that creditor constituency unhappiness, without more, constitutes cause to undermine the debtor's chances of winning final confirmation of its plan during the exclusivity period has been judicially rejected." *See In re Adelphia Commc'ns Corp.*, 336 B.R. 610, 676 (Bankr. S.D.N.Y. 2006), *aff'd*, 342 B.R. 122 (S.D.N.Y. 2006); *see also In re Bigler LP*, 442 B.R. 537 (Bankr. S.D. Tex. 2010) (resolving contested plan provisions through the objection and confirmation process, not through termination of exclusivity).

4

in the Termination Motion is not rendered moot by this Court's ruling on confirmation of the Debtors' Plan, the Court should deny the relief requested in the Termination Motion.

**ARGUMENT**

9.      The Preferred Shareholders fail to demonstrate "cause" to terminate exclusivity under the *Adelphia* factors or otherwise.

**I.      Preferred Shareholders Have Not Shown Cause to Terminate Exclusivity.**

10.     Congress could not have been clearer: "[O]nly the debtor may file a plan" in the first 120 days of the case.  11 U.S.C. § 1121(b).  Where, as here, a debtor proposes a plan within the 120-day exclusive period, that exclusivity period extends to 180 days from the petition date. *Id.* § 1121(c)(3).

11.     The Court can extend (or terminate) a debtor's exclusive period for "cause." *Id.* § 1121(d)(1).    A  party seeking to terminate exclusivity faces a high burden of proof to establish "cause." *In re Dow Corning Corp.*, 208 B.R. 661, 663 (Bankr. E.D. Mich. 1997) (denying motion to terminate; "the party seeking to terminate or modify a debtor's exclusivity period bears the burden of proof since it is the moving party who seeks to change the status quo").  Where the request is to *terminate* exclusivity, as opposed to extend the initial statutory exclusivity period, the standard is even higher.  *See In re Texaco, Inc.*, 81 B.R. 806, 812 (Bankr. S.D.N.Y. 1988) ("In those cases where the exclusivity periods were reduced, factors such as gross mismanagement of the debtor's operations . . . or acrimonious feuding between the debtor's principals . . . were major obstacles to a successful reorganization and were regarded as 'cause' for the reduction of the exclusivity periods.") (internal citations omitted); *In re Fansteel, Inc.*, No. 16-1823-als11 (lead case), 2017 WL 782865, at *3 (Bankr. S.D. Iowa Feb. 28, 2017) (denying creditors committee's motion to terminate exclusive periods where there was no evidence that the debtors had used the exclusive period to coerce creditors to accept a plan, there had been no delay in filing a plan, there

5

were no substantiated allegations of mismanagement or evidence of such conduct, and there was no evidence of an acrimonious relationship between the debtors' principals). The Preferred Shareholders have not alleged, and indeed have no basis to allege, that any of these specific circumstances exist.

12. The Bankruptcy Code does not define "cause" to terminate, but courts consider several factors:

a) the size and complexity of the case;

b) the existence of good-faith progress;

c) the necessity of sufficient time to negotiate and prepare adequate information;

d) whether the debtor is paying its debts as they become due;

e) whether the debtor has demonstrated reasonable prospects for filing a viable plan;

f) whether the debtor has made progress negotiating with creditors;

g) the length of time a case has been pending;

h) whether the debtor is seeking an extension to pressure creditors; and

i) whether or not unresolved contingencies exist.

*See Dow Corning*, 208 B.R. at 664–65 (denying creditors' motion to terminate exclusivity); *In re Express One Int'l*, 194 B.R. 98, 100 (Bankr. E.D. Tex. 1996) (outlining same factors and finding cause existed to *extend* exclusivity). Application of these factors in these chapter 11 cases, at this stage, demonstrates the absurdity of the Preferred Shareholders' request.

**A.      The Chapter 11 Cases Are Large and Complex.**

13. Both Congress and the courts have recognized that the size and complexity of a debtor's case, in itself, is an appropriate basis upon which to extend exclusivity. Legislative history provides that "if an unusually large company were to seek reorganization under chapter 11, the court would probably need to extend the time in order to allow the debtor to reach an agreement."

H.R. Rep. No. 95-595, at 232 (1977).  Indeed, the size and complexity of a chapter 11 case is the basis upon which courts most commonly grant extensions.  *See, e.g., Express One Int'l*, 194 B.R. at 100 ("The traditional ground for cause is the large size of the debtor and the concomitant difficulty in formulating a plan of reorganization." (citing *In re Pine Run Trust, Inc.*, 67 B.R. 432, 435 (Bankr. E.D. Pa. 1986))); *see also In re Texaco Inc.*, 76 B.R. 322, 326 (Bankr. S.D.N.Y. 1987) ("The large size of the debtor and the consequent difficulty in formulating a plan of reorganization for a huge debtor with a complex financial structure are important factors which generally constitute cause for extending the exclusivity periods.").

14.     The size and complexity of these chapter 11 cases is self-evident.  They involve a global enterprise with approximately $6 billion in funded debt, independent fiduciary governance at four entities (QVC, QVCG, LINTA, and CBI), more than 15,800 employees worldwide, and multiple creditor groups with competing interests.  *See Declaration of Bill Wafford in Support of Debtors' Chapter 11 Petitions and First Day Motions* [Docket No. 4], ¶¶ 3, 23, 33, 36, 61, 64; *see also In re Adelphia Commc'ns Corp.*, 352 B.R. 578, 587 (Bankr. S.D.N.Y. 2006) (finding complexity factor weighed against termination where the case involved multiple debtor entities and complex intercreditor disputes).[7]

15.     The Preferred Shareholders attempt to re-frame the interrelated nature of these chapter 11 cases to portray QVCG's case as severable and simple.  The success or failure of QVCG's restructuring does not turn on the resolution of "modest third-party obligations" and a "single central dispute"; it turns on the resolution (whether by settlement or litigation) of billions

---

[7]   Indeed, the Preferred Shareholders noted in their own prior court filing that "[i]t is undisputed that the Chapter 11 Cases are sufficiently large and complex" as they "involve seventy-four (74) debtors operating across several states," with the "Debtors' balance sheet and broad shareholder base further evidence[ing] the size and complexity of these Chapter 11 Cases."  *See Emergency Motion of Certain Preferred Equity Holders for Entry of an Order Directing the Appointment of an Official Committee of Preferred Equity Security Holders* [Docket No. 133], ¶¶ 35–36.

of dollars of intercompany cash transfers, along with complex questions regarding the proper resolution of issues relating to the Debtors' consolidated tax group. And if that resolution is by litigation, then the success or failure of QVCG's restructuring turns on whether it can survive the costs of such litigation (and appeal) while it remains stranded in chapter 11 with dwindling cash. As the Court will hear, *this* complexity was a core underpinning of the Intercompany Settlement.[8]

**B.      The Debtors Have Made Good Faith Progress Toward Confirming the Plan and Demonstrated Reasonable Prospects for Filing a Viable Plan.**

**1.      If the Court Denies Confirmation of the Plan, the Debtors Will Use their Exclusivity Periods to Make Changes to the Plan Necessary to Accord with Such Rulings.**

16.      The Debtors' brief in support of Plan confirmation will further detail the reasons the Debtors' Plan (and the evidence proffered in connection with confirmation) will satisfy section 1129 of the Bankruptcy Code, so the Debtors will not recite all those reasons in this Objection.

17.      Importantly, however, in the event the Court denies confirmation of the Plan, the Court will make rulings regarding the reasons for its denial. The Debtors will need to analyze those rulings and rebuild consensus around a plan that comports with such rulings. All parties will benefit from being able to evaluate next steps without the specter of an unconfirmable alternative "plan" for QVCG only.

**2.      The Preferred Shareholders' Plan is Worse for All QVCG Stakeholders.**

18.      As an initial matter, the Preferred Shareholders' belief that their own plan as to QVCG provides a superior outcome for QVCG is irrelevant under *Adelphia*. *See Express One*

---

[8]      *See*, *e.g.*, *Statement of Disinterested Directors of QVC, Inc.* [Docket No. 147], ¶¶ 16, 20; *Statement of the Special Committee of QVCG* [Docket No. 149], ¶¶ 15–17.

*Int'l*, 194 B.R. at 101 ("The issue to be determined . . . is not whether some other plan may exist which provides greater recovery; the issue is whether debtor has been diligent in its attempts to reorganize.").[9]

19.     But, even if such belief was relevant to the *Adelphia* factors, that belief is wrong; the Preferred Shareholders' alternative "plan" is worse for all QVCG stakeholders.

- *QVCG Administrative Claims*.  Under the Debtors' Plan, QVCG has no obligation to shoulder any of the shared estate professional fees, no need to either incur debt or use existing cash to defend against fact-intensive, massive claims asserted by QVC, and no residual considerations regarding the Debtors' consolidated tax group.  All Administrative Claims against QVCG will be paid in full, in cash.  Under the alternative "plan," QVCG would shoulder some, potentially significant, portion of shared estate professional fees (and participate in a litigation to determine that share), and spend cash to assert a defense against QVC, Inc. (with little to no offensive claims it can bring against QVC or any other Debtor entity).  QVCG would face a potentially lengthy stay in chapter 11 as it mounts its defense, and with QVCG's cash steadily depleting (no additional cash would come into QVCG, a non-operating business), administrative insolvency would be a real risk.

- *QVCG Unsecured Claims*.  Under the Debtors' Plan, all QVCG third-party general unsecured claims will be paid in full.  Under the alternative "plan," holders of general unsecured claims (a) cannot receive a recovery until there is a resolution (by final, non-appealable order) of the *pari passu* Intercompany Claims asserted by QVC, Inc. and (b) may not receive a recovery at all, if QVCG becomes administratively insolvent.

- *QVCG Equity*.  Under the Debtors' Plan, holders of equity are receiving a release in connection with the hundreds of millions of dollars in dividends they received (sourced entirely from QVC/CBI cash).  Under the alternative "plan," such holders (a) may or may not get a recovery under the plan, depending on the outcome of the expensive and protracted litigation on the Intercompany Claims and (b) will not be guaranteed a broad release in connection with historical dividends.

---

[9]     While brushing over the releases Preferred Shareholders receive on their own behalf through the Plan, the Preferred Shareholders suggest that the interests of the Disinterested Directors were fundamentally conflicted in the investigation and settlement negotiation process by the fact that the Plan also affords them releases.  *See* Termination Motion, ¶ 15.  This allegation is meritless under Fifth Circuit precedent.  *See Matter of Highland Cap. Mgmt., L.P.,* 48 F.4th 419, 437 (5th Cir. 2022) ("That leaves one remaining question: whether the bankruptcy court can exculpate the Independent Directors under *Pacific Lumber.*  We answer in the affirmative."); *In re Instant Brand Acquisition Holdings Inc.*, No. 23-90716 (Jointly Administered), 2025 WL 685756, at *3 (Bankr. S.D. Tex. Mar. 3, 2025) (same).

20. Thus, even in a scenario where the Court denies confirmation of the Plan, QVCG deserves an opportunity in its initial exclusivity period to remedy any deficiencies in its Plan, particularly when the only proposed alternative is a litigation frenzy that will be worse for all QVCG stakeholders.

**C. The Remaining *Adelphia* Factors Do Not Provide "Cause" to Terminate Exclusivity.**

21. The other relevant factors courts use to evaluate requests to modify exclusivity all favor denial of the relief requested in the Termination Motion:

- **The Existence of Good-Faith Progress**. The Debtors filed these chapter 11 cases with support from every single funded debt creditor constituency across the capital structure. Additionally, as to QVCG, the Debtors' Plan unimpairs all third-party claims and includes a settlement with QVCG's single largest creditor: QVC. Parties can disagree over whether QVC's claims are contingent, liquidated, or disputed, but there can be no disagreement that such claims exist in an order of magnitude that dwarfs all other claims at QVCG and that such claims will be prosecuted absent a settlement.

- **The Necessity of Sufficient Time to Negotiate and Prepare Adequate Information**. The Debtors filed these Chapter 11 Cases as a prepackaged case with a Disclosure Statement that includes a robust discussion of the Intercompany Claims underpinning the Intercompany Settlement. Additionally, each of the Special Committees filed statements, providing additional information regarding the process and key considerations of the Intercompany Settlement from each of their respective perspectives. If confirmation of the Plan is denied, the Debtors will require additional time to rebuild consensus and update disclosures.

- **The Debtors Have Demonstrated Reasonable Prospects for Filing a Viable Plan**. In the event the Court does not confirm the Debtors' Plan, the Court will provide rulings in connection with its denial. These rulings will provide a roadmap for the Debtors and all of their stakeholders to make those changes necessary to the Plan to accord with the Court's ruling. The Debtors should have an exclusive opportunity to do so.

- **QVCG Did Not Exclude Preferred Holders**. The Preferred Shareholders allege the Debtors intentionally excluded them from participating in the restructuring process. Termination Motion, ¶ 30. That is factually incorrect and legally immaterial. Preferred Shareholders have known since at least February 2026 that negotiations were in process, but made no effort to engage other than one short letter sent to the QVCG Special Committee. In addition, that letter did not identify which preferred shareholders were in the alleged group, nor did it identify how

much they held individually or as a group. They made no effort to participate until after the Petition Date, and only then after a terminated effort to obtain official equity committee status. Once the Preferred Shareholders began to engage, the Debtors began document productions before even receiving document requests: to date, the Debtors have produced over 6,625 documents, with another 1,355 documents produced by the Disinterested Directors.

- **All of the Debtors Are Paying Bills as They Come Due**. All of the Debtors are paying their bills as they come due in accordance with the first day relief.

- **Time Elapsed in the Case.** These Chapter 11 Cases have been pending for only thirty-nine days.

- **Debtors Seeking Extension of Exclusivity.** This factor is not relevant as the Debtors are not seeking an extension of their exclusivity at this time.[10]

- **Existence of Unresolved Contingency.** There are no unresolved contingencies relevant to modifying exclusivity.

## CONCLUSION

22. The Court will hear from a number of witnesses in less than two weeks on confirmation of the Debtors' Plan. If the Court confirms the Debtors' Plan, the relief requested in the Termination Motion will be rendered moot. If the Court denies confirmation of the Plan as to QVCG, the Debtors will be, at that point, less than two months into these Chapter 11 Cases and deserve an opportunity under *Adelphia* and its progeny to make those changes to the Plan necessary to accord with the Court's ruling, without the specter of a deeply-flawed, and materially worse alternative. For those reasons, the Court should deny the relief requested in the Termination Motion under all circumstances.

---

[10] The Preferred Shareholders misstate the case law, stating that "*Adelphia* Factor 8" requires them to "be[] given a seat at the table" because the Debtors are using their Exclusivity Period "to prevent the Preferred Shareholders from defending their substantial financial interest." Termination Motion, ¶ 38. First, that is not the standard. Factor 8 is only implicated when **"the debtor is seeking an extension** of exclusivity in order to pressure creditors." *Adelphia*, 352 B.R. at 587. Second, there is no requirement that every stakeholder—including out-of-the-money equity—be given a seat at the negotiating table. *See In re Chemtura Corp.*, 439 B.R. 561, 608 (Bankr. S.D.N.Y. 2010) (confirming plan over one equity security holder committee's objections and explaining that "[g]ood faith is 'generally interpreted to mean that there exists a reasonable likelihood that the plan will achieve a result consistent with the objectives and purposes of the Bankruptcy Code.'") (internal citation omitted).

11

Dated:  May 25, 2026

/s/ *Jason S. Brookner*

| | |
|---|---|
| **GRAY REED** | **KIRKLAND & ELLIS LLP** |
| Jason S. Brookner (TX Bar No. 24033684) | **KIRKLAND & ELLIS INTERNATIONAL LLP** |
| Lydia R. Webb (TX Bar No. 24083758) | Joshua A. Sussberg, P.C. (admitted *pro hac vice*) |
| Emily F. Shanks (TX Bar No. 24110350) | Aparna Yenamandra, P.C. (admitted *pro hac vice*) |
| 1300 Post Oak Blvd. | 601 Lexington Avenue |
| Suite 2000 | New York, New York 10022 |
| Houston, Texas 77056 | Telephone:     (212) 446-4800 |

GRAY REED

Jason S. Brookner (TX Bar No. 24033684)
Lydia R. Webb (TX Bar No. 24083758)
Emily F. Shanks (TX Bar No. 24110350)
1300 Post Oak Blvd.
Suite 2000
Houston, Texas 77056
Telephone:     (713) 986-7000
Facsimile:    (713) 986-7100
Email:          jbrookner@grayreed.com
                  lwebb@grayreed.com
                  eshanks@grayreed.com

KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS INTERNATIONAL LLP
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
Aparna Yenamandra, P.C. (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900
Email:           joshua.sussberg@kirkland.com
                   aparna.yenamandra@kirkland.com

- and -

Chad J. Husnick, P.C. (admitted *pro hac vice*)
Gabriela Zamfir Hensley (admitted *pro hac vice*)
333 West Wolf Point Plaza
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:     (312) 862-2200
Email:           chad.husnick@kirkland.com
                   gabriela.hensley@kirkland.com

*Proposed Co-Counsel for the Debtors and Debtors in Possession*

*Proposed Co-Counsel for the Debtors and Debtors in Possession*

**<u>Certificate of Service</u>**

I certify that on May 25, 2026, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

/s/ *Jason S. Brookner*
Jason S. Brookner