

# Plan Confirmation

## In re QVC Group, Inc.

(Case No. 26-90447) (ARP)

June 10, 2026

**United States Bankruptcy Court for the Southern District of Texas**
The Honorable Judge Alfredo R. Pérez

# Agenda

I.   How We Got Here

II.   9019 Legal Standard

III.  What the Plan Resolves

IV.  Intercompany Settlement

V.   Why These Terms

VI.  The Preferred Shareholders' Argument

VII. Plan Confirmation & Disclosure Statement Adequacy

VIII. Exclusivity

# Agenda

I. **How We Got Here**

II. 9019 Legal Standard

III. What the Plan Resolves

IV. Intercompany Settlement

V. Why These Terms

VI. The Preferred Shareholders' Argument

VII. Plan Confirmation & Disclosure Statement Adequacy

VIII. Exclusivity

# How We Got Here: QVC Was the ATM



$450mm went to Pref

$800mm to QVCG in December 2022

$340 million dividends to QVCG in 2023

~$512 mm in *excess payments* to QVCG under TSA

2020 MSI retirement and the $1.8bn note from LINTA

QVC, Inc.

# How We Got Here: Key Events

**December 2022**
QVC Cash Management Plan







DX-277 DX-290

**March 2023**
Bill Wafford appointed as CFO



Qurate Retail Group Names Bill Wafford CFO

DX-441

**September 2024**
Liability Management Transaction pursuant to which QVC, Inc. exchanged 89% of its 2027 and 2028 Notes for newly issued 2029 Notes and $352 million of cash

September 11, 2024

QVC, Inc. Announces Private Exchange Offers for Any and All Outstanding 2027 Notes and 2028 Notes

DX-411

**May 2025**
QVCG issues 8-K announcing that upcoming dividends to holders of QVCG Preferred Equity will be suspended



DX-442

**July 2025**
QVC draws $975mm on its revolving credit facility

Day 2: 365:15:17

| 2022 | 2023 | 2024 | 2025 |



# How We Got Here:  Enhanced Governance



# How We Got Here:  Stakeholders

## Who is **<u>not</u>** objecting?

- RCF Lenders & QVC Noteholders:  Allowing ~$500M GUCs to Ride Through

- LINTA Noteholders taking a 92.5% haircut

- Unsecured Creditors Committee (Estate Fiduciary)

- ~67% of the Preferred Equity Holders

- Nearly All Common Equity Holders

## Who **<u>is</u>** objecting?

- Minority group of preferred equity holders who increased their position by buying shares postpetition

# Agenda

I. How We Got Here

II. **9019 Legal Standard**

III. What The Plan Resolves

IV. Intercompany Settlement

V. Why These Terms

VI. The Preferred Shareholders' Argument

VII. Plan Confirmation & Disclosure Statement Adequacy

VIII. Exclusivity

# 9019 Legal Standard: Three-Part Test

**1**    **Complexity and likely duration of litigation**

**2**    **Probability of success in litigating the claim subject to settlement**

**3**    **(i) the best interests of creditors**

      **(ii) the settlement is truly the product of arm's-length bargaining**

# 9019 Legal Standard: The Court's Role

"[A] bankruptcy court does not have to conduct a 'mini-trial' to determine the probable outcome of any claims waived in the settlement. . . . Instead, a court must apprise itself of the relevant facts and law so that it can make an informed and intelligent decision."

*In re Robertshaw US Holding Corp.*, 662 B.R. 300, 314 (Bankr. S.D. Tex. 2024)
(internal quotations and citations omitted)

# Agenda

I.   How We Got Here

II.   9019 Legal Standard

III.  **What The Plan Resolves**

  A.   **Deferred Tax Liability**

IV.  Intercompany Settlement

V.   Why These Terms

VI.  The Preferred Shareholders' Argument

VII. Plan Confirmation & Disclosure Statement Adequacy

VIII. Exclusivity

# Deferred Tax Liability:  Originates with LINTA



**Paul Kearns**

Q.   [T]hese are LINTA notes; right?

A.   Yes.

\* \* \*

Q.   What is your understanding of the origin of that deferred tax liability?

A.   **This gets extremely complicated.** The notes are a contingent payment debt instrument under the IRS rules because they can be exchanged into stock of the nonissuer, and there's other contingencies. And because of the contingencies, the IRS rule require the issuer, which in this case is QVC Group, or LINTA, to compute a yield interest rate on the notes. ***And that interest rate in general on both set of notes is approximately 9 percent. The cash paid to the bondholder by LINTA is 4 percent. So there's a 5 percent difference between what QVC, LINTA, can deduct in the QVC Group tax return.*** They get a tax deduction for 9 percent, but they're only paying interest on the note at 4 percent. So there's a 5 percent difference there that they get to deduct that interest on the notes. ***And that goes into – since they're getting a tax deduction for that, they get a tax savings, and that forms the deferred tax liability.*** I hope I summarized that for -- good enough for everyone.

# Deferred Tax Liability: Risk Remains

The Company believes tax will not materialize, ***but
risk remains***.

*Taxing authorities may challenge tax positions we will take with respect to the consequences of the Chapter 11 Cases and the transactions contemplated thereby and, in the event such a challenge were successful, it could result in a material current tax liability for Reorganized QVC.* It is our position that certain deferred tax liabilities recorded on our financial statements as of December 31, 2025 will not materialize into a current tax liability because of the application of certain tax rules applicable to companies under the protection of a Bankruptcy court. While the Company believes its tax position is the correct interpretation of applicable law, there can be no guarantees, and there are no cases or other guidance beyond the applicable Treasury Regulations that directly address similar situations. Taxing authorities (including the Internal Revenue Service) therefore may disagree with this tax position. If a taxing authority were to successfully challenge this tax position, Reorganized QVC could incur a material current tax liability and significant costs in contesting or resolving any such challenge, which could adversely affect our liquidity and results from operations.

# Deferred Tax Liability: Risk Remains



**Paul Keglevic**

Q. Even with insurance, what is the total size of the tax exposure that Topco would potentially have to QVC, Inc. if there is no settlement and release?

A. $600 to $800 million was the demonstrative of Mr. Ke[a]rns, but does not include the potential change of ownership and loss of interest rate -- ***interest expense carryforwards, which would increase those amounts***.

Q. And would all of those issues have to be resolved before there could be any distribution at Topco?

A. Yes. ***All the claims would need to be resolved before there's any distribution***.

# Deferred Tax Liability: Calculation of Costs



**Paul Kearns**

## The DTL Out-of-Pocket Cost Equation:

Kearns-Dem-1

$DTL\ Exposure = $

+ Base Liability[1]

– Insurance Proceeds

+ Tax on Insurance Proceeds

+ Underpayment Interest

+ Potential Penalties

+ Interest on Penalties

– Tax Benefit IRS Interest Expense Deduction

+ Cost of Defense

[1]This number depends on the blended federal and state effective tax rate, which can vary based on ultimate state tax considerations.

This number also varies based on the number of interest deduction carryforwards available. These may be at risk due to trading of preferred triggering a potential "ownership change" under Section 382 of the Code.

Source DX-435 QVC_0088233



# Deferred Tax Liability: Potential Exposure



**Paul Kearns**

## Calculating the Deferred Tax Liability: DTL Exposure

Kearns-Dem-2

### Illustrative as of 9/30/2025

| 24% ETR | 3-Year | 6-Year |
|---|---|---|
| Base Liability | $864.7M | $864.7M |
| Insurance Coverage | ($925M) | ($925M) |
| Tax on Insurance Proceeds | $222M | $222M |
| Initial Out-of-Pocket | $161.7M | $161.7M |
| Underpayment Interest | $240.3M | $498.8M |
| Potential Penalty | $172.9M | $172.9M |
| Interest on Potential Penalty | $40.4M | $90.4M |
| Tax Benefit IRS Interest Expense Deduction | ($57.7M) | ($119.7M) |
| *DTL Exposure* | $557.6M | $804.1M |

**Carryforward Impact**: These numbers assume that there has not been an "ownership change" under Section 382 of the Code.

DX-435 Source QVC_0088233



# Deferred Tax Liability: Potential Exposure



**Paul Keglevic**

"If, in fact, the actions by the preferred stock caused a change in ownership calculation, we lose some of the interest rate in carryforward, Mr. Ke[a]rns' calculations go up."

# Deferred Tax Liability: QVC, Inc. Paid for Tax Insurance



**Paul Kearns**

Q.   What is your understanding of the amount of insurance coverage that the debtors have procured.

A.   It's $925 million.

Q.   And what entity purchased that coverage.

A.   QVC, Inc.

Q.   How much did QVC, Inc. pay for that?

A.   Approximately $35 million.

# Deferred Tax Liability: Risk Remains



**Paul Kearns**

Q. Does a "should" opinion mean the author believes the deferred tax liability will not result in tax as a result of the Debtors' restructuring?"

A. No. Clearly not.

Q. What does "should" mean?

A. Should just means it's a level above more likely than not, which is 50 percent, 51 percent degree of confidence. And it is not a "will" opinion. ***There's a lot of exposure still with a should opinion***.

"**So some professionals may say it's 65**.  We're talking ranges here.  But it's certainly not above 80."

Day 1: 187:18-188:4; Day 1: 230:7-9

# Deferred Tax Liability:  TopCo Must Indemnify Inc.

10. Indemnification.

   a.   Each Legal Entity that is a member of the Liberty Group shall indemnify and hold harmless each Legal Entity that is a member of the QVC Group and their respective directors, officers, employees, affiliates, agents, successors and assigns (the "QVC Group Indemnitee")...

> a.   Each Legal Entity that is a member of the Liberty Group shall indemnify and hold harmless each Legal Entity that is a member of the QVC Group and their

> Liberty is required to make a payment hereunder to QVC, (ii) any amount QVC is required to pay to any Governmental Authority with respect to any Joint Return in excess of the QVC Group's Separate Return Tax Liability for such Tax jurisdiction,



**Paul Kearns**

Q.   …[W]hat does Liberty Group refer to here in this indemnification provision?

A.   Well, Liberty Group would be QVC Group, Inc.

# Deferred Tax Liability: Recent Purchases May Increase Risk



**Paul Kearns**

"That base liability is the deferred tax liability that was gross, less the interest expense carryover at 100 percent, the amount available. That's the -- then you take the net and multiply it by the 24 percent. ***And again, that interest expense, you know, is -- there's a possibility that there could be an ownership change***. We don't currently think so, but there's -- we just don't know. ***There could be an ownership change there where you'd get limited on that deduction***."

QVC GROUP

# Deferred Tax Liability:  Recent Purchases May Increase Risk



**Paul Kearns**



DX-235

# Deferred Tax Liability: Preferred Put Carryforwards at Risk

A loss of the Company's carryforwards under 382 would **_increase_** the out-of-pocket exposure to **_upwards of $1B_**.



Q. Okay. If you are able to apply the 925 million, what's left?

A. So you are – **half a million to a billion.**

# Deferred Tax Liability:  Unable to Obtain Full Coverage



**Bill Wafford**

Q.  And how much insurance did you seek?

A.  We understood the market to be a billion dollars in insurance and we sought a billion dollars.

Q.  And how much insurance were you able to obtain?

A.  We were able to obtain 925 million.

Day 2: 347:7-15

24

QVC
GROUP

# Deferred Tax Liability: Ins. Does Not Cover Full Risk



**Bill Wafford**

Q.   And did you learn that there are some organizations that are willing to insure above and beyond the market?

A.   Yes. It was my understanding there is a bit of a secondary market out there that was incredibly expensive.

Q.   What do you mean by "incredibly expensive"?

A.   Something in the range of – would have taken the premium over $100 million.

25

# Deferred Tax Liability:  IRS Would Look to QVCG First



**Paul Kearns**

Q.  As a tax professional, what is your understanding of where the IRS would look first for the tax burden on a consolidated return?

A.  On a consolidated return, they're going to look at the lead taxpayer, which in our fact pattern is QVCG.

# Deferred Tax Liability:  Joint and Several Liability

## Members of the Group are joint and severally liable.

"The common parent corporation and each subsidiary which is a member of the group during any part of the consolidated return year shall be severally liable for the tax for such year."

Treasury Regulation Sec. 1.1502-6(a)

"Further, under Treas. Reg. Sec. 1.1.502-6(a)…, companies filing a consolidated return have joint and several liability for its own and the consolidated group's tax payments."

*In re Nelco, Ltd.*, 264 B.R. 790, 805 n.13 (E.D. Va. 1999)

# Agenda

I. How We Got Here

II. 9019 Legal Standard

**III. What the Plan Resolves**

    A. Deferred Tax Liability

    **B. Avoidance Action Claims**

IV. Intercompany Settlement

V. Why These Terms

VI. The Preferred Shareholders' Argument

VII. Plan Confirmation & Disclosure Statement Adequacy

VIII. Exclusivity

# Avoidance Claims: Cash Transfers Exceed $1.5 billion

**1**   **Tax overpayments under TSA**

**2**   **2022 Cash Management Plan**

**3**   **Post-2022 Dividends**

# Avoidance Claims: Funds Flow Analysis



**Ted Stafford**

**General Ledgers did not provide comprehensive view, so Alix performed APIC-Level Analysis.**

"QVC did not use intercompany due-to/due-from account as the sole source for intercompany activity. They also used equity account, APIC account, additional paid-capital account, that recorded certain transactions into equity as well. …

So you cannot just look at the total transactions for a month or even the ending balances in those accounts and get an idea of what the actual intercompany activity is."

# Avoidance Claims: Funds Flow

## Process Points – The Forensic Assessment



**December 2025**
Alix Forensics Team Onboarded

**January 16, 2026**
Alix Forensics, K&E, QVC videoconference to discuss initial observations and diligence requests

**January 22, 2026**
Alix Forensics, K&E, DD Counsel videoconference to discuss flow of funds and diligence requests

**January 29, 2026**
Alix Forensics, K&E, STB, DPW videoconference to discuss flow of funds

**January 30, 2026**
Alix Forensics, K&E, Akin, Centerview videoconference to discuss flow of funds

**February 6, 2026**
Alix Forensics, K&E, DD Counsel videoconference to discuss updated analyses

**February 11, 2026**
Alix Forensics, K&E conference with Liberty Media accounting team

**March 6, 2026**
Alix Forensics, K&E, DD Counsel videoconference

**Initial Diligence**
- More than 550 bank statements for 15 accounts
- ~ 7,300 transactions
- ~ 3,900 pages of bank statements

**Expanded Diligence**
- 15 general ledger reports
- ~ 73,000 transactions
- ~ 1,200 general ledger accounts
- 21 additional sub-ledger reports

2025 | 2026

# Avoidance Claims: Excess TSA Payments



**Schedule 4 - QVCG Tax Sharing Agreement ("TSA")-related payments for the period November 1, 2019 to November 30, 2025**

**I   TSA Payments Upstreamed From QVC, Inc.**

| Counterparty | A<br>TSA Payments From<br>QVC, Inc. | B<br>TSA Payments<br>Returned To QVC, Inc. | C = A + B<br>Combined TSA Payments<br>From QVC, Inc. | |
|---|---|---|---|---|
| QVC, Inc. | $ 986,463,546.06 | $ (32,786,933.00) | $ 953,676,613.06 | D |

**II   QVCG Payments To Tax Authorities**

| Counterparty | E<br>QVCG Payments<br>From Tax Authorities | F<br>QVCG Payments To Tax<br>Authorities | G = E + F<br>Combined QVCG Payments<br>To Tax Authorities | |
|---|---|---|---|---|
| Internal Revenue Service | | $ (339,853,692.79) | $ (339,853,692.79) | H |
| **Other Taxing Authorities** | | | | |
| District of Columbia | | (460,826.48) | (460,826.48) | |
| State and City of New York | | (18,975,946.42) | (18,975,946.42) | |
| State of Arizona | | (300.00) | (300.00) | |
| State of California | | (26,750,317.14) | (26,750,317.14) | |
| State of Colorado | 4,073.75 | (43.66) | 4,030.09 | |
| State of Connecticut | | (1,500.00) | (1,500.00) | |
| State of Delaware | | (1,441,400.00) | (1,441,400.00) | |
| State of Florida | | (1,416,704.06) | (1,416,704.06) | |
| State of Georgia | | (235.00) | (235.00) | |
| State of Idaho | | (532,286.68) | (532,286.68) | |
| State of Illinois | | (149,776.95) | (149,776.95) | |
| State of Kansas | | (360,583.00) | (360,583.00) | |
| State of Kentucky | | (1,219,312.00) | (1,219,312.00) | |
| State of Maine | | (1,350,191.16) | (1,350,191.16) | |
| State of Massachusetts | | (2,119,368.96) | (2,119,368.96) | |
| State of New Hampshire | | (1,546,672.54) | (1,546,672.54) | |
| State of New Jersey | | (15,831,777.74) | (15,831,777.74) | |
| State of North Carolina | | (40,380.67) | (40,380.67) | |
| State of Ohio | | (4,143,879.23) | (4,143,879.23) | |
| State of Oregon | | (2,859,676.80) | (2,859,676.80) | |
| State of Pennsylvania | | (97,147.25) | (97,147.25) | |
| State of Tennessee | | (400.00) | (400.00) | |
| State of Texas | | (9,896,295.58) | (9,896,295.58) | |
| State of Utah | | (76,983.00) | (76,983.00) | |
| State of Vermont | | (177,131.00) | (177,131.00) | |
| State of Virginia | | (5,448,707.00) | (5,448,707.00) | |
| State of West Virginia | | (5,974.00) | (5,974.00) | |
| State of Wisconsin | | (6,030,627.72) | (6,030,627.72) | |
| **Subtotal Combined QVCG Payments to Non-IRS Tax Authorities** | $ 4,073.75 | $ (100,934,444.04) | $ (100,930,370.29) | I |
| **Total Combined QVCG Payments to Tax Authorities** | $ 4,073.75 | $ (440,788,136.83) | $ (440,784,063.08) | J = H + I |

**III   Overpayment from QVC, Inc.**

| | | | |
|---|---|---|---|
| Overpayment from QVC, Inc., less QVCG Payments to IRS | | $ 613,822,920.27 | K = D + H |
| Overpayment from QVC, Inc., less QVCG Payments to Tax Authorities | | $ 512,892,549.98 | L = D + J |

**Notes**

One QVC, Inc. payment ($6,012,181 on 6/15/2023) included above went to a LINTA account (ended 3410), and was transferred to a QVCG investment account on the same date.

Nine payments (combined $368,527.38, from 11/1/2023 to 11/21/2025) to state tax authorities made from LINTA accounts are not included in the above totals.

|  | A<br>TSA Payments From<br>QVC, Inc. | B<br>TSA Payments<br>Returned To QVC, Inc. | C = A + B<br>Combined TSA Payments<br>From QVC, Inc. | |
|---|---|---|---|---|
| | $ 986,463,546.06 | $ (32,786,933.00) | $ 953,676,613.06 | D |

|  | E<br>QVCG Payments<br>From Tax Authorities | F<br>QVCG Payments To Tax<br>Authorities | G = E + F<br>Combined QVCG Payments<br>To Tax Authorities | |
|---|---|---|---|---|
| | | $ (339,853,692.79) | $ (339,853,692.79) | H |

**Overpayment from QVC, Inc.** $ 512,892,549.98   L = D + J



# Avoidance Claims: QVCG Not Party to the TSA Until June 2023

**No Contractual Obligations to TopCo until June 8, 2023**



# Avoidance Claims: Tax-Sharing Payments Claims



**Paul Kearns**

## No Contractual Obligations to TopCo until June 8, 2023

### ASSIGNMENT AND ASSUMPTION AGREEMENT

This Assignment and Assumption Agreement, dated as of June 8, 2023 (this "**Agreement**"), is by and among Liberty Interactive LLC, a Delaware limited liability company (the "**Assignor**"), Qurate Retail, Inc., a Delaware corporation (the "**Assignee**"), and QVC, Inc., a Delaware corporation ("**QVC**"). Except as otherwise described herein, all capitalized terms used but not defined herein shall have the respective meanings attributed to them in the Tax Allocation Agreement (as defined below).

Q. Is Qurate Retail, Inc. associated with QVC Group, Inc.?

A. Yes. There was a name change where **QVC Group, Inc.** is the new company. It used to be called Qurate retail Inc.

DX-001; Day 1: 147:13-17

34

# Avoidance Claims: Tax-Sharing Payments Claims



**Paul Kearns**

## No Contractual Obligations to TopCo until June 8, 2023

### ASSIGNMENT AND ASSUMPTION AGREEMENT

This Assignment and Assumption Agreement, dated as of June 8, 2023 (this "**Agreement**"), is by and among Liberty Interactive LLC, a Delaware limited liability company (the "**Assignor**"), Qurate Retail, Inc., a Delaware corporation (the "**Assignee**"), and QVC, Inc., a Delaware corporation ("**QVC**"). Except as otherwise described herein, all capitalized terms used but not defined herein shall have the respective meanings attributed to them in the Tax Allocation Agreement (as defined below).

Q. Now, to your knowledge was there *any* written tax-sharing agreement between QVC, Inc. and QVCG or TopCo prior to the date of this assignment?

A. **No.**

DX-001; Day 1: 149:12-21

35

# Avoidance Claims:  Pre-Assignment Payments



**Paul Kearns**

Q.   Now, were tax-sharing payments nevertheless flowing from QVC, Inc. to TopCo or QVCG prior to the date of this assignment?

A.   **Yes**.

***Prior to the Assignment:***

**$233.5M** in ***overpayments*** in 2021 alone.

**$70.3M** in ***overpayments*** in 2022 alone.

**$303.8M** in ***overpayments*** in those two years combined.

| Year | QRI Federal Income Tax Liability for the Yr - Per Tax Returns including IRS Post Filing | QVC Tax Paid to QRI for Federal Income Tax under TSA for the Tax Yr | QRI Tax State Income Tax Liability | QVC Paid QRI for State Income Tax under TSA |
|---|---|---|---|---|
| 2018 | 110,267,976 | 231,645,080 | 22,518,567 | 19,711,000 |
| 2019 | 14,613,173 | 137,656,480 | 18,706,088 | 31,261,958 |
| 2020 | 53,388,654 | 200,846,786 | 16,579,949 | 25,540,000 |
| 2021 | 52,154,379 | 258,285,766 | 13,799,529 | 41,166,712 |
| 2022 | 92,383,486 | 173,957,153 | 37,280,693 | 26,027,801 |
| 2023 | 46,214,912 | 101,730,451 | 3,261,038 | 3,736,167 |
| 2024 | 49,768,615 | 76,706,088 | 840,566 | 9,261,272 |
| Total | 418,791,195 | 1,180,827,803 | 112,986,430 | 156,704,910 |

DX-287; Day 1: 149:12-21

# Avoidance Claims: Inc. Receives "No Value" Under TSA



**Paul Kearns**

Q. So, sir, thinking back through everything we've just talked  about and your experience operating under the TSA, what value does QVC, Inc. receive from QVCG because of the TSA itself?

A. **No value**. We didn't get any value.

37

# Avoidance Claims: The 2022 Cash Management Plan

| Transaction | Date | Combined QVCG. |
|---|---|---|
| | | C = A + B |
| Deposit from QVC Inc. account ending 6206 | 12/21/2022 | $ 800,000,000 |



| | | QVCG Bank Accounts | | | LINTA Bank Accounts | | | |
|---|---|---|---|---|---|---|---|---|
| | | A | B | C = A + B | D | E | F = D + E | G = C + F |
| Transaction | Date | 4451269506 | 5W10273111 | Combined QVCG. | 4451753410 | 5W106B6714 | Combined LINTA | Net Combined |
| Deposit from QVC Inc. account ending 6206 | 12/21/2022 | $ 800,000,000 | | $ 800,000,000 | | | $ - | $ 800,000,000 |
| Transfer to 5W106B6714 | 12/21/2022 | (50,000,000) | | (50,000,000) | | 50,000,000 | 50,000,000 | - |
| Transfer to 5W106B6714 | 12/21/2022 | (50,000,000) | | (50,000,000) | | 50,000,000 | 50,000,000 | - |
| Transfer to 5W106B6714 | 12/21/2022 | (50,000,000) | | (50,000,000) | | 50,000,000 | 50,000,000 | - |
| Transfer to 5W106B6714 | 12/21/2022 | (50,000,000) | | (50,000,000) | | 50,000,000 | 50,000,000 | - |
| Transfer to 5W106B6714 | 12/21/2022 | (50,000,000) | | (50,000,000) | | 50,000,000 | 50,000,000 | - |
| Transfer to 5W106B6714 | 12/21/2022 | (50,000,000) | | (50,000,000) | | 50,000,000 | 50,000,000 | - |
| | | | | - | | | - | |
| Transfer between 9506 (QVCG) and 3410 (LINTA) | 12/28/2022 | (500,000,000) | | (500,000,000) | 500,000,000 | | 500,000,000 | - |
| Transfer to 5W10273111 | 12/29/2022 | | 0 | 0 | (0) | | (0) | - |
| Transfer to 5W10273111 | 12/29/2022 | | 0 | 0 | (0) | | (0) | - |
| Transfer to 5W10273111 | 12/29/2022 | | 99,000,000 | 99,000,000 | (99,000,000) | | (99,000,000) | - |
| Transfer to 5W10273111 | 12/29/2022 | | 100,000,000 | 100,000,000 | (100,000,000) | | (100,000,000) | - |
| Transfer to 5W10273111 | 12/29/2022 | | 100,000,000 | 100,000,000 | (100,000,000) | | (100,000,000) | - |
| Transfer to 5W10273111 | 12/29/2022 | | 100,000,000 | 100,000,000 | (100,000,000) | | (100,000,000) | - |
| Transfer to 5W10273111 | 12/29/2022 | | 100,000,000 | 100,000,000 | (100,000,000) | | (100,000,000) | - |
| Transaction Total | | $ - | $ 499,000,000 | $ 499,000,000 | $ 1,000,000 | $ 300,000,000 | $ 301,000,000 | $ 800,000,000 |
| | | [1] | [2] | | [3] | [4] | | |



# Avoidance Claims: Post-2022 Dividends



**Ted Stafford**

| Period | Number of Transactions | Payment Amount from QVC, Inc. | |
|---|---|---|---|
| Q1 2023 | 14 | $ | 198,581,479.15 |
| Q2 2023 | 6 | | 101,612,140.00 |
| Q3 2023 | 4 | | 43,642,401.25 |
| **Total** | **24** | **$** | **343,836,020.40** |

"These are transactions that were amounts paid from QVCI or QVC, Inc. up to TopCo."

# Agenda

I. How We Got Here

II. 9019 Legal Standard

**III. What the Plan Resolves**

    A. Deferred Tax Liability

    B. Avoidance Action Claims

    **C. Dividends to QVCG Preferred Equity Holders**

IV. Intercompany Settlement

V. Why These Terms

VI. The Preferred Shareholders' Argument

VII. Plan Confirmation & Disclosure Statement Adequacy

VIII. Exclusivity

# Avoidance Claims: Dividends to QVCG Pref.



**Ted Stafford**

Total between 2023 and 2025: **$228mm+**

Q. [W]hat is the total amount of dividends that QVCG sent to preferred shareholders during the period you looked at?

A. So if you look at [the] table, the duration between 2020 and 2025, the total amount of payments were approximately $456M

| Year | Date | Total | |
|------|------|-------|---|
| 2020 | 12/15/2020 | $ (25,205,789.21) | |
| 2021 | 3/12/2021 | (25,025,694.00) | |
| 2021 | 6/14/2021 | (25,234,612.00) | |
| 2021 | 9/14/2021 | (25,245,366.00) | |
| 2021 | 12/14/2021 | (25,246,438.00) | |
| 2022 | 3/14/2022 | (25,255,158.00) | |
| 2022 | 6/14/2022 | (25,337,258.00) | |
| 2022 | 9/14/2022 | (25,342,684.00) | |
| 2022 | 12/14/2022 | (25,342,950.00) | |
| 2023 | 3/14/2023 | (25,345,248.00) | [1] |
| 2023 | 6/14/2023 | (25,410,446.00) | [1] |
| 2023 | 9/14/2023 | (25,412,714.00) | |
| 2023 | 12/14/2023 | (25,412,714.00) | |
| 2024 | 3/14/2024 | (25,412,844.00) | |
| 2024 | 6/14/2024 | (25,445,766.00) | |
| 2024 | 9/13/2024 | (25,445,904.00) | |
| 2024 | 12/13/2024 | (25,445,904.00) | |
| 2025 | 3/14/2025 | (25,445,950.00) | |
| Total | | $ (456,013,439.21) | |

# Agenda

I.   How We Got Here

II.  9019 Legal Standard

III. **What the Plan Resolves**

    I.   Deferred Tax Liability

    II.  Avoidance Action Claims

    III. Dividends to QVCG Preferred Equity Holders

    IV.  **Magnitude of Inc.'s Claims Against TopCo**

IV.  Intercompany Settlement

V.   Why These Terms

VI.  The Preferred Shareholders' Argument

VII. Plan Confirmation & Disclosure Statement Adequacy

VIII. Exclusivity



# Magnitude of Claims: Inc. Claims vs. TopCo



**$3 billion+**

## Potential Claims
(against QVCG)

**QVCG Cash:  ~$170mm**

43

# Magnitude of Claims: Inc. Claims vs. TopCo

**Potential Claims**
(against QVCG)

- **2022 Cash Management Plan**

  - December 2022: **QVC distributed ~$800mm to QVCG** as part of an organizational cash management initiative ($300mm of which QVCG distributed to LINTA). DX-290

**Fraudulent Transfers**

2022 Cash Management Plan
($800mm)

Post-2022 Dividends
($340mm)

Tax Payments Under the TSA
($500mm+)

44

# Magnitude of Claims: Inc. Claims vs. TopCo

**Potential Claims**

(against QVCG)

**Fraudulent Transfers**

2022 Cash Management Plan
($800mm)

Post-2022 Dividends
($340mm)

Tax Payments Under the TSA
($500mm+)

- **2022 Cash Management Plan**

  - December 2022:  **QVC distributed ~$800mm to QVCG** as part of an organizational cash management initiative ($300mm of which QVCG distributed to LINTA).  DX-290

- **Post-2022 Dividends**

  - Between Q1-Q3 of 2023, QVC issued an aggregate of approximately ~$340mm in dividends to QVCG.  DX-292

45

# Magnitude of Claims: Inc. Claims vs. TopCo

**Potential Claims**

(against QVCG)

**Fraudulent Transfers**

2022 Cash Management Plan
($800mm)

Post-2022 Dividends
($340mm)

Tax Payments Under the TSA
($500mm+)

- **2022 Cash Management Plan**

  ▪ December 2022:  **QVC distributed ~$800mm to QVCG** as part of an organizational cash management initiative ($300mm of which QVCG distributed to LINTA).  DX-290

- **Post-2022 Dividends**

  ▪ Between Q1-Q3 of 2023, QVC issued an aggregate of approximately ~$340mm in dividends to QVCG.  DX-292

- **Tax Payments Under the TSA**

  ▪ Between November 2019 and November 2025, QVCG **retained $512.9 million in cash from QVC** that was not ultimately required to pay taxing authorities.  DX-294

# Magnitude of Claims: Inc. Claims vs. TopCo

**Potential Claims**

(against QVCG)

**Tax Indemnity Claim – DTL ($500mm up to $800mm-$1billion)**

**Fraudulent Transfers**

2022 Cash Management Plan ($800mm)

Post-2022 Dividends ($340mm)

Tax Payments Under the TSA ($500mm+)

- If the **deferred tax liability** ever becomes payable, the IRS can pursue claims a on a **joint and several basis** for the entire consolidated group.

  - **QVC can look to QVCG to satisfy the liability** under the TSA tax indemnity provision.

  - **Even after $925mm in insurance...**

# Magnitude of Claims: Inc. Claims vs. TopCo

**Potential Claims**

(against QVCG)

**Tax Indemnity Claim – DTL
($500mm up to $800mm-
$1billion)**

**Fraudulent Transfers**

2022 Cash Management Plan
($800mm)

Post-2022 Dividends
($340mm)

Tax Payments Under the TSA
($500mm+)

- If the **deferred tax liability** ever becomes payable, the IRS can pursue claims a on a **joint and several basis** for the entire consolidated group.

  - **QVC can look to QVCG to satisfy the liability** under the TSA tax indemnity provision.



**Paul Keglevic**

"If, in fact, the actions by the preferred stock caused a change in ownership calculation, we lose some of the interest rate in carryforward, Mr. Ke[a]rns' calculations go up."

# Magnitude of Claims: Inc. Claims vs. TopCo

**Potential Claims**
(against QVCG)

**Tax Indemnity Claim – DTL
($500mm up to $800mm-
$1billion)**

**Fraudulent Transfers**

2022 Cash Management Plan
($800mm)

Post-2022 Dividends
($340mm)

Tax Payments Under the TSA
($500mm+)

**$2 billion+**

- Taken together, the quantum of claims QVC has against QVCG could rise as high as **$2bn+**, *assuming QVC successfully pursues each category of claims in full*.

- All it takes is **8 percent risk of loss** on these claims and **all of QVCG's cash is wiped out**.

**QVCG Cash:  ~$170mm**

49

# Magnitude of Claims: Inc. Claims vs. TopCo

**Pre-judgment Interest**

Tax Indemnity Claim – DTL ($500mm up to $800mm-$1billion)

**Fraudulent Transfers**

2022 Cash Management Plan ($800mm)

Post-2022 Dividends ($340mm)

Tax Payments Under the TSA ($500mm+)

**$3 billion+**



**Paul Keglevic**

**QVCG Cash:  ~$170mm**

Q.  [T]he total value of the claims that you assessed against Topco was 3 billion, I believe you testified?

A.  The gross amount?

Q.  Yes.

A.  Yes.

Q.  Not including sort of other tax issues that you mentioned, prejudgment interest and the like.

A.  Excluding those two issues, correct.

Day 3: 30:18-31:3

50



# Agenda

I. How We Got Here

II. 9019 Legal Standard

III. What the Plan Resolves

**IV. Intercompany Settlement**

    **A. Overview of the Deal**

V. Why These Terms

VI. The Preferred Shareholders' Argument

VII. Plan Confirmation & Disclosure Statement Adequacy

VIII. Exclusivity

# Intercompany Settlement: Overview of the Deal

## QVC – QVCG Settlement Claim



- Resolves all (1) potential claims against QVCG and (2) future tax risk for QVCG (known and unknown).

- Eliminates clawback risk for preferred shareholders who received $450 million in dividends.

- In exchange, QVC to receive QVCG's remaining assets, including QVCG distributable cash.

## QVC and LINTA



- QVC will not receive any distributions from LINTA on account of intercompany claims.

- LINTA to release all claims against all Debtors.

- QVC to contribute ~$23mm to LINTA.

## Global Releases & Fee Burden



- QVCG, LINTA, Cornerstone, and QVC, Inc. to grant and receive mutual releases.

- All postpetition shared estate professional fees covered by QVC.

- Cornerstone transferred to QVC, all claims unimpaired.

DX-179; DX-198



# Agenda

I.     How We Got Here

II.    9019 Legal Standard

III.   What the Plan Resolves

**IV.  Intercompany Settlement**

    A.     Overview of the Deal

    **B.     Gives and Gets**

V.     Why These Terms

VI.    The Preferred Shareholders' Argument

VII.   Plan Confirmation & Disclosure Statement Adequacy

VIII.  Exclusivity

# Intercompany Settlement: Gives and Gets

## TopCo



### GETS

- Full and final resolution on tax and other exposure that could exceed $3B
- No obligation on shared administrative costs
- Cash to satisfy TopCo's administrative and GUC claims in full
- Releases for preferred stockholders ($450M in dividends)
- Avoids fact-intensive and expert-heavy litigation on tax liability and intercompany transfers

### GIVES

- $400M general unsecured claim after deducting TopCo's administrative expenses and third-party GUCs
- Distributable cash and 62% interest in Cornerstone
- Mutual release of other potential claims (known and unknown)

## Inc



### GETS

- Fast and final resolution:  global peace across the organizational structure through single settlement
- $400M general unsecured claim after deducting TopCo's administrative expenses and third-party GUCs
- Potential (but uncertain) upside value in Cornerstone

### GIVES

- Steep discount on billions in potentially viable claims
- Comprehensive releases
- Takes on Cornerstone to save 1,500 jobs and preserve viability

# Agenda

I. How We Got Here

II. 9019 Legal Standard

III. What the Plan Resolves

IV. **Intercompany Settlement**

    A. Overview of the Deal

    B. Gives and Gets

    C. **Process**

V. What Did They Settle

VI. The Preferred Shareholders' Argument

VII. Plan Confirmation & Disclosure Statement Adequacy

VIII. Exclusivity



# Process: The October Proposal Was a Framework



THIS TERM SHEET IS FOR DISCUSSION PURPOSES ONLY, AND IS DISSEMINATED AS A SETTLEMENT COMMUNICATION UNDER FRE 408.  THE COMPANY'S MANAGEMENT TEAM AND ADVISORS ARE DISTRIBUTING THIS TERM SHEET AS A FRAMEWORK PROPOSAL TO FACILITATE NEGOTIATIONS ON A COMPREHENSIVE RESTRUCTURING AND WITH THE EXPECTATION THAT THE COMPANY, ITS ADVISORS, THE BOARDS (INCLUDING THE DISINTERESTED DIRECTORS AND MANAGERS, AS APPLICABLE) OF EACH OF QVC GROUP, INC., QVC, INC., LIBERTY INTERACTIVE LLC, AND QRI CORNERSTONE, INC. WILL CONFER IN GOOD FAITH IN THE NEGOTIATION, PREPARATION, AND PROSECUTION OF A COMPREHENSIVE RESTRUCTURING.

THIS TERM SHEET IS SUBJECT IN ITS ENTIRETY TO, AND THE COMPANY HAS NOT SOUGHT, PRE APPROVAL OF THE BOARDS OF QVC GROUP, INC., QVC, INC., LIBERTY INTERACTIVE LLC, AND QRI CORNERSTONE, INC ON THE TERMS HEREIN OR THE DISTRIBUTION OF IT; THEY ARE REVIEWING AND CONSIDERING IN PARALLEL.  THE DISINTERESTED DIRECTORS AND MANAGERS OF EACH OF QVC GROUP, INC., QVC, INC., LIBERTY INTERACTIVE LLC, AND QRI CORNERSTONE, INC. IN CONSULTATION WITH ANY ADVISORS THEY MAY RETAIN WITH RESPECT TO POTENTIAL OR ACTUAL CONFLICTS MATTERS, WILL REPRESENT THEIR RESPECTIVE COMPANY ENTITY IN ANY NEGOTIATIONS REGARDING ANY ACTUAL CONFLICTS MATTERS.  THE DISINTERESTED DIRECTORS AND MANAGERS OF EACH OF THE ENTITIES RESERVE ALL RIGHTS IN CONNECTION WITH THE TREATMENT OF ANY INTERCOMPANY CLAIMS AS WELL AS WHICH ESTATES MAY BE LIABLE FOR AND/OR COMPROMISE SUCH CLAIMS.

**Project Quartz**

**Company Proposal**

**October 17, 2025**

Evercore   KIRKLAND & ELLIS   AlixPartners

DX-437

HIGHLY CONFIDENTIAL                                              QVC_0094552

"It was – we proposed a general construct and this proposal had not been something that . . . had been opined on yet by the disinterested directors of the full board."

Day 2: 333:2-5

# Process: Full Access to Diligence & Management

Disinterested Directors used Kirkland and AlixPartners to facilitate document review, diligence, and management interviews – also receiving a factual summary of material transactions in **November 2025.**



**KIRKLAND & ELLIS**

DX-277

## QVC GROUP

Key Historical Transactions
Fact Overview

NOVEMBER 2025

HIGHLY CONFIDENTIAL  | SUBJECT TO NON-DISCLOSURE AGREEMENT AND REVISION
© 2025 Kirkland & Ellis LLP. All rights reserved.

HIGHLY CONFIDENTIAL                                                    QVC_0023645

## Agenda

1. Overview

2. Liberty Interactive LLC's $1.825 billion Promissory Note

3. **2022 Cash Management Plan**

4. Other Dividends & Transfers

5. Tax Sharing Agreements

6. Intercompany Shared Services Agreement

7. TopCo-LMC Arrangements

8. Other Transactions

KIRKLAND & ELLIS ——

HIGHLY CONFIDENTIAL                    HIGHLY CONFIDENTIAL  | SUBJECT TO NON-DISCLOSURE AGREEMENT AND REVISION
© 2025 Kirkland & Ellis LLP. All rights reserved.                                        QVC_0023653

DX-277

57

# Process: Independent Investigations

**October 2025** to **February 2026**

Each Special Committee performed independent investigations pertaining to potential and actual intercompany claims.

- reviewed and analyzed 60,000+ documents

- participated in over 25 meetings with other disinterested directors and / or through counsel

- conducted 7 interviews with key management personnel

- TopCo Special Committee retained Holtz, Slavett, Drabkin & Warner for independent tax advice relating to the potential intercompany settlement



| 2025 | 2026 |
|------|------|

DX-179; DX-182; DX-186; DX-187

58

# Process: Investigation and Negotiations

**February 13, 2026**
DD Counsel-Only Meeting: DD counsel exchange positions on claims and defense. DX-24; DX-43; DX-270.

**February 19, 2026**
Inc. and TopCo DDs hold meetings with their counsel regarding settlement. DX-76; DX-92.

**February 22, 2026**
Initial demand letters & term sheets sent by Katten to Kobre and Milbank. DX-120; DX-121.

**February 23–24, 2026**
Virtual and in-person DD Settlement Conferences. Counterproposals exchanged. TopCo makes ask for $25 million for preferred shareholders. June 8
Tr. 108:8-16.

**February 25, 2026**
Kobre Markup: TopCo returns markup reducing claim to $350M and removing 100% asset transfer language. DX-037.

**February 26, 2026**
Milbank sends counter-proposal to Katten. Inc. and TopCo DDs agree in principle on claim amount, subject to overall resolution. DX-416; DX-448.

**February 27, 2026**
Katten circulates proposed response, subject to client signoff, to Milbank. DX-417.

**February 28, 2026**
LINTA/QVC Joint Settlement Framework agreed between LINTA Independent Managers and QVC Independent Directors ($420M–$780M claim range). DX-419.

**March 1, 2026**
Agreement in Principle: QVC/QVCG settlement at $400M GUC claim with mutual releases, subject to Cornerstone analysis. Kirkland circulates QVC Company Proposal incorporating LINTA terms.

**March 10, 2026**
Kirkland circulates plan and creditor-facing materials incorporating DD settlement framework. DX-242

**March 20, 2026**
Kirkland circulates Cornerstone Funding Analysis (AlixPartners) to DD counsel. DX-265.

**March 30, 2026**
Company Term Sheet circulated reflecting agreements in principle among DDs. DX-466.

**April 7, 2026**
Katten proposed settlement term sheet provided to Kobre. DX-278.

**April 8–15, 2026**
Continued Cornerstone discussions; Debtors and creditors exchange terms sheets and drafts of Plan and RSA incorporating potential settlements. DX-243; DX-246

**April 13, 2026**
Katten Markup of QVC–TopCo Settlement Term Sheet: QVC receives 100% of QVCG's CBI interests, Distributable Cash, and Remaining Assets; new cash-use covenant and fiduciary out added. Kobre returns TopCo markup. DX-36; DX-41.

**April 14, 2026**
Special Committee formally approves Interco settlement terms. Final pre-filing term sheet circulated with RSA termination right and cash restriction provisions. DX-096.

**April 16, 2026**
Authorization of bankruptcy filing and entry into RSA. Bankruptcy filed. DX-375.

**2026**

# Process: Disinterested Evaluations



**Roger Meltzer**

Q. In the course of Kobre & Kim's investigation, don't tell me what they said, but had Kobre & Kim discussed with the Special Committee the strengths and weaknesses of the fraudulent transfer claim?

A. Yes.

Q. Had they discussed the strengths and weaknesses of the deferred liability claim?

A. Yes.

Q. Did the Special Committee assess the strengths and weaknesses of the fraudulent transfer claim?

A. With the advice of counsel.

Q. As well as the deferred tax liability claim?

A. With the advice of counsel.

# Process:  Disinterested Evaluations



**Paul Keglevic**

"***So in total***, if you add up the billion 3 of dividends, the billion 5 of I'll call it the DTL tax indemnity pre-insurance, and then the $500 million excess payments, ***it's about $3 billion***. ***And ultimately, the amounts were so big and the value at Topco was $180 million***.  So we went to effectively, you know, the ***lowest amount we as fiduciaries could kind of accept and we picked $400 million***."

\*  \*  \*

"So the claim was a substantial reduction of the gross amount."

# Process: Disinterested Evaluations



**Paul Keglevic**

Q.   During the course of the in-person negotiations, did TopCo make a proposal for preferred shareholders to receive some sort of payout?

A.   Yes. I believe they asked – **they wanted $25 million**, if I remember correctly.

Q.   And what was your response to that proposal?

A.   Our response was **this kind of an impossible line of cross**, you know, given our stakeholders and the fact that **$450 million of QVC, Inc. money had already gone to the preferred**, that have additional funds go to them just, you know, was not palatable.

# Process:  Trading Proposals



**Paul Keglevic**

Q. And in your initial proposed term sheet that you authorized counsel to send, did that include a release of their shareholders of Topco?

A. No. *The initial term sheet did not include the release of preferred shareholders.*

# Process:  Disinterested Evaluations



**Roger Meltzer**

"Well, we believed that we took the principal risks off the table. ***We provided a release to the preferred holders*** that were the most at risk, which were the ones that got the $456 million. ***We took our tax liabilities off the table. We took our tax indemnity off the table***, which was extremely important. We provided – and we provided the releases, as I think I said a minute ago, releases for the preferreds. ***We allowed for the GUCs to be paid in full.*** And we also reached a resolution of the fact that we would no longer be responsible for advisory fees."

# Process: Disinterested Evaluations



**Roger Meltzer**

Q. Incidentally, if you had succeeded on defending the fraudulent transfer claims, was it your understanding of ***whether Topco could distribute the assets*** in light of the deal?

A. ***No***. We would have had a very significant potential deferred tax liability claim that would, again even more so, dwarf the fraudulent conveyance.

# Process:  Trading Proposals



**Paul Keglevic**

"[W]e also looked at, you know, the cost, the time value of that type of litigation, how long it would take, the **disruption to the business** of not being finalized and not distract the management of QVC.  Because, of course, **I represent the operating company**.  I'm the only one that will continue after the restructuring. So we considered all of those factors. . ."

# Process: Considering Alternatives



**Paul Keglevic**

"We couldn't have gotten more from QVC, the parent, Topco, than we were getting under the settlement.  But **we would have also pursued the preferred holders, which was another source of potential [value]**."

**Day 3: 102:7-11**

# Process:  Considering Alternatives



**Paul Keglevic**

Q.   And certainly, pursuing these individual claims against all the preferred shareholders would not enable a fast and final approach, correct?

A.   Correct.  But once again, we only would pursue that if the settlement gets blown up.  So by that point we're not at fast and final anyway.  So why not try to maximize returns.

Day 3: 125:11-19

# Apples and Oranges:  LINTA and TopCo

**Disregarded entity**

**Fall 2024 capital contribution to Inc. ($277mm)**

**Cannot confirm plan at LINTA without support from LINTA funded debt**

**Meaningful tax risk with disposition of LINTA's assets**

**Large claims pool;  $70mm in cash**

69



# Apples and Oranges: LINTA From Inc.'s Perspective



**Paul Keglevic**

Q. The first category of potential claims against LINTA identifies a LINTA promissory note with associated potential damages of 1.74 billion, correct?

A. Correct.

*   *   *

A. ***But I should point out to you, and I know we keep talking about these numbers, if we had gotten the entire promissory note, and they had gotten the debt, we would have got 50 percent of the pool, which was $35 million.***

**Day 3: 76:23-77:8**

# Agenda

I. How We Got Here

II. 9019 Legal Standard

III. What the Plan Resolves

IV. Intercompany Settlement

**V. Why These Terms**

   **A. Solvency Is Litigable**

VI. The Preferred Shareholders' Argument

VII. Plan Confirmation & Disclosure Statement Adequacy

VIII. Exclusivity

# Solvency is Litigable: Multiple Indicia



**Paul Keglevic**

- Severely discounted debt

- "Substantial reductions in revenue"

- "Substantial reduction in EBITDA"

- "Difficult environment for retail companies"

- Borrowings to pay dividends

- "Covenant issues"

**Day 3: 37:4-38:11**

72

# Solvency Is Litigable: The 2022 Kroll Opinion





DX-047

# Solvency Is Litigable:  Issues with Kroll Opinion



**Paul Keglevic**

A.    But, you know, I've seen a lot of those, and they relied on management's forecast, which I think in the first two years, '23 and '24, the revenue line was **missed in total by $2 billion.** The operating income line was also missed by a substantial amount.

\* \* \*

A.    But this management company, unfortunately -- and a lot of it was outside factors -- was missing forecasts routinely.  **So I don't think there was enough sensitivity put in the underlying numbers there**.

\* \* \*

A.    [A]lmost at the same time they issued the report, that **the yields on the debt went up** from 20 to 40 percent.  And Duff & Phelps & Phelps still used historical debt rates, you know, and came up in total with a weighted average cost of capital I think around 12 1/2 percent. So I thought there was some, you know, questions associated with that. There was really **no mention of retail stress**, you know, industry wide. I think this company -- you know, there was no mention -- I think they used **selected company multiples that were higher than what QVC, Inc. was trading at in the market**. So, you know, while not an expert myself, I certainly thought all the dials were kind of turned in the favor of QVC, Inc.  And those dials have changed, you know, somewhat in a battle of other fact experts and, you know, you could get a different conclusion.  You could get that there was certainly risk that the company was insolvent.

# Solvency is Litigable: No Rebuttal from FTI in 2026

FTI Consulting, Inc. (" ___ ___ ferred Shareholders' expert ___ ___ confirmed QVC's solvency using the three traditional tests a ___ ___ expert testimony in ___ ___ VC's solvency at trial.

Pref. Conf. Obj. at 3 fn.5

30.    The evid ___ a trial ___ ___ ___ on TI has performed a three-pronged solvency analysis of QV ___ ___ th ___ ___ and reaches the same result Kroll did: QVC was solvent under ea ___ ___ nce sheet, ab ___ ___ debts, and adequate capitalization tests, with a substant ___ ___ plus in every year.

___ Conf. Obj. ¶ 30

**No Evidence**

75

# Solvency is Litigable: FTI's Perspective in 2022





**Qurate Retail has not evolved with the market and is experiencing significant cash flow challenges; urgent need to reposition its overall business strategy**

## Current Situation

- 1H '22 financial results (YOY):
  - Revenue dropped 14.7%
  - EBITDA dropped 51.4%
  - Operating cash flow down $760M (-$58M)
- Revenue and EBITDA margins declined over the last 3 years (Peer group did not experience same challenges)
- Commenced 'Project Athens' in June 2022 to "correct executional weaknesses throughout the organization"; 100+ ongoing initiatives
- Executed network optimization: decommissioned 2 fulfillment centers
- Fire in NC fulfillment center – reallocated 25% to 30% of QVC inventory to other less cost-efficient centers
- Global macro economic shift will drive near to intermediate term pressure on sales & margin

## FTI Point of View and Go Forward Implications

Our initial hypotheses to optimize go-forward strategy include:

- Target segment: Reconsider the target segment and positioning for QxH to adjust with changing demographics (millennials, GenZ) with higher discretionary spending power. Sustainable revenue growth can be achieved by targeting a younger demographic while simultaneously maintaining the core 40+ demographic
- Customer acquisition: Marketing efforts have been ineffective and unable to draw new customers and reactivate past customers, signaling a need to revamp the strategy; QxH is relying heavily on loyal customer base to drive sales
- Product margin and mix: Shift in product mix, from higher margin products to lower margin products, is adding additional pressure on profitability
- Sourcing and Inventory strategy: Qurate must revisit its sourcing and inventory management practices to generate positive FCF from operations
- Store Fleet Optimization: Cornerstone Brand's store fleet can be downsized to optimize footprint and improve profitability

Based on FTI's extensive retail and consumer experience, we believe Qurate Retail can enable capital and emerge-to-grow by reviewing the following focus areas:

- Supply Chain & Inventory
- Direct & Indirect Spend
- Labor
- Real Estate

# Solvency is Litigable: FTI's Perspective in 2022



**Qurate Retail has not evolved with the market and is experiencing significant cash flow challenges; urgent need to reposition its overall business strategy**

**Current Situation**

- 1H '22 financial results (YOY):
  - Revenue dropped 14.7%
  - EBITDA dropped 51.4%
  - Operating cash flow down $760M (-$58M)
- Revenue and EBITDA margins declined over the last 3 years (Peer group did not experience same challenges)
- Commenced 'Project Athens' in June 2022 to "correct executional weaknesses throughout the organization"; 100+ ongoing initiatives
- Executed network optimization: decommissioned 2 fulfillment centers
- Fire in NC fulfillment center – reallocated 25% to 30% of QVC inventory to other less cost-efficient centers
- Global macro economic shift will drive near to intermediate term pressure on sales & margin

**DX-461**

Tearsheet

**Qurate Retail Group**

Draft

October 2022

---

- 1H '22 financial results (YOY):
  - Revenue dropped 14.7%
  - EBITDA dropped 51.4%
  - Operating cash flow down $760M (-$58M)

management practices to generate positive FCF from operations

- Global macro economic shift will drive near to intermediate term pressure on sales & margin

  - Direct & Indirect Spend
  - Labor
  - Real Estate




# Solvency is Litigable: FTI's Perspective in 2022



DX-461

**Tearsheet**

**Qurate Retail Group**

Draft

October 2022

All business segments (except for Cornerstone Brands) have experienced a decline in sales and EBITDA margin – this needs to be addressed to enable the Company to embark on a path to sustainable profitability

**Revenue by Business Segments**

- 1H '21
- 1H '22

Total: -14.69%, 6,841 → 5,836
QxH: -12.41%, 3,925 → 3,438
QVC International: -16.42%, 1,565 → 1,308

**EBITDA margin by Business Segments**

Total: -27.33%, 16.1% → 11.7%
QxH: 19% → 13%
QVC International: 18% → 15%
Zulily: 2% → -8%
Cornerstone: 10% → 10%

**Key takeaways**

- **Top Line pressures.** Sales failed to materialize post-pandemic; need to revisit target segment and positioning to turnaround its double-digit declining sales

- ...leading to a significant drop-off in sales and margins

- Qurate's merchandise and supply chain costs need review to optimize cost structure (via sourcing & logistics review)

- Decline in sales and margins in 1H' 22 dropped operating cashflows by $760M compared to 1H' 21

Source: CapIQ, 10K, 10Q

**Top Line pressures.** Sales failed to materialize post-pandemic; need to revisit target segment and positioning to turnaround its double-digit declining sales

**Decline in sales and margins in 1H' 22 dropped operating cashflows by $760M compared to 1H' 21**

DX-461

78

# Solvency Is Litigable: Circumstances Around Upstreaming



**Bill Wafford**

Q. What is your understanding as to why the company implemented the '22 cash management plan at the end of the December '22?

A. My understanding was under the revolving credit facility, and there are certain covenant ratios that the business needs to be in compliance with. The business had been deteriorating to some extent but was still in compliance with all covenant ratios. ***The organization had the ability to move cash upstream while still under compliance in certain covenant ratios.*** Once you were beyond what those ratios were, leverage ratios in the business , you no longer had the ability to move money from QVC Inc. up to QVC Group, or Retail Inc. at the time. So the organization took the step to move capital there while it still could.

# Solvency Is Litigable: Inc. Borrowed to Make '22 Dividend



**Paul Keglevic**

Q.   [D]id you also investigate essentially payments related to the 2022 cash management plan?

A.   Yeah.  That was really the starting point, because the biggest dividend paid was $800 million as part of that plan.  And it's also important to note that $600 million of that was borrowed to make that payment.

# Solvency Is Litigable: Prolonged Battle



**Roger Meltzer**

"Well, it was clearly a litigable issue. I think we all understood – particularly because Mr. Flaton and I are not babes in the woods as far as the analysis of claims – that there would be a very strong likelihood that if Inc. decided that they were actually going to bring claims, that it would be – we might have defenses, ***but it would be certainly a battle of the experts***. It would be very fact intensive. ***It would have a long duration with, honestly, an uncertain outcome.***"

# Agenda

I. How We Got Here

II. 9019 Legal Standard

III. What the Plan Resolves

IV. Intercompany Settlement

V. **Why Did They Settle**

    A. Solvency is Litigable

    B. **Cornerstone**

VI. The Preferred Shareholders' Argument

VII. Plan Confirmation & Disclosure Statement Adequacy

VIII. Exclusivity

# Cornerstone: Historical & Projected Performance



**Jason Keyes**

## Historical and Projected CBI Revenue and OIBDA Margin

KEYES DEM-2

Revenue and OIBDA Margin trend ($, in M)

Revenue values by year: 2018A: 970, 2019A: 901, 2020A: 1,070, 2021A: 1,238, 2022A: 1,313, 2023A: 1,165, 2024A: 1,040, 2025A: 938, 2026E: 940, 2027E: 950, 2028E: 978, 2029E: 1,008

OIBDA Margin values by year: 2018A: 2%, 2019A: 4%, 2020A: 9%, 2021A: 11%, 2022A: 6%, 2023A: 6%, 2024A: 3%, 2025A: 2%, 2026E: 3%, 2027E: 4%, 2028E: 4%, 2029E: 4%

Legend: Revenue, OIBDA Margin

Source: DX-013

# Cornerstone: Business Plan Down v. Reforecast



**Jason Keyes**

KEYES DEM-6

## 2026 Business Plan versus 4+8 Reforecast

**Business Plan versus 4+8 Reforecast 2026 Revenue ($, in M)**

-33M

940 → 907 (Business Plan → 4+8 Reforecast)

**Business Plan versus 4+8 Reforecast 2026 OIBDA ($, in M)**

-2M

30 → 28 (Business Plan → 4+8 Reforecast)

**Source:** DX-16 - QVC_0105200

# Cornerstone: Worth $85mm With QVC Synergies



**Patrick Griffin**

GRIFFIN DEM-1

## Cornerstone Enterprise Value: $85M Midpoint

| Methodology | Key Input(s) | Implied Value |
|---|---|---|
| **1** Discounted Cash Flows | Perpetuity Growth<br>WACC: 16% – 20%<br>PGR: 2% – 4% | $36 – $59 |
| **2** Public Company Trading Analysis | TEV / 2026E EBITDA Multiple<br>3.0 – 4.5x | $91 – $136 |

Using consolidated (not standalone) and unlevered capital structure

Overall Midpoint: $85

($ in millions)

EVERCORE

85

# Cornerstone: Liquidity Questions



**Jason Keyes**

"[T]he concern was that ***once you get to liquidity that low, you're going to have to stop paying vendors, and it could lead to operational disruption***, particularly in the context of . . . press about QVC imminently filing Chapter 11."



DX-265; Day 1: 280:21-281:3

# Cornerstone: Benefits from Inc. Synergies



**Jason Keyes**

Q.    And so, sir, in total, what would you project the incremental cost to the business plan to be in the next three years if CBI were to leave the QVC mothership?

A.    $25 million.

## Separation Analysis

**Incremental Costs to Business Plan 2027-2029 ($, in M)**

|  | FY 2027 | FY 2028 | FY 2029 |
|---|---|---|---|
| UPS Agreement | (3.8) | (8.4) | (9.3) |
| New Employees | (1.5) | (1.5) | (1.5) |
| Outside Services (e.g., Tax, Legal) | (0.7) | (0.7) | (0.7) |
| IT Services and Audit (Extra Costs) | (1.5) | (1.5) | (1.6) |
| Management Fee | 2.2 | 2.3 | 2.3 |
| **Incremental Costs to Business Plan** | **(5.2)** | **(9.9)** | **(10.9)** |

DX-255; Day 1: 274:12-16

# Cornerstone:  LINTA Did Not Want It

- The LINTA bondholders' January 15, 2026 term sheet stated that no LINTA cash was to be used for CBI funding.

**Cornerstone Restructuring**

- QRI Cornerstone, Inc. ("CBI") treatment to be determined; potentially sold, liquidated, or contributed to Reorganized QVC
  - Subject to review of value-maximizing alternatives and ongoing diligence, including liquidation analysis currently being conducted by Company advisors
- No LI LLC cash used for CBI funding but alternative financing to be evaluated, including ABL financing, if CBI remains a going concern

# No Rebuttal, Period: FTI Never Showed Up

The Preferred Shareholders listed *five* FTI expert witnesses that were never called to the stand.

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

In re:                                    Chapter 11

QVC GROUP, INC., *et al.*,[1]             Case

        Debtors.                          (Join

**PREFERRED SHAREHOLDERS' FOURTH AMEN
EXHIBIT LIST FOR THE JUNE 4, 2026 CONF**

Certain Preferred Shareholders (the "Preferred Sh

("QVCG" and, together with its subsidiaries and affiliates

Cases, the "Debtors"), by and through their undersigned coun

LLP, Cleary Gottlieb Steen & Hamilton LLP, and Kane Russ

Second Amended Final Witness and Exhibit List for the Co

June 4, 2026.

**A.    WITNESSES**

1.  Ted Stafford (Expert);
2.  Patrick Griffin (Expert);
3.  Andrew Scruton (Expert);
4.  Scott Drago (Expert);
5.  Guy Davis (Expert);

_____

[1]  A complete list of each of the Debtors in these Chapter 11 cases (the "Chapter 11 Cases") may be obtained on the website of the Debtors' proposed claims and noticing agent at https://restructuring.ra.kroll.com/QVC. The location of Debtor QVC Group, Inc.'s corporate headquarters and the Debtors' service address in these Chapter 11 Cases is 1200 Wilson Drive, West Chester, Pennsylvania 19380.

[2]  The Preferred Shareholders are certain institutional and individual holders of the 8.000% Series A Cumulative Redeemable Preferred Stock (the "Preferred Stock") issued by QVCG as identified in the Second Amended Verified Statement pursuant to Bankruptcy Rule 2019 (Dkt. No. 315).

Consistent with Local Rule 9013-2, the Preferred Shareholders have served expert disclosures from Andrew Scruton, Scott Drago, Guy Davis, Anuj Mody and Bradley Henn.  These witnesses may also provide fact testimony within the scope of their personal knowledge.

# Agenda

I. How We Got Here

II. 9019 Legal Standard

III. What the Plan Resolves

IV. Intercompany Settlement

V. Why Did They Settle

    A. Solvency is Litigable

    B. Cornerstone

    **C. Costs**

VI. The Preferred Shareholders' Argument

VII. Plan Confirmation & Disclosure Statement Adequacy

VIII. Exclusivity



# Cost: Magnitude and Duration of Litigation



**Roger Meltzer**

"[Y]ou could have very extensive claims in different jurisdictions with different facts and so on and so forth, which all that does is it multiplies [the cost] . . . ."

"But as I said, we thought that was kind of – all that did is hurt the estate because significant length of time it would take to litigate, appeal, et cetera, those issues. When you have fact-based arguments like – that have to be brought to bear to solve this litigation, you know, you have dueling experts, which cost a lot of money and a lot of time. You have the disruption to the operating company, you know."



**Paul Keglevic**

# Cost: Professional Fees

**Prepetition QVCG Paid**

*$75 million*

Shared Professional Fees
Net of QVC/LINTA
Contribution



**Bill Wafford**

**QVC Paid / Will Pay**

+ Accrued Shared Professional Fees ($41 million)
+ Tax Insurance Premium ($35 million)

___

***~$76 million (as of May 31)***

+ Future Shared Professional Fees

+ Potential Cost to Defend Future Tax Liabilities

# Agenda

I.    How We Got Here

II.   9019 Legal Standard

III.  What The Plan Resolves

IV.   Intercompany Settlement

V.    Why These Terms

**VI.  The Preferred Shareholders' Argument**

VII.  Plan Confirmation & Disclosure Statement Adequacy

VIII. Exclusivity

# Response: Preferred Shareholders' Key Themes

**1** Process Was a Sham

**2** QVCG Capitulated

**3** QVCG Did Not Use Holdup Value

**4** Preferred Shareholders Excluded

**5** Tax Risk Is Minimal

# Pref Allege:  QVCG Capitulated

## Evidence

▶ **The intercompany "settlement" cannot be approved.**

　　▶ QVCI is getting even more than 100% of what it could get in a litigation (i.e., all of QVCG's assets without having to spend anything on litigation).

　　▶ The Special Committee made no probability assessment, and no deduction for its litigation costs.  QVCG gets 0% of what it could get in a litigation.

　　▶ **This settlement is the worst possible outcome for QVCG,** and forfeits any chance of success in litigation.

　　▶ All affected stakeholders oppose it.

▶ **Rule 9019 permits approval of *compromises*.  This is not a compromise;  it is a complete capitulation.**

© 2026 DOAR, Inc.

95

# Response: QVCG Protected Its Stakeholders



**Roger Meltzer**

"Well, we believed that **we took the principal risks of the table**. We provided a **release to the preferred holders** that were the most at risk, which were the ones that got the $456 million. We took our tax liabilities off the table. **We took our tax indemnity off the table**, which was extremely important. We provided – we provided the releases, as I think I said a minute ago, releases for the preferreds. We allowed for the **GUCs to be paid in full**. And we also reached a resolution of the fact that we would no longer be responsible for **advisory fees**."

# Response: Litigation Is Lose-Lose



**Paul Keglevic**

"I'm comparing [the Settlment] to blowing up the settlement and potentially litigating everything and winning and getting money back from the preferred. Potentially, that could have been a better outcome, but highly uncertain, costly, you know. I just – I think we are very satisfied with the outcome and thik it's fair to not have the settlement. ***It's lose/lose for both estates***. Both estates drain cash for an uncertain outcome."

# Pref Allege: QVCG Capitulated

## Evidence

- ▶ **The intercompany "settlement" cannot be approved.**

    - ▶ QVCI is getting even more than 100% of what it could get in a litigation (i.e., all of QVCG's assets without having to spend anything on litigation).

    - ▶ The Special Committee made no probability assessment, and no deduction for its litigation costs.  QVCG gets 0% of what it could get in a litigation.

    - ▶ <u>**This settlement is the worst possible outcome for QVCG,**</u> and forfeits any chance of success in litigation.

    - ▶ All affected stakeholders oppose it.

- ▶ **Rule 9019 permits approval of *compromises*.  This is not a compromise;  it is a complete capitulation.**

© 2026 DOAR, Inc.

98

# Response: Confirmable Plan is Far From Worst Outcome



**Roger Meltzer**

Q.   And specifically what was your understanding of whether or not Inc. could emerge from Chapter 11 without resolving the claims against Topco?

A.   They could clearly have done that.

*  *  *

A.   Topco would have had an extremely difficult time emerging because of all the claims against it. And you had **no clear path** given the litigation profile from the – litigation profile from the claims or potentially from the IRS to be able to pay general unsecured creditors and, honestly, t**o be able to pay either administrative claims or priority claims or anything**.

**Day 3: 201:11-15; 201:22-202:6**

99

# Response: Confirmable Plan is Far From Worst Outcome



**Paul Keglevic**

Q. And so you mentioned that.  So, what would happen if you couldn't come to an agreement with Topco?  What were you prepared to do?

A. Well, ***it's ugly***.  We would litigate all of the issues and the claims that we have, including going after the preferred shareholders for the $450 million of dividends.

\* \* \*

A. ***So, all of that is bad***.  But, you know, I think we would be forced to pursue those actions that I think our stakeholders are prepared to do that, you know.  But that's why we thought settlement was much more attractive and consistent with fast and final our objectives here.

# Pref Allege: Cut out of Process / Not Considered



# Response: Preferred Holders Didn't Organize



**Bill Wafford**

Q. How would you generally describe the preferred equity holders as a group?

A. As a group, predominantly **very disparately held**. The preferred was a dividend from the common when it originated. So it was largely a lot of retail shareholders.

**Day 2: 330:4-10**

# Response: Preferred Holders Didn't Organize



**Bill Wafford**

A.   . . . In the fall of '25, there was an inbound call from a firm, Houlihan Lokey. I believe they reached out to our financial advisor, Evercore, proposing to -- they represented a percentage, I don't know the percentage of preferred equity holders. . . . **It was our desire to actively engage with any holders**.

Q.   What is your understanding as to whether the Houlihan Lokey firm was successful in organizing a group of preferred equity holders?

A.   **My understanding is our advisors replied back to them but then we really didn't hear anything beyond that.**

# Response:  Preferred Holders Didn't Organize





**Roger Meltzer**

Q.   So what was your understanding of the amount of [preferred] shareholder interests that Mr. Brody represented?

A.   ***1 – 2 percent.***

# Pref Allege: Insurance Premium = Risk

Ex. 11, QVC, Inc., Annual Report (Form 10-K) (Feb. 27, 2025) at II-48.  Moreover, they have an opinion of PricewaterhouseCoopers LLP backing their position, and they have obtained tax liability insurance covering the $1 billion of potential exposure at a premium of only $36 million (*pricing the risk at approximately 3.6% of exposure*).  *See* Ex. 8, QVCINCDD_001098 (2/22/26 Katten Settlement Proposal to Kobre) at 3.  The fact that sophisticated insurance underwriters priced this risk so low is powerful evidence that the probability of the liability crystallizing is negligible.  Indeed, having already obtained insurance coverage for this very exposure, any

Pref. Conf. Obj. ¶ 37

# Response: Insurance Premium ≠ Risk



**Paul Kearns**

"Probably depends upon the issuing accounting firm, ***but I don't think you can equate a dollar amount you pay for insurance coverage to what a tax professional opines on in a  level of opinion***. It's just – it's apples to oranges. You're going to be the insurance market to insure something and you may have an opinion, but it's based upon all sorts of facts and code sections and interaction of the two. ***And I just don't think you can take a premium and divide it by the issuance coverage and try to equate that with a level of confidence on a tax opinion***. I just don't think you can."

Day 1: 237:22-238:15

106

# Pref Allege:  Paramount Interest of <u>Stakeholders</u>

Case 26-90447   Document 417   Filed in TXSB on 06/04/26   Page 8 of 41

## Requirements for 9019 Settlements

▶ **The settlement must be:**

  ▶ Fair and equitable to the Debtor and affected stakeholders.

  ▶ In the best interest of the estate (not affiliates).

▶ **To make these determinations, the Debtor must show:**

  ▶ Probability of success in the litigation.

  ▶ Complexity, cost and duration of the litigation.

  ▶ <mark>Paramount interest of stakeholders</mark> is being respected, particularly where the settlement is between insiders and the overwhelming majority of stakeholders oppose it.

  ▶ The settlement is the product of arm's-length bargaining.

8

© 2026 DOAR, Inc.

# Response: Courts Look to <u>Creditors</u>

Courts consider "the paramount interest **of creditors** with proper deference to their reasonable views."

*In re Foster Mortg. Corp., 68 F.3d 914, 917 (5th Cir. 1995) (citation ommited) (emphasis added)*

"It is well settled that the bankruptcy court and the trustee should carefully consider **the wishes of a majority of the creditors**…"

*In re Transcon. Energy Corp., 764 F.2d 1296, 1299 (9th Cir. 1985)*

"In determining **whether a settlement is fair and equitable, the Fifth Circuit applies a three-part test**: (1) the probability of success in litigating the claim subject to settlement, with due consideration for the uncertainty in fact and law; (2) the complexity and likely duration of litigation and any attendant expense, inconvenience, and delay; and (3) all other factors bearing on the wisdom of the compromise, including (i) **the best interests of creditors…**"

*In re Robertshaw US Holding Corp., 662 B.R. 300, 314 (Bankr. S.D. Tex. 2024)*

108

# Magnitude of Claims: Inc. Claims vs. TopCo

**Potential Claims**
(against QVCG)

Tax Indemnity Claim – DTL
($500mm up to $800mm-
$1billion)

**Fraudulent Transfers**

2022 Cash Management Plan
($800mm)

Post-2022 Dividends
($340mm)

Tax Payments Under the TSA
($500mm+)

**$2 billion+**

**QVCG Cash:  ~$170mm**

- Taken together, the quantum of claims QVC has against QVCG could rise as high as **$2bn+**, *assuming QVC successfully pursues each category of claims in full*.

- All it takes is **8 percent risk of loss** on these claims and **all of QVCG's cash is wiped out**.

# Agenda

I.     How We Got Here

II.    9019 Legal Standard

III.   What the Plan Resolves

IV.    Intercompany Settlement

V.     Why These Terms

VI.    The Preferred Shareholders' Argument

**VII. Plan Confirmation & Disclosure Statement Adequacy**

VIII.  Exclusivity

# The Debtors' Plan: Global Plan, Global Settlement

- **Two Going-Concern Transactions.** The Plan **preserves over 15,800 jobs** by ensuring both QVC, Inc. and Cornerstone emerge as going concerns.

- **Massive Balance Sheet Deleveraging. Eliminates billions** in funded debt obligations.

- **Ensures Post-Emergence Capitalization**. With a $600 million committed exit ABL facility, Reorganized QVC will be **well capitalized upon emergence**.

- General Unsecured Claims **Paid in Full.**

- **Resolution of Sprawling Inter-Debtor Litigation.**

# 1129 Elements: Overview

| Section 1129 Provision | Disputed / Undisputed | Witness(es) |
|---|---|---|
| **1129(a)(1)**: The Plan complies with applicable Bankruptcy Code provisions (*e.g.,* mandatory requirements of section 1122 and 1123) | **Disputed** | Bill Wafford [DX-445 ¶ 19-23)]; Roger Meltzer (Live) |
| **1129(a)(2)**: The proponent of the Plan complies with applicable Bankruptcy Code provisions (*e.g.,* section 1125 procedural requirements) | **Disputed** | Bill Wafford [DX-445 ¶ 22]; Craig Johnson [Docket No. 364] |
| **1129(a)(3)**: The Plan is proposed in good faith | **Disputed** | Bill Wafford (Live); Roger Meltzer (Live); Tom Walper [DX-480; Live]; Paul Keglevic (Live); Jon Foster [DX-479] |
| **1129(a)(4)**: Professional fees have been approved or are subject to court approval as reasonable | Undisputed | Bill Wafford [DX-445 ¶ 26] |
| **1129(a)(5)**: The proponent of the Plan has made required governance disclosures | Undisputed | Bill Wafford [DX-445¶ 27-30] |
| **1129(a)(6)**: Any regulatory rate change provided for in Plan has been approved | Undisputed | Bill Wafford [DX-445 ¶ 31] |

# 1129 Elements: Overview (Cont'd)

| Section 1129 Provision | Disputed / Undisputed | Witness(es) |
|---|---|---|
| **1129(a)(7)**: The Plan satisfies the "best interests" test | **Disputed** | Jason Keyes (Live) |
| **1129(a)(8)**: Each class of claims or interests has accepted the Plan or is not impaired under the Plan | Undisputed | N/A (Not Satisfied) |
| **1129(a)(9)**: The Plan satisfies administrative claims and priority tax claims | Undisputed | Bill Wafford [DX-445 ¶ 32] |
| **1129(a)(10)**: If a class of claims is impaired under the Plan, at least one class of claims that is impaired under the plan has accepted the plan, determined without including any acceptance of the plan by any insider. | **Disputed** | N/A (Legal Argument) |

# 1129 Elements: Overview (Cont'd)

| Section 1129 Provision | Disputed / Undisputed | Witness(es) |
|---|---|---|
| **1129(a)(11)**: The Plan is feasible | Undisputed | Bill Wafford [DX-445 ¶ 33-37] Jason Keyes (Live) |
| **1129(a)(12)**: Section 1930 fees have been paid or the Plan provides for such payment | Undisputed | Bill Wafford [DX-445 ¶ 38] |
| **1129(a)(13)**: The Plan provides for continuation of post-confirmation retiree benefits | Undisputed | Bill Wafford [DX-445 ¶ 39] |
| **1129(a)(14)-1129(a)(16) // 1129(c)-(e)**: Various Inapplicable Provisions | Undisputed | Bill Wafford [DX-445 ¶ 40] |
| **1129(b)**: "Cramdown" Requirements | **Disputed** | Jason Keyes (Live), Bill Wafford (Live), Patrick Griffin (Live) |

114

# 1129(a)(1): The Plan Provides for "Equal Treatment"

## All Holders of Preferred Equity Are Receiving The Same Recovery.

| Objections From Minority Preferred Group and/or Pro Se Objectors | Rebuttal |
|---|---|
| The releases for the benefit of the preferred shareholders are unequally distributed and primarily benefit insiders. | • *Serta* is inapplicable:<br>  ▪ No liability management transaction creating disparate lender groups.<br>  ▪ Court in *Serta* was protecting those parties that chose not to participate in the uptier (and thus did not value the indemnity)—as are the Debtors here.<br>  ▪ Inequalities in the evaluation of the indemnity arose from the prepetition LME, not from opportunistic claims trading.<br>• The releases on $450 million of dividends primarily benefit **thousands upon thousands** of retail holders |

115

# 1129(a)(2): The Disclosure Statement Should be Approved

**The Disclosure Statement is More Than Adequate.**
**The Court Heard Three Days of Testimony On The Intercompany Claims.**

| Objections From Minority Preferred Group and/or Pro Se Objectors | Rebuttal |
| --- | --- |
| The Disclosure Statement is inadequate with respect to the Intercompany Settlement | • No requirement in the Code or in law to assign values to individual intercompany claims or analyze their respective strengths and weaknesses.<br><br>• The Objecting Preferred Holders' argument that this information must be included is façade for their true goal—to litigate the merits of the potential Claims underlying the Intercompany Settlement.<br><br>• Black letter law that the purpose of section 1125 is to ensure **voting parties** have adequate information to vote on the Plan.<br><br>• No voting party has objected to the adequacy of the disclosure statement. |

# 1129(a)(3): The Plan Was Proposed in Good Faith

"Where the plan is proposed with the **legitimate and honest purpose to reorganize and has a reasonable hope of success**, the good faith requirement of § 1129(a)(3) is satisfied."

*Fin. Sec. Assurance Inc. v. T-H New Orleans Ltd. P'ship (In re T-H New Orleans Ltd. P'ship),* 116 F.3d 790, 802 (5th Cir. 1997

"[F]or purposes of determining good faith under section 1129(a)(3)[.] . . . [T]he important point of inquiry is the plan itself and **whether such a plan will fairly achieve a result consistent with the objectives and purposes of the Bankruptcy Code**."

*In re PWS Holding Corp.*, 228 F.3d 224, 242 (3d Cir. 2000)

# 1129(a)(3): The Plan Was Proposed in Good Faith

- **All the disinterested directors** engaged in a **multi-month** and **arms-length** process (*see, "Process: Full Access to Diligence & Management; Independent Investigations; Disinterested Evaluations"*);

- The Debtors' **Chief Financial Officer** testified as to the need to delever the operating businesses to ensure long-term success (*see, "How We Got Here: Key Events"*);

- **Three separate witnesses** testified as to the **uncertain future for Cornerstone absent this Plan** (*see, "Cornerstone"*);

- **All of the disinterested directors** and **AlixPartners** testified as to the **billions of dollars in claims resolved** by the Plan (*see, "Magnitude of Claims"*);

- **All of the disinterested directors** testified as to the **"lose-lose"** for **all estates** if the Intercompany Settlement is replaced with **multi-year, multi-jurisdictional litigation** (*see, "Prolonged Battle"*).

# 1129(a)(3): The Plan Was Proposed in Good Faith



"To fulfill its fiduciary obligations, a representative should maximize the estate's value…**but the process does not require raw maximization at the expense of all other considerations**….an estate representative **must perpetually balance potential value maximization against any countervailing costs, risks, and delays as part of satisfying the representative's fiduciary duties**."

*In re Easterday Ranches, Inc.*, 647 B.R. 236 (Bankr. E.D. WA. 2022)



"The Debtor's duty is to maximize value to the creditors, and that **maximization includes considerations such as finality, stability, and expeditious resolution** of the bankruptcy proceeding."

*In re 160 Royal Palm, LLC*, 600 B.R. 119, 130 (S.D. Fla. 2019)

119

# 1129(a)(7): The Plan Satisfies the "Best Interests Test"

**Common and responsible practice to make assumptions regarding material intercompany claims for purposes of a hypothetical chapter 7 liquidation.**

"Without the Global Settlement Agreement, an additional $54 billion in claims would have to be considered . . . . [U]nder a scenario where no similar global settlement agreement is consummated, the recovery under the Chapter 7 Cases would be less than the recovery under the Chapter 11 Cases."

*In re Wash. Mut., Inc.*, No. 08-12229 (MFW), 2012 Bankr. LEXIS 895, at *70 (Bankr. D. Del. Feb. 23, 2012)

The debtors' evidence-based assumptions regarding the viability of the debtors' intercompany claims are critical to their liquidation analysis because "[t]he magnitude of the intercompany claims is significant and clearly affects the liquidation analysis."

*In re Abeinsa Holding, Inc.*, 562 B.R. 265, 275–76 (Bankr. D. Del. 2016)

# 1129(a)(7): The Plan Satisfies the "Best Interests Test"

| Recoveries | Under the Plan | Liquidation After Approval of Intercompany Settlement | Liquidation Without Intercompany Settlement |
|---|---|---|---|
| **Administrative Claims** | 100% | 100% | No guarantee of any recovery |
| **Third-Party GUCs** | 100% | 43.9% (*See Liquidation Analysis*) | No guarantee of any recovery |
| **Preferred Equity** | 0% | 0% | 0% |
| **Common Equity** | 0% | 0% | 0% |

QVC GROUP

# 1129(a)(10): Does Not Apply to QVCG

"[p]arties who **agree to a settlement under this provision [to be] considered unimpaired**."

*In re Container Store Grp., Inc.*, 676 B.R. 356, 377  (Bankr. S.D. Tex. 2026)

"[W]henever a particular creditor has agreed or consented to less favorable treatment, which **is usually evidenced through some form of stipulation or agreement, then the claim of this creditor is deemed unimpaired under [section] 1124**."

*In re K Lunde, LLC*, 513 B.R. 587, 595 n. 5 (Bankr. D. Colo. 2014)

"[Section 1123(a)(4)] contemplates the possibility of a creditor consenting to specific treatment that is **less than the creditor's full legal and equitable rights, with such agreed upon treatment not constituting impairment**."

*In re Spirit Airlines, Inc.*, 668 B.R. 689, 702 (Bankr. S.D.N.Y. 2025).

122

# 1129(a)(10): Does Not Apply to QVCG

- 1129(a)(10) applies if there is a class of claims that is impaired under the Plan.

- As to QVCG, there are two classes of <u>claims</u> at QVCG: (a) third-party general unsecured claims and (b) the QVCG-QVC Intercompany Claim.

- Third-party GUC claims are being paid in full, in cash and are unimpaired.

- Pursuant to the RSA, QVC contractually agreed to **settle all of its Claims** against QVCG–as a result, under *Container Store* and its predecessors, **this claim is also unimpaired**.

- The **exact same result** could have been achieved by classifying all general unsecured claims together in one class–the Debtors opted for transparency in separately classifying the claims.

# 1129(a)(10): The Preferred Group's Challenge is Illogical

- The Preferred Group argues that "any plan proponent could evade the impaired accepting class requirement by drafting a settlement entitling a creditor to "whatever is left over," guaranteeing "100%" recovery by definition while paying pennies on the dollar." Docket No. 358, ¶ 45.

- **This is illogical on its face for two reasons.**

- *First*, a settlement, by definition, **requires the consent** of the parties to the settlement.

  - Where a creditor is **forced** to accept a lesser treatment or recovery, that is **not a settlement.**

  - Where a creditor **agrees** (as QVC agreed here, in executing the RSA and supporting the Plan) to a specified treatment or recovery, **that *is* the type of settlement expressly contemplated by *Container Store*.**

- The scenario the Preferred Shareholders describe is one in which there is not an actual settlement—in that scenario, the creditor has not consented to its treatment and recovery and is therefore impaired under 1129(a)(10).

124



# 1129(a)(10): The Preferred Group's Challenge is Illogical

- *Second*, even in the Preferred Shareholders scenario, 1129(a)(10) **would still apply if there was another class of claims being impaired**.

- That is the protection of 1129(a)(10)—it allows creditors to consensually agree that **lesser treatment** renders them **unimpaired** (i.e., *Container Store*) **but only if** all other **claims** are also unimpaired.

- The Preferred Shareholders attempt to use 1129(a)(10) to elevate equity to claims. That is plainly not contemplated anywhere in the Bankruptcy Code.

125

# 1129(b): The Plan is "Fair and Equitable"

| Objections From Minority Preferred Group and/or Pro Se Objectors | Rebuttal |
|---|---|
| The Plan is not "fair and equitable" because QVC is receiving a greater than 100% recovery on account of its claim. | • The **unrebutted evidence** is that:<br>  ▪ Cornerstone's midpoint valuation is $85 million **with the benefit of QVC synergies**.<br>  ▪ Cornerstone balance sheet cash is not "excess cash" and is not additive to the $85 million.<br>  ▪ QVCG owns 62% of the potential $85 million in value, or ~$53.2m.<br>• **For QVC to be receiving more than a 100% recovery, QVCG cash would need to be at least $347 million ($400 million *less* $53.2 million).**<br>• There is **no testimony** and **no scenario** in which QVCG's cash is that high. |

# 1129(b): The Third-Party Releases Are Consensual

| Objection from Office of the United States Trustee | Rebuttal |
|---|---|
| The Third-Party Release is not consensual | • Well established precedent in this district that a failure to opt out of a third-party release constitutes consent (*Container Store*, at *19) ("For these reasons, consistent with its longstanding precedent, the court holds that the failure to opt-out constitutes consent to a third-party release under the appropriate circumstances.").<br><br>• The Plan already provides that any classes deemed to reject must opt *in* to the release (also consistent with *Container Store*). |

# Agenda

I.    How We Got Here

II.   9019 Legal Standard

III.  What the Plan Resolves

IV.   Intercompany Settlement

V.    Why These Terms

VI.   The Preferred Shareholders' Argument

VII.  Plan Confirmation & Disclosure Statement Adequacy

**VIII.Exclusivity**

# Exclusivity: The Preferred Group Cannot Meet Its Burden



"Courts, **in the early stages of a bankruptcy** case ... should be **hesitant to find no reasonable possibility of reorganization**.")

In re Playa Dev. Corp., 68 B.R. 549, 556 (Bankr.W.D.Tex.1986)



"The issue to be determined . . . is not whether some other plan may exist which provides greater recovery; the issue is **whether debtor has been diligent in its attempts to reorganize**."

*Express One Int'l*, 194 B.R. 98, 101 (Bankr. E.D. Tex. 1996).

# The Debtors Have Satisfied the Adelphia Factors

| Adelphia Factor | Response |
|---|---|
| **The size and complexity of the case** | • Global enterprise with approximately $6 billion in funded debt. *First Day Declaration*, ¶¶ 35-68.<br><br>• Four separate sets of independent fiduciaries. *Wafford (Live)*<br><br>• Over 15,800 employees worldwide. *First Day Declaration*, ¶ 33. |
| **The existence of good-faith progress** | • Restructuring Support Agreement with three separate creditor groups. *First Day Declaration*, Exhibit A.<br><br>• No objections from 60%+ of preferred equity. |
| **The need for sufficient time to negotiate and prepare adequate information** | • Disclosure Statement includes a robust discussion of the Intercompany Claims. *Disclosure Statement*, Article VII.<br><br>• Each of the Special Committees has provided additional information regarding the Intercompany Settlement. *Tom Walper* [Docket No. 399; Live]; *Paul Keglevic* (Live); *Jon Foster* [Docket No. 398]; *Roger Meltzer* (Live) |

# The Debtors Have Satisfied the Adelphia Factors

| Adelphia Factor | Response |
|---|---|
| **Whether the debtor is paying its debts as they become due** | No evidence to the contrary |
| **Whether the debtor has demonstrated reasonable prospects for filing a viable plan** | If Court does not confirm the Debtors' Plan, the Debtors should have an exclusive opportunity to respond to those rulings in an Amended Plan.<br><br>The "Alternative Plan" is a bridge to nowhere. *Roger Meltzer* (Live). |
| **Whether the debtor has made progress negotiating with creditors** | • Restructuring Support Agreement with three separate creditor groups. *First Day Declaration*, Exhibit A.<br><br>• No objections from 60%+ of preferred equity. |
| **The length of time a case has been pending** | Case has been pending less than two months |
| **Whether the debtor is seeking an extension to pressure creditors** | N/A |
| **Whether or not unresolved contingencies exist** | N/A |

131

QVC GROUP

# Exclusivity: The Alternative is a Bridge to Nowhere

| Term | The Debtors' Plan | The Alternative Plan |
|---|:---:|:---:|
| Intercompany Claims Resolved? | ✔ | ✘ |
| Deferred Tax Liability Risk Allocation | ✔ | ✘ |
| Unknown Tax Risks | ✔ | ✘ |
| Releases for Preferred | ✔ | ✘ |
| General Unsecured Claim Recoveries | ✔ | ✘ |
| Litigation Costs | ✔ | ✘ |

132

QVC
GROUP

